**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ) | |
| ) | |
| ) | |
| NOWAK DENTAL SUPPLIES, INC., ) | |
| ) | |
| Plaintiff, ) | No. 1:07-cv-01799 |
| ) | |
| v. ) | |
| ) | (Judge Conner) |
| DENTSPLY INTERNATIONAL INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**DEFENDANT DENTSPLY INTERNATIONAL INC.'S BRIEF IN SUPPORT**
**OF ITS MOTION TO TRANSFER VENUE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ............................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ............................. 2

STATEMENT OF QUESTION PRESENTED ...................................... 7

ARGUMENT ............................................................................................ 8

I.    NOWAK COULD HAVE FILED ITS COMPLAINT IN THE DISTRICT OF DELAWARE .................................................................. 9

II.   THE INTERESTS OF JUSTICE FAVOR TRANSFER TO THE DISTRICT OF DELAWARE .................................................................. 9

      A.    The District of Delaware Is The Best Forum Because Judge Robinson Has Adjudicated The Sherman Act Section 2 Issues That The Nowak Complaint Presents ................................................... 9

      B.    The District of Delaware Is Also The Best Forum Because Judge Robinson Has Adjudicated The Issue Of The Preclusive Effect Of Her Findings In The Underlying Government Litigation, And The Third Circuit's Reversal Of Her Opinion .......... 13

III.  THE DISTRICT OF DELAWARE IS A MORE CONVENIENT FORUM FOR THE PARTIES AND WITNESSES ..................................... 16

      A.    Plaintiff's Choice Of Forum Is Not Entitled To Deference Because Nowak Does Not Reside In Pennsylvania And The Claim Did Not Arise In Pennsylvania .................................................. 17

      B.    Keeping *Nowak* In Pennsylvania Does Not Facilitate Access To Documentary Evidence ...................................................................... 18

      C.    The Related Pending Actions In Delaware Make Delaware More Convenient For The Parties And Witnesses .............................. 18

CONCLUSION ...................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Auto. Techs. Int'l, Inc. v. Am. Honda Motor Co.*,
    No. 06-187 GMS, 2006 U.S. Dist. LEXIS 92249 (D. Del. Dec. 21,
    2006) ................................................................................................17

*Ayling v. Travelers Prop. Cas. Corp.*,
    No. 99-3243, 1999 U.S. Dist. LEXIS 16716 (E.D. Pa. Oct. 27, 1999)........10, 19

*Bank of Am. N.A. (USA) v. US Airways, Inc.*,
    No. 05-793-JJF, 2005 U.S. Dist. LEXIS 34902 (D. Del. Dec. 21,
    2005) ................................................................... 10-12, 15

*CIBC World Markets, Inc. v. Deutsche Bank Secs. Inc.*,
    309 F. Supp. 2d 637 (D.N.J. 2004)............................................. 18-19

*Cont'l Grain Co. v. Barge FBL-585*,
    364 U.S. 19 (1960)..............................................................10

*Haize v. Hanover Ins. Co.*,
    536 F.2d 576 (3d Cir. 1976) ................................................. 15

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*
    424 F.3d 363 (3d Cir. 2005) ................................................5

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*
    --- F. Supp. 2d ----, Civ. No. 99-255-SLR, 2007 WL 2807292 (D. Del.
    Sept. 26, 2007) ...........................................................6, 13

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    No. Civ. A. 99-255-SLR, 2001 WL 624807 (D. Del. March 30, 2001) .... 3-4, 12

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...........................................................4

*In re Amendt*,
    169 Fed. Appx. 93 (3d Cir. 2006)..........................................8, 11

*Jersey Dental Labs. v. Dentsply Int'l Inc.*
    126 S. Ct. 2320 (2006).........................................................................................5

*Jersey Dental Labs. v. Dentsply Int'l, Inc.*
    No. Civ. A. 01-267-SLR, 2002 WL 2007916 (D. Del. Aug. 27, 2002) ............4

*Jersey Dental Labs. v. Dentsply Int'l, Inc.*
    180 F. Supp. 2d 541 (D. Del. 2001) ...................................................................4

*Job Haines Home for the Aged v. Young*,
    936 F. Supp. 223 (D.N.J. 1996).................................................................. 9-10

*Jumara v. State Farm Ins. Co.*,
    55 F.3d 873 (3d Cir. 1995) .................................................................10, 16, 18

*KAB Enter. Co. v. Ursich Elec. Prods. Inc.*,
    No. 06-4361, 2007 U.S. LEXIS 27524 (E.D. Pa. Apr. 13, 2007) ............... 17-18

*LG Elecs. Inc. v. First Int'l Computer of America, Inc.*,
    138 F. Supp. 2d 574 (D.N.J. 2001)...................................................................18

*Liggett Group, Inc. v. R. J. Reynolds Tobacco Co.*,
    102 F. Supp. 2d 518 (D.N.J. 2000).....................................................................11

*Navigators Mgmt. Co., Inc. v. St. Paul Fire & Marine Ins. Co.*,
    No. 06 Civ. 599(LBS), 2006 WL 3317030 (S.D.N.Y. Nov. 9, 2006).......... 13-14

*Reiffin v. Microsoft Corp.*,
    104 F. Supp. 2d 48 (D.D.C. 2000)................................................................ 14-15

*Dentsply Int'l, Inc. v. United States*,
    546 U.S. 1089 (2006)...................................................................................... 2-3

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ..............................................................................2

*United States v. Dentsply Int'l, Inc.*,
    No. 99-005, 2006 U.S. Dist. LEXIS 94907 (D. Del. Apr. 26, 2006) ...................3

*United States v. Dentsply Int'l, Inc.*,
   277 F. Supp. 2d 387 (D. Del. 2003)......................................................................2

*Weinberger v. Tucker*,
   391 F. Supp. 2d 241 (D.D.C. 2005)............................................................ 14-15

*Woodall v. Piper Aircraft Corp.*,
   No. 82-1554, 1983 U.S. Dist. LEXIS 17465 (M.D. Pa. Apr. 25, 1983) ............11

## STATUTES AND RULES

15 U.S.C. § 2 ................................................................................................................9

15 U.S.C. § 15 ..............................................................................................................9

15 U.S.C. § 22 ..............................................................................................................9

28 U.S.C. § 1404(a) .............................................................................................passim

28 U.S.C. § 1292(b) .....................................................................................................6

28 U.S.C. § 1331 ..........................................................................................................9

28 U.S.C. § 1337 ..........................................................................................................9

28 U.S.C. § 1391(b), (c)...............................................................................................9

Fed. R. Civ. P. 54(b) ....................................................................................................6

## TREATISE

15 Charles A. Wright et al., *Federal Practice and Procedure* § 3847 (2d ed.
1986) ..........................................................................................................................16

Dentsply International Inc. ("Dentsply") submits this memorandum in support of its motion to transfer this action to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1404(a) (2007).

## PRELIMINARY STATEMENT

The District of Delaware is the best venue for this tag-along action for several reasons.  First, transferring this case to Delaware will serve the interests of justice because Chief Judge Sue L. Robinson has actually decided the facts and legal issues involved in this lawsuit in related cases.  She presided over the government's initial lawsuit against Dentsply for the same challenged conduct from May 2000 through April 2006, and has presided over (and continues to preside over) multiple tag-along lawsuits against Dentsply for almost eight years.  Second, in one of these related cases, *Hess v. Dentsply*, Judge Robinson recently held that the Third Circuit's opinion in the government litigation did not collaterally estop Dentsply from contesting whether plaintiffs in *Hess* suffered antitrust injury.  Nowak also argues that Dentsply is collaterally estopped from contesting that the Third Circuit's opinion held that Dentsply's policy injured dealers like Nowak.  Transferring this action to Delaware thus will ensure that the same judge will preside over all current tag-along purchaser actions against Dentsply and will reduce the possibility of inconsistent rulings in those cases.

Third, the District of Delaware is, on balance, a more convenient forum for the parties and witnesses. Accordingly, this Court should grant Dentsply's motion.

## PROCEDURAL AND FACTUAL BACKGROUND

*The Underlying Government Litigation.* On January 5, 1999, the United States Department of Justice, Antitrust Division sued Dentsply in the United States District Court for the District of Delaware. It alleged that Dentsply's now-extinct policy that dental products dealers who sold Dentsply's artificial teeth to dental laboratories could not sell competing tooth lines ("Dealer Criterion 6") violated Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Discovery in that case lasted over three years, during which the parties collectively deposed more than 100 witnesses. Chief Judge Sue L. Robinson presided over a five-week bench trial in 2002. In August 2003, eleven months after closing arguments, Judge Robinson issued a 165-page decision holding that Dentsply's conduct did not violate Sections 1 or 2 of the Sherman Act or Section 3 of the Clayton Act. *United States v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387 (D. Del. 2003). The government appealed Judge Robinson's ruling on the Section 2 claim, and, on February 24, 2005, the Third Circuit reversed, holding that Dentsply's conduct violated Section 2 of the Sherman Act. *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005). The Third Circuit remanded the case to Judge Robinson with directions to grant injunctive relief to the government. *Id.* at 196. The Supreme Court later

denied Dentsply's request to review the Third Circuit's decision. *Dentsply Int'l, Inc. v. United States*, 546 U.S. 1089 (2006).

On remand, the parties engaged in extensive mediation efforts to reach a compromise on the terms of the injunction. On April 26, 2006, Judge Robinson entered final judgment in the government action and granted the government an injunction for a period of 7.5 years. *United States v. Dentsply Int'l, Inc.*, No. 99-005, 2006 U.S. Dist. LEXIS 94907 (D. Del. Apr. 26, 2006) (eliminating Dealer Criterion 6). Under the terms of the Final Judgment, "Dentsply shall not require any dealer to be, or agree with any dealer that it will become, an exclusive Dentsply tooth dealer." *Id.* at *3. In total, Judge Robinson presided over the government's action for nearly six years.[1]

*Related Dentsply Litigation Pending Before Judge Robinson ("Hess" and "Jersey").* On April 21, 1999, Howard Hess Dental Laboratories Inc. ("Hess") filed a tag-along complaint against Dentsply on behalf of a putative national class of dental laboratories who bought Dentsply's artificial teeth from Dentsply's dealers. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, No. Civ. A. 99-255-SLR, 2001 WL 624807 (D. Del. March 30, 2001). In March 2001, Judge

---

[1] District Judge Murray M. Schwartz originally presided over the Dentsply actions. In May 2000, Judge Schwartz retired and Judge Robinson took over the then-pending Dentsply actions.

Robinson granted Dentsply's motion for partial summary judgment on the ground that, as indirect purchasers of artificial teeth from Dentsply, plaintiffs lacked standing to bring their damages claim based on the Supreme Court's ruling in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  2001 WL 624807 at *12.

On April 24, 2001, the *Hess* plaintiffs changed their name to Jersey Dental Laboratories ("Jersey"), and filed a separate complaint against Dentsply and 26 of its dental dealers, including Nowak, based on the same exclusive dealing arrangements.  *Jersey Dental Labs. v. Dentsply Int'l, Inc.*, 180 F. Supp. 2d 541 (D. Del. 2001) ("*Jersey I*").  Judge Robinson again dismissed plaintiffs' damages claims against Dentsply on the ground that plaintiffs could not circumvent *Illinois Brick* with their allegation that Dentsply and its dealers were "co-conspirators."  *Id*. at 552.  Thereafter, plaintiffs moved to reargue the court's Rule 12(b)(6) decision that dismissed the *Jersey I* complaint and to amend the *Jersey I* complaint.  *Jersey Dental Labs. v. Dentsply Int'l, Inc.*, No. Civ. A. 01-267-SLR, 2002 WL 2007916 (D. Del. Aug. 27, 2002) ("*Jersey II*").  Judge Robinson denied plaintiffs' motion to reargue as futile and also denied plaintiffs' request for leave to amend.  *Id*. at *2.

Plaintiffs appealed the *Hess* and *Jersey I* and *II* decisions to the Third Circuit on May 24, 2004.  The Third Circuit affirmed the dismissal of Hess's damages claims in its entirety and, as to *Jersey*, affirmed in part and reversed in part and

remanded for further proceedings.  *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 384 (3d Cir. 2005).  In *Jersey*, the Third Circuit found that the district court erred in its refusal to allow plaintiffs to amend their complaint in *Jersey II* because they had standing to seek damages from Dentsply for its alleged price-fixing conspiracy with the dealers.  *Id*. at 378.  On May 26, 2006, the Supreme Court denied plaintiffs' request to review the Third Circuit's decision.  *Jersey Dental Labs. v. Dentsply Int'l Inc.*, 126 S. Ct. 2320 (2006).

On remand, plaintiffs filed an amended complaint ("*Jersey III*") against Dentsply and most of its tooth dealers, again including Nowak, on October 10, 2006.  Plaintiffs alleged a price-fixing conspiracy among Dentsply and the tooth dealers, but also included Section 2 claims for conspiracy to monopolize and group boycott based on Dentsply's exclusive dealing policy.  On December 1, 2006, defendants moved to dismiss all of the Section 2 claims.

During this time, on October 23, 2006, the *Hess* plaintiffs moved for summary judgment on their injunctive relief claim on the ground that the Third Circuit's decision in the government litigation collaterally estopped Dentsply from contesting the *Hess* plaintiffs' Section 2 claim.

On September 26, 2007, in a consolidated opinion and order, Judge Robinson denied the *Hess* plaintiffs' summary judgment motion and granted the

defendants' motion to dismiss the Section 2 claims in the *Jersey III* case. *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, --- F. Supp. 2d ----, Civ. No. 99-255-SLR, 2007 WL 2807292 (D. Del. Sept. 26, 2007). In *Hess*, the Court agreed with Dentsply that the Third Circuit's February 24, 2005 opinion in the government litigation did not collaterally estop Dentsply from contesting whether plaintiffs suffered antitrust injury because the issue of whether the Hess plaintiffs suffered antitrust injury was not litigated in the government action. *Id.* at *7. The Court also held that plaintiffs could not obtain injunctive relief because such relief was duplicative of injunctive relief that the government had already obtained. *Id.* at *8.

On October 26, 2007, plaintiffs in *Jersey* filed a motion for immediate appellate review of the dismissed exclusive dealing claims under Fed. R. Civ. P. 54(b) or 28 U.S.C. § 1292(b). In *Hess*, Judge Robinson approved the parties' stipulation dismissing with prejudice all claims other than the monopoly maintenance claim, which remains pending. That same day, the *Hess* plaintiffs filed a Motion to Supplement the Record with evidence that the plaintiffs believe shows that Dealer Criterion 6 resulted in higher prices.

*The Current Action.* On October 2, 2007, Nowak filed a complaint against Dentsply on behalf of itself and a putative class of all tooth dealers that have purchased pre-fabricated artificial teeth directly from Dentsply. It is a tag-along

case to the government's case against Dentsply, as well as to the *Hess* and *Jersey* cases. (Dkt. No. 1). Like *Hess*, Nowak alleges that "Dentsply's conduct has caused Plaintiff and the other Class members to pay more for prefabricated artificial teeth than they otherwise would have absent" Dealer Criterion 6. (Compl. ¶ 39). Nowak bases its claim for injury solely on the decisions rendered by Judge Robinson and the Third Circuit in connection with the government action. (Compl. ¶¶ 7, 21-34, 40). Indeed, the complaint urges this Court to accept Judge Robinson's findings as "binding upon Dentsply in the instant action pursuant to the judicial principle of collateral estoppel." (*Id.* ¶ 34). On November 26, 2007, Dentsply filed its answer to Nowak's complaint. (Dkt. No. 10).

## STATEMENT OF QUESTION PRESENTED

Whether this Court should transfer this action to the United States District Court for the District of Delaware pursuant to 28 U.S.C. § 1404(a) where the presiding chief judge in Delaware has presided over related litigation for over 7 years and where transfer is more convenient for the parties and witnesses.

# ARGUMENT

A district court  may transfer any civil action to any other district or division "where it might have been brought" "[f]or the convenience of parties and witnesses" and "in the interest of justice."  28 U.S.C. § 1404(a).  The Third Circuit has articulated  "an extensive list of factors" in ruling on a motion to transfer: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) convenience of the parties as indicated by their relative physical and financial conditions; (5) the convenience of the witnesses – but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; (6) the location of books and records; (7) the enforceability of the judgment; (8) practical considerations that could make the trial easy, expeditious, or inexpensive; (9) the level of court congestion in the two fora; (10) local interest in deciding local controversies at home; (11) the public policies of the fora; and (12) the familiarity of the trial judge with the applicable state law in diversity cases.  *In re Amendt*, 169 Fed. Appx. 93, 96 (3d Cir. 2006) (holding that the district court properly transferred the case pursuant to § 1404(a) because "[a]djudicating almost identical issues in separate fora would waste judicial resources").  The relevant factors dictate that this Court should transfer this case to the District of Delaware.

I.   **NOWAK COULD HAVE FILED ITS COMPLAINT IN THE DISTRICT OF DELAWARE**

Section 1404 first requires that the transferee district be one in which the plaintiff might have brought the action. The District of Delaware has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. §§ 2, 15. Furthermore, venue is proper in the District of Delaware under 15 U.S.C. § 22 and 28 U.S.C. § 1391 (b), (c), because Dentsply is a Delaware corporation. Thus, Nowak could have filed its complaint in the District of Delaware.

II.  **THE INTERESTS OF JUSTICE FAVOR TRANSFER TO THE DISTRICT OF DELAWARE**

A.   **The District of Delaware Is The Best Forum Because Judge Robinson Has Adjudicated The Sherman Act Section 2 Issues That The Nowak Complaint Presents**

The District of Delaware is the ideal forum for this litigation because Judge Robinson has already considered and decided the Sherman Act Section 2 issues that the Nowak complaint presents as a result of her extensive involvement with the *Dentsply* cases since May 2000.

There is a strong policy favoring the transfer of a related case to a judicial officer that has already adjudicated issues relating to the underlying facts and legal questions of the case. *Job Haines Home for the Aged v. Young*, 936 F. Supp. 223, 224 (D.N.J. 1996) (granting transfer where transferee judge presided over

numerous earlier cases based on the same conduct because "[i]t would be a gross waste of judicial resources to start litigating this case from scratch in the District of New Jersey"). "Where the parties and issues are the same, *or similar*, and another court is already familiar with the case, bringing related litigation together in one forum ensures that 'pretrial discovery may be conducted more efficiently, witnesses' time may be conserved, public and parties' litigation expenses may be reduced, and inconsistent results can be avoided.'" *Id.* at 233 (emphasis added) (quoting *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960)).

In fact, the presence of a judicial officer in the transferee court that has presided over related cases weighs so heavily in favor of transfer that "this consideration is powerful enough to tilt the balance in favor of a transfer even when the convenience of the parties and witnesses would point to a denial." *Ayling v. Travelers Prop. Cas. Corp.*, No. 99-3243, 1999 U.S. Dist. LEXIS 16716, at *13-14 (E.D. Pa. Oct. 27, 1999) (granting transfer where the judge in the transferee court had presided over related cases involving different parties and facts and was "already familiar with the factual and legal issues of the putative class' allegations"); *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) (granting the motion to transfer venue "notwithstanding the proximity of the alternative fora"); *Bank of Am. N.A. (USA) v. US Airways, Inc.*, No. 05-793-JJF, 2005 U.S. Dist. LEXIS 34902, *8-9 (D. Del. Dec. 21, 2005) (ordering transfer to

the Eastern District of Virginia where the defendants were involved in Chapter 11 proceedings before Judge Stephen S. Mitchell, who was vastly more familiar with the nature of the claims in the case, the correct interpretation of his own orders, and the dispositive facts and thus "well positioned to quickly and efficiently resolve these and other issues").

In addition, the presence of related cases in the transferee court, involving similar claims and issues, strongly supports a transfer to that forum.  *See, e.g.*, *In re Amendt*, 169 Fed. Appx. 93, 96-97 (3d Cir. 2006) (holding that the district court properly transferred the case pursuant to § 1404(a) because "[a]djudicating almost identical issues in separate fora would waste judicial resources"); *Woodall v. Piper Aircraft Corp.*, No. 82-1554, 1983 U.S. Dist. LEXIS 17465, at *16 (M.D. Pa. Apr. 25, 1983) ("The presence of a related action in the transferee forum has been considered an overriding factor in the balancing of interests.").  In *Liggett Group, Inc. v. R. J. Reynolds Tobacco Company*, the court transferred an antitrust action in part because a related case was pending in the transferee forum, even though the two cases did not involve the same litigants and were not candidates for consolidation.  102 F. Supp. 2d 518, 539 (D.N.J. 2000).  The court held that transfer was in the interests of justice because the two cases involved "similar issues" concerning alleged anti-competitive practices and thus should have "proceed[ed] before one tribunal." *Id.*

11

Nowak, like several plaintiffs before it, challenges Dentsply's exclusive dealing policy under Section 2 of the Sherman Act. But that is precisely what the government did almost nine years ago in the original *Dentsply* case, and is the precise legal issue that Judge Robinson decided in Dentsply's favor after a five-week bench trial in 2002, *supra*. She currently presides over two related cases, *Hess* and *Jersey*, where the lawfulness of Dentsply's conduct under Section 2 is also at issue, *supra*. Moreover, Judge Robinson presided over another putative class action by "all individuals and entities who purchased false teeth" under the equivalent antitrust laws of sixteen states and the District of Columbia until the action was closed on March 28, 2003. *Kaminer v. Dentsply Int'l, Inc.*, 1:99-cv-00854-SLR (D. Del.).[2] Thus, like Judge Mitchell in *Bank of America*, Judge Robinson is "simply in a far better position than this Court to expeditiously decide the critical questions" in the case. *Bank of Am. N.A.*, No. 05-793-JJF, 2005 U.S. Dist. LEXIS 34902, at *8.[3] As a result of Judge Robinson's stewardship of all the

---

[2] The United States District Court for the Southern District of New York had transferred that case to the District of Delaware pursuant to 28 U.S.C. § 1404(a). *Hess*, 2001 WL 624807, at *1 & n.1.

[3] Importantly, *Nowak*, *Hess*, *Jersey* and *Kaminer* are all putative class actions by *purchasers* of Dentsply's artificial teeth at different levels of the distribution chain – direct purchasers in *Nowak*, indirect purchasers in *Hess* and *Jersey Dental*, and purchasers of dentures in *Kaminer*. In contrast, the *Universal* and *Lactona* actions pending before this Court are individual actions by Dentsply's *competitors* who, unlike the plaintiffs in *Nowak*, *Hess*, *Jersey* and *Kaminer*, never purchased Dentsply's artificial teeth.

related Dentsply cases, transferring this case to Judge Robinson would avoid an enormous and needless expenditure of this Court's resources.

**B.    The District of Delaware Is Also The Best Forum Because Judge Robinson Has Adjudicated The Issue Of The Preclusive Effect Of Her Findings In The Underlying Government Litigation, And The Third Circuit's Reversal Of Her Opinion**

Nowak alleges that the findings and conclusions of the Third Circuit, and the undisturbed findings of Judge Robinson are "conclusive" in the instant action against Dentsply, and thus Dentsply is estopped from contesting the same here. (Dkt. No. 1 ¶ 34).  This is the core of Nowak's case.

Judge Robinson has already adjudicated this issue in another context.  The Hess plaintiffs recently argued that the Third Circuit had adjudicated the issues of whether the dental labs (Nowak's customers) had suffered injury from Dentsply's exclusive dealing policy.  Judge Robinson held that plaintiffs were not entitled to collateral estoppel because antitrust injury was not litigated in the government action.  *Hess v. Dentsply*, 2007 WL 2807292, at *7.  Nowak has argued that the Third Circuit's opinion also decided whether the dealers were injured by the policy.

Where, as here, the preclusive effect of another court's judgment is in question, the court that rendered the original judgment is best suited to preside over the later case and transfer to that judge is appropriate.  *See, e.g.*, *Navigators Mgmt.*

*Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 06 Civ. 599(LBS), 2006 WL 3317030, at *4 (S.D.N.Y. Nov. 9, 2006) (granting transfer because "it is appropriate to leave it to the [transferee court] to determine the preclusive effect of its prior judgment"); *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 57 (D.D.C. 2000) (granting defendants' motion to transfer in part because the transferee forum "is in the best position to determine which claims or issues in the instant complaint are precluded by its own decision"); *Weinberger v. Tucker*, 391 F. Supp. 2d 241, 243 (D.D.C. 2005).

In *Weinberger*, the defendants moved to dismiss the plaintiff's complaint on grounds of collateral estoppel. *Weinberger*, 391 F. Supp. 2d at 242. The basis of the defendant's motion was a prior opinion in a related case by Judge Claude M. Hilton in the Eastern District of Virginia. *Id.* Because the motion "turn[ed] on the preclusive effect" of Judge Hilton's opinion, the court *sua sponte* requested briefing on whether it should transfer the case to Judge Hinton. *Id.*

The court noted that collateral estoppel prevents relitigation of "an issue that was (1) actually litigated; (2) determined by a valid, final judgment on the merits; (3) after a full and fair opportunity for litigation by that party; and (4) under

circumstances where the issue was essential to the judgment. *Id*. at 243.[4]  The

court found that "Judge Hilton appears to be in the best position to resolve these

questions." *Id.*  Thus, the court held that "the interests of justice strongly support a

transfer to the court that reviewed and decided the prior litigation . . . , especially

because this case turns on the preclusive effect of that court's judgment." *Id.* at

245.  In contrast, the court held that "[l]itigating the matter here would 'squander

judicial resources' and would 'run the risk of inconsistent judgments.'"  *Id*.

(quoting *Reiffin*, 104 F. Supp. 2d at 55).[5]

For the same reasons, Judge Robinson is the ideal jurist to preside over the

*Nowak* case.  The fact that she has already decided a very similar issue in the

related *Hess* case only further dictates that the District of Delaware is the best

possible forum for this case.  Moreover, Judge Robinson is currently considering

Hess's motion to supplement the record with evidence that it believes shows that

Dealer Criterion 6 resulted in supracompetitive prices to consumers.  Nowak

---

[4]  The Third Circuit requires the party invoking collateral estoppel to satisfy the same four factors.  *Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976).

[5]  *See also Bank of Am. N.A. (USA)*, 2005 U.S. Dist. LEXIS 34902, at *8-9 (granting the defendants' motion to transfer largely because the judge in the transferee district is "vastly more familiar" with the prior history in the case and is therefore "in a far better position than this Court to expeditiously decide the critical questions" in the case); *Reiffin*, 104 F. Supp. 2d at 53 (transferring a case involving facts and claims closely related to an action previously decided by the transferee

alleges the exact same thing – *i.e.*, Dentsply's exclusive dealing policy caused Nowak "to pay more for prefabricated artificial teeth than they otherwise would have paid." (Compl. ¶¶ 37, 39.) Transfer to Delaware will thus promote the interests of justice by avoiding duplicative litigation and inconsistent rulings on this issue, as well as by conserving judicial resources.

## III.   THE DISTRICT OF DELAWARE IS A MORE CONVENIENT FORUM FOR THE PARTIES AND WITNESSES

The Third Circuit's list of factors encompasses a wide variety of "private interest" and "public interest" factors that courts may consider in deciding motions to transfer pursuant to § 1404(a). The Third Circuit has emphasized, however, that "there is no definitive formula or list of factors to consider" in determining whether a transfer under § 1404(a) is appropriate. *Jumara*, 55 F.3d at 879. Rather, the court must consider the "relevant factors to determine whether, on balance the litigation would more conveniently proceed and the interests of justice be better served by transferring to a different forum." *Id.* (quoting 15 Charles A. Wright et al., *Federal Practice and Procedure* § 3847 (2d ed. 1986). On balance, the remaining factors weigh in favor of transferring this action to the District of Delaware as well.

---

judge because that judge "knows best which points [plaintiff] raised, or was given the opportunity to raise" in the prior case).

A. **Plaintiff's Choice Of Forum Is Not Entitled To Deference Because Nowak Does Not Reside In Pennsylvania And The Claim Did Not Arise In Pennsylvania**

Although a plaintiff's choice of forum is generally accorded deference in § 1404(a) proceedings, a plaintiff's "choice is given less weight" where "a plaintiff chooses a forum other than his state of residence or the situs of the occurrence upon which the suit is based." *KAB Enter. Co. v. Ursich Elec. Prods. Inc.*, No. 06-4361, 2007 U.S. Dist. LEXIS 27524, at *5 (E.D. Pa. Apr. 13, 2007) (granting defendant's motion to transfer); *see also Auto. Techs. Int'l, Inc. v. Am. Honda Motor Co.*, No. 06-187 GMS, 2006 U.S. Dist. LEXIS 92249, at *4 (D. Del. Dec. 21, 2006) ("As an initial matter, the court notes that it will afford less deference to [plaintiff's] choice of Delaware as a forum because it is not its 'home turf,' or principle place of business.").

Here, as in *KAB Enterprise*, the plaintiff has no connection to Pennsylvania and Pennsylvania is not the "situs of the occurrence upon which the suit is based." Nowak is a Louisiana corporation, with a Mississippi business address. (Compl. ¶ 11.) Furthermore, Dentsply's complained-of conduct allegedly affected consumers of artificial teeth nationwide, not just those living in Pennsylvania. *KAB Enter. Co.*, 2007 U.S. LEXIS 27524, at *5 (noting that because plaintiff's products are sold nationwide, there is not one situs of occurrence). Nowak's own complaint alleges that Dentsply has engaged in anti-competitive practices and monopolized

17

the market for pre-fabricated artificial teeth throughout the United States.  (Compl. ¶¶ 5, 20-22, 36.)  Thus, Nowak's choice of forum is not entitled to deference.

### B.    Keeping *Nowak* In Pennsylvania Does Not Facilitate Access To Documentary Evidence

The location of documentary evidence should only be considered in extreme circumstances.  *See, e.g.*, *LG Elecs. Inc. v. First Int'l Computer of America, Inc.*, 138 F. Supp. 2d 574, 591 (D.N.J. 2001) ("The location of documentary proof is to be considered to the extent that the records could not be produced in the alternative forum." (citing *Jumara*, 55 F.3d at 879)).  Furthermore, "[i]n light of current technology" access to documents "should not weigh heavily" in the court's analysis.  *KAB Enter. Co.*, 2007 U.S. LEXIS 27524, at *8.

To the extent that location of documentary evidence is considered in this case, it is notable that the vast majority of the documents produced during discovery in the government litigation are located at Dentsply's outside counsel's offices in Washington, D.C.  They are not located in Pennsylvania.

### C.    The Related Pending Actions In Delaware Make Delaware More Convenient For The Parties And Witnesses

Where the same defendant is defending "at least two . . . factually and legally related cases," it is more convenient for parties and witnesses to "appear in one rather than two courtrooms."  *CIBC World Markets, Inc. v. Deutsche Bank*

*Secs. Inc.*, 309 F. Supp. 2d 637, 650 (D.N.J. 2004).  Here, it would be more convenient for the parties and witnesses to appear in Delaware alone, than to be compelled to testify in both Delaware and Pennsylvania.[6]

The presence of two competitor cases against Dentsply in this Court, *Univac* and *Lactona*, does not compel a different result, particularly given Judge Robinson's long history with Dentsply and her knowledge of the issues involved in this case.  *Ayling v. Travelers Prop. Cas. Corp.*, No. 99-3243, 1999 U.S. Dist. LEXIS 16716, *13-14 and n.4 (E.D. Pa. Oct. 27, 1999) (ordering transfer where the presence of a judicial officer in the transferee court who was already familiar with the facts and legal issues of a related case weighed so heavily in favor of transfer that "this consideration [was] powerful enough to tilt the balance in favor of a transfer even when the convenience of the parties and witnesses would point to a denial.").  Accordingly, on balance, it would be more convenient for the parties and witnesses to litigate this case in Delaware.

---

[6] Wilmington is equally, if not slightly more convenient for the parties than Harrisburg.  Neither location is particularly accessible for the plaintiff.  However, there are multiple daily direct flights between New Orleans and Philadelphia, which is only twenty miles from Wilmington.  In contrast, flying from New Orleans to Harrisburg requires a layover.  For Dentsply, both locations are convenient, with Harrisburg a thirty-mile drive from York and Wilmington a seventy-mile drive.

## CONCLUSION

For the foregoing reasons, Dentsply respectfully requests that the Court transfer this case to the District of Delaware.

Dated: December 6, 2007

Respectfully submitted,

/s/ Harvey Freedenberg

Of Counsel:

Harvey Freedenberg
McNEES WALLACE & NURICK LLC
100 Pine Street

Brian M. Addison
DENTSPLY INTERNATIONAL INC.
Susquehanna Commerce Center
221 W. Philadelphia Street
York, PA 17405-0872
(717) 849-4363

Harrisburg, PA 17101
(717) 237-5267

Margaret M. Zwisler
Eric J. McCarthy
Charles R. Price
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

Attorneys for Defendant,
DENTSPLY INTERNATIONAL INC.

## <u>CERTIFICATE OF COMPLIANCE PURSUANT</u>
## <u>TO LOCAL RULE 7.8(b)(2)</u>

Pursuant to Local Rule 7.8(b)(2), it is hereby certified that the forgoing

*Defendant Dentsply International Inc.'s Brief In Support Of Its Motion To Transfer*

*Venue* contains 4,532 words (exclusive of the title page, table of contents, table of

authorities, this certificate, certificate of non-compliance, and certificate of

service), according to the Microsoft® Word 2003 word processing system used to

prepare it, and that the memorandum therefore complies with the type-volume

limitations of Local Rule 7.8(b)(2).

/s/ Harvey Freedenberg
Harvey Freedenberg

Dated: December 7, 2007

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a copy of the foregoing document was served

this 7th day of December 2007 via electronic means upon counsel via the ECF

filing system.


/s/ Harvey Freedenberg
Harvey Freedenberg

Of Counsel for Defendant

## ATTACHMENT – UNREPORTED DECISIONS

*Auto. Techs. Int'l, Inc. v. Am. Honda Motor Co.*,
    No. 06-187 GMS, 2006 U.S. Dist. LEXIS 92249 (D. Del. Dec. 21, 2006)

*Ayling v. Travelers Prop. Cas. Corp.*,
    No. 99-3243, 1999 U.S. Dist. LEXIS 16716 (E.D. Pa. Oct. 27, 1999)

*Bank of Am. N.A. (USA) v. US Airways, Inc.*,
    No. 05-793-JJF, 2005 U.S. Dist. LEXIS 34902 (D. Del. Dec. 21, 2005)

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*
    --- F. Supp. 2d ----, Civ. No. 99-255-SLR, 2007 WL 2807292 (D. Del. Sept. 26, 2007)

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
    No. Civ. A. 99-255-SLR, 2001 WL 624807 (D. Del. March 30, 2001)

*Jersey Dental Labs. v. Dentsply Int'l, Inc.*
    No. Civ. A. 01-267-SLR, 2002 WL 2007916 (D. Del. Aug. 27, 2002)

*KAB Enter. Co. v. Ursich Elec. Prods. Inc.*,
    No. 06-4361, 2007 U.S. LEXIS 27524 (E.D. Pa. Apr. 13, 2007)

*Navigators Mgmt. Co., Inc. v. St. Paul Fire & Marine Ins. Co.*,
    No. 06 Civ. 599(LBS), 2006 WL 3317030 (S.D.N.Y. Nov. 9, 2006)

*United States v. Dentsply Int'l, Inc.*,
    No. 99-005, 2006 U.S. Dist. LEXIS 94907 (D. Del. Apr. 26, 2006)

*Woodall v. Piper Aircraft Corp.*,
    No. 82-1554, 1983 U.S. Dist. LEXIS 17465 (M.D. Pa. Apr. 25, 1983)

LEXSEE 2006 U.S. DIST. LEXIS 92249

**AUTOMOTIVE TECHNOLOGIES INT'L, INC., Plaintiff, v. AMERICAN HONDA MOTOR CO., INC., ET AL, Defendants.**

**Civil Action No. 06-187 GMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 92249*

**December 21, 2006, Decided**

**COUNSEL:** [*1] For Automotive Technologies International Inc., Plaintiff: Richard K. Herrmann, LEAD ATTORNEY, Morris James LLP, Wilmington, DE.

For American Honda Motor Company, a California corporation, Elesys North America Inc., a Georgia corporation, Defendants: Thomas C. Grimm, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For General Motors Corporation, a Delaware corporation, Defendant: Thomas C. Grimm, LEAD ATTORNEY, Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Timothy Q. Delaney, Pro Hac Vice.

For TS Tech USA Corporation, Defendant: Benjamin J. Schladweiler, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, United States District Judge.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

On March 17, 2006, the plaintiff, Automotive Technologies International, Inc. ("ATI") filed the above-captioned action against American Honda Motor Company ("Honda"), Elesys North America Inc. ("Elesys"), and General Motors Corporation ("GM"), (collectively the "Defendants"), alleging infringement of

*United States Patent Nos. 5,901,978;* 6,242,701; 6,325,414; 6,397,136; 6,422,595; 6,869,100; 6,757,602; 6,712,387; 6,942,248; [*2] 6,950,022; and 6,958,451, which are generally related to technology in automobile seats. On May 3, 2006, ATI filed a First Amended Complaint, adding two additional patents, U.S. Patent Nos. 6,484,080 and 6,850,824, and withdrawing one of the previously asserted patents, *U.S. Patent No. 6,950,022.*

On June 16, 2006, ATI filed a separate action, C.A. No. 06-391, against Hyundai Motor America ("Hyundai"), BMW of North America LLC ("BMWNA"), and Kia Motors America Inc. ("Kia"). Ten of the 12 asserted patents in the above-captioned action are asserted in ATI's suit against Defendants Hyundai, BMWNA and Kia. Presently before the court are motions to transfer this action, and the related action, to the Eastern District of Michigan, pursuant to *28 U.S.C. § 1404(a).* For the following reasons, the court will deny the motion.

**II. DISCUSSION**

Pursuant to *Section 1404(a),* the court may transfer a civil action "for the convenience of parties and witnesses, in the interest of justice, . . . to any other district . . . where it might have been brought." *28 U.S.C. § 1404(a).* It is the movant's burden to establish the need to transfer, and "the [*3] plaintiff's choice of venue [will] not be lightly disturbed." *Truth Hardware corp. v. Ashland Prods., Inc.,* No. C.A. 02-1541 GMS, 2003 WL 118005, at *1 (quoting *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)).* In other words, "unless the balance of convenience strongly favors a transfer in favor of defendant, the plaintiff's choice of forum should

prevail." *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970).*

When considering a motion to transfer, the court must determine "whether on balance the litigation would more conveniently proceed and the interest of justice be better served by transfer to a different forum." *Jumara, 55 F3d. at 879.* This inquiry requires "a multi-factor balancing test," embracing not only the statutory criteria of convenience of the parties and the witnesses and the interest of justice, but all relevant factors, including certain private and public interests. *Id. at 875.* These private interests include the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the convenience of the parties; the convenience of the expected witnesses; [*4] and the location of books and records, to the extent that they could not be produced in the alternative forum. [1] *Id at 879.* Among the relevant public interests are: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; [and] the public policies of the fora." *Id. at 879-80.*

> [1]   The first three of these private interest factors collapse into other portions of the *Jumara* analysis. Thus, the court will consider them in the context of the entire inquiry only. *See Affymetrix, Inc. v. Synteni, Inc., 28 F. Supp. 2d 192 (D. Del. 1998).*

As an initial matter, the court notes that it will afford less deference to ATI's choice of Delaware as a forum because it is not its "home turf," or principal place of business. *See Waste Distillation Tech., Inc. v. Pan Am. Res., Inc., 775 F. Supp. 759, 764 (D. Del. 1991).* [*5] Nonetheless, the court should not disregard a plaintiff's choice of forum where it has a rational and legitimate reason for choosing the forum. *See Joint Stock Soc'y v. Heublein, Inc., 936 F. Supp. 177, 187 (D. Del. 1996).* With these principles in mind, after consideration of the relevant factors, the court finds that the Defendants have not met their burden of demonstrating that transfer is appropriate.

In the present case, ATI submits the following rationale for suing the Defendants in Delaware: "ATI, and at least one of the Defendants are incorporated in Delaware, all parties are subject to personal jurisdiction

in this forum, this forum's docket is noticeably faster to resolution of complex cases than the proposed transferee court and many others, and there was no other forum in which witnesses had a markedly more convenient location than this one." (D.I. 22 at 2.) The court finds that ATI's explanation is a rational and legitimate reason for choosing to sue the Defendants in Delaware. *See Stratos Lightwave, Inc. v. E2O Communs., Inc., No. C. A. 01-309-JJF, 2002 U.S. Dist. LEXIS 5653, 2002 WL 500920, at * 2 (D. Del. Mar. 26, 2002).* Further, having received the benefits [*6] of Delaware incorporation, a Defendant cannot now complain that another corporation has chosen to sue it here. *See id.*

The court also finds that the location of books and records weighs against granting the Defendants' motion to transfer. The Defendants contend that their books and records necessary for litigation are in Michigan. A court should consider the location of books and records in its analysis. It must only do so, however, to the extent that the files could not be produced in the alternative forum. *Jumara, 55 F.3d at 879.* Here, the Defendants do not suggest that their documents could not be produced in Delaware, especially in this day and age where large-scale "document" productions are reduced to digitized records that parties transfer via electronic media. Accordingly, this factor does not weigh in favor of granting a transfer.

The Defendants also contend that non-party witness convenience weighs in favor of a transfer. The briefs set forth in detail the parties' positions with regard to this factor. Essentially, the Defendants contend that travel to Delaware is less convenient than travel to Michigan for its third-party witnesses. (D.I. 18 at 6-7.) [*7] The court is not persuaded by the Defendants' arguments. Further, as this court has previously held, a flight to Delaware is not an onerous task warranting transfer. *Truth Hardware Corp. v. Ashland Prods., Inc.,* No. C.A. 02-1541 GMS, 2003 WL 118005, at * 2 (D. Del. Jan 13, 2003). The court concludes that the convenience of the witnesses does not favor transfer in this case.

Additionally, the court finds that the public interest factors do not weigh strongly in favor of transfer to Michigan. First, the court is not persuaded that any disparity in court congestion will be so great as to weigh strongly in favor of a transfer. [2] Second, it is well settled that patent rights are not considered state or local matters and do not implicate local interests. *Jones Pharma, Inc. v.*

*KV Pharm. Co., No. Civ. A. 03-786 JJF, 2004 U.S. Dist. LEXIS 2333, 2004 WL 323109, at * 3 (D. Del. Feb. 17, 2004).* The court, therefore, finds no strong local interest in litigating in the transferee forum. Third, ATI's pending litigation in Michigan involves different patents. Thus, the court believes that this is not a relevant consideration in favor of transfer. *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 77 F. Supp. 2d 505, 513 (D. Del. 1999)* [*8] (refusing to give "any weight whatsoever" to a mirror image action filed by the defendant).

2    Even accepting Defendants' position on the percentage of cases over three years old pending in the Eastern District of Michigan, this district's percentage appears to be lower. *Compare* (D.I. 22 at 24) *with* (D.I. 23 at 3, fn. 2).

Finally, the court notes that the circumstances driving the court's decision to transfer in *Alloc, Inc. v. Unilin Decor N.V.* [3] are distinguishable from those in the present case. As ATI remarked in its letter of December 12, 2006 (D.I. 52), the patents before this court in *Alloc* involved the same patents at issue in the transferee forum. Here, the court is not aware of a single patent in this lawsuit that is asserted in any action in the Eastern District of Michigan. The court agrees with ATI that nothing in the Detroit lawsuits yields any potential savings in judicial economy, given the attenuated

connection between those patents and the patents here in suit. Accordingly, the [*9] court concludes that public interest factors do not favor transfer in the instant case.

3    *Alloc, Inc. v. Unilin Decor N. V., C.A. Nos. 03-253-GMS, 05-587-GMS, 2006 U.S. Dist. LEXIS 78019, 2006 WL 3050815 (D. Del. Oct. 26, 2006).*

Dated: December 21, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

The defendants' Motion to Transfer the above-captioned matter to the United States District Court for the Eastern District of Michigan (D.I. 17) is DENIED.

Dated: December 21, 2006

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

LEXSEE 1999 U.S. DIST. LEXIS 16716

**THERESA AYLING, on behalf of herself, and all others similarly situated, Plaintiff, v. TRAVELERS PROPERTY CASUALTY CORP.; TRAVELERS GROUP INC.; TRAVELERS LIFE AND ANNUITY COMPANY, TOWER SQUARE SECURITIES, INC.; SALOMON SMITH BARNEY HOLDINGS, INC.; RINGLER ASSOCIATES, INC.; WELLS AND ASSOCIATES, INC.; UNIDENTIFIED BROKERS 1 THROUGH 99, Defendants.**

CIVIL ACTION NO. 99-3243

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*1999 U.S. Dist. LEXIS 16716*

**October 27, 1999, Decided**

**DISPOSITION:** [*1] Defendants' Motion to Transfer Venue to the District of Connecticut GRANTED and case Transferred to the District of Connecticut.

**COUNSEL:** For THERESA AYLING, PLAINTIFF: JOHN JOSEPH GALLAGHER, PHILADELPHIA, PA USA. LAURENCE S. BERMAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA.

For TRAVELERS PROPERTY CASUALTY CORP., TRAVELERS GROUP INC., TRAVELERS LIFE AND ANNUITY COMPANY, DEFENDANTS: JOHN CHESNEY, MARY E. KOHART, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

For TOWER SQUARE SECURITIES, INC., SALOMON SMITH BARNEY HOLDINGS, INC., DEFENDANTS: MARY E. KOHART, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

For RINGLER ASSOCIATES, INC., MICHAEL J. DUNN, MURPHY & O'CONNOR, PHILADELPHIA, PA USA.

For WELLS AND ASSOCIATES, DEFENDANT: JOSEPH M. HANKINS, BRITT, HANKINS, SCHAIBLE & MOUGHAN, PHILA, PA USA. C. SCOTT CRABTREE, DENVER, CO USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINION BY:** RONALD L. BUCKWALTER

**OPINION**

**MEMORANDUM & ORDER**

BUCKWALTER, J.

October 27, 1999

Presently before the Court is the Travelers Defendants [1] Motion to Transfer Venue pursuant to *28 U.S.C. § 1404(a)* and to Enlarge Defendants' Time to Respond. For the reasons [*2] stated below, the Motion is Granted as to the Transfer. The Motion to Enlarge the Time to Respond will be decided by the Transferee Court.

> 1    The Travelers Defendants who made this motion include Travelers Property Casualty Corp. ("TPC"), Travelers Group, Inc. ("Travelers"), Travelers Life and Annuity Company ("TLAC"), Tower Square Securities, Inc. ("Tower"), and Salomon Smith Barney Holdings, Inc. ("Smith Barney"). Ringler Associates, Inc. ("Ringler") has requested that it be joined in the Motion of the Travelers' Defendants.

**I. Factual Background**

This action has been brought on behalf of a class of persons who entered into structured settlement

1999 U.S. Dist. LEXIS 16716, *2

agreements with TPC and allegedly were subsequently defrauded as a result of Defendants' elaborate rebating scheme. Structured settlements involve a defendant's promise to make a specified number of future periodic payments in lieu of a single lump sum payment. They are often used as a means of resolving personal injury lawsuits. A single premium settlement [*3] annuity is then purchased by the insurer naming the settling plaintiff as beneficiary.

Plaintiff asserts that the Travelers Defendants have undertaken to defraud persons entering into structured settlements with TPC by misrepresenting the cost of annuities, and in so doing, have taken advantage of class members. The basic scheme of the alleged fraud is that TPC would first enter into exclusive contracts for the purchase of the structured settlement annuities with the various securities companies. In exchange for these exclusive contracts, TPC would then agree to rebate a percentage of the commissions (50-75%) they were to receive from the purchase of the annuities. TPC would then show the settling plaintiff the amount that the annuity had cost, while including the full commission price. [2] The settling plaintiff would never know the true cost of the annuity. The Plaintiffs allege that this business practice was fraudulent, in violation of both federal and state law.

> 2  For example, TPC would report to the settling plaintiff that the annuity would be funded with a hypothetical $ 104,000. That would include the $ 100,000 principal and $ 4,000 commission. Then the broker would return $ 2,000 of the commission, so that the annuity really cost TPC only $ 102,000. Plaintiff alleges that this practice led to the settling plaintiffs receiving less than the amount to which they were entitled.

[*4] Plaintiff brings this action pursuant to the "RICO" statute, *18 U.S.C. § 1961 et seq.*. Plaintiff also asserts claims under Pennsylvania common law, sounding in fraud and negligent misrepresentation, as well as violations of the Pennsylvania Unfair Insurance Practices Act and Unfair Trade Practices Act.

The Travelers Defendants ask the Court to transfer this case to the District of Connecticut pursuant to *28 U.S.C. § 1404(a)*. They raise three major reasons as to why such a transfer would be in the interests of justice. First, a case alleging the same violations by the same defendants on behalf of the same class is currently before

a judge in the District of Connecticut. [3] Secondly, the majority of witnesses and documents needed for this case are located in the vicinity of Hartford in that state, which serves as the headquarters of TPC. Finally, Defendants assert that Connecticut is where the alleged violations arose.

> 3  Abdullah v. Traveler Property Cas. Corp., No. 399-CV-0155, filed on January 27, 1999 (currently pending before Judge Warren Eginton of the District of Connecticut.). Two other cases involving very similar claims, defendants and class members, Macomber v. Travelers Property Cas. Co., No. 398-CV-1060, filed June 5, 1998, and Huaman v. Travelers Property Cas. Co., No. 398-CV-1093, June 10, 1998, were dismissed by Judge Eginton on March 30, 1999.

[*5] **II. Legal Standard**

A district court may transfer the venue of any civil action for the convenience of parties and witnesses or in the interests of justice, to any other district where it might have been brought. *28 U.S.C. § 1404(a)*. The purpose of this section is "to prevent the waste of 'time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'" *Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964)* (*quoting Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26-27, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)*). Although § 1404(a) gives a district court the discretion to decide a motion based on a individualized case by case basis consideration of convenience and fairness, such motions are not to be liberally granted. *Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1987)*.

In ruling on a motion to transfer, the Court should consider "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a [*6] different forum. See, *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)*. The first step in a court's analysis of a transfer motion is to determine whether venue would be proper in the transferee district. If the first prong of the inquiry is satisfied, the court then should determine whether a transfer would be in the interests of justice. *Id. at 879*. It is important to note that the party moving to transfer a case on grounds of inconvenience has the burden of showing that the existing

forum is inconvenient. *Britamco Underwriters v. Raymond E. Wallace Productions, Inc., 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999)* (Joyner, J.).

### III. Discussion

### A. Could the action have been brought in Connecticut?

Any civil action wherein jurisdiction is not found solely on the diversity of citizenship may be brought in a district in which a substantial part of the events or omissions giving rise to the claim occurred. *28 U.S.C. § 1391(b)(2)*. Likewise, as Plaintiffs assert a RICO violation, venue would be proper in any district in which such person resides. See, *18 U.S.C. 1965* [*7] *(a)*. Since TPC (the primary defendant) resides in Connecticut, and the alleged 'kickbacks' were paid to TPC in Hartford, the action could have been brought in the District of Connecticut.

### B. Would a transfer to Connecticut be in the interests of justice and for the convenience of witnesses and parties?

The second part of the transfer analysis requires a balancing of the interests of justice and the convenience of witnesses and parties. Factors to be considered in determining whether to transfer venue include (1) the convenience and preference of the parties, including the plaintiff's choice of forum, (2) the convenience of witnesses, (3) access to sources of proof such as books and records, (4) practical considerations that make litigation easy, expeditious or inexpensive, (5) the relative calendar congestion of the two competing districts, (6) where the events at issue took place and the interest of the respective courts in deciding local controversies (7) the enforceability of any judgment and (8) the familiarity of the trial judge with the applicable law. See, *Jumara, 55 F.3d at 879-880*. These factors will be discussed in turn.

1. Convenience [*8] of Parties and Plaintiff's Choice of Forum:

The plaintiff's choice of forum is a paramount consideration that should not lightly be disturbed. See, *First Union National Bank v. United States, 55 F. Supp. 2d 331, 332 (E.D. Pa. 1999)* (*quoting Sovereign Bank, F.S.B. v. Rochester Community Savings Bank, 907 F. Supp. 123, 126 (E.D. Pa. 1995)*) (denying motion to

transfer even though plaintiff filed in a district which was not his home nor the situs of events in contention). Moreover, unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail. See, *Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)*. When considering a motion to transfer, a court may consider the "convenience of the parties as indicated by their relative physical and financial condition." *Jumara, 55 F.3d at 879*.

In this case, the named Plaintiff's physical and financial condition are much more limiting than are those of the Travelers Defendants. The named Plaintiff in this putative class action is a 20 year old paraplegic. The Defendants are a group of corporations [*9] worth billions of dollars. The mere fact that the Travelers Defendants have more resources than Plaintiff should not be the sole reason for refusing a transfer, but an assessment of relative inconvenience weighs in her favor. See, *National Mortgage Network, Inc. v. Home Equity Centers, Inc., 683 F. Supp. 116, 119 (E.D. Pa. 1988)*. Three of the five Travelers Defendants, including TPC and TLAC, are headquartered in Connecticut. The remaining Defendants are not headquartered in either of the potential forum states. While Connecticut would be more convenient for the Travelers' Defendants, traveling to Philadelphia is probably not as significant a hardship for the Defendants from Connecticut as it would be for Ms. Ayling to travel to Connecticut. On the other hand, Ms. Ayling is not the only party on the plaintiff's side. Since she is bringing the suit on behalf of a nationwide class, it is not clear how convenient Pennsylvania would be to other members of the putative class.

The Defendant also argues that a plaintiff's choice of forum deserves less deference in a class action than in ordinary litigation. See, *Bolton v. Tesoro Petroleum Corp., 549 F. Supp. 1312, 1314-15 (E.D. Pa. 1982)* [*10] (finding that plaintiff's forum choice is of less weight in actions in which the nominal plaintiff's role is likely to be quite minimal). As Plaintiff has proposed a nationwide class, this suit probably could have been brought in almost any state in which TPC does business. Since the named plaintiff in a class action is often not very relevant to the litigation, the Defendants' point is well taken. However, Plaintiff asserts that her role in this litigation could be extensive and that she has a significant financial stake in the outcome of the litigation. At this point in the proceedings we accept these statements as true. Since this

is not a derivative security suit, Ms. Ayling's role may be more than nominal. It is difficult to make a showing that will overcome the strong presumption towards keeping the plaintiff's chosen forum. Therefore, the 'convenience of parties' factor favors denying the transfer.

2. Convenience of the Witnesses:

The Plaintiff, in her brief, spends significant time arguing against the Travelers' Defendants' claim that the 'convenience of witnesses' factor favors Connecticut. The focus of Plaintiff's position is that the Defendants have not specifically [*11] identified which witnesses will testify. See, Pl. Mem. in Opp. pp. 8-11. In assessing the propriety of a district court's decision to transfer an action, the Court of Appeals for the Third Circuit has required that defendants submit affidavits, depositions or other evidence to support their motion for transfer. See, *Plum Tree v. Stockment, 488 F.2d 754, 756 (3d. Cir. 1973)*. The Defendants haves included such documentation in their Reply Brief. See, Affidavit of Peter F. Sexton, Associate General Counsel of TPC, dated September 28, 1999 ("Sexton Aff."). Sexton lists four witnesses who are likely to testify in this case by name and position. Sexton Aff. P 6. There is some credibility to Sexton's declaration because the Defendants have gone through three similar suits and should now know who is likely to testify in a suit raising similar claims. All four of these witnesses work and reside in Connecticut. The only potential witness identified by the Plaintiff is Ms. Ayling herself (although they do assert that several key witnesses live in the Eastern District of Pennsylvania without any further elaboration. See, Pl. Mem in Opp. p. 14). It would not be [*12] an overwhelming inconvenience for the Travelers' Defendants to transport four witnesses to Philadelphia. However, since the Plaintiff has only speculatively identified one witness who resides in Pennsylvania, the Court finds that the Defendants have demonstrated that the 'convenience of witnesses' factor favors transfer to Connecticut.

3. Access to Documents:

Defendants state that the vast majority of the documents are located at TPC's headquarters in Hartford. Sexton Aff. P 7. However, it is not clear how great a burden it would be to move the necessary documents to Philadelphia. The Plaintiffs do not argue that any of the relevant documents are located in this district. The Court finds on balance that while this factor favors transfer, it

should not be accorded great weight.

4. Practical Considerations Making Litigation Easy, Expeditious and Inexpensive.

The Supreme Court has stated that to permit a situation in which two cases involving precisely the same issues are simultaneously pending in two different District Courts leads to the wastefulness of time, energy and money that *§ 1404(a)* was designed to prevent. See, *Continental Grain, 364 U.S. at 26*. [*13] Therefore, courts have found that the presence of related cases in the transferee forum is a reason to grant a transfer. See, e.g., *Prudential Insurance Company of America v. Rodano, 493 F. Supp. 954, 955 (E.D. Pa. 1980)*; *Jontri Transp. Co. v. North Bank Dev. Co., 1990 U.S. Dist. LEXIS 10857, 1990 WL 121511 at *2 (E.D. Pa. 1990)*. In fact this consideration is powerful enough to tilt the balance in favor of a transfer even when the convenience of the parties and witnesses would point to a denial. See, *Blanning v. Tisch, 378 F. Supp. 1058, 1061 (E.D.Pa.1974)*. The Plaintiff distinguishes Continental because in that case the action transferred arose out of the same incident as the related case. She asserts that this case involves different parties and different facts. However, in reviewing the Abdullah, Macomber and Huaman complaints, this Court finds them to be almost identical to Ms. Ayling's complaint. The Defendants are virtually the same. So too are the factual allegations of RICO violations, common law fraud, negligent misrepresentation and violations of state insurance and trade acts. Each of the actions was on the behalf of the same [*14] class of persons who entered into structured settlements with TPC from 1982 to the present. Therefore, the only real difference is who the class has decided to name as lead plaintiff. Of course the particular factual allegations pertaining to the structured settlement entered into by Ms. Ayling will be different than those made by the named plaintiffs in Abdullah, Macomber and Huaman. But the point of these putative class actions is that the Travelers' Defendants engaged in a pattern of behavior that harmed any plaintiff who entered into a structured settlement with TPC. The result of these actions will be a determination of whether the Travelers' Defendants have defrauded plaintiffs with whom they entered structured settlements by engaging in the allegedly illegal rebating scheme. Allowing two separate actions on behalf of the same class might lead to inconsistent results, even if the witnesses and documentary evidence were identical. Furthermore, as

Judge Eginton is already familiar with the factual and legal issues of the putative class' allegations, having him decide the present matter would serve the interests of judicial efficiency. [4] This factor favors transfer [*15] of the case to the District of Connecticut.

> [4] Due to Judge Eginton's knowledge of the factual allegations, and the very similar nature of Ms. Ayling's Complaint to those he has previously ruled upon, this Court feels that a transfer would be justified even if the Abdullah complaint is dismissed prior to transfer.

5. Calendar Congestion:

Although courts may consider calendar congestion in ruling upon a 1404(a) motion, the relative congestion of the respective courts dockets is not a factor of great importance in this type of motion. See, *Kisko v. Penn. Cent. Transp. Co., 408 F. Supp. 984 (M.D. Pa. 1976)*. It appears, given the more complete analysis provided by the Plaintiffs, that Connecticut has a more congested forum. However, the real issue would be the congestion of Judge Eginton's docket, because if the case were transferred to Connecticut, it would most likely be assigned to him. The Court does not currently have information concerning Judge Eginton's docket. Therefore, [*16] although this factor leans slightly towards denying the transfer, it will be assigned little weight.

6. Where the events at issue took place.

In Continental Grain Co., a court transferred a suit from New Orleans to Memphis because a related case arising from the same boat crash in Memphis was already under consideration in that city. *364 U.S. at 19*. The cases involving the Travelers' Defendants are likewise similar in so far as they all arise from the same corporate policy decisions by TPC to allegedly defraud their customers. Where plaintiff's cause of action arises from strategic policy decisions of a defendant corporation, the defendant's headquarters can be considered the place where events giving rise to the claim occurred. See, *Paul v. Lands' End, 742 F. Supp. 512, 514 (N.D. Ill. 1990)* (granting transfer to district of corporation's headquarters after finding that plaintiffs' cause of action essentially stemmed from corporate policy and decisions made at the corporation's headquarters). If Plaintiff is to prove her case, she will have to show that TPC made certain decisions that affected the whole organization. The type

of decision [*17] that could have this kind of effect would likely have been made at the highest levels of TPC management in Hartford. Such decisions included (1) entering exclusive agreements with the various brokerages through whom the annuities were purchased, (2) arranging rebates of the commissions paid to the brokers for selling the annuities, and (3) not sharing the true cost of the annuity with the plaintiffs. So while it is true that Ms. Ayling did not enter into the settlement in Connecticut, the decisions that led to her alleged injury all were made in Connecticut. The Defendant also asserts that the majority of structured settlements entered into by TPC were created and approved at TPC's Hartford headquarters. Sexton Aff., P 7. Since Connecticut is the place where the events giving rise to this claim occurred, this factor favors a transfer of venue.

7. Enforceability of Judgment.

As both sides agree, a judgment obtained in either the Eastern District of Pennsylvania or the District of Connecticut will be equally enforceable.

8. Familiarity of the Trial Judge with Applicable State Law.

As to the federal claims, both Judge Eginton and this court are equally familiar [*18] with the applicable federal claims. Of course, Judge Eginton is more familiar with the particular factual allegations. The two complaints that Judge Eginton has dismissed, Macomber and Huaman, both stated violations of Connecticut's Unfair Trade and Insurance Practice Acts. Judge Eginton obviously found that the allegations did not support a claim under either of these acts. The Ayling complaint attempts to state a claim under the equivalent Pennsylvania statutes and similar statutes in other states (one of which is presumably Connecticut). Therefore, the trial judge will have to be familiar not just with Pennsylvania state law, but with similar statutes of many states. Judge Eginton's familiarity of the law of other states is likely comparable to this Court's. This factor is neutral with regard to transfer. Judge Eginton's factual knowledge weighs in favor of transfer while this Court's better familiarity with Pennsylvania state law weighs against the transfer.

**IV. Conclusion.**

The Court finds a transfer of venue to the District of Connecticut is justified in this case. Connecticut is a

forum more related to this action as the events giving rise to the claim occurred [*19] in that state. Also, the Defendants, identified witnesses and documents reside in that state. The interests of judicial efficiency require the transfer as the trial judge currently has a virtually identical case before him and is very familiar with the factual allegations at the center of this Complaint. The only significant factor weighing against the transfer is the putative class' choice of Ms. Ayling, a paraplegic resident of Pennsylvania, as its lead plaintiff. The plaintiff's choice of forum has been given significant weight, but the Court finds that the other interests overcome the strong presumption towards the choice of Pennsylvania as a forum. Therefore, Defendant's motion is granted in its entirety.

An appropriate Order follows.

**ORDER**

AND NOW, this 27th day of October, 1999, upon consideration of Defendants' Motion to Transfer Venue to the District of Connecticut (Docket No. 11), Plaintiff's Response thereto (Docket No. 15), and Defendants' Reply (Docket No. 16); it is hereby **ORDERED** that Defendants' Motion is **GRANTED** and this case is Transferred to the District of Connecticut.

BY THE COURT:

RONALD L. BUCKWALTER, J.

LEXSEE 2005 U.S. DIST. LEXIS 34902

**BANK OF AMERICA, N.A. (USA), Plaintiff, v. US AIRWAYS, INC., US AIRWAYS GROUP, INC. and AMERICA WEST AIRLINES, INC., Defendants, and JUNIPER BANK, Intervenor.**

**Civil Action No. 05-793-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 34902*

**December 21, 2005, Decided**

**SUBSEQUENT HISTORY:** Later proceeding at, Transferred to *Bank of Am., N.A. (USA) v. US Airways, Inc., 2006 U.S. Dist. LEXIS 49026 (E.D. Va., July 19, 2006)*

**COUNSEL:** [*1] Richard L. Horwitz, Esquire, Kevin R. Shannon, Esquire and Brian C. Ralston, Esquire of POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware. Of Counsel: Evan R. Chesler, Esquire and David R. Marriott, Esquire of CRAVATH, SWAINE & MOORE LLP, New York, New York, for Plaintiff Bank of America, N.A. (USA).

David C. McBride, Esquire, Martin S. Lessner, Esquire and Christian Douglas Wright, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Of Counsel: Mark H. Epstein, Esquire and Kristin Linsley Myles, Esquire of MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Defendants US Airways, Inc., US Airways Group, Inc. and America West Airlines, Inc.

Kenneth J. Nachbar, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Intervenor Juniper Bank.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION**

***MEMORANDUM OPINION***

December 21, 2005

Wilmington, Delaware

Joseph J. Farnan Jr.

**Farnan, District Judge.**

Pending before the Court are Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5) and Plaintiff's Motion For Expedited Remand To Vice Chancellor Strine Of The Delaware Chancery Court [*2] (D.I. 11). For the reasons discussed, the Court will grant Defendants' Motion to Transfer and decline to rule on Plaintiff's Motion To Remand.

**BACKGROUND**

Plaintiff Bank of America, N.A. (USA) ("Bank of America") is a Delaware corporation with its principal executive offices in Arizona. Defendants US Airways, Inc. and US Airways Group, Inc. are Delaware corporations with their principal executive offices in Virginia. US Airways, Inc. is the principal operating subsidiary of US Airways Group, Inc. Defendant America West Airlines Inc., which is wholly owned by America West Holdings Corp., is a Delaware corporation with its principal executive offices in Arizona.

In May, 2003, Bank of America and US Airways, Inc. entered into a co-branded credit card agreement under which Bank of America was to be the sole issuer of the US Airways credit card to United States residents until December 3, 2008. On September 27, 2005, as a part of US Airways Group's reorganization plan under Chapter 11 of the United States Bankruptcy Code, US

2005 U.S. Dist. LEXIS 34902, *2

Airways Group merged with America West Holdings, with the merged entity operating under the US Airways name. In August, 2005, America West, US Airways Group, [*3] and Juniper Bank ("Juniper") entered into an agreement under which Juniper will issue a co-branded credit card for US Airways. That agreement took effect with the merger on September 27, 2005.

By its Complaint, Bank of America alleges breach of contract and tortious interference with contract and prospective economic relations. Specifically, Bank of America alleges that, as a result of contracting with Juniper to issue a US Airways credit card, Defendants breached provisions on exclusivity and marketing obligations in the co-branded card agreement between them and Bank of America. Bank of America further alleges that America West tortiously interfered with its contract with US Airways and that both America West and US Airways Group tortiously interfered with its prospective economic advantage. Bank of America seeks unspecified monetary damages, specific performance of the co-branded card agreement, and injunctive relief barring Juniper from issuing a US Airways credit card.

Bank of America originally filed this action in the Court of Chancery for the State of Delaware in and for New Castle County as Del. Ch. C.A. No. 1713-N. On November 15, 2005, Defendants and Juniper removed the [*4] action to this Court (D.I. 1) and on November 16, 2005, Defendants filed their Motion To Transfer (D.I. 5). On November 23, 2005, Bank of America filed its Motion For Expedited Remand (D.I. 11).

## DISCUSSION

### I. Whether The Court Has Subject Matter Jurisdiction

Bank of America contends that the Court must deny Defendant's Motion To Transfer and grant its Motion To Remand because the Court lacks subject matter jurisdiction. (D.I. 12 at 10; D.I. 18 at 3.) Defendants contend that the Court has subject matter jurisdiction under *28 U.S.C. § 1334(b)* because this case is a core proceeding within the meaning of *28 U.S.C. § 157(b)* and is related to a case under title 11. The Court concludes that it does have subject matter jurisdiction.

*Section 1334(b)* provides in relevant part that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11,

or arising in or related to cases under title 11." *28 U.S.C. § 1334(b)*. The Court of Appeals for the Third Circuit has given a broad interpretation to "related to," even in cases like this one that arise after [*5] confirmation of the debtor's reorganization plan. *See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 164 (3d Cir. 2004)*. Under *§ 1334(b)*'s "related to" standard, a district court has jurisdiction of a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Id.* (quoting *Pacor, Inc., v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)*). A proceeding is related to a case under title 11 "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.* According to Defendant's brief in support of their Motion To Transfer, a significant percentage of the cash needed to implement US Airways' Chapter 11 reorganization plan was to come from the contract with Juniper, which Bank of America seeks to enjoin. (D.I. 6 at 11.) Taking this into account, and applying the Third Circuit's broad standard, the Court concludes that this action is related to Defendants' case under title 11. Therefore, the Court has subject matter jurisdiction [*6] under *28 U.S.C. § 1334(b)*.

### II. Whether The Court Should Transfer Venue To The Eastern District Of Virginia

Defendants contend that the Court should transfer venue to the United States District Court for the Eastern District of Virginia where proceedings concerning US Airways' Chapter 11 case are pending before the Honorable Stephen S. Mitchell. (D.I. 6 at 1.) In support of this contention, Defendants argue that, because Judge Mitchell has presided over this large and complex bankruptcy, he is in a better position than this Court to weigh the issues raised by Bank of America's Motion to Remand as well as its Complaint. In response, Bank of America contends that its choice of forum should be given substantial deference and that Defendants have not met their burden, under *28 U.S.C. § 1412*, of showing that transfer of venue would serve the interest of justice or the convenience of the parties. (D.I. 18 at 6.)

*Section 1412* provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for

2005 U.S. Dist. LEXIS 34902, *6

the convenience of the parties." *28 U.S.C. § 1412*. [*7] A determination of whether to transfer a proceeding under *§ 1412* should be based on the same factors used to decide a motion to transfer under *§ 1404(a)*, which permits a court to transfer any civil action for the convenience of the parties or in the interest of justice. *Son v. Coal Equity, Inc. (In re Centennial Coal, Inc.), 282 B.R. 140, 144 (Bankr. D. Del. 2002)*. The Third Circuit set forth a list of those factors in *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879-80 (3d Cir. 1995)*. That list includes: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; (6) the location of books and records, similarly limited to the extent that the files could not be produced in one of the fora; (7) the enforceability of the judgment; (8) practical considerations that could make the trial easy, expeditious, or inexpensive; (9) the relative administrative difficulty in the two fora resulting from [*8] court congestion; (10) the local interest in deciding local controversies at home; (11) the public policies of the fora; and (12) the familiarity of the trial judge with the applicable state law. *Id.* The burden is on the movant to establish that the balance of the interests weighs strongly in favor of transfer. *Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc., 185 F.Supp.2d 407, 412 (D. Del. 2002)*.

Having considered all of the relevant factors, the Court concludes that the balance of interests here weighs strongly in favor of transferring this action to the Eastern District of Virginia, where related bankruptcy matters are pending. That conclusion is based largely on the eighth factor, practical considerations. Judge Mitchell is simply in a far better position than this Court to expeditiously decide critical questions pertaining to Bank of America's Motion To Remand and the merits of the case. For example, Bank of America contends that the Court must abstain from hearing this case pursuant to *28 U.S.C. § 1334(c)(2)*, because it is not a core proceeding. (D.I. 12 at 21.) Defendants, on the other hand, contend that the claims in the Complaint [*9] are "functionally identical" to administrative claims filed by Bank of America in US Airways' Chapter 11 proceedings, (D.I. 6 at 1), and that those administrative claims, therefore, transform this

action into a core proceeding, *Id.* at 9-10. Also at issue with respect to the Motion For Remand, is the effect on the Court's jurisdiction of a paragraph in Judge Mitchell's order confirming the reorganization plan, which reserves certain of Bank of America's rights with respect to the co-branded credit card agreement. (D.I. 13, Ex. 13 at 49.) Another crucial issue in contention is the importance to the reorganization plan of the cash received by US Airways from its contract with Juniper. (D.I. 6 at 10-11.) Judge Mitchell, being vastly more familiar with the nature of the administrative claims filed by Bank of America, the correct interpretation of his own orders, and the details of US Airways' reorganization plan, is well positioned to quickly and efficiently resolve these and other issues, whereas this Court would have to expend considerably more time and resources to arrive at a just resolution. Therefore, the Court concludes that, for practical considerations alone, it is in the interest [*10] of justice to transfer this case to the Eastern District of Virginia.

**CONCLUSION**

For the reasons discussed, the Court will grant Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5). The Court declines to rule on Plaintiff's Motion For Expedited Remand To Vice Chancellor Strine Of The Delaware Chancery Court (D.I. 11).

An appropriate order will be entered.

***ORDER***

At Wilmington, this *21* day of December 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1. Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5) is ***GRANTED.***

2. This case is transferred to the United States District Court for the Eastern District of Virginia.

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

H

United States District Court,
D. Delaware.
HOWARD HESS DENTAL LABORATORIES
INC. and Philip Guttierez d/b/a Dentures Plus,
on behalf of themselves and all others similarly
situated, Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
Jersey Dental Laboratories f/k/a Howard Hess
Dental Laboratories Incorporated,
and Philip Guttierez d/b/a Dentures Plus, on behalf
of themselves and all
others similarly situated, Plaintiffs,
v.
Dentsply International, Inc., and named dental deal-
ers, Defendants.
**Civ. Nos. 99-255-SLR, 01-267-SLR.**

Sept. 26, 2007.

**Background:** Dental laboratories brought antitrust
class actions against manufacturer of artificial teeth
and designated dealers, alleging exclusive dealing
and price-fixing conspiracies. Following partial re-
versal and remand, 424 F.3d 363, laboratories
moved for summary judgment and defendants
moved for partial dismissal.

**Holdings:** The District Court, Robinson, J., held
that:
(1) manufacturer was not collaterally estopped from
contesting its liability;
(2) court lacked personal jurisdiction over non-
resident dealers;
(3) laboratories lacked standing to seek damages
from dealers under *Illinois Brick* doctrine; and
(4) dealers did not share manufacturer's alleged in-
tent to monopolize artificial tooth market.
Motions granted in part and denied in part.

**[1] Judgment** ☞713(1)

228k713(1) Most Cited Cases
For collateral estoppel to apply: (1) identical issue
was previously adjudicated; (2) issue was actually

litigated; (3) previous determination was necessary
to decision; and (4) party being precluded from rel-
itigating issue was fully represented in prior action.

**[2] Judgment** ☞725(5)

228k725(5) Most Cited Cases
Manufacturer of artificial teeth was not collaterally
estopped from contesting its liability in action
brought against it by dental laboratories alleging
exclusive dealing and price-fixing conspiracies,
notwithstanding prior antitrust action against same
manufacturer; prior court's finding of anticompetit-
ive effects did not necessarily imply finding in in-
stant action that laboratories had suffered antitrust
injury.

**[3] Antitrust and Trade Regulation** ☞963(1)

29Tk963(1) Most Cited Cases
"Antitrust injury" is injury of type that antitrust
laws were intended to prevent, and that flows from
that which makes defendants' acts unlawful.

**[4] Antitrust and Trade Regulation** ☞969

29Tk969 Most Cited Cases
District court lacked personal jurisdiction, pursuant
to Clayton Act, over non-resident dealers of artifi-
cial teeth, with respect to action brought by dental
laboratories alleging exclusive dealing and price-
fixing conspiracies; dealers were not incorporated
in forum state, had conducted no business within
state, and had not purposefully availed themselves
of doing business with citizens of state. Clayton
Act, § 12, 15 U.S.C.A. § 22.

**[5] Antitrust and Trade Regulation** ☞969

29Tk969 Most Cited Cases
Clayton Act defendant is "inhabitant" of state for
venue purposes if it is incorporated under laws of
that state. Clayton Act, § 12, 15 U.S.C.A. § 22.

**[6] Antitrust and Trade Regulation** ☞967

29Tk967 Most Cited Cases
Dental laboratories that sued designated dealers of
artificial teeth, alleging exclusive dealing and price-
fixing conspiracies, were barred from pursuing
damages under Sherman Act, since laboratories, as

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

indirect purchasers, lacked requisite standing pursuant to *Illinois Brick* doctrine; complaint contained no indication that manufacturer and dealers were equal participants in alleged conspiracies. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[7]** Antitrust and Trade Regulation ☞972(3)
29Tk972(3) Most Cited Cases
Dental laboratories that sued designated dealers of artificial teeth, stemming from purported exclusive dealing and price-fixing, failed to allege that dealers shared manufacturer's specific intent to monopolize artificial tooth market, as required to state antitrust conspiracy claims under Sherman Act; complaint did not aver facts from which it could be inferred that maintaining manufacturer's alleged monopolies was goal that dealers themselves wanted to accomplish. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.

**[8]** Antitrust and Trade Regulation ☞713
29Tk713 Most Cited Cases

**[8]** Antitrust and Trade Regulation ☞715
29Tk715 Most Cited Cases
To state conspiracy to monopolize claim under Sherman Act, plaintiffs must allege: (1) agreement or understanding between two or more parties; (2) specific intent to monopolize; and (3) overt acts in furtherance of alleged
conspiracy. Sherman Act, § 2, as amended, 15 U.S.C.A. § 2.
Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, and A. Zachary Naylor, Esquire of Chimicles & Tikellis LLP, Wilmington, DE, of counsel: Thomas A. Dubbs, Esquire, Richard T. Joffe, Esquire, and Craig L. Briskin, Esquire of Labaton Sucharow & Rudoff LLP, New York, NY, for Plaintiffs.

W. Harding Drane, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, DE, of Counsel for Defendant Nowak Dental Supplies, Inc.; H. Cary A. Des Roches, Esquire of the Law Offices of Cary A. Des Roches, APLC, New Orleans, LA, for Defendants Accu Bite, Inc., Dental Supplies and Equipment, Inc., Hendon Dental Supply, Inc., Henry

Schein Inc., Kentucky Dental Supply Co. Inc. n/k/a KDSC Liquidation Corp., Mohawk Dental Co., and Nowak Dental Supplies, Inc.

Kathleen Jennings, Esquire and Karen V. Sullivan, Esquire of Oberly Jennings & Rhodunda, P.A., Wilmington, DE, for Defendant Arnold Dental Supply Co.

Henry E. Gallagher, Esquire and Jaclyn M. Mason, Esquire of Connolly Bove Lodge & Hutz LLP, Wilmington, DE, for Defendants Atlanta Dental Supply Co., Benco Dental Co., and Darby Dental Laboratory Supply Co., Inc.

Kurt M. Heyman, Esquire and Particia L. Enerio, Esquire of Proctor Heyman LLP, Wilmington, DE, for Defendant Burkhart Dental Supply Co.

William D. Johnston, Esquire and Christian Douglas Wright, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, of counsel: Margaret M. Zwisler, Esquire, Eric J. McCarthy, Esquire, Charles R. Price, Esquire, and Amanda P. Biles, Esquire of Latham & Watkins LLP, Washington, D.C., and Brian M. Addison, Esquire, of Dentsply International Inc., York, PA, for Defendant Dentsply International Inc.

Edward M. McNally, Esquire and Fotini Antonia Skoukvas, Esquire of Morris James LLP, Wilmington, DE, for Defendants Iowa Dental Supply, Co., LLC, Johnson & Lund Co., Inc. and Marcus Dental Supply Co.

William J. Wade, Esquire of Richards, Layton & Finger, Wilmington, DE, for Defendant Patterson Dental Co.

James J. Maron, Esquire, Wayne A. Marvel, Esquire, and Antionette Hubbard, Esquire of Maron Marvel Bradley & Anderson, P.A., Wilmington, DE, for Defendant Pearson Dental Supply, Inc.

Thomas P. Preston, Esquire of Blank Rome LLP, Wilmington, DE, of counsel: Charles W. Jirauch, Esquire of Quarles & Brady LLP, Pheonix, AZ, for Defendant Ryker Dental of Kentucky, Inc.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

## MEMORANDUM OPINION

ROBINSON, District Judge.

## I. INTRODUCTION

**\*1** Currently pending before the court are several motions in two related cases. Plaintiffs Howard Hess Dental Laboratories, Inc. ("Hess") and Philip Guttierez d/b/a Dentures Plus ("Dentures Plus") filed an antitrust class action against Dentsply International, Inc. ("Dentsply") on April 21, 1999. *Hess Dental Laboratories, et. al v. Dentsply International Inc.* ("the *Hess* action"), Civ. No. 99-255 (D.I.1). Hess subsequently became Jersey Dental Laboratories ("Jersey Dental") and, on April 24, 2001, the same plaintiffs filed an antitrust class action against Dentsply and twenty-six dental dealers. [FN1] *Jersey Dental Laboratories f/k/a Howard Hess Dental Laboratories, Inc. and Philip Guttierez d/b/a Dentures Plus v. Dentsply et. al* ("the *Jersey Dental* action"), Civ. No. 01-267 (D.I.1). An amended complaint was filed in the *Jersey Dental* action on October 10, 2006, wherein plaintiffs allege that defendants have conspired to maintain a purported monopoly on the manufacture of artificial teeth for sale in the United States, to restrain trade by the implementation of exclusive dealing arrangements, and to sell such teeth at anticompetitive prices. (Civ. No. 01-267, D.I. 259 at ¶ 45) Plaintiffs seek damages, equitable relief, and costs.

Currently before the court is plaintiffs' motion for summary judgment in the *Hess* action. (Civ. No. 99-255, D.I.256) For the reasons that follow, the court denies plaintiffs' motion. In the *Jersey Dental* action, several motions to dismiss have been filed: (1) motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3), brought by nine non-resident defendants (D.I.266) [FN2] and by defendant Nowak Dental Supplies, Inc. ("Nowak") (D.I.274) (collectively, the "non-Delaware defendants"); (2) certain dental dealer defendants' motion to dismiss counts II and IV of the amended complaint (D.I.264); [FN3] and (3) Dentsply's motion to dismiss counts III and V of the amended complaint (D.I.279). For the reasons that

follow, the court grants each of these motions.

## II. BACKGROUND

### A. The Parties

Plaintiffs Jersey Dental and Dentures Plus are dental laboratories that purchase Dentsply products, including Dentsply's "Trubyte" brand of artificial teeth, indirectly through dental dealers. They bring this action on behalf of themselves and other similarly situated dental laboratories that have purchased and regularly purchase Dentsply's Trubyte brand of artificial teeth. According to the amended complaint, the class includes "thousands of other similarly situated dental laboratories." (Civ. No. 01-267, D.I. 259 at ¶¶ 2, 3)

Defendant Dentsply is a leading manufacturer and worldwide distributor of products and equipment for the dental market. Through its Trubyte Division, Dentsply manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.* at ¶ 4)

**\*2** The remaining defendants are dental dealers that distribute Dentsply's products, including Trubyte brand teeth, through direct sales to dental laboratories. (*Id.* at ¶¶ 5-26) The dental dealers are the primary source of distribution of artificial teeth to dental laboratories. (*Id.* at ¶¶ 55, 59) Dental dealers stock a "full array" of products needed to make dentures, including artificial teeth, and generally employ skilled sales and service people to provide services to dental laboratory customers. (*Id.* at ¶ 60)

### B. History of this Antitrust Litigation

For more than fifteen years, Dentsply operated under a policy that discouraged the dental dealers from carrying competitors' artificial teeth. *U.S. v. Dentsply Int'l, 399 F.3d 181, 185 (3d Cir.2005),* cert. denied, 546 U.S. 1089, 126 S.Ct. 1023, 163 L.Ed.2d 853(2006). In 1993, Dentsply adopted "Dealer Criterion 6," which provided that dental dealers promoting Dentsply's products "may not add further tooth lines to their product offering." *Id.* Dentsply's relationship with the dealers is "espe-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

cially terminable at will" because Dentsply operates on a purchase order basis. *Id.* Dealer Criterion 6 was enforced against dealers that were not "grand-fathered" for sales of competing products, i.e., that had carried competing products before 1993. *Id.* "[I]n the recent past, none of [the dental dealers] have given up the popular Dentsply teeth to take on a competitive line." *Id.* Dentsply also rebuffed attempts by [the grandfathered dealers] to expand their lines of competing products beyond the grand-fathered ones." *Id.*

**1. The government action**

The first suit to be filed regarding Dealer Criterion 6 was an antitrust action filed by the United States("the government action") on January 5, 1999. (Civ. No. 99-005, D.I.1) In its suit, the government alleged that Dentsply: (1) acted unlawfully to maintain a monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (2) entered into un-lawful restrictive dealing agreements that substan-tially lessened competition in violation of § 3 of the Clayton Act, 15 U.S.C. § 14; and (3) entered into unlawful agreements in unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (*Id.*) Following a bench trial, this court entered judgment in favor of Dentsply on August 12, 2003. (*Id.,* D.I. 517) This court found that Dealer Criterion 6 did not preclude Dentsply's main rivals from marketing their teeth directly to the dental laboratories and, therefore, Dentsply had no power to control prices or exclude competitors from the consumers. (*Id.,* D.I. 514 at 157-59) The Third Circuit reversed, finding that Dealer Criterion 6 functionally excluded competit-ors from the dealers' network, "a narrow, but heav-ily traveled channel to the dental laboratories," and ultimately was "a solid pillar of harm to competi-tion." *U.S. v. Dentsply,* 399 F.3d at 190-91.

**\*3** Following the Third Circuit's mandate (Civ. No. 99-005, D.I.534), the court entered injunctive relief in favor of the government (*Id .,* D.I. 559). The in-junction was entered on April 26, 2006 and direc-ted, *inter alia,* Dentsply to cease requiring its deal-ers to be exclusive Dentsply dealers and to remove

Dealer Criterion 6 from its list of dealer require-ments. (*Id.*) The injunction will be in effect for sev-en and one-half years, or until October 26, 2013. (*Id.*)

**2. The private actions**

Plaintiffs Hess and Dentures Plus filed the *Hess* ac-tion against Dentsply on April 21, 1999. (Civ. No. 99-255, D.I.1) Plaintiffs alleged the same antitrust violations as the government and, in addition, ad-ded causes of action for attempt to monopolize and conspiracy to monopolize, as well as damages claims, against Dentsply. (*Id.*) Dentsply moved for summary judgment against plaintiffs on April 3, 2000. On March 30, 2001, this court granted in part Dentsply's motion. Specifically, the court found that plaintiffs are indirect purchasers who lack standing to sue for damages under *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). (*Id.,* D.I. 181, 182) Therefore, the court granted Dentsply's motion "to the extent the *Hess* plaintiffs [sought] damages" and denied the motion to the extent they sought injunctive relief. (*Id.,* D.I. 182 at 33, found at 2001 WL 624807 (D.Del. Mar.30, 2001))

Less than a month later, on April 24, 2001, plaintiffs filed the *Jersey Dental* action in this court, alleging Sherman Act violations against Dentsply and twenty-six dental dealers (the "dealer defendants") arising from the same exclusive deal-ing arrangement alleged in the government and *Hess* actions. (Civ. No. 01-267, D.I.1 [FN4]) This time, plaintiffs alleged that they were direct pur-chasers. The court subsequently granted Dentsply's motion to dismiss the damages portion of the anti-trust claims against it, finding that the indirect pur-chaser rule still applied to plaintiffs (i.e., that the "co-conspirator" exception to *Illinois Brick* did not apply). (*Id.,* D.I. 166; D.I. 167, found at 180 F.Supp.2d 541 (D.Del.2001)) The court reasoned that despite plaintiffs having named, or attempted to name, all alleged co-conspirators as co-defendants, the policy concerns of *Illinois Brick* were still implicated, namely: (1) nothing prevented the dental dealers, who were not "substantially

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

equal" participants in the alleged conspiracy under any set of alleged facts, from filing their own law-suits against Dentsply; (2) the difficulties of damage apportionment between direct and indirect purchasers was still present; and (3) plaintiffs did not fall within the group of private attorneys general that Congress created to redress Dentsply's assumed antitrust violation through use of the treble damage remedy. (*Id.,* D.I. 166)

Plaintiffs thereafter moved to amend their complaint in an attempt to overcome some of these deficiencies. The proposed amended complaint alleged that defendants have engaged in a retail price-fixing conspiracy, that intermediary dental dealers act only as agents for Dentsply, that plaintiffs suffered lost profits from the unrealized sale of competitive teeth, and that the dental dealers will not sue Dentsply. (*Id.,* D.I. 170, exs. A & B) The court denied leave to amend, reasoning that plaintiff's amended claims would not withstand a motion to dismiss; the co-conspirator exception to *Illinois Brick* still did not apply because the dental dealers could still sue Dentsply; and *Illinois Brick* barred recovery of lost profits damages because plaintiffs were indirect purchasers. (*Id.,* D.I. 208, found at 2002 WL 2007916 (D.Del. Aug.27, 2002))

**\*4** On September 21, 2005, having heard the appeal of the *Hess* action, the Third Circuit affirmed this court's decision that plaintiffs, as indirect purchasers, lacked standing to sue for damages on its exclusive dealing claims. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc., 424 F.3d 363 (3d Cir.2005).* The Third Circuit held that a co-conspirator exception for conspiracies that are not resale price maintenance conspiracies "would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator--the manufacturer--because their involvement in the conspiracy was 'truly complete'." *Id. at 378-79.* The Court found that plaintiffs did not qualify for such an exception "because the [d]istrict [c]ourt concluded, and [p]laintiffs have conceded, that the dealers' involvement in the alleged conspiracy with Dentsply was **not** 'truly complete'." *Id. at 383* (emphasis in origin-

al). Plaintiffs' admission on appeal that the dealers and Dentsply were not "substantially equal," [FN5] therefore, was fatal to its claim for damages for the alleged exclusive dealing; plaintiffs were nevertheless permitted to proceed under the co-conspirator exception to pursue an action for overcharge damages caused by the alleged vertical price-fixing conspiracy. *Id. at 384 & n. 19.*

**C. The Amended *Jersey Dental* Complaint**

Plaintiffs responded to the Third Circuit's *Hess* decision by filing an amended complaint in the *Jersey Dental* action on October 10, 2006. (Civ. No. 01-267, D.I.259) Plaintiffs continue to assert claims against all defendants for retail price-fixing; [FN6] these claims are not challenged in the present motions to dismiss. (*Id.* at ¶¶ 131-136) The amended complaint alleges that Dentsply and the dental dealers engaged in an exclusive dealing conspiracy in violation of sections 1 and 2 of the Sherman Act, 15 U .S.C. §§ 1, 2. In counts II and III, plaintiffs allege that Dentsply and the dental dealers conspired to monopolize the artificial teeth market. (*Id.* at ¶¶ 137-165) In count II, plaintiffs seek both damages and injunctive relief against the dealer defendants for this alleged conspiracy. (*Id.* at ¶¶ 148- 149) In count III, plaintiffs seek only an injunction, and not damages, against Dentsply for its role in this alleged conspiracy. (*Id.* at ¶¶ 161, 165)

In counts IV and V, plaintiffs allege that Denstply and the dental dealers conspired to restrain trade which, they allege, constituted a group boycott of Dentsply's competitors. (*Id.* at ¶¶ 166-187) Once again, plaintiffs seek both damages and injunctive relief against the dealer defendants (count IV) (*id.* at ¶¶ 175-176), but seek only an injunction against Dentsply (count V) (*id.* at ¶ 186). [FN7]

**III. STANDARDS OF REVIEW**

**A. Summary Judgment**

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c).* The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita, 475 U.S. at 587* (quoting *Fed.R.Civ.P. 56(e)).* The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*

**B. Motion to Dismiss for Lack of Personal Jurisdiction**

**\*5** When reviewing a motion to dismiss pursuant to *Fed.R.Civ.P. 12(b)(2),* a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the de-

fendant and the forum state to support jurisdiction. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir.1987).* To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. *See Reach & Assoc., P.C. v. Dencer, 269 F.Supp.2d 497, 502 (D.Del.2003).* With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. *See id.* As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See id.; see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).*

**C. Motion to Dismiss for Improper Venue**

A court may dismiss a lawsuit for improper venue pursuant to *Fed.R.Civ.P. 12(b)(3).* However, the Federal Rules of Civil Procedure do not contain any specific venue provisions or requirements. A court, therefore, must determine whether venue is proper in accordance with the appropriate statutes when deciding a motion to dismiss for improper venue. *See Albright v. Gore,* Civ. A. No. 02-304, 2002 WL 1765340, \*3 (D.Del. July 31, 2002) (citations omitted). The moving party has the burden of proving that venue is improper. *See id.* (citing *Myers v. American Dental Ass'n, 695 F.2d 716, 724 (3d Cir.1982)).* "[I]n ruling on defendant['s] motion the plaintiff's choice of venue should not be lightly disturbed." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.1995)* (citations omitted).

**D. Motion to Dismiss Pursuant to Rule 12(b)(6)**

In reviewing a motion filed under *Fed.R.Civ.P. 12(b)(6),* the court must *accept* all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus, --- U.S. ----, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007); Christopher v. Harbury, 536 U.S. 403, 406, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).* A complaint must contain " 'a short and plain statement of the claim showing that the plead-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

er is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id . at 1964-65* (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* at 1959.

## IV. DISCUSSION

### A. Plaintiffs' motion for summary judgment in the *Hess* action

**\*6** In the *Hess* action, the dental laboratory plaintiffs have moved for summary judgment on their claim against Dentsply for "exclusive dealing/ monopoly maintenance" (count II). (Civ. No. 99-255, D.I. 256, D.I. 257 at 1, 5) Plaintiffs claim that, because the Third Circuit found that Dentsply violated section 2 in the government action, Dentsply is collaterally estopped from contesting its liability vis-a-vis the *Hess* complaint. Although Dentsply's violations are claimed to be the same, plaintiffs also claim that they are presently entitled to greater injunctive relief than that awarded by this court in the government action.

### 1. Collateral estoppel

[1] The doctrine of collateral estoppel states that, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. U.S.,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 153(1979). Plaintiffs must establish the following four requirements for collateral estoppel to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actu-

ally litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir.2006) (citations omitted). Doubts about application of the doctrine of collateral estoppel should usually be resolved against its use. *See Witkowski v. Welch,* 173 F.3d 192, 206 (3d Cir.1999) (citing *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir.1970)).

### 2. Discussion

[2] The complaint in the *Hess* action contains certain causes of action pled in the government action, and some new claims. Both cases involve monopoly maintenance, restrictive dealing, and restraint of trade claims against Dentsply. [FN8] *U.S. v. Dentsply,* 399 F.3d at 184, (Civ. No. 99-255, D.I. 1 (counts I, II, and V)) The section 2 claim brought in the government action was a monopoly maintenance claim. *U.S. v. Dentsply,* 399 F.3d at 184. "Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anticompetitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power ... There must be proof that competition, not merely competitors, has been harmed." *Id.* at 187 (citations omitted). Following its review of the relevant market, Dentsply's power to exclude, and the efficacy of Dealer Criterion 6, the Third Circuit found in *U.S. v. Dentsply* that "the government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated [s]ection 2" of the Sherman Act. 399 F.3d at 196) Plaintiffs assert that, in view *of* this determination, Dentsply is collaterally estopped from contesting its liability for monopoly maintenance in the *Hess* case. (Civ. No. 99-255, D.I. 257 at 10-14) Dentsply counters that collateral estoppel does not apply because the issue of antitrust injury, specifically, the question of whether plaintiffs paid higher prices due to Dentsply's conduct, was never litigated in the government action. (*Id.,* D.I. 262 at 8-10)

**\*7** The relevant market for Dentsply's teeth, as

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

defined by the Third Circuit, consists of two consumers combined: the dental dealers and the dental laboratories. *Id.* at 188. The question posed by plaintiffs' motion is, essentially, whether the Third Circuit's finding that competition in this market was harmed necessarily means that plaintiffs have suffered antitrust injury. Put another way, do plaintiffs' claims require proof of specific injuries to plaintiffs, such as higher prices paid?

In support for their argument that an acknowledgment of their injuries is implicit in the Third Circuit's decision, plaintiffs highlight the Court's finding that Dentsply's exclusive dealing had two anticompetitive effects: (1) "keep[ing] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share"; and (2) "impair [ing] the laborator[ies'] choice in the marketplace." (D.I. 266 at 6-7, 11 (citing *U.S. v. Dentsply*, 399 F.3d at 191, 194) Certainly, these findings are to be given preclusive effect. *See Montana v. U.S.*, 440 U.S. at 153; *Burlington Northern R. Co. v. Hyundai Merchant Marine Co., Ltd.*, 63 F.3d 1227, 1231 (3d Cir.1995).

[3] Plaintiffs' estoppel argument, however, impermissibly combines the concepts of causation and injury. Antitrust injury "is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Angelico, M.D. v. Lehigh Valley Hospital*, 184 F.3d 268, 273 (3d Cir.1999) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)) (additional citations and internal quotations omitted). Plaintiffs, therefore, must have both suffered an injury, and that injury must have resulted from the occurrence of the condemned events, here, the use of Dealer Criterion 6 and other exclusionary practices to maintain Dentsply's monopoly. It is certainly plausible that plaintiffs, representing one of two consumer groups who collectively form the relevant market in this case, lost profits as the result of Dentsply's exclusionary practices. *See U.S. v. Dentsply*, 399 F.3d at 190- 91 ("experts for both parties testified that were Dealer Criterion 6 abolished, prices would fall," presumably raising the

profit margin for the laboratories). The Third Circuit, however, has issued no such finding.

The court declines to infer that a "finding of anti-competitive effects necessarily implies a finding that consumers [here, the dental laboratories] have been hurt" (D.I. 257 at 19-20), [FN9] in view of the lack of a determination that plaintiffs have suffered an injury in fact (which is demonstrably linked to the conduct which has been proscribed by the Third Circuit) and the nature of such injury. The court, therefore, declines to grant plaintiffs' motion for summary judgment on the ground of collateral estoppel. *See In re Microsoft Corp. Antitrust Litig.*, 232 F.Supp.2d 534, 538 (D.Md.2002) (denying motions for partial summary judgment where "[n]othing in the [previous] government case against Microsoft demonstrate[d] that the consumer plaintiffs ... suffered any such injuries").

**3. Injunctive relief sought**

**\*8** The court notes that the fact that plaintiffs seek only injunctive relief rather than damages does not alter plaintiffs' obligation to establish its antitrust injuries. It does, however, provide an additional basis for the court's denial of plaintiffs' motion in view of the fact that Dentsply has already been enjoined from the monopolist activities condemned by the Third Circuit. (Civ. No. 99-005, D.I.559)

Plaintiffs assert that granting another injunction "will not be redundant but, rather, will substantially enhance the effectiveness of the injunctive relief already granted." (Civ. No. 99-255, D.I. 257 at 23) In addition to provisions that are "essentially the same" as the prohibitions set forth in the government's injunction, plaintiffs additionally request that another injunction: (1) be of unlimited duration, as compared *to* seven and a half years; (2) require that Dentsply (a) post the injunction on its website and (b) hire an outside, independent monitor, in contrast to the employee it has designated as the antitrust compliance officer for the government's injunction; and (3) prohibit Dentsply's participation in meetings or phone calls between dental dealers and laboratories absent the laboratories' re-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2807292                                                                    Page 9
--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

quest. (*Id.* at 25-28)

Aside from its theories on why additional relief would be beneficial to them, plaintiffs have not adequately explained why the government's injunction is insufficient to prevent Dentsply from engaging in anticompetitive practices. In fact, despite seeking a permanent injunction, plaintiffs assert only that they are "threatened with loss or injury proximately resulting from the recurrence of Dentsply's exclusive dealing/monopoly maintenance." (D.I. 257 at 24) Even if plaintiffs could meet the stringent requirements of the permanent injunction standard (and the court believes they cannot), [FN10] plaintiffs nevertheless fail to demonstrate a need for further, non-duplicative measures to those already in place. [FN11] The court, therefore, denies plaintiffs' motion on the alternative basis that plaintiffs have not demonstrated that they are entitled to additional injunctive relief. [FN12] *See Harthman v. Witty,* 480 F.2d 337, 339-40 (3d Cir.1973) (holding that "a second injunction was unnecessary and it would have been the duty of the court to refuse to grant it" where a first, permanent injunction of broad terms was in place, and plaintiff could have sought relief for continuing violations under that injunction) (vacating district court's order denying plaintiff's motion for damages); *see also Ellis v. Gallatin Steel Co.,* 390 F.3d 461, 476 (6th Cir.2004) (district court committed reversible error in concluding irreparable harm had been shown, and awarding injunctive relief, three months after standing consent decree was obtained by the government).

**B. The Non-Delaware Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue**

Nine non-Delaware defendants move to dismiss in the *Jersey Dental* action for lack of jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3). (Civ. No. 01-267, D.I.266) [FN13] Defendant Nowak has filed its own motion on these grounds. (D.I.274)

**1. The Clayton Act**

*\*9 Section 12 of the Clayton Act provides:*
> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an **inhabitant,** but also in any district wherein it may be **found** or **transacts business;** and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added). The first clause relates to venue, while the second clause concerns service of process and, therefore, personal jurisdiction. *In re: Automotive Refinishing Paint Antitrust Litigation* (hereinafter, "*Automotive Refinishing* "), 358 F.3d 288, 293 (3d Cir.2004).

**2. Jurisdiction**

In response to defendants' challenge to personal jurisdiction by this court, plaintiffs bear the burden of showing that personal jurisdiction exists. *Marten v. Godwin,* No. Civ. A. 05-5520, 2007 WL 2377807, \*2 (3d Cir. Aug. 22, 2007) (citing *Gen. Elec. Co. v. Deutz AG,* 270 F.3d 144, 150 (3d Cir.2001)). Plaintiffs must meet this burden through "affidavits or other competent evidence." *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir.1996) (citations omitted). Personal jurisdiction must be considered separately from venue pursuant to section 12 of the Clayton Act. *See Automotive Refinishing,* 358 F.3d 294-97.

Plaintiffs assert that the jurisdictional clause of the Clayton Act requires only that personal jurisdiction be demonstrated by "national contacts," rather specific contacts with the jurisdiction in which defendants have been sued. (D.I. 289 at 6-13) Since each of the moving defendants are incorporated in one of the states of the United States, plaintiffs assert that sufficient national contacts exist. (*Id.* at 12) In support for their argument, plaintiffs rely on the Third Circuit's decision in *Automotive Refinishing,* 358 F.3d 288, 296-97 (3d Cir.2004); defendants dispute the applicability of *Automotive Refinishing* to the present case.

*Automotive Refinishing* involved an antitrust class

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

action filed against two German corporations that subsequently brought a motion to dismiss for lack of personal jurisdiction. *Id.* at 290. In contrast to the case at bar, the *Automotive Refinishing* Court was not confronted with a challenge to personal jurisdiction brought by domestic corporate defendants. The dispute involved whether the jurisdiction and venue clauses of section 12 operate independently of each other; the *Automotive Refinishing* Court resolved this question by stating that "the service of process provision on **foreign** corporations is independent of, and does not require satisfaction of, the specific venue provision under [s]ection 12 of the Clayton Act." *Id.* at 297 (emphasis added). The *Automotive Refinishing* Court next proceeded to analyze appellants' arguments that section 12 did not confer personal jurisdiction over them, and concluded that "personal jurisdiction in federal antitrust litigation is assessed *on* the basis of a defendant's aggregate contacts with the United States as a whole." *Id.* at 298.

**\*10** Though this holding is not, in literal terms, limited to jurisdiction over foreign corporations, there are several compelling reasons for limiting *Automotive Refinishing* to its facts. First, the authority relied upon by the *Automotive Refinishing* Court does not concern domestic defendants. The *Automotive Refinishing* Court relied upon prior Third Circuit precedent set forth in *Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir.2002),* in which the Court assessed a foreign defendant's "national contacts" in determining that jurisdiction was appropriate. *Automotive Refinishing, 358 F.3d at 298- 99; see also Pinker, 292 F.3d at 371-72* ("A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating that market."). The *Automotive Refinishing* Court also stated that its holding is consistent with *Federal Rule of Civil Procedure 4(k)(2),* which establishes personal jurisdiction over foreign defendants. *358 F.3d at 298-99; see also Fed.R.Civ.P. 4(k)(2)(A) (2007)* (personal jurisdiction may be established by service "if the defendant is not subject to jurisdiction in any state's courts of general jurisdiction").

Secondly, and perhaps most importantly, the *Automotive Refinishing* Court had no occasion to consider jurisdiction vis-a-vis domestic defendants; it acknowledged, however, a "crucial" distinction between alien and domestic corporations in its discussion of venue. *Automotive Refinishing, 358 F.3d at 297 n. 10* ("The general value provision of 28 U.S.C. § 1391(c) governing such **domestic** corporations is, in contrast to § 1391(d) governing **alien** corporations, **more** difficult to satisfy than the [s]ection 12 venue requirements.") (quoting *Gen. Elec. Co. v. Bucyrus-Erie Co., 550 F.Supp. 1037, 1041 (S.D.N.Y.1982)*) (internal brackets omitted) (emphasis in original); *see also Cumberland Truck Equipment Co. v. Detroit Diesel Corporation, 401 F.Supp.2d 415, 421 (E.D.Pa.2005)* (noting that the *Automotive Refinishing* Court "emphasized the importance of distinguishing between out-of-state and foreign corporate antitrust defendants" in its opinion) (citing *Automotive Refinishing, 358 F.3d at 296 n. 10).*

Insofar as the Third Circuit has never applied a "national contacts" test for establishing personal jurisdiction over a domestic antitrust defendant, the court declines to extend the holding of *Automotive Refinishing* in a manner that would counterindicate traditional long-arm jurisprudence with respect to such defendants. [FN14] The court, therefore, will review whether plaintiffs have alleged facts sufficient to satisfy both the Delaware long-arm statute, [FN15] i.e., specific jurisdiction, and the Constitutional due process requirements of the Fifth Amendment, i.e., general jurisdiction, with respect to the domestic defendants. [FN16] *See Automotive Refinishing, 358 F.3d at 299* ("[P]ersonal jurisdiction under [s]ection 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment.") (citations omitted).

**\*11** Specific jurisdiction arises when a defendant has both purposefully directed its activities at residents of the forum state and the action arises from, or is directly related to, the defendant's actions within the forum state. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).* As for the Constitutional basis,

2007 WL 2807292
--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

Case 1:08-cv-00483-SLR    Document 23-2    Filed 12/07/2007    Page 23 of 72    Page 11

the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See Reach & Assoc. P.C. v. Dencer, 269 F.Supp.2d 497, 502 (D.Del.2003); see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).*

[4] In the case at bar, the moving defendants have submitted affidavits which demonstrate that they are not incorporated in Delaware, and have conducted no business within the State. (D.I. 267, exs. A-H; D.I. 276; D.I. 295, ex. A [FN17]) In response, plaintiffs have put forward no evidence that defendants "purposefully availed" themselves of doing business with Delaware citizens. [FN18] Likewise, the court is not satisfied that defendant Nowak or the non-Delaware defendants "[had] certain minimum contacts with [the State] such that the maintenance of [plaintiffs'] suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe, 326 U.S. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).* For these reasons, the court grants the moving defendants' motions to dismiss on the basis of lack of jurisdiction. (D.I.266, 274)

**3. Venue**

Although the court need not address the moving defendants' arguments regarding venue in view of this holding, the court notes that there is no indication that venue in this district is appropriate and, therefore, improper venue provides an alternative basis for the court's disposition of the motions.

[5] In order to establish that venue is improper in this case, defendants must demonstrate that they are not inhabitants of, found in, or do not transact business in, the District of Delaware pursuant to section 12. *15 U.S.C. § 22.* A defendant is an "inhabitant" if it is "incorporated under the laws of [Delaware]." *Automotive Refinishing, 358 F.3d at 293 n. 6* (citation omitted).

Being "found" in a district is generally equated with "doing business" there, and requires greater contacts than does "transacting business." A corporation is "found" where it has "presence" and

"continuous local activities" in the district. *Id.* (citations omitted). Defendants' affidavits demonstrate no such activities within this district.

In response, and despite pleading that venue in this district is proper pursuant to section 12 of the Clayton Act, *15 U.S.C. § 22,* plaintiffs argue that venue in the District of Delaware is proper pursuant to the general venue statute, *28 U.S.C. § 1391(c),* which provides that a corporation is a resident of "any judicial district in which [defendant corporation] is subject to personal jurisdiction at the time the action is commenced." (D.I. 259 at ¶ 27; D.I. 289 at 14) Plaintiffs argue, based on their interpretation of *Automotive Refinishing* and the "national contacts" theory rejected above, that all defendants "reside" in Delaware because "there is personal jurisdiction in this district over each and every [d]efendant." (D.I. 289 at 14)

**\*12** The court finds that domestic defendants' national contacts do not suffice to render venue appropriate in the District of Delaware. Put another way, section 12 of the Clayton Act may not be supplemented with the general venue provisions of *28 U.S.C. 1391(b)* and/or *(c)* for purposes of establishing venue for domestic defendants, and must be considered independently of those provisions. *See Cumberland Truck Equipment Co., 401 F.Supp.2d at 420-21, 424* (finding that Third Circuit precedent supported "allowing [s]ection 12's venue clause to be supplemented for alien but not domestic defendants.") (citing *Automotive Refinishing, 358 F.3d at 296 & n. 10). [FN19]* To extend *Automotive Refinishing* in such a manner would effectually, and improperly, create unlimited venue for antitrust actions against domestic corporations. *Id.* at 423.

Plaintiffs do not contest the facts as alleged in defendants' affidavits (D.I. 289 at 21), and have provided only legal argument, rather than counter-evidence, in opposition to defendants' motion. The court, therefore, finds that the moving defendants have satisfied their burden to establish that venue in this district is improper; defendants' motions (D.I.266, 274) are properly denied on this alternate ground.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

**C. Motions to Dismiss Counts II-V in the *Jersey Dental* Action Pursuant to Rule 12(b)(6)**

Counts II and III of the amended complaint contain plaintiffs' conspiracy to monopolize claims against the dealer defendants (count II) and Dentsply (count III). (D.I. 259 at ¶¶ 137-165) Counts IV and V of the amended complaint contain plaintiffs' exclusive dealing claims, in which plaintiffs allege that the dealers (count IV) and Dentsply (count V) conspired to restrain trade, which constituted a group boycott of Dentsply's competitors. (*Id.* at ¶¶ 166-187) Several defendants [FN20] and Dentsply have separately moved to dismiss these claims. (D.I.264, 279 [FN21]) The court will address defendants' arguments in turn.

**1. Injunctive relief sought against Dentsply for violations asserted in counts III and V**

Dentsply asserts that, even assuming plaintiffs have stated viable claims against it, plaintiffs would still lack standing to seek injunctive relief in view of the injunction that has already been secured by the government. (D.I.279) As discussed above, plaintiffs have not alleged any facts that could demonstrate a threat of future injury and/or irreparable harm. Absent such a proffer, plaintiffs cannot establish that they are entitled to a second injunction against Dentsply for the same conduct currently enjoined by the government's injunction. [FN22] Count V, for which only injunctive relief is sought, therefore, is dismissed for failure to state a claim upon which can be granted. [FN23] With respect to Dentsply's conduct asserted in count III, plaintiffs also seek "a declaratory judgment that Dentsply's actions complained of herein are violations of the prohibition against combining or conspiring to monopolize, under [s]ection 2 of the Sherman Act, 15 U .S.C. § 2," and for this court to order the "divestiture of the Trubyte division from Dentsply." (D.I. 259 at ¶ 165) The parties do not address this proposed relief in their submissions; the court, therefore, proceeds to evaluate defendants' additional arguments with respect to claim III.

**2. Damages sought from the dealers for viola-**

tions asserted in counts II and IV

**\*13** [6] The dealer defendants assert that plaintiffs are barred from suing for damages by reason of the Third Circuit's prior decision in the *Hess* case, in which the Court held that plaintiffs, as indirect purchasers, had no standing to sue under *Illinois Brick.* (D.I. 265 at 23-24 (citing *Howard Hess Dental Labs., 424 F.3d at 376, 384*)) Plaintiffs respond that, although plaintiffs are indirect purchasers from Dentsply, they are direct purchasers from the dealers, and should not be deemed to be "indirect purchasers" regardless of who plaintiffs' claims are brought against. (D.I. 288 at 37-40)

This court previously determined, and the Third Circuit agreed, that "[t]he intermediate dental dealers suffer the direct harm from any lost opportunity to sell a greater volume of Dentsply products or to sell competitive product lines and profit therefrom. Any harm suffered by plaintiffs remains indirect." *See Howard Hess Dental Labs., 424 F.3d at 376.* Plaintiffs "claim[ed] that they come within the [general] 'co-conspirator exception' to *Illinois Brick* because their purchases from Dentsply's dealers were made [directly] from members of an exclusive-dealing conspiracy." *Id. at 378.* The Third Circuit disagreed, since the facts did not demonstrate that "the [dealer] middlemen would be barred from bringing a claim against [Dentsply]." *Id. at 379.*

Plaintiffs are correct that the Third Circuit had no occasion in *Hess* to evaluate plaintiffs' standing to sue the dealers for damages, as the dealers were not parties to that action. Nevertheless, counts II and IV in the case at bar allege non-vertical price-fixing conspiracies that are subject to the Third Circuit's ruling. *Howard Hess Dental Labs., Inc., 424 F.3d at 378* (a general co-conspirator exception "would only exist in circumstances where ... [the dealers'] involvement in the conspiracy was 'truly complete'.") This is so regardless of the fact that plaintiffs purchased artificial teeth "directly" from the dental dealers. As in *Hess,* and as discussed in further detail *infra,* the amended complaint in the present action contains no indication that Dentsply and the dealers were equal participants in the al-

2007 WL 2807292
--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

leged conspiracies. Consequently, there is no indication that plaintiffs may pursue overcharge damages from the dealers pursuant to the general co-conspirator exception of *Illinois Brick*. Dismissal of counts II and IV is appropriate, therefore, on the basis that plaintiffs cannot obtain the relief sought.

### 3. Counts II and III--specific intent

[7] The court also finds that dismissal of counts II and III is appropriate for failing to allege any factual allegations that support plaintiffs' claim that the dental dealers shared Dentsply's specific intent for Dentsply to monopolize the artificial tooth market. (D.I. 265 at 17-22; D.I. 279)

[8] To state a conspiracy to monopolize claim, plaintiffs must allege: (1) an agreement or understanding between the dealers and Dentsply; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy. *See Untracht v. Fikri,* 454 F.Supp.2d 289, 315 (W.D.Pa.2006) (citation omitted); *ID Security Systems Canada, Inc. v. Checkpoint Sys., Inc.,* 249 F.Supp.2d 622, 657 (E.D.Pa.2003) (citing *Pontius v. Children's Hosp. .,* 552 F.Supp. 1352, 1377 (E.D.Pa.1982)). The specific intent element requires plaintiffs to plead that both alleged conspirators "had a conscious commitment to [Dentsply's] common scheme designed to achieve an unlawful objective, namely that of endowing [Dentsply] with monopoly power." *ID Security Systems Canada, Inc.,* 249 F.Supp.2d at 660 (citation and internal quotations omitted).

*14 To this end, plaintiffs have pled that the dealer defendants "have conspired with Dentsply and with each other to, among other things, restrict Dentsply's dealers from carrying the artificial teeth of any competing manufacturer, and to restrict which dealers are allowed to carry Dentsply's artificial teeth." (D.I. 259 at ¶ 72) Plaintiffs further assert that "the intended effect of this exclusive dealing arrangement, known to each and every [d]efendant, has been the elimination of any and all competition to Dentsply sufficiently significant to pose a threat to its monopoly of the markets for artificial teeth

and/or premium artificial teeth sold in the U.S." (*Id.* at ¶ 73) Finally, "each and every [d]efendant knew that this exclusive dealing arrangement was and is an illegal restraint of trade designed to maintain Dentsply's monopoly." (*Id.* at ¶ 74)

On its face, the asserted complaint contains the general allegation that the dealers intended for Dentsply to maintain a monopoly. (*Id.* at ¶¶ 73, 156) [FN24] The court finds that plaintiffs have not, however, pled "facts from which it can reasonably be inferred that the [dealers] formulated [the] intent" that "maintaining [Dentsply's] monopolies was a goal that they themselves wanted to accomplish." *In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 728, 731 (D.Md.2001).

The amended complaint does not appear to contain and, indeed, plaintiffs do not point out any facts that could supplement their general assertion of intent. In contrast, and as discussed previously, plaintiffs have maintained throughout this litigation that the dealers were coerced into accepting Dentsply's terms. Plaintiffs have pled that Dentsply demanded the dealers' participation in the exclusive dealing arrangement (*id.* at ¶¶ 81, 84); in fact, several dealer relationships were terminated by Dentsply when dealers did not accept its terms (*id.* at ¶¶ 91-99). Based on plaintiffs' own allegations, "it is at least as likely that the [dealer] defendants simply chose to make the best of a bad situation" in order to have access to the Dentsply tooth line. *In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d at 732.

In response to Dentsply's motion, plaintiffs assert that a specific intent is "inferable, without more, from [the dealers'] participation in a conspiracy whose purpose and means is the unlawful ... creation or maintenance of a monopoly." (D.I. 288 at 34) This logic, however, is circular; an element required to prove the existence of conspiracy cannot be inferred from the existence of a conspiracy. Plaintiffs also assert that "the fact that a conspirator has been threatened does not necessarily mean that when it finally decides to **agree to conspire,** its only motive is fear." (D.I. 288 at 35) (emphasis added). This argument, again, presumes the presence

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

of a conspiracy in the first instance. Even if the dealer defendants were compensated for their acceptance of Dealer Criterion 6, it does not follow that they shared the specific intent for Dentsply to achieve a monopoly.

**\*15** Finally, plaintiffs' allegation that the defendants have conspired, "each with all of the others," to achieve a Dentsply monopoly does not substantiate plaintiffs' claim that defendants were part of a single conspiracy. No facts have been pled from which it could be inferred that the dealer defendants acted in unison, "sharing a unity of purpose" or a "meeting of the minds," rather than in parallel. [FN25] For all of these reasons, the court finds that plaintiffs have not sufficiently pled a section 2 conspiracy to monopolize claim. *See In re Microsoft Corp. Antitrust Litig., 127 F.Supp.2d at 733-34* (granting defendant's motion to dismiss conspiracy to monopolize claim under similar circumstances).

**V. CONCLUSION**

For the aforementioned reasons, plaintiffs' motion for summary judgment in the *Hess* action (Civ. No. 99-255, D.I.256) is denied, and each of the motions to dismiss in the *Jersey Dental* action (Civ. No. 01-267, D.I.264, 266, 274, 279) are granted. An order shall follow.

**ORDER**

At Wilmington this 26th day of September 2007, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment (Civ. No. 99-255, D.I.256) is denied.

2. Defendants' motion to dismiss counts II and IV of the amended complaint (Civ. No. 01-267, D.I.264) is granted.

3. Defendants' motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I.266) is granted.

4. Dentsply's motion to dismiss counts III and V. of

the amended complaint (Civ. No. 01-267, D.I.272) is denied as moot.

5. Defendant Nowak's motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I.274) is granted.

6. Dentsply's motion to dismiss counts III and V. of the amended complaint (Civ. No. 01-267, D.I.279) is granted.

> FN1. The defendants are Dentsply; A. Leventhal & Sons, Inc.; Accubite Dental Lab, I nc.; Addium Dental Products; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Edentaldirect.com, Inc., as successor to Crutcher Dental, Inc.; Hendon Dental Supply, Inc.; Henry Schein, Inc. and its affiliates, including, without limitation, Zahn Dental Co., Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; JB Dental Supply Co., Inc.; Johnson & Lund Co ., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Midway Dental Supply Inc.; Mohawk Dental Co. Inc.; Nashville Dental, Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company, its subsidiaries, predecessors, successors, assigns, affiliates, and related companies; Pearson Dental Supplies, Inc.; Ryker Dental Supplies, Inc.; and Thompson Dental Company.

> FN2. The moving defendants are Arnold Dental Supply Company; Atlanta Dental Supply Company; Dental Supplies and Equipment, Inc.; Iowa Dental Supply Company, LLC; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc. n/k/a/ KDSA Liquidation Corporation; Marcus Dental Supply Company, Inc.; Mohawk Dental Co.; and Ryker Dental of

2007 WL 2807292    Page 15
--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

Kentucky, Inc..

FN3. The moving defendants are Accubite Dental Lab, Inc.; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Hendon Dental Supply, Inc.; Henry Schein, Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Mohawk Dental Co. Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company; Pearson Dental Supplies, Inc.; and Ryker Dental Supplies, Inc.. (D.I.264)

FN4. In their original complaint, the Jersey Dental plaintiffs alleged that the named defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; conspired to monopolize in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and conspired to restrain trade in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

FN5. (Civ. No. 01-267, D.I. 273 at 9 (citing Appellants' Reply Br. at 23 n. 16)) Plaintiffs do not contest defendants' recount of these statements in their responsive brief. (D.I. 290 at 26)

FN6. Omitted from the amended complaint are originally-named defendants A. Leventhal & Sons, Inc.; Midway Dental Supply Inc.; Nashville Dental, Inc.; and Thompson Dental Company. (D.I.259) Zila, Inc. is presently named "as successor to Ryker Dental of Kentucky, Inc." (*Id.*)

FN7. Plaintiffs state in the heading for count V that this claim is "[a]gainst Dentsply, for [i]njunctive [r]elief," but, aside from alleging that plaintiffs have no ad-

equate remedy at law (*id.* at 175), fail to particularly request injunctive relief vis-a-vis Dentsply in the body of the amended complaint. (*Compare id.* at ¶ 176 (seeking "damages from the [d]ealer [d]efendants, ... and a permanent injunction enjoining the continuing violation of [s]ection 1 of the Sherman Act, 15 U.S.C. § 1"))
For each count discussed above, plaintiffs also seek a declaratory judgment that the complained-of actions constitute Sherman Act violations. (*Id.* at ¶¶ 149, 165, 176, 187)

FN8. Plaintiffs acknowledge that the *Hess* complaint contains two claims against Dentsply not pled in the government action: attempt to monopolize; and conspiracy to monopolize in violation of section 2 of the Sherman Act. (Civ. No. 99-255, D.I. 257 at 2; D.I. 1 (counts III and IV)) Plaintiffs limit their motion to count II, or their "exclusive dealing/monopoly maintenance" claim. (*Id.* at 1, 5)

FN9. The authority cited by plaintiffs on this point is not persuasive. (D.I. 257 at 19-20) In *The Serpa Corp. v. Mewane, Inc.,* 199 F.3d 6 (1st Cir.1999), the First Circuit affirmed a finding that plaintiff did not have standing based on antitrust injury where plaintiff brought "its claim as [n]either a competitor [n]or a consumer but as a distributor whose injuries resulted from the loss of [market] position." *Id.* at 12. In *Bell v. Dow Chem. Co.,* 847 F.2d 1179 (5th Cir.1988), the Fifth Circuit also affirmed the district court's holding that plaintiff, a manufacturer-seller who was "neither a consumer nor a competitor" in the relevant market, did not have standing where "there [was] no evidence that [defendant's] conduct caused the loss of future sales, as opposed to any number of factors--e.g. price, market conditions, unproven technology, limited product uses, or [plaintiff's] inability to purchase tech-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2007 WL 2807292   Page 16

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

nical material from other distributors." *Id.* at 1183. Finally, the Third Circuit's decision in *In re Doctoroff,* 133 F.3d 210 (3d Cir.1997), in which the Court found that a plaintiff who was barred from contesting liability for a debt as a sanction for discovery abuses could not challenge the debt in a subsequent bankruptcy proceeding, is equally unpersuasive in this context. *Id.* at 215 ("We do not hesitate in holding that a party such as Docteroff, who deliberately prevents resolution of a lawsuit, should be deemed to have actually litigated an issue for purposes of collateral estoppel application.").

**FN10.** In deciding whether to grant a permanent injunction, courts must consider whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest." *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001).
The Third Circuit has recently recognized a conflict in its precedent regarding whether irreparable harm is a prerequisite to the grant of a permanent injunction relief. *See Stolt-Nielsen, S.A. v. U.S.,* 442 F.3d 177, 185 n. 5 (3d Cir.2006) (collecting cases).

**FN11.** This case presents a scenario opposite to that presented in *U.S. v. Borden Co.,* 347 U.S. 514, 74 S.Ct. 703, 98 L.Ed. 903 (1954), where the Court found a refusal to grant the **government** an injunction under the Clayton Act in view of the existence of a **private** injunction already in place. In *Borden,* the Court noted that a private litigant "may be expected to exercise [its remedy] only when its personal interest will be served," while the "[g]overnment [has a] right and duty to seek an injunction to protect the public interest [ ] without regard to

any private suit or decree." *Id.* at 518-19.
While plaintiffs argue in this case that it would be advantageous to have over 7,000 dental laboratories police Dentsply's conduct (Civ. No. 99- 255, D.I. 257 at 23), clearly any dental laboratory can notify the government of any further antitrust violations by Dentsply, regardless of the status of the instant private litigation.

**FN12.** It appears as though the record in this case is closed; it is unclear to the court whether plaintiffs have, but did not put forward, evidence sufficient to demonstrate antitrust injury and that additional injunctive relief is warranted (notwithstanding the presence of the government's injunction). The court will provide a mechanism for the parties to address these issues.

**FN13.** Hereinafter, all docket items referenced by the court refer to the *Jersey Dental* action, Civ. No. 01-267.

**FN14.** *Cf. Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir.2004).

**FN15.** 10 Del. C. § 3104(c).

**FN16.** Defendants have not challenged the sufficiency of service under Delaware's long-arm statute.

**FN17.** Plaintiffs assert that Ryker Dental has been succeeded by Zila, Inc., a Delaware corporation. (D.I. 289 at 20) Ryker Dental asserts that Zila, Inc. is not its successor, but its parent corporation, and has submitted a Certificate of Existence issued by the Commonwealth of Kentucky which demonstrates that Ryker Dental is a distinct corporate entity in good standing in that state. (D.I.295, ex. A) As Zila, Inc. is not a party to this litigation, and the record demonstrates that Ryker Dental and Zila, I nc. maintain distinct corporate indentities, plaintiffs' assertions that

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890

**(Cite as: 2007 WL 2807292 (D.Del.))**

Ryker Dental is an inhabitant of Delaware (and has "waived any objection to venue") are unpersuasive.

FN18. Because jurisdiction based on specific contacts is lacking, there is clearly no general jurisdiction based upon "systematic" or regular contacts with this forum. 10 Del. C. § 3104(c)(4).

FN19. The court in *Cumberland Truck Equipment Co. v. Detroit Diesel Corporation, 401 F.Supp.2d 415 (E.D.Pa.2005),* analyzed in detail three distinct approaches utilized by district courts for assessing proper venue when a plaintiff asserts personal jurisdiction pursuant to section 12:(1) courts that "suggest that a plaintiff suing a domestic defendant for antitrust violations must use the [s]ection 12 venue clause exclusively, but allow a plaintiff suing an alien defendant to use the general alien venue statute, 28 U.S.C. § 1391(d)"; (2) courts that allow plaintiffs to establish venue under section 12 or an alternative source interchangeably; and (3) courts that "find that the [s]ection 12 venue claims is the exclusive venue for all defendants, alien and domestic, and it preempts the general venue statutes." *Id. at 420* (collecting cases). The district court in *Automotive Refinishing,* affirmed by the Third Circuit, noted that [t]he broad grant of venue under [Section 1391(d) ] is inapplicable to domestic corporations ... [N]othing in *Go-Video, Inc. v. Akai Electric Co., 885 F.2d 1406 (9th Cir.1989)* ] permits a domestic corporation to be sued in any district. Rather, a domestic corporation could only be sued [ ] according to [s]ection 12.... *In re Automotive Refinishing Paint Antitrust Litigation, No. Civ. A. 1426, 2002 WL 31261330, *9 (E.D.Pa. July 31, 2002)* (citation omitted). The court, therefore, agrees with the rationale of *Cumberland Truck* that the Third Circuit approves of

the first approach discussed above, or allowing supplementation of section 12 venue only for alien corporations. *See Cumberland Truck Equipment Co., 401 F.Supp.2d at 420-21.*

FN20. *Supra* n. 3

FN21. The current motion is a corrected version of D.I. 272, which is denied as moot.

FN22. There is no indication, and the court does not assume, that the injunction sought by plaintiffs in the *Jersey Dental* suit would contain stricter measures than those imposed by the government's injunction, such as has been asserted by plaintiffs in the *Hess* action.

FN23. As discussed *supra* (fn.7), plaintiffs characterize count V as "[a]gainst Dentsply, for [i]njunctive [r]elief," but, aside from alleging that plaintiffs have no adequate remedy at law (*id.* at 175), plaintiffs fail to particularly request injunctive relief with respect to Dentsply in the body of that count. (*See* D.I. 249 at ¶ 187 (seeking damages from the dealer defendants, a declaratory judgment that the dealers' actions violate section 1 of the Sherman Act, and generally, "a permanent injunction enjoining the continuing violation of [s]ection 1")) The parties have not addressed this discrepancy. For purposes of the present motion, and consistently with the parties' arguments, the court has treated count V as seeking injunctive relief from Dentsply.

FN24. Plaintiffs point only to paragraphs 71-74 of the amended complaint in support for their argument that specific intent was pled. (D.I. 288 at 34; D.I. 290 at 27-28)

FN25. Similarly, plaintiffs have not proffered facts that could demonstrate a "concerted action" between the defendants as required for plaintiffs' section 1 claims

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890
**(Cite as: 2007 WL 2807292 (D.Del.))**

(counts IV & V). *See Cosmetic Gallery, Inc. v. Schoeneman Corp., 495 F.3d 46, 55 (3d Cir.2007)* ("[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.") (citation omitted); *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir.1988)* ("[A] plaintiff must plead the essential facts of a horizontal restraint or group boycott in order to plead either properly.... A general allegation of conspiracy without a statement of facts is an allegation of a legal conclusion and insufficient to constitute a cause of action.") (quoting *Black & Yates v. Mahogany Ass'n, 129 F.2d 227, 231-32 (3d Cir.1941)*) (internal quotations omitted).

This deficiency is especially troubling considering that the dealers had no rational motive to join a conspiracy with Dentsply which would limit the dealers' ability to sell a variety of products to its customers. *See U.S. v. Dentsply, 399 F.3d at 192* (dealers "provide laboratories the benefit of 'one stop shopping' and extensive credit services. Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources."). Dismissal of these counts, therefore, is appropriate on this alternate ground. *See Brunson Communs., Inc. v. Arbitron, Inc., 239 F.Supp.2d 550, 562 (E.D.Pa.2002)* ("[U]nder any theory, Plaintiff has not alleged the essential statutory element of concerted activity ... The facts alleged in the Amended Complaint are extremely vague and do not sufficiently describe any contract, combination or conspiracy") (dismissing section 1 claim).

--- F.Supp.2d ----, 2007 WL 2807292 (D.Del.), 2007-2 Trade Cases P 75,890

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

United States District Court, D. Delaware.
UNITED STATES of America, Plaintiff,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
HOWARD HESS DENTAL LABORATORIES IN-
CORPORATED and Philip Guttierez d/b/a
Dentures Plus, on behalf of themselves and all oth-
ers similarly situated,
Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
Amnon KAMINER, Frieda Simon and Lorraine
Goldsmith, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., Defendant.
**No. CIV. A. 99-005-SLR, CIV .A. 99-255-SLR,
CIV. A. 99-854-SLR.**

March 30, 2001.

Carl Schnee, United States Attorney and Judith M.
Kinney, Assistant United States Attorney, United
States Attorney's Office, Wilmington, Delaware.
William E. Berlin, Esquire and Jon B. Jacobs, Es-
quire of the United States Department of Justice,
Antitrust Division, Washington, D.C.

Pamela S. Tikellis, Esquire and Robert J. Kriner,
Esquire of Chimicles & Tikellis, Wilmington,
Delaware. Counsel for plaintiffs Howard Hess
Dental Laboratories et al. Thomas A. Dubbs, Es-
quire and Hollis L. Salzman, Esquire of Goodkind
Labaton Rudoff & Sucharow, New York, New
York. Of counsel for plaintiffs Howard Hess Dental
Laboratories et al.

Neal J. Levitsky, Esquire of Agostini, Levitsky,
Isaacs & Kulesza, Wilmington, Delaware. Counsel
for plaintiffs Amnon Kaminer et al. Sigmund S.
Wissner-Gross , Esquire, May Orenstein, Esquire,
and Allen M. Eisenberg, Esquire of Heller, Horow-
itz & Feit, New York, New York. Of counsel for
plaintiffs Amnon Kaminer et al.

James P. Hughes, Esquire and John W. Shaw, Es-
quire of Young, Conaway, Stargatt & Taylor,
Wilmington, Delaware. Counsel for defendant
Dentsply International, Inc. Margaret M. Zwisler,
Esquire, Richard A. Ripley, Esquire, Kelly A.
Clement, Esquire, Eric J. McCarthy, Esquire, and
David P. Burns, Esquire of Howrey Simon Arnold
& White, Washington, D.C. Of counsel for defend-
ant Dentsply International, Inc.

MEMORANDUM OPINION

ROBINSON, Chief J.

**I. INTRODUCTION**

**\*1** Plaintiff United States of America ("the govern-
ment") filed an antitrust action against Dentsply In-
ternational Inc. ("Dentsply") on January 5, 1999.
Dentsply makes and sells artificial teeth and other
dental merchandise. The government generally al-
leges that Dentsply uses anticompetitive tactics to
keep its competitors from entering the artificial
tooth market.

Plaintiff Howard Hess Dental Laboratories, Inc.
and Philip Guittierez d/b/a Dentures Plus
(hereinafter referred to collectively as "the Hess
plaintiffs") filed an antitrust class action against
Dentsply on April 21, 1999. The Hess plaintiffs are
dental laboratories. Plaintiffs Amnon Kaminer,
Frieda Simon, and Lorraine Goldsmith (hereinafter
referred to collectively as "the Kaminer plaintiffs")
filed another class action against Dentsply in the
Supreme Court of the State of New York on behalf
of a consumer class . [FN1] Dentsply removed that
action on diversity grounds to the United States
District Court for the Southern District of New
York, which transferred the action to this court on
November 29, 1999 pursuant to 28 U.S.C. §
1404(a).

> FN1. The Kaminer plaintiffs' counsel in-
> dicated that Amnon Kaminer will be with-
> drawing his claim against Dentsply. (C.A.
> No. 99-854, D.I. 63 at 1 n. 1)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

In its suit, the government specifically alleges that Dentsply 1) acted unlawfully to maintain a monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; 2) entered into unlawful restrictive dealing agreements that substantially lessen competition in violation of § 3 of the Clayton Act, 15 U.S.C. § 14; and 3) entered into unlawful agreements in unreasonable restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. As a result, the government seeks injunctive relief and costs.

The Hess plaintiffs in their case allege the same three antitrust violations as the government. In addition to injunctive relief, the Hess plaintiffs seek compensatory and treble damages for the alleged violations.

The Kaminer plaintiffs in their suit seek compensatory and treble damages for alleged violations of the antitrust laws of sixteen states and the District of Columbia.

Dentsply is a Delaware corporation with its principal place of business in York, Pennsylvania. Dentsply transacts business in and is found within this district. Thus, this court has jurisdiction pursuant to 15 U.S.C. § 22.

Currently before the court are Dentsply's motions for summary judgment on the merits of the antitrust causes of action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45) [FN2] Also before the court are Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs based on standing and statute of limitations grounds. (C.A. No. 99-255, D.I. 133, 135; C.A. No. 99-854, D.I. 48, 51)

> FN2. Unless otherwise noted, docket entries refer to submissions made in C.A. No. 99-005.

## II. BACKGROUND

This case focuses on the manufacture and sale of artificial teeth in the United States. Artificial teeth are marketed to dentists and dental laboratories for use in the fabrication of dentures. As a result of the need to match variances in the teeth in a human mouth, artificial teeth are manufactured in thousands of shade and mould [FN3] combinations. They are sold on a card of six anterior or eight posterior teeth of the same shade and mould. Thus, a full denture (one that replaces all natural teeth) requires 28 teeth and four cards. Partial dentures are constructed when only a few teeth need replacement. (D.I. 231 at 3)

> FN3. A review of the artificial teeth trade literature had found that the preferred spelling of this word is "mould" instead of "mold."

**\*2** Generally, the process of constructing a denture begins with the dentist, who writes a denture "prescription" that specifies size, shape, and color requirements for the teeth in the denture appliance and sends it to a dental laboratory for fabrication. The dental laboratories purchase artificial teeth from dental product dealers, from artificial teeth manufacturers, or from other dental laboratories. (*Id.* at 3-4) The dental product dealers purchase artificial teeth from manufacturers such as Dentsply, Vita Zahnfabrik H. Rauter GmbH & Co. KG ("Vita"), and Ivoclar AG ("Ivoclar")). (D.I. 244 at 3)

A. The Relevant Market and its Participants

The relevant market for purposes of this action is the sale of prefabricated, artificial teeth in the United States. [FN4] (D.I.1, ¶ 5) Dentsply is the world's leading manufacturer of dental prosthetics and other dental products. Its Trubyte Division sells, among other things, the artificial teeth used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.*) Dentsply distributes its teeth exclusively through dental laboratory dealers. (D.I. 231 at 7)

> FN4. Dentsply accepts the government's market definition for the purposes of this summary judgment motion. (D.I. 231 at 23 n. 41)

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

The government alleges that Dentsply has maintained a market share in the artificial tooth market of 70% to 80% for the past ten years. (D.I.1, ¶ 7) Dentsply distributes its artificial teeth through approximately 30 dental laboratory dealers ("Trubyte dealers") with 200 branch outlets. Dentsply and the Trubyte dealers are not bound by a written contractual agreement. Trubyte dealers purchase teeth on a purchase order basis.

In 1995, Dentsply distributed its teeth through approximately 37 dental laboratory dealers with 238 branch outlets. (D.I. 233 at A-276-79). At that time, there were 344 "dental dealers" according to the Twenty-third Annual Directory of U.S. Dental Dealers. (*Id.* at A-280-311) Five years later, Dentsply distributed Trubyte teeth to only 30 dealers with 200 branch outlets. (*Id.* at A-312-27; D.I. 234 at A-534)

Dentsply's biggest competitors are Vita and Ivoclar. Vita is a German company that manufactures and sells premium teeth throughout the world. Vita distributes its teeth in the United States through Vident, Inc. ("Vident"). Vident uses approximately 15 non-Trubyte subdealers to distribute Vita teeth. (D.I. 236 at A-1014-15) Ivoclar is a Liechtenstein company that manufactures and sells artificial tooth lines throughout the world. In the United States, Ivoclar promotes, sells, and distributes teeth through Ivoclar NA, its wholly-owned subsidiary. (D.I. 231 at 11) Ivoclar distributes its teeth directly to dental laboratories and has attempted to sell teeth through dental laboratory dealers. (D.I. 245 at B-1129) Other smaller competitors include Universal Dental Company, Austenal, Inc., and Heraeus Kulzer GmbH. (D.I. 231 at 16-18)

1. The Hess Plaintiffs

The Hess plaintiffs represent a putative class of dental laboratories seeking money damages and injunctive relief. In their complaint, the Hess plaintiffs allege that they purchased Trubyte teeth from a Dentsply dental laboratory dealer at artificially high prices caused by Dentsply's unlawful restraint of trade and monopolization. (C.A. No.

99-255, D.I.1, ¶ 4) The Hess plaintiffs purport to represent "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply dealers .... Excluded from the Plaintiff Class are ... any co-conspirator[s] of the defendant ...." (*Id.,* ¶ 10)

**\*3** The named Hess plaintiffs purchased artificial teeth from dental laboratory dealers and, therefore, are indirect purchasers. The dental laboratory dealers, on the other hand, are the direct purchasers. In their opposition to Dentsply's motions for summary judgment, the Hess plaintiffs claim that some dental laboratories purchase artificial teeth from Dentsply. (C.A. No. 99-255, D.I. 151 at 44) This is done in one of two ways. First, Dentsply "drop ships" teeth to laboratories at the request of its dealers. Drop shipping occurs when a laboratory places an order with its dealer, which the dealer cannot fill out of its existing inventory. (D.I. 256 at C-13) The dealer sends the order, along with its dealer purchase order number, to Dentsply and directs Dentsply to ship the teeth directly to the laboratory. Dentsply then charges the dealer for the shipment. (*Id.*) The second way that laboratories "directly" purchase teeth from Dentsply is through the Dentsply Order Network ("DON"). The DON is an internet-based system that allows laboratories to order products by scanning a bar code of the product it wants. (*Id.* at C-139) That information goes to a network communications company who sends the order to the dealer selected by the laboratory. [FN5] (*Id.* at C-148) The laboratory then fills the order just as if it received it on the telephone.

> FN5. The system also allows customers to order directly from Dentsply. (D.I. 256 at C-148) The Hess plaintiffs have not offered evidence that they or anyone else has used the DON to order directly from Dentsply.

2. The Kaminer Plaintiffs

The Kaminer plaintiffs represent a putative class comprised of

[a]ll individuals and entities who purchased false

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

teeth manufactured by [Dentsply], from entities or persons other than [Dentsply] in New York, Alabama, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia, Wisconsin, and the District of Columbia.

(C.A. No. 99-854, D.I.1, Ex. A, ¶ 40) Although the class covers all indirect purchasers [FN6], the named plaintiffs are residents of New York who purchased dentures in New York from New York dentists. (C.A. No. 99-854, D.I. 64, Ex. C at 6; Ex. D at 6) The Kaminer plaintiffs allege that Dentsply has restrained trade in the United States market for prefabricated artificial teeth in violation of New York Gen. Bus. Law § 340 and the indirect antitrust laws of fifteen states and the District of Columbia.

> FN6. The court notes that since the Kaminer class purports to cover all indirect purchasers, the Hess plaintiffs would also be included in that class.

B. Dentsply's Dealer Criteria

The focal point of this antitrust suit is Dentsply's "Dealer Criteria." Dentsply published its Dealer Criteria in 1993. The Dealer Criteria lists requirements for becoming and remaining an authorized Dentsply Trubyte dealer. (D.I. 245 at B-272) Among other things, the Dealer Criteria provides that "dealers that are recognized as authorized distributors may not add further tooth lines to their product offerings." (*Id.* at B-273) There is no contractual agreement between Dentsply and its Trubyte dealers. Thus, although Trubyte dealers may not add a competing line of teeth, they can switch to a rival manufacturer at any time. (D.I. 231 at 21)

*4 All of the plaintiffs in these cases (collectively, "plaintiffs") allege that this exclusive dealing policy was designed to and has thwarted competitors' attempts to build a dealer network and thus compete effectively in the United States. (D.I.1, ¶ 30) Plaintiffs further allege that Dentsply, through its exclusive dealing policy, has undermined the efforts of competitors to maintain or recruit dental

laboratory dealers and has induced some dealers to stop distributing competitors' teeth. (D.I.1, ¶ 31) For example, in 1987, Frink Dental ("Frink"), a Trubyte dealer, agreed to start selling a competing tooth line. Dentsply terminated Frink as both a tooth and merchandise dealer. Dentsply also threatened to terminate other dealers that were supplying Frink with Trubyte teeth. Frink eventually agreed to stop selling the competing tooth line, and Dentsply reinstated Frink as a Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1493; D.I. 245 at 1540-48)

Atlanta Dental Supply ("ADS") is another example of a Trubyte dealer whom Dentsply allegedly intimidated into foregoing a competitive tooth line. Sometime after 1993, ADS became interested in selling a competitive tooth line because it received a number of requests for them. ADS reached a tentative agreement with the competitor, but backed off the deal after Dentsply threatened to drop ADS as an authorized Trubyte dealer. (D.I. 244 at 6; D.I. 245 at B-1737-58)

In 1994, Pearson Dental Supply ("Pearson"), an authorized Trubyte dealer, took on a consignment of Vita teeth and began advertising them in its product catalog. Dentsply threatened to terminate Pearson. Pearson dropped Vita and then decided not to add a different competitor's line. (D.I. 244 at 6; D.I. 245 at B-1827-48)

In 1995, Dentsply permitted one of its former dealers, Dental Technicians Supply ("DTS"), to resume selling Trubyte teeth only after DTS agreed to stop selling Vita, Ivoclar, and Justi teeth in its Kansas City, Denver, and Orlando locations. Dentsply placed different restrictions on DTS's New York location that allowed DTS to continue selling Vita. (D.I. 244 at 6; D.I. 245 at B-2048- 80; 333-40; 236-44)

In November 1998, DTS was acquired by Darby Dental ("Darby"), a Trubyte dealer that was not permitted to sell Vita in any location. When Darby acquired DTS's New York office, Darby management wanted to retain the Vita line in order to satisfy existing New York DTS customers. Dentsply in-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

sisted that if Darby were to sell Vita in its newly acquired New York office, Darby would be violating the Dealer Criteria. Dentsply gave Darby six months to exhaust DTS's Vita supply and offered to buy the remaining Vita inventory so that Darby would be in compliance. (C.A. No. 99-854, D.I. 64 at DPLY-A-018242-43)

C. Alleged Anticompetitive Effects of Dentsply's Restrictive Dealing Agreements

Plaintiffs allege that Dentsply, through its Dealer Criteria and other conduct, has entered into restrictive dealing arrangements with dental laboratory dealers, and sold teeth to them, on the condition that those dealers not deal with rival manufacturers. Plaintiffs allege that independent dental laboratory dealers have been, and continue to be, the primary channel of distribution of artificial teeth to dental laboratories. (D.I.1, ¶ 14) Dentsply's Trubyte Division distributes its teeth through a network of these independent dental laboratory dealers who collectively constitute approximately 80% of the outlets distributing artificial teeth and other dental laboratory products in the United States. (D.I.1, ¶ 16) Because Dentsply has a substantial market share, many dental laboratories currently use Dentsply Trubyte teeth and expect local dental laboratory dealers to have the Trubyte line available. By requiring the dental laboratory dealers to carry only the Trubyte line of teeth, plaintiffs allege that competitors are not able to effectively compete in the United States. (D.I.1, ¶ 24, 30) Plaintiffs further allege that Dentsply's conduct has undermined the efforts of small domestic competitors of Dentsply in the United States to maintain or recruit dental laboratory dealers. (D.I.1, ¶ 31)

**\*5** Dentsply contends that because its exclusive dealing policy does not foreclose its competitors from the market for artificial teeth in the United States, the policy is not forbidden under the Sherman or Clayton Acts. Dentsply argues that rather than being foreclosed from the relevant market, alternative channels of distribution exist for Dentsply's rivals. For example, Ivoclar and Vita sell teeth directly to dental laboratories without going

through an intermediary--a dental laboratory dealer. Thus, even if Dentsply's restrictive dealing arrangement has the effect of foreclosing access to dental laboratory dealers, Ivoclar, Vita, and other manufacturers can reach the end users--the dental laboratories--without hindrance. Trubyte dealers are free to stop selling Dentsply teeth and switch to a rival at any time. Dentsply further supports its restrictive dealing policy by arguing that it has procompetitive benefits.

D. Standing

Dentsply filed motions for summary judgment on standing grounds against the Hess and Kaminer plaintiffs. Dentsply's standing arguments against the Hess plaintiffs center around the Supreme Court's decision in *Illinois Brick,* [FN7] while the standing arguments against the Kaminer plaintiffs relate to the named plaintiffs' ability to maintain a class action antitrust suit.

> FN7*. Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

E. Statutes of Limitations

Dentsply filed motions for summary judgment on statute of limitations grounds against the Hess and Kaminer plaintiffs. The allegations against both sets of plaintiffs are essentially the same . [FN8]

> FN8. Because the statute of limitations for antitrust actions in Maine and Wisconsin is six years, Dentsply does not seek summary judgment on statute of limitations grounds for claims arising under those laws. The federal antitrust laws and the antitrust laws of all other states involved here provide a limitations period of four years or less. *See* discussion *infra* Section IV.D.

Dentsply argues that the Hess and Kaminer plaintiffs' claimed injuries are derived from Dentsply's Dealer Criteria which was announced in February 1993. The Hess and Kaminer plaintiffs filed their suits in 1999, more than four years after Dentsply announced the policy. As a final, binding ver-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

sion of an allegedly anticompetitive policy, Dentsply argues that the suits are time-barred because they were not filed within four years after February 1993.

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).* "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995)* (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita, 475 U.S. at 587* (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995).* The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).*

## IV. DISCUSSION

**\*6** Plaintiffs charge that by agreeing with some dental laboratory dealers that the dealers would not carry competitive tooth lines, Dentsply willfully maintained and abused a monopoly in the United States market for prefabricated artificial teeth in violation of § 2 of the Sherman Act, 15 U.S.C. § 2. (D.I.1, ¶ 41) Plaintiffs allege that by entering into, maintaining, and enforcing these restrictive dealing agreements, Dentsply causes a substantial lessening of competition in the relevant market in violation of § 3 of the Clayton Act, 15 U.S.C. § 14, and unreasonably restrains trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

### A. Antitrust Claims

### 1. The Legal Standard

Plaintiffs' first cause of action is Dentsply's alleged violation of § 2 of the Sherman Act. Section 2 prohibits a business with monopoly power from maintaining that monopoly power through means that go beyond competition on the merits. [FN9] To prove a claim under § 2, the plaintiffs must show that 1) Dentsply has a monopoly and 2) Dentsply maintained that monopoly through anticompetitive conduct as opposed to accident or superior business acumen. *See United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).*

> FN9. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...." 15 U.S.C. § 2.

Plaintiffs' second cause of action alleges violations of § 1 of the Sherman Act and § 3 of the Clayton Act. Section 1 of the Sherman Act provides that, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1. Only unreasonable restraints of trade are prohibited. *See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988).* Thus, to establish

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

a claim under § 1 of the Sherman Act, plaintiffs must show that 1) there was a contract, combination, or conspiracy; 2) that unreasonably restrained trade; and 3) affected interstate commerce. *See Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp., 185 F.3d 154, 157 (3d Cir.1999).* All exclusive dealing agreements must comply with § 1 of the Sherman Act. *Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992),* citing *American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1239 (3d Cir.1975).*

Section 3 of the Clayton Act makes it unlawful for a person to sell goods on the condition, agreement, or understanding that the purchaser shall not deal in the goods of a competitor where the effects of such conditions, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 14. In order to prove a claim under § 3 of the Clayton Act, plaintiffs must prove that the probable effect of Dentsply's restrictive dealing agreements is to decrease competition. *See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356 (1922).* Exclusive dealing contracts are unlawful where they significantly foreclose the opportunity for rivals to enter or remain in the market. *See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327-29 (1961). See also,* Stephen F. Ross, *Principles of Antitrust Law,* 304-05 (1993). If an exclusive dealing policy "does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of [§ 1 and § 2 of the Sherman Act.]" *Tampa Electric,* 365 U.S. at 335.

2. Analysis

**\*7** Dentsply argues in support of its motions for summary judgment that its exclusive dealing agreements do not foreclose its rivals from reaching the end users--the dental laboratories. Dentsply points to four factors identified in the caselaw that preclude a claim of foreclosure:

• Competitors use other dealers;
• Competitors sell directly to end users;
• Competitors can pursue new dealers; and
• Dealers can switch to the defendant's competit-

ors.

In this regard, Dentsply contends that where the record demonstrates the above factors, exclusion from the dealers of the defendant has been held not to constitute a substantial lessening of competition.

Dentsply is correct in its assertion that, in the cases it cites, no antitrust violations were found. Of the five cases cited, however, three were decided after trial on the merits. One was decided on a preliminary injunction record. [FN10] Only one was decided on a summary judgment record. *See CDC Techs. v. IDEXX Labs ., 186 F.3d 74 (2d Cir.1999).* [FN11] In that case, plaintiff CDC Technologies ("CDC") sold blood analysis machines to veterinarians. It filed suit against its competitor, IDEXX Laboratories ("IDEXX"), and alleged, among other things, unlawful restraint of trade in violation of § 3 of the Clayton Act and monopolization and conspiracy to monopolize in violation of § 1 of the Sherman Act. In particular, CDC alleged that IDEXX illegally entered into exclusive dealing arrangements with CDC's former distributors. The distributors' role with CDC had been to provide CDC with the names of veterinarians potentially interested in purchasing blood analysis machines. IDEXX, a later entrant in the market, signed up CDC's distributors to play the same role in furnishing the names of likely veterinarians. The distributors did not purchase or resell the machines; rather, they merely located prospective customers.

FN10. In that case, *Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380 (7th Cir.1984),* the court specifically held that, "although we have concluded that the district judge should not have granted Roland's motion for a preliminary injunction, our discussion of the probable merits of Roland's antitrust claim is tentative. We do not exclude the possibility that on the fuller record made in the trial on the merits Roland will succeed in establishing its claim." *Id. at 395-96.*

FN11. Therefore, while some general principles may be distilled from these de-

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

cisions, all but one are distinguishable based upon the procedural posture of this case.

The district court granted IDEXX's motion for summary judgment, concluding that CDC could not prove that the exclusive dealing arrangements had anticompetitive effects because: 1) the role of the distributors was so limited; 2) CDC had successfully used other techniques to reach end users; and 3) the exclusive dealing arrangements were of short duration and easily terminable. *Id.* at 75. On appeal, the Second Circuit affirmed the grant of summary judgment, finding that CDC's Clayton Act claim failed on a threshold level because the Clayton Act "does not regulate an arrangement with a distributor or middleman unless it involves actual sales." *Id.* at 75-76.

Of the three remaining cases, none have facts comparable to those at bar. For instance, in *U.S. Healthcare v. Healthsource*, 986 F.2d 589 (1st Cir.1993), the court found no antitrust violations where defendants controlled only 4% to 5% of the relevant market and the doctors who had signed the exclusivity contracts at issue were not prohibited from seeing patients from the plaintiff HMOs; the only consequence of their doing so was that the doctors would lose the pay differential for being an exclusive service provider. In the district court's opinion, such an "exclusive clause [was] simply not 'an exclusive dealing arrangement' cognizable under antitrust laws." ' *U.S. Healthcare v. Healthsource,* 1992 U.S. Dist. LEXIS 5826 at * 26 (citing *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.,* 663 F.Supp. 1360, 1478 (D.Kan.1987)). The appellate court affirmed.

**\*8** The defendant in *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215 (8th Cir.1987), had been one of plaintiff Ryko's distributors. Under its distributor contract, Eden had an exclusive geographic territory and was prohibited from selling competitive car-wash equipment, including a water reclaim device developed by Eden. In examining the exclusive dealing provisions of the distributor contract under § 1 of the Sherman Act and § 3 of the

Clayton Act, the court declared that

> exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of the market in which the foreclosure occurs.

*Id.* at 1234. With Ryko's market share of 8% to 10%, the court concluded that Eden had not shown that the restraint had a probable adverse effect on interbrand competition.

> Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of the antitrust law is the protection of competition, not individual competitors; the law is not designed to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern.

*Id.*

Finally, the court in *Omega Envtl. v. Gilbarco, Inc.,* 127 F.3d 1157 (9th Cir.1997), concluded that Omega had not shown at trial that Gilbarco's exclusive dealing policy foreclosed competition in the market under the Clayton Act. In so concluding, the court noted that Gilbarco's policy foreclosed roughly 38% of the relevant market for sales, a "significant" foreclosure rate. Nevertheless, the court recognized under the rule of reason that other factors weighed against a finding of unreasonable restraint of trade.

> First, exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern.... The record contains undisputed evidence that direct sales to end-users are an alternative channel of distribution in this market.... The record also contains undisputed evidence of potential alternative sources of distribution.
> Second, the short duration and easy termination of these agreements negate substantially their potential to foreclose competition.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

*Id.* at 1163-64.

Based upon its reading of the above caselaw, Dentsply asserts that its Dealer Criteria satisfies each of the four factors considered by courts in evaluating the competitive effects of exclusive dealing policies. First, Dentsply's competitors use different dental laboratory dealers to sell to dental laboratories. For example, Vita sells its teeth through Vident and Vident's subdealers. Second, some of Dentsply's competitors sell directly to the end users. For example, Ivoclar distributes its artificial teeth directly to dental laboratories in the United States. Third, its competitors could pursue new dealers. Dentsply claims there are 344 "dental dealers" in the United States, of which only approximately 30 are Trubyte dealers. Finally, the Trubyte dealers can switch to competing tooth lines at any time. No contract binds a Trubyte dealer to Dentsply. Dealers are free to switch to Vita, Ivoclar, or any other tooth manufacturer at any time.

**\*9** While the court agrees that the existence of alternative channels of distribution to end users lessens the likelihood that an exclusive dealing policy forecloses competition in the relevant market, Dentsply has not met its burden of showing that it is entitled to judgment as a matter of law. A genuine issue of material fact still exists as to whether selling directly to the end users is a viable option for manufacturers of artificial teeth.

Moreover, a genuine issue of material fact exists with respect to the foreclosure rate. Dentsply claims that the foreclosure rate in this case is approximately 10% because it only controls 30 of the over 300 "dental dealers." The government claims, however, that the number of available dental laboratory dealers is far less than what Dentsply claims. Dentsply relies on the figure of "dental dealers" listed in the Directory of U.S. Dental Dealers. That number, according to the government, includes "operatory" dealers. These operatory dealers sell various merchandise and equipment to dentist offices as opposed to the dental laboratories who purchase teeth. Dentsply has not convinced the court that these "operatory" dealers "have actual or potential

ability to deprive existing dental laboratory dealers of significant levels of business." *Id.* at 1163, citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1374 (9th Cir.1989).

Dentsply also argues that because its exclusive dealing policy has procompetitive benefits, plaintiffs must prove that rivals are foreclosed from the market to maintain their claims. For example, Dentsply markets and promotes its teeth to dental laboratories, dentists, and dental students through national advertising, sales calls by its sales representatives, and through training and education programs. (D.I. 231 at 35) Dentsply claims that its ability to recoup its investment in these promotional efforts necessarily depends upon its ability to restrict its dealers from distributing rival tooth products. (*Id.*) Dentsply is correct that the plaintiffs have the ultimate burden of proving that the probable effect of the Dealer Criteria is to "foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric,* 365 U.S. at 327. However, even if Dentsply creates demand for its Trubyte teeth, Dentsply has not presented enough evidence to demonstrate as a matter of law that its business justifications prevent the plaintiffs from meeting their burdens.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on the merits of the antitrust action. (C.A. No. 99-005, D.I. 230; C.A. No. 99-255, D.I. 130; C.A. No. 99-854, D.I. 45)

B. Standing Under Federal Antitrust Laws

1. The Legal Standard

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). Although the Clayton Act provides relief to anyone injured, the Supreme Court limited the scope of injured plaintiffs in *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

Case 1:08-cv-00483-SLR     Document 23-2     Filed 12/07/2007     Page 40 of 72     Page 10

**\*10** In *Illinois Brick,* the State of Illinois and 700 local government entities sought treble damages from defendant concrete block manufacturers under § 4 of the Clayton Act for an alleged price-fixing conspiracy. Plaintiffs alleged that the defendants had passed on overcharges resulting from the price-fixing conspiracy to masonry contractors who then passed on the overcharges to general contractors who then passed the overcharges to plaintiffs who purchased buildings made from concrete block. The plaintiffs, therefore, were indirect purchasers of concrete block. *Id.* at 726-27.

The issue before the Supreme Court was whether indirect purchaser plaintiffs could use the "pass on" theory to state a damage claim against an alleged antitrust violator. Previously, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481 (1968), the Court held that antitrust defendants could not argue that plaintiffs seeking treble damages were not injured because the plaintiffs had "passed on" the illegal overcharge to their own customers. *Id. at 489.* Maintaining consistency, the *Illinois Brick* Court held that antitrust plaintiffs could not claim an injury resulting from overcharges passed on to them through those who purchased directly from the defendant. *Illinois Brick,* 431 U .S. at 724-26, 735. The Court gave three reasons why the *Hanover Shoe* rule would apply to both plaintiffs and defendants. First, symmetry was necessary to avoid multiple liability. Without symmetry, both the brick masons and the state could sue the defendants and recover the full amount of the overcharge. *Id. at 730.* Second, the Court was concerned that judicial analysis of pass-on arguments would increase the complexity of antitrust litigation. *Id. at 731-32,* Finally, the majority argued that the private attorney general rationale underlying § 4 is best served by keeping all relief in the hands of the direct purchaser. *Id. at 737-47, See generally,* Ross, *supra,* at 218-19.

The Supreme Court has identified some exceptions to the indirect purchaser rule. In *Illinois Brick* itself, the Court noted that exceptions to the indirect purchaser rule would include situations where the indirect purchaser acquired goods through a preex-

isting cost-plus contract or "where the direct purchaser is owned or controlled by its customer." *Illinois Brick,* 431 U.S. at 736 & n. 16.

Since *Illinois Brick,* the Court has issued two notable opinions regarding antitrust standing. In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC* "), the Supreme Court synthesized its previous rulings on antitrust standing by analyzing five factors to resolve the standing issue before it. As the Third Circuit explained in *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996), the Supreme Court considered 1) the causal connection between the antitrust violation and the harm to the plaintiff, 2) whether the antitrust injury is "of the type that the antitrust statute was intended to forestall," 3) the directness or indirectness of the asserted injury, 4) the existence of more direct victims of the alleged violation, and 5) the potential for duplicative recovery or complex apportionment of damages. *See id.* at 850 (citing *AGC,* 459 U.S. at 537-44).

**\*11** In *Kansas v. Utilicorp United, Inc.,* 497 U.S. 199 (1990), plaintiffs, state attorneys general representing residential users of natural gas, sued various producers of natural gas who allegedly conspired to fix prices. The indirect purchaser plaintiffs argued that *Illinois Brick* did not apply because the concerns regarding risk of multiple recovery and difficulty in apportionment would not be implicated where the regulated utilities passed on one hundred per cent of their costs to customers. *Id. at 208.* The Court rejected the plaintiffs' theory, holding that the absence of a particular *Illinois Brick* predicate in an individual case does not change the bar against indirect purchaser suits. "[E]ven assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id. at 217.*

In addition to *Illinois Brick* 's "control exception," several courts have recognized a "co-conspirator exception." *See, e.g.,* *McCarthy,* 80 F.3d at 855. Under this exception, indirect buyers have standing

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy. *Id.* at 854. The Third Circuit, however, has "refused to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants." *Id.*

2. Analysis

The Hess plaintiffs attack the standing issue with several theories. First, they assert that some dental laboratories are "direct" purchasers from Dentsply for purposes of *Illinois Brick* . [FN12] The Hess plaintiffs claim that when Dentsply drop ships teeth directly to a dental laboratory or when the laboratory orders teeth through the internet-based DON, the Hess plaintiffs are direct purchasers and, thus, are entitled to pursue a damage claim under § 4 of the Clayton Act. When teeth are drop shipped or ordered through the DON, the shipment may go directly from Dentsply's York, Pennsylvania plant to the dental laboratory. According to § 2-103(d) of the Uniform Commercial Code, Dentsply is the "seller" of the goods. Section 2-106(1) defines a "sale" as "consist [ing] of the passing of title from the seller to the buyer for a price." Finally, § 2-401(2) dictates that such title passes to the buyer at the time and place for physical delivery of the goods. The Hess plaintiffs argue that since the Trubyte dealers never have physical custody of the teeth, title never passes to them. Since title passes directly from Dentsply to the dental laboratory, the Hess plaintiffs claim they are direct purchasers.

> FN12. The Hess plaintiffs' complaint specifically limits the class to "all dental laboratory purchasers of any Dentsply products who purchased such products through Dentsply Dealers ...." (C.A. No. 99-255, D.I.1, ¶ 10) (emphasis added). In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs claimed that "discovery has revealed that a substantial portion of Dentsply's sales are made directly to labs." (C.A. No. 99-255, D.I. 151 at 44 n. 21) The Hess plaintiffs offered to amend the

complaint to allege that some laboratories purchased teeth directly from Dentsply. (*Id.*)

The court rejects this theory foremost because the complaint specifically alleges that the Hess plaintiffs are not direct purchasers. The named plaintiffs do not claim to have themselves purchased teeth directly from Dentsply. The court is likewise not convinced that this creative title theory is sufficient to overcome *Illinois Brick.* When a dental laboratory places an order through the DON or the teeth are drop shipped, the Trubyte dealer is still involved in the transaction. The dental laboratory pays the Trubyte dealer for the teeth and the Trubyte dealer in turn pays Dentsply. Because the Trubyte dealer acts as an intermediary between the dental laboratory and Dentsply, the court finds that the Hess plaintiffs are not direct purchasers under this theory.

***12** The Hess plaintiffs next argue that even if they are indirect purchasers, they have standing because the Trubyte dealers are co-conspirators of Dentsply and, therefore, *Illinois Brick* does not apply. The Hess plaintiffs did not join the dental laboratory dealers as co-conspirators. Instead, the named Hess plaintiffs signed stipulations with 22 of the 26 Trubyte dealers. (C.A. No. 99-255, D.I.175) The stipulations provide that the Trubyte dealers will release Dentsply from all claims for antitrust violations in exchange for the named plaintiffs agreeing not to file suit against the Trubyte dealers. According to the Hess plaintiffs' expert, Raymond S. Hartman, that group of 22 Trubyte dealers represents approximately 95% of the gross sales of Dentsply's Trubyte tooth products. (*Id.,* ¶ 3) The Hess plaintiffs argue that the stipulations alleviate the concerns of duplicative recovery and difficulty in apportionment. Without addressing the merit of that claim, [FN13] the court declines to make a new exception to *Illinois Brick* in light of 1) the Third Circuit's "refus[al] to adopt such an exception where the alleged co-conspirators immediately upstream were not also joined as codefendants," *McCarthy,* 80 F.3d at 854, and 2) the Supreme Court's ruling in *Utilicorp* whereby the Court invoked *Illinois Brick* to deny

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

indirect purchaser standing even though the same economic assumptions in *Illinois Brick* were not present. 497 U.S. at 217.

> FN13. The court is not convinced that the stipulations will have the purported effects of eliminating duplicative recovery or difficulty in apportionment. The stipulations are only between the named plaintiffs and the 22 individual Trubyte dealers. Even if this court were to certify the class of dental laboratory dealers, the stipulations would not bind those class members who opt out of the class.

Next, the Hess plaintiffs argue that Dentsply exerts virtual control over its Trubyte dealers and, therefore, *Illinois Brick* does not apply. The co-conspirator exception has been recognized in the Third Circuit when an antitrust defendant actually owns the direct purchaser. *See In re Sugar Indus. Antitrust Litig., 579 F .2d 13, 18-19 (3d Cir.1978)* (permitting indirect purchasers to maintain damage claims against defendant even though the plaintiffs actually purchased goods from divisions or subsidiaries of defendant). Since Dentsply does not own its authorized dental laboratory dealers, the Hess plaintiffs have failed to show that they fit within the "control exception" in its current form. The Hess plaintiffs recognize that "the Third Circuit has [not] yet extended the 'control exception' to *Illinois Brick* beyond the scope of the parent-subsidiary relationship." The Hess plaintiffs nevertheless invite the court to expand the law to situations in which the manufacturer's control over its dealers is sufficiently strong enough to eliminate any possibility that the dealers might sue. In the absence of Third Circuit precedent, the court declines to expand the law.

The Hess plaintiffs argue further that they have standing because they also seek non-overcharge damages arising out of Dentsply's monopolistic and other conduct. In their opposition to Dentsply's motion for summary judgment on standing grounds, the Hess plaintiffs indicate that if they are barred by *Illinois Brick* from proving overcharge damages,

they wish to retain the option of proving damages that, from their point of view, do not involve the difficulties of proof outlined in *Illinois Brick.* For example, the Hess plaintiffs claim that after discovery, they may be able to articulate a lost profits or other damages theory. Because the Hess plaintiffs have failed to articulate any theory of damages that would be anything other than the overcharges they incurred, the court holds that the Hess plaintiffs are barred by *Illinois Brick* from seeking money damages against Dentsply.

**\*13** The court must still decide, however, whether the Hess plaintiffs can seek injunctive relief. Section 16 of the Clayton Act provides that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. *Illinois Brick* 's indirect purchaser rule is not applicable to claims for injunctive relief. McCarthy, 80 F.3d at 856. In order to seek injunctive relief, the Hess plaintiffs must show 1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust injury. *In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 400 (3d Cir.2000).*

The Hess plaintiffs argue that they have been damaged in the form of over-payments for artificial teeth and will continue to be damaged as long as the conspiracy between Dentsply and its Trubyte dealers is allowed to remain in place. Dentsply argues that the Hess plaintiffs' claims for injunctive relief are essentially moot because the government's case also seeks injunctive relief. Dentsply suggests that the government can obtain the same relief for the Hess plaintiffs without tackling the procedural hurdles of Rule 23. Although Dentsply ultimately may be correct in its assertion, the court will reserve judgment on this issue until further argument on whether the interests of the Hess plaintiffs and those of the government are sufficiently identical to preclude the Hess plaintiffs from pursuing their claims for injunctive relief.

For the foregoing reasons, the court shall grant in part and deny in part Dentsply's motion for sum-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

mary judgment on standing grounds. (C.A. No. 99-255, D.I.133) The motion is granted to the extent that the Hess plaintiffs seek damages. The motion is denied to the extent that they seek injunctive relief.

C. Standing Under State Antitrust Laws

1. The Legal Standard

Several states have enacted statutes known as *Illinois Brick* repealers. These statutes provide that indirect purchasers may recover damages for violations of state antitrust laws where overcharges were passed on to them by direct purchasers. In *California v. ARC America Corp., 490 U.S. 93 (1989)*, the Supreme Court upheld the legality of such statutes.

Although the state laws involved here do not follow the indirect purchaser rule, most of them nevertheless look to cases construing the federal antitrust laws for guidance in interpreting their statutes. [FN14] Thus, the court will look to federal antitrust cases to determine the general standing requirements under the state antitrust laws.

> FN14. *See* D.C.Code Ann. § 28-4515 (1981); Fla. Stat. Ann. § 501.204(2) (West 1997 & Supp.1998); Mich. Comp. Laws Ann. § 445.784(2) (West 1989); N.M. Stat. Ann. § 57-1-15 (Michie 1995); S.D. Codified Laws § 37-1-22 (Michie 1994); W. Va.Code § 47-18-16 (1995); *Marshall v. Planz*, 13 F.Supp.2d 1231, 1246 (M.D.Ala.1998); *Vinci v. Waste Mgmt., Inc.*, 43 Cal.Rptr.2d 337, 338 n. 1 (Cal.Ct.App., 1st Dist.1995); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 875 F.Supp. 8, 14 (D.Me.1994); *Keeting v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn Ct.App.1987); *NAACP v. Claiborne Hardware Co.*, 393 So.2d 1290, 1301 (Miss.1980), *rev'd on other grounds*, 458 U.S. 886 (1982); *Chow v. Union Central Life Ins. Co*, 457 F.Supp. 1303, 1308 (E.D.N.Y.1978); *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C.1973); *State ex rel. Leech v. Levi Straus & Co.*, 1980 WL 4696 at *2 n. 2 (Tenn. Ch.

Ct.1980); *Grams v. Boss, 294 N.W.2d 473 (Wis.1980)*. It is not clear whether Kansas and North Dakota use the federal antitrust laws for guidance in interpreting their own antitrust statutes.

2. Analysis

The Kaminer plaintiffs maintain they have standing to seek damages under the antitrust laws of sixteen states and the District of Columbia. Dentsply attacks their standing on several grounds. First, Dentsply argues that the Kaminer plaintiffs suffered no injury under the antitrust statutes of the fifteen states other than New York and the District of Columbia. Since the Kaminer plaintiffs are New York residents who purchased dentures from a New York dentist in New York, the Kaminer plaintiffs suffered no antitrust injury in, for example, Minnesota. The Kaminer plaintiffs maintain that they only need individual standing to assert the claims of the absent class members. If the court certifies the class of indirect purchasers from the various states, the Kaminer plaintiffs contend that they will be a representative member of that class. The Kaminer plaintiffs argue that Dentsply's argument on this point is more appropriately made in opposition to class certification, not individual standing. The court agrees.

**\*14** Dentsply next argues that the Kaminer plaintiffs do not have standing because they did not participate in the relevant market. The Kaminer plaintiffs' complaint defines the relevant product market as "the sale of prefabricated artificial teeth in the United States." (C.A. No. 99-854, D.I.1, ¶ 10) The Kaminer plaintiffs purchased dentures rather than prefabricated artificial teeth. Dentsply contends that only about 6% of the price that dentists charge for dentures is attributable to the raw materials of the dentures, including the artificial teeth. (C.A. No. 99-854, D.I. 52 at 4) Despite the lack of complete identity between dentures and prefabricated artificial teeth, the court finds a sufficient nexus on the record presented between the Kaminer plaintiffs' purchases and the relevant product market. At this stage of the proceedings,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

the Kaminer plaintiffs are participants in the artificial tooth market because they arguably are unable to fill their need for dentures without becoming indirect purchasers of prefabricated artificial teeth.

Dentsply argues that the Kaminer plaintiffs' alleged injury is too remote and speculative to confer upon them antitrust standing. While the *Illinois Brick* repealers allow indirect purchasers to recover for their antitrust injuries, Dentsply argues that they do not confer automatic standing upon indirect purchasers. Instead, Dentsply asserts that the court should apply the *AGC* factors in determining standing under the state indirect purchaser statutes. The Kaminer plaintiffs argue that the purpose of the *AGC* factors is to guide the court's exercise of judgment in deciding standing in the absence of explicit statutory directives. The Kaminer plaintiffs contend that the states have issued an explicit legislative conferral of standing on indirect purchasers.

The Supreme Court in *Illinois Brick* discussed what class of persons could sue for treble damages in an antitrust action and concluded that only direct purchasers could sue. In *AGC,* however, the Court discussed the "conceptually more difficult question of 'which persons have sustained injuries too remote from an antitrust violation to give him standing to sue for damages.'" *Merican Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir.1983).* Thus, although the various states may have "repealed" *Illinois Brick* under their state schemes, that alone does not mean that they rejected the requirement that a plaintiff demonstrate injury sufficient to confer individual standing. *See, e.g., Stationary Eng'rs Local 39 Health & Welfare Trust Fund v. Philip Morris, Inc.,* 1998 U.S. Dist. LEXIS 8302, *17 n. 2, 27 (N.D.Cal.1998)(stating that although *Illinois Brick* does not apply to California antitrust statute, plaintiff must still allege a direct injury to sustain a claim).

In this regard, Dentsply argues that the Kaminer plaintiffs' theory requires proof that 1) Dentsply's Dealer Criteria and its other alleged anticompetitive behavior excluded competitive artificial tooth manufacturers from the market and limited competition

in the sale of artificial teeth to dental laboratories; 2) the limited competition enabled Dentsply to exact monopoly profits from dental laboratory dealers; 3) Dentsply in fact charged supracompetitive prices for teeth; 4) all dealers, in turn, increased the prices they charged to dental laboratories; 5) when dental laboratories used Dentsply teeth in a denture, they increased the price that they charged the dentists for the denture and the price increase was attributable to the higher cost of the teeth; and 6) when the dentist sold the denture to the plaintiffs, all dentists independently chose to increase the price that they charged for the dentures.

**\*15** Regardless of whether Dentsply is correct in its analysis of plaintiffs' burden of proof, the court concludes that there are genuine issues of material fact relating to the Kaminer plaintiffs' antitrust injury that preclude the entry of summary judgment in favor of Dentsply as a matter of law under *AGC.*

As its final argument, Dentsply contends that New York law prohibits the Kaminer plaintiffs from maintaining their state law claims as a class action. When the Kaminer plaintiffs filed their complaint, they sought to maintain their various state claims, including New York's Donnelly Act, as a class action pursuant to Section 901(b) of the New York Civil Practice Law. Section 901(b) provides:

> Unless a statute creating or imposing a penalty, or a minimum measure of recovery specifically authorizes the recovery thereof in a class action, an action to recover a penalty, or minimum measure of recovery created or imposed by statute may not be maintained as a class action.

New York State case law characterizes the Donnelly Act's treble damages remedy as penal. *See, e.g., Rubin v. Nine West Group, Inc.,* 1999 N.Y. Misc. LEXIS 655, (Sup.Ct.N.Y.Co.1999). *See also, In re Microsoft Antitrust Litig., 127 F.Supp.2d 702, 727 (D.Md.2001)* (dismissing antitrust class action claims under New York law because class actions cannot be maintained if the remedy is penal).

The Kaminer plaintiffs argue that since Dentsply removed this case to federal court, Fed.R.Civ.P. 23

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

governs this action rather than N.Y. C.P.L.R. § 901(b). The court must determine which law to apply.

The Third Circuit has recently reiterated the steps of analysis in choosing between a substantive state law and a potentially conflicting federal procedural rule. *See Chamberlain v. Giampapa,* 210 F.3d 154, 158-59 (3d Cir.2000). A federal court sitting in diversity must apply state substantive law and federal procedural law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). This substantive/procedural dichotomy of the "*Erie* rule" must be applied with the objective that "in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945). This focus on whether application of a state rule will or may affect the outcome is intended to serve "twin aims": "discouragement of forum shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer,* 380 U .S. 460, 468 (1965).

> Erie and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so important an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court.

**\*16** *Id.* at 468 n. 9.

The Supreme Court has added two caveats to these *Erie* principles. First, even though application of the state rule may hold some potential for affecting the outcome, a strong countervailing federal interest will dictate recourse to the federal rule. *Byrd*

*v. Blue Ridge Rural Electric Coop, Inc.,* 356 U.S. 525 (1958). Second, the *Erie* rule may not be "invoked to void a Federal Rule" of Civil Procedure. *Hanna,* 380 U.S. at 470. Where a Federal Rule of Civil Procedure provides a resolution of an issue, that rule must be applied by a federal court sitting in diversity to the exclusion of a conflicting state rule so long as the federal rule is authorized by the Rules Enabling Act and consistent with the Constitution. *Id.*

Under *Hanna,* a federal court sitting in diversity first must determine whether a Federal Rule directly "collides" with the state law it is being urged to apply. *See id.* at 470-74. If there is such a direct conflict, the Federal Rule must be applied if it is constitutional and within the scope of the Rules Enabling Act. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 427 n. 7 (1996). If a "direct collision" does not exist, then the court applies the Erie rule to determine if state law should be applied. *Hanna,* 380 U.S. at 470.

The court finds no conflict between Fed.R.Civ.P. 23 and N.Y. C .P.L.R. § 901(b). Rule 23 of the Federal Rules of Civil Procedure governs the manner of determining whether class certification is appropriate in federal courts; § 901(b) establishes a bar to certain claims being considered for class action treatment on a threshold level. Given that Rule 23 and § 901(b) coexist without conflict, the court shall consider traditional *Erie* principles to determine which rule applies.

In order to ensure that the outcome of the litigation at bar will be substantially the same, "so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court," *Guaranty Trust,* 326 U.S. at 109, the court shall apply N.Y. C.P.L.R. § 901(b), which precludes these New York State residents from maintaining a class action under the Donnelly Act.

For the foregoing reasons, the court shall grant Dentsply's motion for summary judgment on standing grounds. (C.A. No. 99-854, D .I. 51)

D. Statute of Limitations

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

**(Cite as: 2001 WL 624807 (D.Del.))**

1. The Legal Standard

Claims for monetary and injunctive relief under the Clayton Act are governed by a four-year statute of limitations. 15 U.S.C. § 15b; *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 815 F.2d 270, 277-78 (3d Cir.1987)(assuming that four-year limitation period in § 15b applies to injunctive relief). When the government files suit seeking to enforce the federal antitrust laws, however, the statute of limitations for private rights of action is tolled while the government's suit is pending and for one year afterwards. 15 U.S.C. § 16(i). The government filed its antitrust action against Dentsply on January 7, 1999. Thus, in order for the Hess plaintiffs' claims under the federal antitrust statutes to be timely, their causes of action must have accrued after January 7, 1995.

**\*17** Ten of the state laws at issue also follow the four-year statute of limitations. [FN15] Five states have a limitations period shorter than four years. [FN16] Maine and Wisconsin have six-year statutes of limitations. [FN17] Although the Hess and Kaminer plaintiffs have different theories as to why their claims are timely, the underlying factual inquiries are the same.

> FN15. Cal. Bus. & Prof.Code § 16750.1 (West 1997); D.C.Code Ann. § 28-4511(b)(1981); Mich. Comp. Laws Ann. § 445.781(1) (West 1997); Minn.Stat. Ann. § 325D.64 (West 1997); N.M. Stat. Ann. § 57-1- 12 (Michie 1995); N.Y. Gen. Bus. Laws § 340(5)(McKinney 1997); N.C. Stat. Ann. § 75-16.2 (1996); N.D. Cent.Code § 51-08.1-10 (1997); S.D. Codified Laws Ann. § 37-1-14.4 (1994); W. Va.Code Ann. § 47-18-11 (1997).

> FN16. Kan. Stat. Ann. § 60-512 (1997)(three years); Miss.Code. Ann. § 15-1-49 (1991)(three years); Ala.Code § 6-2-38(1)(two years); *State ex rel. Leech v. Levi Straus & Co.,* 1980 WL 4696 at *1 (Tenn. Ch. Ct.1980)(stating that antitrust actions in Tennessee are subject to the

three-year statute of limitations in Tenn.Code. Ann. § 28-305); Fla. Stat. Ann. § 501.204(2) (stating that Florida's Deceptive and Unfair Trade Practices Act is to be construed in light of federal precedent interpreting the Federal Trade Commission Act which has a three-year limitations period under 15 U.S.C. § 57b).

> FN17. Wis. Stat. Ann. § 133.18 (West 1997); Me.Rev.Stat. Ann. tit. 14 § 752 (West 1980). Dentsply concedes that the Kaminer plaintiffs' claims under Wisconsin and Maine law are timely because the statutes of limitations encompass the time that Dentsply announced its Dealer Criteria for the first time.

2. Analysis

Dentsply argues that the Hess and Kaminer plaintiffs' claims are barred because neither of the plaintiff groups alleges an overt act by Dentsply during the limitations period. Dentsply admits that it issued its Dealer Criteria in February 1993 and has enforced the policy since that time. The issue for the court is whether the statute of limitations starts anew each time Dentsply enforces its Dealer Criteria or whether the enactment of the Dealer Criteria was a final act in itself.

Generally a cause of action accrues when the defendant 1) commits an act that 2) injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). In the context of a continuing conspiracy to violate the antitrust laws, this is understood to mean that each time the plaintiff is injured by an act of the defendant, a cause of action accrues to him. *Id.*

The Hess and Kaminer plaintiffs urge the court to apply the continuing violations rule to the various statutes of limitations. They allege that the overt acts could include charging monopolistic prices or enforcing the Dealer Criteria. The injuries they allege include having a lack of choice in the market and paying supracompetitive prices for prefabricated artificial teeth or dentures.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247
**(Cite as: 2001 WL 624807 (D.Del.))**

The court finds that the continuing violations rule should apply to the facts at bar and that the single event of Dentsply's announcing its Dealer Criteria does not constitute the sole overt act permissibly alleged in this litigation. The court further finds, however, that the overt act alleged by a plaintiff must be causally related to the plaintiff's claimed injury. *See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1163 (3d Cir.1993).* Under this standard, there are genuine issues of material fact as to the application of the statutes of limitations to the various plaintiffs. [FN18]

> FN18. A jury, for instance, could find that by terminating a particular dealer or forcing a dealer to give up a competitive tooth line, Dentsply committed an overt act that caused the Hess or Kaminer plaintiffs to pay higher prices or face a limited selection during the limitations period. The court notes that since the Hess plaintiffs are now only seeking injunctive relief, they only need to allege a threatened loss or injury. *Warfarin, 214 F.3d at 400.* On the other hand, if the Kaminer plaintiffs were allowed to pursue their claims, each such plaintiff would have to show that he purchased dentures sometime after January 7, 1995.

For the foregoing reasons, the court shall deny Dentsply's motions for summary judgment on statute of limitations grounds. (C.A. No. 99-255, D.I. 135; C.A. No. 99-854, D.I. 48)

V. CONCLUSION

For the foregoing reasons, the court denies Dentsply's motions for summary judgment on the merits of the antitrust causes of action. The court grants Dentsply's motion for summary judgment against the Hess plaintiffs on standing grounds to the extent that the Hess plaintiffs seek money damages. The court denies that motion to the extent that the Hess plaintiffs seek injunctive relief. The court grants Dentsply's motion for summary judgment against the Kaminer plaintiffs on standing grounds. The court denies Dentsply's motions for summary judgment against the Hess and Kaminer plaintiffs on statute of limitations grounds. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2001 WL 624807 (D.Del.), 2001-1 Trade Cases P 73,247

END OF DOCUMENT

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2002 WL 2007916 (D.Del.), 2002-2 Trade Cases P 73,825
**(Cite as: 2002 WL 2007916 (D.Del.))**

United States District Court, D. Delaware.
JERSEY DENTAL LABORATORIES f/k/a
Howard Hess Dental Laboratories Incorporated,
and Philip Guttierez d/b/a Dentures Plus, on behalf
of themselves and all
others similarly situated, Plaintiffs,
v.
DENTSPLY INTERNATIONAL, INC., et al. De-
fendants.
**No. Civ.A. 01-267-SLR.**

Aug. 27, 2002.

Dental laboratories brought Sherman Act suit
against manufacturer of artificial teeth, and desig-
nated dealers, alleging price fixing claims. Manu-
facturer moved to dismiss. The United States Dis-
trict Court for the District of Delaware, 180
F.Supp.2d 541, dismissed case. Laboratories moved
for reconsideration and for leave to amend com-
plaint. The District Court, Sue L. Robinson, Chief
Judge, held that: (1) district court would refrain
from re-deciding issues that were resolved earlier in
closely related litigation; (2) indirect purchaser
price-fixing claims would be barred; and (3) agents
of manufacturer would not fall within scope of ex-
ception to *Illinois Brick* doctrine barring indirect
purchaser claims for parent-subsidiary relation-
ships.

Motion denied.

West Headnotes

**[1] Courts** ⬤═99(1)
106k99(1) Most Cited Cases
Under law of the case doctrine, district court would
refrain from re-deciding issues that were resolved
earlier in closely related litigation.

**[2] Antitrust and Trade Regulation** ⬤═967
29Tk967 Most Cited Cases
    (Formerly 265k28(1.6))
Indirect purchaser price-fixing claims by dental
laboratories, under Sherman Act, against manufac-

turer of artificial teeth, would be barred under
*Illinois Brick* doctrine; intermediate dealers were
alleged to be coerced, rather than substantially
equal co-conspirators, and intermediate dental deal-
ers, rather than dental laboratories, were party dir-
ectly harmed by alleged anticompetitive activities.
Sherman Act, § 1 et seq., as amended, 15 U.S.C.A.
§ 1 et seq.

**[3] Antitrust and Trade Regulation** ⬤═967
29Tk967 Most Cited Cases
    (Formerly 265k28(1.6))
Agents of manufacturer of artificial teeth would not
fall within scope of exception for parent-subsidiary
relationships, to *Illinois Brick* doctrine barring in-
direct purchaser claims under Sherman Act, as re-
quired to support dental laboratories' claims against
agents, although laboratory allegedly controlled re-
tail prices for teeth and filled some teeth orders dir-
ectly
through drop shipments. Sherman Act, § 1 et seq.,
as amended, 15 U.S.C.A. § 1 et seq.

MEMORANDUM ORDER
ROBINSON, J.

*1 At Wilmington this 27th day of August, 2002,
having reviewed plaintiffs' motion to reargue and to
request leave to amend complaint (D.I.170) and the
responses thereto;

IT IS ORDERED that:

1. Motion to Reargue. Plaintiffs seek reconsidera-
tion of the court's decision to dismiss damages
claims against defendant Dentsply International.
[FN1] The court may reconsider a decision to "cor-
rect manifest errors of law or fact or to present
newly discovered evidence." *Harsco Corp. v. Zlot-
nicki,* 779 F.2d 906, 909 (3d Cir.1985). "[A] judg-
ment may be altered or amended if the party seek-
ing reconsideration shows at least one of the fol-
lowing grounds: (1) an intervening change in the
controlling law; (2) the availability of new evidence
that was not available when the court granted the
motion for summary judgment; or (3) the need to

Not Reported in F.Supp.2d                                                                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 2007916 (D.Del.), 2002-2 Trade Cases P 73,825
**(Cite as: 2002 WL 2007916 (D.Del.))**

correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).

> FN1. Damages claims were dismissed by Memorandum Opinion (D.I.166) and Order (D.I.167) dated December 19, 2001.

[1] 2. Plaintiffs argue the court did not fully consider their allegations of direct purchases from Dentsply in making its decision, thereby committing clear error. [FN2] However, the court expressly acknowledged these allegations and determined that they had been made and rejected in the course of previous, closely related litigation. (D.I. 166 at 166 at 2 n. 3) Although plaintiffs have corrected the pleading deficiency noted in the court's *Hess* summary judgment opinion, [FN3] plaintiffs offer no new theories or factual allegations on which to base their direct purchaser claims. Accordingly, the court will "refrain from redeciding issues that were resolved earlier in the [closely related] litigation." *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.,* 123 F.3d 111, 116 (3d Cir.1997); *see also Casey v. Planned Parenthood,* 14 F.3d 848, 856 n. 11 (3d Cir.1994) (finding the law of the case doctrine applies "to subsequent rulings by the same judge in the same case or a closely related one").

> FN2. Plaintiffs also express concern that the court did not review all the relevant arguments and exhibits before making its decision. The court, however, fully considered all arguments and exhibits submitted by the parties, as is the court's practice in all issues submitted for decision.

> FN3. See D.I. 181 in *Hess et al. v. Dentsply International,* Civ. No. 99-255-SLR.

3. Request for Leave to Amend Complaint. "A party may amend the party's pleading once as a matter of course at anytime before a responsive pleading is served...." Fed.R.Civ.P. 15(a). "Otherwise, a party may amend the party's pleading only by leave of court or by written consent of the adverse party...." *Id.* Where plaintiff files a motion for

leave to amend the complaint, the court treats the case as one in which leave of the court is required, even if plaintiff could have amended the complaint as a matter of course. [FN4] *Centifanti v. Nix,* 865 F.2d 1422, 1431 (3d Cir.1989). Though motions to amend are to be liberally granted, a district court "may properly deny leave to amend where the amendment would not withstand a motion to dismiss." *Id.; see also* Oran v. Stafford, 226 F.3d 275, 291 (3d Cir.2000) (refusal to permit amendment is proper where amendment would cause undue delay or prejudice or where amendment would be futile).

> FN4. Plaintiffs assert that the effect of dismissal on a party's right to amend a pleading as a matter of course is an unresolved issue in the Third Circuit. (D.I. 188 at 1 n. 2) Nevertheless, plaintiffs have requested leave to amend, so the court will decide the motion accordingly.

*2 [2] 4. Plaintiffs seek leave to amend the complaint to allege that defendants have engaged in a retail price-fixing conspiracy, that intermediary dental dealers act only as agents for Dentsply, that plaintiffs have suffered lost profits from the unrealized sale of competitive teeth, and that the dental dealers will not sue Dentsply. (D.I. 170, Exs. A & B)

5. In its December 19, 2001 opinion, the court noted that the original complaint did not clearly allege a retail price-fixing conspiracy. (D.I. 166 at 21) Plaintiffs propose to amend the complaint to specifically allege such a scheme. (D.I. 170, Exs. A & B) While this amendment cures a pleading deficiency, it does not change the court's ultimate decision that a retail price-fixing conspiracy does not allow plaintiffs to escape the bar to indirect purchaser lawsuits, where the intermediate dealers are alleged to be coerced, not substantially equal, coconspirators. [FN5] (D.I. 166 at 19-24)

> FN5. Plaintiffs assert active involvement on the part of dental dealers in "policing" the price deviations that allegedly result in retail price-fixing, citing deposition testi-

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 2007916 (D.Del.), 2002-2 Trade Cases P 73,825
**(Cite as: 2002 WL 2007916 (D.Del.))**

mony submitted in the *Hess* summary judgment proceedings. (D.I. 171 at 12 n. 4) The court notes plaintiffs made the opposite contention in their *Hess* summary judgment brief, claiming the same deposition testimony showed that policing was "orchestrated by Dentsply, not the dealers." (*See* D.I. 152 at 5)

[3] 6. Plaintiffs also propose to add specific allegations that the dental dealers act merely as Dentsply's agents in the sale of Dentsply's teeth, because Dentsply controls the retail prices for teeth and fills some teeth orders directly through drop shipments and orders placed on the Dentsply Order Network. (D.I. 170, Exs. A & B at ¶¶ 56-60) While the court acknowledges that some courts have treated a principal-agent relationship as potentially falling within the "control" exception to *Illinois Brick,* [FN6] the Third Circuit has not yet extended the scope of the exception beyond parent-subsidiary relationships. Therefore, as in *Hess,* the court declines to expand the exception to cover the agency relationship alleged by plaintiffs here, where the dealers are not subsidiaries of Dentsply.

FN6. *See, e.g., In re Mercedes-Benz Anti-Trust Litig.,* 157 F.Supp.2d 355, 366-67 (D.N.J.2001).

7. Plaintiffs also propose to allege that they have suffered injury in the form of lost profits from unrealized sales of other manufacturers' teeth. (D.I. 170, Exs. A & B at ¶ 86) Plaintiffs argue these lost profits result from a foreclosure, not an overcharge, thus taking these damages outside of *Illinois Brick.* (D.I. 171 at 11) The court considered this argument in deciding the motion to dismiss and decided that any harm suffered by plaintiffs as a result of lost profits remained indirect. (D.I. 166 at 23-24 n. 9) As discussed at length in its December 19, 2001 opinion, the court finds that plaintiffs, as indirect purchasers, do not fall within the group of "private attorneys general" meant to enforce the antitrust laws, because the intermediate dental dealers remain the party directly harmed by the alleged anticompetitive activities of Dentsply. [FN7]

FN7. *See Illinois Brick v. Illinois,* 431 U.S. 720, 746, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) ("the legislative purpose in creating a group of 'private attorneys general' to enforce the antitrust laws ... is better served" by concentrating all overcharge damages recovery in the hands of the direct purchaser); *Kansas v. Utilicorp United, Inc.,* 497 U.S. 199, 218, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990) (expressing willingness to consider new exceptions to the indirect purchaser rule only when "the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury") (emphasis added); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 969 (3d Cir.1983) (finding indirect purchasers' claims to lost profits implicated *Illinois Brick* concern about overly complex and speculative damage theories, and applying *Illinois Brick* to indirect purchasers where intermediate dealers had a potential claim against the manufacturer for lost profits, thus risking duplicative recovery because the dealers "would be claiming treble damages for injuries arising from the very same transactions").

8. Plaintiffs' proposed allegations that the dental dealers will not sue Dentsply are also futile because, so long as the dealers can sue (i.e., are not substantially equal coconspirators), [FN8] the fact that they will not sue does not eliminate the *Illinois Brick* bar to indirect purchaser lawsuits. *See Illinois Brick,* 431 U.S. at 746 (finding that adhering to indirect purchaser rule best encourages vigorous private enforcement of the antitrust laws even though some direct purchasers "may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers").

FN8. *See Link v. Mercedes-Benz, Inc.,* 788 F.2d 918, 932 (3d Cir.1986) (citing *Perma-life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)).

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2002 WL 2007916 (D.Del.), 2002-2 Trade Cases P 73,825
**(Cite as: 2002 WL 2007916 (D.Del.))**

**\*3** 9. Based on the above discussion, the court declines to reconsider its order dismissing damages claims against Dentsply and finds the proposed amended complaint would not survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6). Accordingly, the court denies the motion to reargue and the request for leave to amend the complaint (D.I.170).

Not Reported in F.Supp.2d, 2002 WL 2007916 (D.Del.), 2002-2 Trade Cases P 73,825

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

1 of 1 DOCUMENT

**KAB ENTERPRISE CO., Plaintiff, v. URSICH ELECTRIC PRODUCTS INC. and COLEMAN CABLE, INC., Defendants.**

**CIVIL ACTION NO. 06-4361**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2007 U.S. Dist. LEXIS 27524**

**April 12, 2007, Decided
April 13, 2007, Filed**

**COUNSEL:** [*1] For KAB ENTERPRISE CO., LTD., Plaintiff: KAO H. LU, LEAD ATTORNEY, LU & ASSOCIATES, P.C., HAVERTOWN, PA; FRANK A. MAZZEO, FRANK A. MAZZEO, PC, COLMAR, PA.

For URSICH PRODUCTS, INC., Defendant: DONALD REED PIPER, JR., DANN, DORFMAN, HERRELL AND SKILLMAN, PHILADELPHIA, PA; LYNN CELESTE FISCHER, DANN DORFMAN HERRELL & SKILLMAN, PHILADELPHIA, PA.

For COLEMAN CABLE, INC., Defendant: DONALD REED PIPER, JR., DANN, DORFMAN, HERRELL AND SKILLMAN, PHILADELPHIA, PA.

**JUDGES:** RONALD L. BUCKWALTER, S.J.

**OPINION BY:** RONALD L. BUCKWALTER

**OPINION**

*MEMORANDUM*

BUCKWALTER, S.J.

Presently before the Court are Defendant Ursich Electrical Products, Inc.'s Motion for Transfer pursuant to 28 U.S.C. § 1404(a) from the Eastern District of Pennsylvania to the Northern District of Illinois, Eastern Division and Plaintiff's Motion in Opposition. For the reasons explained below, this case will be **TRANSFERRED** to the Northern District of Illinois, Eastern Division.

**I. BACKGROUND**

Plaintiff, KAB Enterprise Co., is a Taiwanese corporation with its principal place of business in Taiwan. Defendant Ursich Electrical Products, Inc. ("UEP") is a corporation incorporated [*2] in Illinois with its principal place of business in Tinley Park, Illinois. Defendant Coleman Cable, Inc. ("Coleman") is incorporated in Delaware with its principal place of business in Waukegan, Illinois.

On September 29, 2006, Plaintiff filed this action in the Eastern District of Pennsylvania against UEP and Coleman seeking a declaratory judgment that its products do not infringe on two patents owned by UEP which UEP licenses to Coleman. Presently before the Court is UEP's Motion to Transfer Venue to the Northern District of Illinois, Eastern Division pursuant to 28 U.S.C. § 1404(a). As further explained below, the Court has determined that for the convenience of the parties and in the interests of justice, it will transfer this case to the Northern District of Illinois, Eastern Division.

**II. STANDARD OF REVIEW**

A court may transfer the venue of any civil action for the convenience of parties and witnesses or in the interests of justice, to any other district where it might have been brought. 28 U.S.C. § 1404(a). The purpose of this section is "to prevent the waste of 'time, energy and money' and 'to protect litigants, witnesses [*3] and the public against unnecessary inconvenience and expense.'" *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L.Ed.2d 945 (1964) (quoting *Continental Grain Co. v. FBL-585*, 364 U.S. 19, 26-27, 80 S. Ct. 1470, 4 L.Ed.2d 1540 (1960)). Although § 1404(a) gives a district court

Case 1:08-cv-00483-SLR   Document 23-2   Filed 12/07/2007   Page 53 of 72

Page 2
2007 U.S. Dist. LEXIS 27524, *3

the discretion to decide a motion on a case-by-case basis, these motions are not to be granted liberally. *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970).

In ruling on a motion to transfer, a court should consider "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995). The first step in a court's analysis of a transfer motion is to determine whether venue would be proper in the transferee district. If the first prong of the inquiry is satisfied, the court determines whether a transfer would be appropriate by weighing a series of private and public factors. *Id.* The private factors to be considered include: (1) plaintiff's choice [*4] of forum; (2) defendant's choice of forum; (3) where the claim arose; (4) convenience of the parties as indicated by their relative physical and financial conditions; (5) convenience of the witnesses -- but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records. *Id.* The public factors to be considered include: (7) enforceability of the judgment; (8) practical considerations that could make the trial easy, expeditious, or inexpensive; (9) level of court congestion in the two fora; (10) local interest in deciding local controversies; (11) public policies of the fora, and (12) in a diversity case, familiarity of the two courts with state law. *Id.* at 879-880. The party moving to transfer a case on grounds of inconvenience has the burden of showing that the existing forum is inconvenient. *Id.* at 879.

## III. DISCUSSION

### A. First Prong -- Venue Proper in Transferee District:

The Court has determined that venue would be proper in the transferee district, Northern District of Illinois, Eastern Division. The properness of the transferee district has not been challenged; [*5] therefore, the Court will not further expound on this prong.

### B. Second Prong -- Balancing of All Relevant Private and Public Factors:

#### 1. Private Factors:

The first factor to be weighed is the Plaintiff's choice of forum, as evidenced by where if filed suit, which is the Eastern District of Pennsylvania. Plaintiff's choice of forum is a significant factor and should not be disturbed lightly. *First Union Nat'l Bank v. United States*, 55 F.Supp.2d 331, 332 (E.D.Pa. 1999). However, where a plaintiff chooses a forum other than his state of residence or the situs of the occurrence upon which the suit is based, his choice is given less weight. *Remick v. Manfredy*, 138 F. Supp. 2d 652, 655 (E.D.Pa. 2001). In this case, the Plaintiff is a Taiwanese corporation with its principal place of business in Taiwan. Further since Plaintiff's products are sold throughout the United States there is not one situs of occurrence. Therefore, the Plaintiff's choice of forum is given less weight.

The second factor to be consider is defendant's choice of forum. In this case, we only have Defendant UEP's choice of forum because Defendant Coleman did not join in [*6] the transfer motion nor did it make a motion to keep the action in the Eastern District of Pennsylvania. [1] UEP's choice of forum is the Northern District of Illinois, Eastern Division. As the moving party, UEP has the burden of establishing that the interests of convenience and justice would be better served by the transfer of this case to the Northern District of Illinois, Eastern Division. *Jumara* at 879. The Court has determined that UEP has met its burden because none of the parties have any connection to the Eastern District of Pennsylvania. As previously stated, both Defendants' principal place of business are located in Illinois, and Plaintiff's principal place of business is in Taiwan. The only reason the Court has found that the Plaintiff filed in the Eastern District of Pennsylvania is because its attorney's firm is located in the Eastern District of Pennsylvania. That is an insufficient basis to keep this action in the Eastern District of Pennsylvania.

> 1   The Plaintiff has urged the Court to consider that Defendant UEP's filing of the motion to transfer venue was done by UEP instead of Coleman for a "purely tactical reason in an attempt to give the Court the impression that UEP [a one man company] would be inconvenienced by having this matter litigated in Pennsylvania." Pl's Opposition at 10. The Court does not find this argument relevant to the question of whether this case may be transferred.

[*7]   The third factor, where the claim arose, weighs in favor of UEP. The Plaintiff argues that because its products are sold throughout the United States, the claim

arose in the Eastern District of Pennsylvania. While this may be accurate it would be more precise to conceive of the claim as arising in Illinois. After all, the Plaintiff is seeking a declaratory judgment that its products do not infringe on two patents owned by UEP and licensed to Coleman. Both UEP and Coleman have principal places of business in Illinois. Therefore, from a practical stand point the claim "arose" in Illinois.

The fourth factor is the convenience of the parties. This factor cuts in favor of neither party because both parties have made good convenience arguments for their particular forum choice. The Plaintiff argues that it is more convenient for it to litigate in the Eastern District of Pennsylvania because its attorney practices with a small firm that is located in this District and it is a company of limited resources. Meanwhile, UEP argues that it is more convenient for it to litigate in the Northern District of Illinois, Eastern Division because that is where it is incorporated and principally located. [*8] On balance the factor of convenience of the parties does not weigh in favor of either party and will therefore not be a factor considered in the Court's analysis.

The fifth factor is convenience of witnesses to the extent witnesses would be unavailable in one of the fora. The Court will not consider this factor because as the Plaintiff points out, UEP has not established that it would be burdensome for it to produce witnesses in the Eastern District of Pennsylvania.

The sixth and final private factor to be considered is the location of relevant documents. In light of current technology, this factor should not weigh heavily in its analysis. *IMS Health, Inc. v. Vality Tech. Inc.*, 59 F.Supp.2d 454, 470 (E.D. Pa. 1999). However, to the extent that documents would be produced, this factor weighs in favor of the UEP because its business is principally located in Illinois. Further, Plaintiff's documents are located in Taiwan so it would be no more burdensome to produce them in Illinois than in Pennsylvania. Therefore, although this factor will not be weighed heavily in light of current technology, it is a factor in favor of UEP.

**2. Public Factors:**

The seventh factor [*9] to be weighed is the enforceability of the judgment. In the present case, this factor will not be considered because the Court does not believe it would be difficult to enforce a declaratory judgment in either jurisdiction.

The eighth factor to be weighed is practical considerations that could make the trial easier, expeditious, or inexpensive. The Court has determined that this factor weighs in favor of Defendant UEP's choice of forum, Northern District of Illinois, Eastern Division, because it will be easier to litigate matters in a jurisdiction that has a connection to the subject of the litigation, i.e. two patents owned by UEP and licensed to Coleman. The only connection the Plaintiff has to the Eastern District of Pennsylvania is that its attorney works for a firm located in this District. Thus, the eighth factor will be weighed in favor of UEP.

The ninth factor is court congestion. The Court has found there to be little difference in the congestion within either District and therefore, this factor will not be considered in its decision to transfer this case to the Northern District of Illinois, Eastern Division.

The tenth factor is local interest. The Court has determined [*10] that this factor weighs in favor of Defendant UEP because the Northern District of Illinois, Eastern Division has more of an interest in declaring whether patents owned by a company incorporated and located in its District are being infringed. The Plaintiff argues that because its products are sold throughout the United States and this is a patent infringement case, Pennsylvania has a local interest. The Court disagrees with Plaintiff's analysis because it implies any district court in the United States would have a local interest in this case. Instead, this Court has concluded that Northern District of Illinois, Eastern Division has the local interest because the declaratory judgment directly impacts the rights of a patent owner located and incorporated within the Northern District of Illinois, Eastern Division.

Factors eleven and twelve are not relevant to a balancing of the factors to determine which forum is more convenient because public policy is the same in both forums and this case is not before this Court based on diversity of the parties.

**IV. CONCLUSION**

For all the forgoing reasons, this Court finds that UEP has established that it is more convenient for the [*11] parties and the interests of justice will be better served by transferring this case to the United States District Court for the Northern District of Illinois, Eastern

Division. An appropriate order follows.

***ORDER***

    AND NOW, on this 12th day of April, 2007, upon consideration of Defendant UEP's Motion for Transfer (Docket No. 3) and Plaintiff's Motion in Opposition thereto (Docket No.6), it is hereby **ORDERED** that this

case be **TRANSFERRED** to the Northern District of Illinois, Eastern Division.

    This case is **CLOSED**.

    BY THE COURT:

    s/ Ronald L. Buckwalter, S. J.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 3317030 (S.D.N.Y.)
**(Cite as: 2006 WL 3317030 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
NAVIGATORS MANAGEMENT COMPANY,
INC., (f/d/b/a Somerset Marine, Inc .), as
Managing General Agent of a Certain Slip of Un-
derwriters Identified as AP-97
(Marine) 1/97, and American Home Assurance
Company, Plaintiffs,
v.
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, Essex Insurance Company, and Royal
Indemnity Company, Defendants.
**No. 06 Civ. 599(LBS).**

Nov. 9, 2006.

*MEMORANDUM AND ORDER*

SAND, J.

**\*1** After several preliminary proceedings (which
have little or no relevance to the motion for change
of venue which is presently before the Court) the
parties now seem to agree that the question of cov-
erage (which is the subject of this declaratory judg-
ment action) turns on whether the captain of the
towboat (Captain Johnson) that caused the damage
in the underlying action was an employee or bor-
rowed servant of plaintiff's insured, American
Milling. Navigators asserts that this question of
coverage should be resolved as a matter of law
based on the language of the insurance policy and
factual determinations already made by the federal
court in Missouri in a related liability and limitation
action. Defendants assert that the question of
whether the Captain was an "employee" and there-
fore covered by American Milling's insurance
policy is not a pure question of law, but rather re-
quires factual determinations after discovery and
hearings. These proceedings, defendants urge, are
not appropriately held here, far removed from the
situs of the allision and the persons who are know-
ledgeable as to the facts relevant to the characteriz-

ation of the relationship between Captain Johnson
and American Milling. The question presently be-
fore the Court is not whether there is coverage, but
whether this Court should decide the issue or trans-
fer it to the Eastern District of Missouri, under 28
U.S.C. § 1404(a), "for the convenience of the
parties and witnesses, in the interest of justice."

I

This case has a somewhat tortured procedural his-
tory. It arises out of an allision that occurred on the
Upper Mississippi River near St. Louis. A river
towboat, owned by American Milling (an Illinois
corporation) and operated by Captain Johnson (a
Louisiana citizen) under a crewing agreement with
his employer Winterville Marine Service, Inc. (a
Mississippi corporation), was pushing barges up the
river when it struck a bridge causing some of the
barges to break free and allide with a floating
casino owned by President Casino and moored in
St. Louis, Missouri. Unsurprisingly, property dam-
age and personal injuries were the result. Various
negligence actions (with claimants including Pres-
ident Casino, certain barge owners, and approxim-
ately 125 individuals alleging personal injury) and
exoneration/limitation of liability cases were filed
and consolidated before Judge Limbaugh in the
Eastern District of Missouri. *See In re American
Milling Co., 270 F.Supp.2d 1068 (E.D.Mo.2003),
aff'd in part, rev'd in part, 409 F.3d 1005 (8th
Cir.2005).* Judge Limbaugh found that American
Milling, Winterville, and Captain Johnson were
80% liable for the allision (jointly and severally)
and that President Casino was 20% liable for failing
to taking reasonable precautions to protect its
casino from runaway barges. *Id. at 1111.* On ap-
peal, the Eight Circuit affirmed the decision in part,
but held that Winterville and Captain Johnson were
not entitled to protections under the Limitation of
Liability Act. *In re American Milling Co., 409 F.3d
1005 (8th Cir.2005), reh'g and reh'g en banc denied*
(8th Cir.2005). Litigation still continues in the East-
ern District of Missouri as the underlying action is
in the damages phase.

Not Reported in F.Supp.2d                                                     Page 2
Not Reported in F.Supp.2d, 2006 WL 3317030 (S.D.N.Y.)
**(Cite as: 2006 WL 3317030 (S.D.N.Y.))**

**\*2** In addition to its primary insurance coverage, American Milling had obtained an excess liability, or "bumbershoot," policy underwritten by Navigators [FN1] (a New York corporation). Acordia of Pittsburgh (located in Pittsburgh, Pennsylvania) brokered the bumbershoot policy. Defendants claim that the Charles L. Crane Agency (located in St. Louis, Missouri), who arranged the primary policy for American Milling, was also involved in arranging the bumbershoot policy. The bumbershoot policy provided coverage for (1) the named assured, (2) any employee of the named assured, (3) any person to whom the named assured is obligated by virtue of a written contract or agreement to provide insurance, and (4) any person added, with notice to Navigators, as an additional assured. (*See* Pl.'s Mem. in Opp. at 2.) The bumbershoot insurance contract was bound and signed in New York.

> FN1. Navigators was then doing business as Somerset Marine, Inc.

Plaintiffs denied coverage to Captain Johnson and Winterville under the bumbershoot policy and then filed a declaratory judgment action in this Court on December 3, 2004 seeking a declaration that they have no coverage obligations to Captain Johnson or Winterville. On June 23, 2005, Captain Johnson assigned any rights he had against American Milling and any interest he had in any of American Milling's insurance policies to President Casino and its insurers (who are the defendants in the instant case). In exchange, President and its insurers agreed not to execute against Captain Johnson or his personal assets any judgment obtained in the underlying negligence action. Through a Rule 25 substitution, President and its insurers stepped into the shoes of Captain Johnson in the original declaratory judgment action and then moved to dismiss for lack of personal jurisdiction over Captain Johnson, claiming that he had no contacts with New York. Before the Court ruled on that motion, plaintiffs filed the instant declaratory judgment action on January 25, 2006 directly against some of President's insurers, the defendants in this case. [FN2] The Court has held original declaratory judgment action in abeyance. Plaintiffs essentially seek

a declaration that they are not liable under the bumbershoot policy to the defendants as Captain Johnson's assignees. Before the Court now is defendants' motion to transfer venue under 28 U.S.C. § 1404(a).

> FN2. The instant declaratory judgment action does not name President, Captain Johnson, HIH (another one of President's insurers), or Winterville as defendants. On June 16, 2006, defendants moved to dismiss for failure to join indispensable parties (including President, Captain Johnson, HIH, the 125 personal injury claimants, and various barge claimants) and under the doctrine of forum non conveniens. Because the parties, in letters and at oral argument, addressed the possibility of a transfer of venue to the Eastern District of Missouri, the Court invited them to file the instant motion, and has held the prior motion in abeyance.

II

Section 1404(a), states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Notions of convenience and fairness must be determined on a case-by-case basis. *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992). Some of the factors that courts should consider include (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties." *D.H. Blair & Co. v. Gottdiener,* 462 F.3d 95, 106-07 (2d Cir.2006). Courts have also considered the forum's familiarity with the governing law and judicial economy and the interests of justice, based on the totality of the circumstances. *See, e.g., Albert Fadem Trust v. Duke Energy Corp.,* 214 F.Supp.2d 341, 341 (S.D.N.Y.2002).

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

**\*3** Plaintiffs contend that defendants have not made a sufficient showing that the factors favoring a transfer outweigh the deference that is due to the plaintiff's choice of forum, *see Gottdiener,* 462 F.3d at 107 (plaintiff's choice of forum "given great weight"), because, they argue, the issues essential to the question of coverage can be determined purely as a matter of law. Therefore, plaintiffs argue, many of the factors that would favor a transfer simply drop out of the picture. Plaintiffs argue that this Court need only interpret the terms of the bumbershoot policy, and that no witnesses will be needed because all of the relevant factual issues have been resolved by the Eastern District of Missouri in the underlying action. The parties seem to agree that the dispositive issues as to coverage are (1) whether Captain Johnson was an employee or borrowed servant of American Milling, and (2) whether the term "employee" in the bumbershoot policy encompasses the relationship that Captain Johnson had with American Milling. Plaintiffs argue that the Eastern District of Missouri has already determined that Captain Johnson was not an employee of American Milling and that determination has preclusive effect in this case because Captain Johnson was a party to that case and defendants stepped into Captain Johnson's shoes. Plaintiffs argue further that all of the facts necessary to determine whether Captain Johnson was a borrowed servant have also been determined by the Eastern District of Missouri. Defendants, on the other hand, argue that the Eastern District's factual findings are insufficient for a court to determine whether Captain Johnson was an employee or borrowed servant of American Milling within the terms of the bumbershoot policy. That determination, defendants argue, will require fact discovery and witness testimony, and those activities are more conveniently done in the Eastern District of Missouri.

*A. Collateral Estoppel*

A party is collaterally estopped from relitigating an issue if: "(1) the identical issue was raised in a previous proceeding, (2) the issue was actually litigated and decided in the previous proceeding, (3) the party had a full and fair opportunity to litigate the

issue, and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998). This Court need not determine the preclusive effect of the Eastern District of Missouri's factual findings that Captain Johnson was an employee of Winterville. [FN3] Nor must it decide whether the term "employee" as used in the bumbershoot policy has the same meaning as employee for the purposes of liability. [FN4] It is enough to note that the issue of whether Captain Johnson was a borrowed servant of American Milling was never raised in the proceedings in the Eastern District of Missouri, nor did Judge Limbaugh need to rely on factual findings that would determine Captain Johnson's status as a borrowed servant to decide the issue of whether Winterville was liable as an owner pro hac vice of the M/V Anne Holly. *See In re American Milling Co.,* 270 F.Supp.2d at 1100-01. Even a determination that Captain Johnson was an employee of Winterville for the purposes of vicarious liability, a finding that the Eastern District of Missouri did not explicitly make, would not necessarily preclude a finding that he is also a borrowed servant of American Milling for the purposes of the bumbershoot policy. The issue of Captain Johnson's status as a borrowed servant of American Milling was not before the court; American Milling's liability did not turn on it; Winterville's liability did not turn on it.

> FN3. Judge Limbaugh in his factual findings stated that Captain Johnson was employed by Winterville. *In re American Milling,* 270 F.Supp.2d at 1073. The court found that American Milling paid Winterville to supply crew (including Captain Johnson) for the M/V Anne Holly. *Id.* at 1078. Winterville paid the crew's salaries (including withholding applicable taxes), provided the crew with transportation to and from the vessel, and provided the crew with communications equipment. *Id.* The court went on to find, however, that there were certain special aspects of the relationship between American Milling and Captain Johnson and the rest of the crew.

Not Reported in F.Supp.2d, 2006 WL 3317030 (S.D.N.Y.)

**(Cite as: 2006 WL 3317030 (S.D.N.Y.))**

American Milling was consulted prior to hiring a pilot and retained the authority to have any of the crew removed from its vessel. *Id.* American Milling personnel met with the crew to review operating policies and procedures, as well as information on maintenance work and navigation conditions. *Id.* American Milling officers would board the vessel throughout the towing season to confer with the crew. *Id.* at 1079. The crew was required to submit daily pilothouse and engine room logs to both American Milling and Winterville, which American Milling reviewed daily. *Id* .

FN4. At oral argument, counsel for plaintiffs argued that it would be incongruous for the definition of employee for the purposes of insurance coverage to differ from the definition of employee for the purposes of liability, and that the Eastern District of Missouri had determined that Winterville was vicariously liable for the actions of Captain Johnson because he was their employee. (*See* Oral Arg. Tr. at 13, Oct. 26, 2006.) In fact, the court determined that Winterville was liable for the damages caused by the towboat M/V Anne Holly as an owner pro hac vice, and thus also entitled to protection under the limitation of liability act. *See In re American Milling,* 270 F.Supp.2d at 1100-01, 1111. This portion of the holding was overturned by the Eighth Circuit. *See In re American Milling Co.,* 409 F.3d 1005 (8th Cir.2005), *reh'g and reh'g en banc denied* (8th Cir.2005). Nowhere in his opinion did Judge Limbaugh discuss whether Winterville or American Milling or both were vicariously liable for the actions of Captain Johnson as either an employee or borrowed servant, though one could infer that the Eight Circuit assumed that Winterville was vicariously liable for the negligence of Captain Johnson because the court upheld the finding that Winterville was liable even though it was not an owner pro hac vice.

Neither the Judge Limbaugh nor the Eight Circuit based any portion of their holdings on the relationship between American Milling and Captain Johnson.

**\*4** Because the defendants are not clearly collaterally estopped from litigating the status of the relationship between Captain Johnson and American Milling, and because the ultimate determination of that status may depend on the particular facts and circumstances of this case, which are more conveniently presented in the Eastern District of Missouri, this Court holds that it is appropriate to leave it to the Eastern District of Missouri to determine the preclusive effect of its prior judgment.

*B. Factors Favoring Transfer*

If the issue of coverage in this declaratory judgment action cannot be determined solely as a matter of law, several factors favor a transfer of venue to the Eastern District of Missouri. The convenience of witnesses, especially nonparty witnesses, is an important factor in considering a transfer. *See Indian Harbor Ins. Co. v. Factory Mutual Ins. Co.,* 419 F.Supp.2d 395, 402 (S.D .N.Y.2005). To determine whether the bumbershoot policy extended coverage to Captain Johnson, a court must determine the nature of Captain Johnson's relationship with American Milling, and the meaning of the term "employee" in the bumbershoot policy. [FN5]

FN5. Additionally, defendants claim that they will need to present witnesses on two other issues relating to coverage: whether there was an agreement within the meaning of the bumbershoot policy that American Milling would provide Winterville with insurance coverage, and whether American Milling ever provided notice to plaintiffs that Winterville should be added as an additional named assured. The witnesses on these issues would be the same as the witnesses they would offer on the status of Captain Johnson and the meaning of the terms of the insurance policy, namely representatives from American Milling and

Not Reported in F.Supp.2d, 2006 WL 3317030 (S.D.N.Y.)

**(Cite as: 2006 WL 3317030 (S.D.N.Y.))**

Winterville on the existence and nature of any agreement, and American Milling, Acordia, Crane, and Navigators on notice.

The issue of whether Captain Johnson was an employee or borrowed servant of American Milling could require the testimony of representatives of American Milling, representatives of Winterville and Captain Johnson himself. None of these potential witnesses are parties to this suit. American Milling's offices are located in Cahokia Illinois, just across the border from Missouri and less than five miles from St. Louis and the Eastern District of Missouri. Clearly it would be more convenient for witnesses from American Milling to testify in the Eastern District of Missouri than in the Southern District of New York. While Winterville's offices are located in Greenville, Mississippi and Captain Johnson lives in Louisiana, both are parties to ongoing litigation in the Eastern District of Missouri arising out of the same incident. Therefore, while neither New York nor St. Louis would be ideal, it would seem more convenient for them to appear in St. Louis.

The issue of the meaning of the term "employee" in the bumbershoot policy could require testimony from American Milling (the insured), Acordia of Pittsburgh and the Charles L. Crane Agency [FN6] (the brokers), and Navigators (the underwriters). Of the nonparty witnesses, two are located in or very near St. Louis--Crane is located in St. Louis and American Milling just across the river in Illinois--and one, Acordia, is located in Pittsburgh, far from either New York or St. Louis. Only Navigators is located in New York, and the convenience of a party witness is entitled to less weight than the convenience of a nonparty. *See Indian Harbor Ins. Co., 419 F.Supp.2d at 402.*

FN6. Plaintiffs assert that Acordia was the sole broker on the bumbershoot policy, and therefore witnesses from the Crane Agency would not be needed, however defendants claim that the Crane Agency was involved in arranging all of American Milling's insurance coverage, including the bumber-

shoot policy. Defendants point to an affidavit of plaintiffs' counsel stating that Acordia was replaced by Crane as American Milling's broker. (*See* Nicoletti Aff. ¶ 5, June 13, 2005.) This is a question of fact that the Court need not resolve at this time. It is enough to note that the testimony of representatives of the Crane Agency would be helpful in resolving this issue and could also be relevant in determining whether Navigators was ever given notice that Winterville was an additional insured.

Other factors are either neutral or favor a transfer to the Eastern District of Missouri. While a transfer is not generally appropriate merely to shift the burden of inconvenience from one party to the other, *Dwyer v. General Motors Corp., 853 F.Supp. 690, 693 (S.D.N.Y.1994),* in this case a transfer would be of great convenience to a number of interested parties that have not been joined in the action. In particular, 125 personal injury claimants in Missouri have expressed interest in joining the action as defendants, but have stated they are unable to afford the costs of litigating in New York. (See August 21, 2006 Letter to Court, attached as Ex. 14 to Def.'s Reply Mem.) A transfer to the Eastern District of Missouri would provide these parties with an opportunity to intervene. [FN7] A transfer would be less convenient to plaintiffs, but because they already have a presence in the Eastern District of Missouri to litigate a related action, they would not be greatly inconvenienced.

FN7. At oral arguments, counsel for plaintiffs stated that if a court found that the bumbershoot policy covered Captain Johnson and that the assignment was valid, plaintiffs would post the judgment in the court in the Eastern District of Missouri or initiate an interpleader action. (Oral Arg. Tr. at 24.) Plaintiffs argue that this would ensure that any claimants in Missouri would be protected and not deprived of the proceeds of their policy. (*Id.*) This argument misses the point. The issue is not where the plaintiffs would tender judgment

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3317030 (S.D.N.Y.)
**(Cite as: 2006 WL 3317030 (S.D.N.Y.))**

if found liable, but rather whether the personal injury claimants who seek to intervene would have their interests adequately represented in the declaratory judgment action to determine coverage. A mere assurance that a judgment, if ordered, would be paid in a jurisdiction where the personal injury claimants would have access to it does not suffice to eliminate the issue of those claimants' interest in the determination of coverage.

**\*5** The location of relevant documents is not a very compelling factor because records are easily portable. *See Coker v. Bank of America,* 984 F.Supp. 757, 766 (S.D.N.Y.1997). In any event, relevant documents are located in both potential fora; documents relating to the bumbershoot policy are located in New York and documents relating to Captain Johnson's status are located in or near St. Louis. This factor is neutral.

The locus of operative facts in this case is indeterminate. While courts should consider where the insurance contract was made when determining the locus of operative facts in a declaratory judgment action, *see Indian Harbor Ins. Co.,* 419 F.Supp.2d at 405, the Court must also take into account the facts surrounding Captain Johnson's employment status. The insurance contract was bound and signed in New York, but negotiated in Pittsburgh and (defendants contend) in St. Louis. Therefore the issuance of the policy did not occur in one state. The facts and circumstances surrounding Captain Johnson's relationship with American Milling occurred in or around Missouri. Therefore, while there is no single locus of operative fact, a substantial portion of the facts relevant to this declaratory judgment action occurred in or around the Eastern District of Missouri.

Neither party has made a sufficient showing that it will need to use service of process to compel the appearance of unwilling witnesses, but if it became necessary, the Eastern District of Missouri could subpoena more (though not all) relevant witnesses than this Court. The relative financial means of the parties is a neutral factor, as both plaintiffs and defendants are corporations with access to substantial resources.

### III

Based on the totality of the circumstances, this Court finds that it would be in the interests of justice to transfer this declaratory judgment action to the Eastern District of Missouri. Despite plaintiff's insistence that all relevant factual issues have been already resolved by the Eastern District, this Court finds that further factual inquiry may be required, and if it is, the Eastern District of Missouri is a more convenient forum for many of the witnesses who may testify. Likewise if the personal injury claimants were to seek to intervene as parties, the Eastern District of Missouri would be a more convenient forum for them. The existing parties will not be greatly inconvenienced by litigating in the Eastern District as they are already parties to an ongoing action arising out of the same incident in that forum. Finally, this Court finds it in the interests of judicial economy for the court already familiar with the underlying cause of action giving rise to this coverage dispute, and before which several other related actions have already been consolidated, to decide this case as well. These factors outweigh the deference to which the plaintiff's choice of forum is due. We leave it the Eastern District of Missouri to determine the extent of the preclusive effect of its judgment in *In re American Milling Co.,* 270 F.Supp.2d 1068 (E.D.Mo.2003).

**\*6** The motion to transfer venue under 28 U.S.C. 1404(a) is granted. The case is transferred to the Eastern District of Missouri.

SO ORDERED.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE 2006 U.S. DIST. LEXIS 94907

**UNITED STATES OF AMERICA, Plaintiff, vs. DENTSPLY INTERNATIONAL, INC., Defendant.**

**Civil Action No. 99-005 (SLR)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2006 U.S. Dist. LEXIS 94907; 2006-2 Trade Cas. (CCH) P75,383*

**April 26, 2006, Decided**

**PRIOR HISTORY:** *United States v. Dentsply Int'l, Inc., 399 F.3d 181, 2005 U.S. App. LEXIS 3219 (3d Cir. Del., 2005)*

**COUNSEL:** [*1] For USA, Plaintiff: Patricia C. Hannigan, LEAD ATTORNEY, U.S. Attorney's Office, Wilmington, DE.

For Dentsply International, Inc., Defendant: William D. Johnston, LEAD ATTORNEY, Christian D. Wright, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Ivoclar Vivadent Inc, Movant: Chad Michael Shandler, LEAD ATTORNEY, Richards, Layton & Finger, Wilmington, DE.

For Vident, Vita Zahnfabrik, Movants: Steven J. Balick, LEAD ATTORNEY, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**FINAL JUDGMENT**

Plaintiff, the United States of America, filed its Complaint on January 5, 1999. Defendant, Dentsply International, Inc., appeared and filed its Answer on January 20, 1999. This Court, having jurisdiction over the parties and over the subject matter, conducted a trial and entered findings of fact and conclusions of law on August 8, 2003. On May 26, 2005, the United States Court of Appeals for the Third Circuit issued its mandate in this case. Pursuant to that mandate, judgment is hereby entered in favor of plaintiff United States of America and against Dentsply International, Inc., and it is further ORDERED, [*2] ADJUDGED, AND DECREED as follows:

**I.** *INJUNCTIVE RELIEF*

A. Dentsply shall not condition the sale of its teeth or any other product to a dealer, or authorize a person as a dealer of Dentsply teeth, based on that dealer's sale of non-Dentsply teeth or that dealer's consideration to sell non-Dentsply teeth.

B. Dentsply shall not take, or threaten to take, any of the following retaliatory or deterrent actions against a dealer based on that dealer's sale of non-Dentsply teeth or that dealer's consideration to sell non-Dentsply teeth:

(1) terminating that dealer as an authorized dealer of Dentsply's teeth or other products;

(2) selling teeth or other products to that dealer on terms or conditions less favorable than those offered to other dealers;

(3) providing less training, education, marketing, promotion, or other support to that dealer than is provided to other dealers;

(4) encouraging or influencing any customer of that dealer to buy Dentsply teeth or other products from a different

2006 U.S. Dist. LEXIS 94907, *2; 2006-2 Trade Cas. (CCH) P75,383

dealer, except in response to that dealer selling a competitive tooth to such customer and that dealer not offering to the customer a Dentsply offer to meet the competitive tooth offering; [*3]

(5) selling teeth or other products directly to any customer of that dealer; or

(6) authorizing a new dealer of Dentsply's teeth or other products solely for the purpose of selling to any customer of that dealer.

C. Dentsply shall not require any dealer to be, or agree with any dealer that it will become, an exclusive Dentsply tooth dealer, or offer market-share discounts to any dealer.

D. Dentsply shall remove Dealer Criterion 6 from its list of requirements for dealers to be recognized and maintained as authorized Dentsply tooth dealers. Within thirty days of this Final Judgment taking effect, Dentsply shall distribute to each dealer selling Dentsply teeth:

(1) its revised dealer criteria, which shall comply with the terms of this Final Judgment; and

(2) a copy of this Final Judgment.

Dentsply shall promptly provide its dealer criteria and a copy of this Final Judgment to any tooth dealer it authorizes, or prospective tooth dealer it negotiates with, after this Final Judgment takes effect. Dentsply shall apply and enforce its dealer criteria in a non-discriminatory manner.

E. Nothing in this Final Judgment shall prohibit Dentsply from taking any of the following [*4] actions:

(1) terminating any or all of its dealers if it does so solely as part of a plan to modify its distribution scheme for artificial teeth and/or other dental products, and only if the dealers that are terminated as part of that plan are s elected for termination for reasons not based on their sale of non-Dentsply teeth and/or

their consideration to sell non-Dentsply teeth. Dentsply shall not threaten any dealer with the implementation of such a plan for the purpose of deterring that dealer from selling non-Dentsply teeth; or

(2) offering volume discounts or prompt-payment discounts or incentives for increased sales of Dentsply teeth to its dealers, as long as such discounts and incentives are publicized and offered to all tooth dealers on a uniform basis and without regard to whether such dealers sell, or are considering selling, non-Dentsply teeth.

F. Dentsply shall not terminate any authorized dealer of its teeth or artificial tooth related products, without providing in writing to the Plaintiff and the dealer, at least sixty days before termination, where feasible, and no later than 14 days before termination in extenuating circumstances, a detailed description of [*5] the reasons for the termination. Dentsply's Antitrust Compliance Officer shall certify that the description fully reflects all of the reasons for termination and that the termination would not violate this Final Judgment. Dentsply may not use a decline in a dealer's sales of Dentsply teeth as a basis for termination if that dealer also sells non-Dentsply teeth, unless the dealer's purchases of Dentsply teeth fall below $ 200,000 per year or the decline in the dealer's purchases of Dentsply teeth is greater than fifty percent (50%) of the dealer's prior year's purchases. Dentsply shall have the right to seek permission from Plaintiff to terminate an authorized dealer of its teeth or artificial tooth related products that also sells non-Dentsply teeth, for a decline in the dealer's purchases of teeth from Dentsply which is less than fifty percent (50%) of the dealer's prior year's purchases, provided Dentsply shall not terminate such dealer unless and until it receives written permission from Plaintiff.

G. Unless authorized to do so by an order from this Court, Plaintiff shall not disclose any information or documents obtained by the means provided in Section I (F) to any person other [*6] than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party, including grand jury proceedings, or for the purpose of securing compliance

2006 U.S. Dist. LEXIS 94907, *6; 2006-2 Trade Cas. (CCH) P75,383

with this Final Judgment. In the event that Plaintiff intends to seek such authorization from this Court, it shall provide to Dentsply reasonable prior notice of production of the materials so that Dentsply can seek a Protective Order if it deems necessary.

## II. *COMPLIANCE PROGRAM*

A. Dentsply shall designate, within thirty days after this Final Judgment takes effect, an Antitrust Compliance Officer with responsibility for implementing an antitrust compliance program for the purpose of ensuring full compliance with this Final Judgment.

B. The Antitrust Compliance Officer shall:

(1) within sixty days after this Final Judgment takes effect, provide a copy of this Final Judgment to each of Dentsply's directors and officers, and to each employee whose job responsibilities relate in any way to the marketing or sale of teeth or any other product to dealers;

(2) distribute in a timely manner a copy of this Final Judgment to any person who [*7] succeeds to, or subsequently holds, a position of director or officer or an employee whose job responsibilities relate in any way to the marketing or sale of teeth or any other product to dealers; and

(3) within sixty days after this Final Judgment takes effect, develop and implement the procedures necessary to ensure Dentsply's compliance with this Final Judgment. Such procedures shall ensure that questions from any Dentsply director, officer, or employee about this Final Judgment can be answered by counsel as the need arises.

## III. *CERTIFICATION*

A. Within seventy-five days after this Final Judgment takes effect, Dentsply shall certify to the Plaintiff whether it has: (1) designated an Antitrust Compliance Officer and identify the person so designated; (2) distributed the Final Judgment in

accordance with Section II (B)(1); (3) developed the procedures required by Section II (B)(3); and (4) distributed its revised dealer criteria in accordance with Section I (D).

B. Dentsply shall certify annually, from the first anniversary date of this Final Judgment taking effect until this Final Judgment expires, to Plaintiff that it has complied with the provisions of this Final [*8] Judgment.

## IV. *PLAINTIFF'S ACCESS*

A. For the purposes of determining or securing compliance with this Final Judgment, or determining whether it should be modified or vacated, and subject to any legally recognized privilege, authorized representatives of the Antitrust Division of the United States Department of Justice, upon written request of a duly authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Dentsply, shall be permitted:

(1) access during regular business hours to inspect and copy, or at Plaintiff's option, to require that Dentsply provide copies of all records and documents in Dentsply's possession, custody, or control relating to any matter contained in this Final Judgment;

(2) to interview, either informally or on the record, Dentsply's directors, officers, employees, or agents, who may have individual counsel present, concerning such matters; and

(3) to obtain written reports from Dentsply, under oath if requested, relating to any matters contained in this Final Judgment.

B. Dentsply shall have the right to be represented by counsel in any proceeding under this Section [*9] IV.

C. No information or documents obtained by the means provided in this Section IV shall be divulged by the Plaintiff to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which

2006 U.S. Dist. LEXIS 94907, *9; 2006-2 Trade Cas. (CCH) P75,383

the United States is a party, including grand jury proceedings, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D. If at the time information or documents are furnished by Dentsply to the Plaintiff, Dentsply represents in writing that certain material is entitled to confidentiality protection under *Rule 26(c)(7) of the Federal Rules of Civil Procedure*, and identifies the confidential information by marking each pertinent page of such material, "Subject to claim of protection under *Rule 26(c)(7) of the Federal Rules of Civil Procedure*," then the Plaintiff shall use its best efforts to give ten days' notice to Dentsply prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which Dentsply is not a party.

E. Dentsply shall have the right to [*10] claim protection from public disclosure, under the Freedom of Information Act, *5 U.S.C. § 552*, or any other applicable law or regulation, for any material submitted to the Plaintiff under this Final Judgment. After appropriate consideration of such claim of protection, the Plaintiff will either assert that the material is protected from disclosure under law or give such defendant ten calendar days notice of its intent to disclose the material.

### V. *APPLICABILITY*

A. This Final Judgment shall apply to Dentsply and to all persons acting in concert with Dentsply that have received actual notice of this Final Judgment by personal service or otherwise.

B. Dentsply shall require, as a condition of the sale or other disposition of all or substantially all of its assets (or of a lesser business unit that includes Dentsply's tooth business), its shares, or other indicia of ownership, that any purchaser agree to be bound by the provisions of this Final Judgment and that such agreement be filed with this Court.

### VI. DEFINITIONS

A. "Dealer" means any person transacting business in the United States that is not wholly owned by Dentsply who resells dental products [*11] to end users and has, at any time, purchased or acquired, or who is considering purchasing or acquiring, Dentsply teeth or other products for resale.

B. "Dealer Criterion 6" means the criterion that Dentsply applied to its authorized tooth dealers, and which was published in written form on February 16, 1993, which stated, "In order to effectively promote Dentsply/York products, dealers that are recognized as authorized distributors may not add further tooth lines to their product offering."

C. "Dentsply" means Dentsply International, Inc., a for-profit corporation organized and existing under the laws of the State of Delaware, with its headquarters at 221 West Philadelphia Street, York, Pennsylvania 17405-0872; each of its affiliates, subsidiaries, divisions, officers, directors, agents, employees, and assigns; and any successor to any substantial part of the business.

D. "Exclusive Dentsply tooth dealer" means a dealer that sells Dentsply teeth but not the teeth of any other person.

E. "Including" means including, but not limited to.

F. "Market-share discounts" means any discounts, lower prices, rebates or other financial incentives offered to a dealer if that dealer's sales [*12] of Dentsply teeth, in any specified period of time, constitute a specified percentage of that dealer's sales of all (both Dentsply and non-Dentsply) teeth.

G. "Non-Dentsply teeth" means any tooth manufactured by a person other than Dentsply.

H. "Person" means any individual, corporation, partnership, company, sole proprietorship, firm or other legal entity.

I. "Prompt-payment discounts" means any discounts, lower prices, rebates or other financial incentives offered to a dealer if that dealer pays its bills to Dentsply in a timely manner.

J. "Sale" or "sell" includes an offer to sell. As used in this Final Judgment, a dealer sells teeth if, but not only if, that dealer acquires a stock of teeth on consignment and distributes, or offers to distribute, those teeth to dental laboratories or other end users.

K. "Teeth" or "tooth" means prefabricated artificial teeth that are manufactured for use in dentures.

L. "Volume discounts" means any discounts, lower prices, rebates or other financial incentives offered to a

2006 U.S. Dist. LEXIS 94907, *12; 2006-2 Trade Cas. (CCH) P75,383

tooth dealer if that dealer purchases a specified volume of teeth from Dentsply.

## VII. *RETENTION OF JURISDICTION*

This Court retains jurisdiction to enable any [*13] party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, or to punish violations of its provisions.

## VIII. *EFFECTIVE DATE AND EXPIRATION OF FINAL JUDGMENT*

A. This Final Judgment shall take effect 30 days after the date on which it is entered.

B. Unless this Court grants an extension, this Final Judgment shall expire seven and one-half (7 1/2) SLR years from the date on which it takes effect.

Sue L. Robinson

United States District Judge

Dated: 4/26/06

LEXSEE 1983 U.S. DIST. LEXIS 17465

**MARLENE WOODALL, Administratrix and Personal Representative of the Estates of LETCHER W. BREEDEN and PATRICIA ANN BREEDEN, Deceased v. PIPER AIRCRAFT CORPORATION and HOOF PRODUCTS COMPANY**

**Civil No. 82-1554.**

**United States District Court for the Middle District of Pennsylvania**

*1983 U.S. Dist. LEXIS 17465*; *18 Av. Cas. (CCH) P17,169*

**April 25, 1983**

**COUNSEL:** [*1] Michael J. Pangia, Washington, D.C., for plaintiff.

Scott A. Williams and Williams & Seevers, Williamsport, Pennsylvania, and Lord, Bissell & Brook, Chicago, Illinois, for Piper Aircraft.

Charles J. McKelvey, and McNearney, Page, Vanderlin & Hall, Williamsport, Pennsylvania, and Seawell, Dalton, Hughes & Timms, Norfolk, Virginia, for Hoof Products Co.

**OPINION BY:** MUIR

**OPINION**

OPINION

MUIR, District Judge: Plaintiff Marlene Woodall, personal representative of the Estates of Letcher W. Breeden, deceased, and Patricia Ann Breeden, deceased, filed this products liability action against Defendants Piper Aircraft Corporation (Piper Aircraft) and Hoof Products Company (Hoof Products) on December 31, 1982. This action arises out of the crash of a Piper Comanche aircraft on December 14, 1980 near the Patrick Henry International Airport in Newport News, Virginia, which resulted in the deaths of Letcher W. Breeden and Patricia Ann Breeden. According to the complaint, the Piper Comanche aircraft was manufactured by Piper Aircraft and Defendant Hood Products manufactured a fuel selector valve which was a component part in the Piper Comanche aircraft. The fuel selector valve was allegedly distributed [*2] by Hoof Products and installed by Piper Aircraft in the Piper Comanche. It is alleged that a defect in the cast aluminum housing of the fuel selector valve caused the crash of the Piper Comanche aircraft. By order of December 14, 1982, this case was placed on the Court's February 1984 list for trial in Williamsport, Pennsylvania.

On February 11, 1983, Piper Aircraft filed a motion for a stay of these proceedings pending the outcome of trial and final determination of Woodall vs. Piper Aircraft, et al., Nos 81-1149N and 81-1150N (E.D. Va., Norfolk Div., 1981) (hereinafter sometimes "the Virginia action"). The Virginia action, filed on December 4, 1981, is allegedly identical or substantially similar to the action before this Court. See Exhibits "A", "B", "C", "D", and "E" annexed to Piper Aircraft's motion to stay. By order of February 16, 1983, the motion to stay this action pending resolution of the Virginia actions was denied. The Court noted:

This Court will not clog its docket with cases which are stayed indefinitely pending resolution of other cases. . . . This Court is of the opinion that the proper procedure is not to stay this action but, rather, to transfer this [*3] action to the Eastern District of Virginia for consolidation with the earlier actions. There is, however, no motion presently before the Court requesting transfer. The Court will in the first instance await such a motion and possible briefing so that the views of counsel may be considered. If no such motion is filed within a reasonable time, the Court will act on its own.

On February 22, 1983, Plaintiff Woodall filed a motion to transfer this action to the United States District Court for the Eastern District of Virginia, Norfolk

Case 1:08-cv-00483-SLR    Document 23-2    Filed 12/07/2007    Page 68 of 72

Page 2

1983 U.S. Dist. LEXIS 17465, *3; 18 Av. Cas. (CCH) P17,169

Division, where the Virginia action is pending. While Woodall originally indicated the concurrence of opposing counsel in the motion to transfer, a revised certificate of concurrence indicates that counsel for Piper Aircraft and Hoof Products do not concur in the motion. Also on February 22, 1983, Woodall filed a memorandum of law in support of the motion to transfer. Piper Aircraft and Hoof Products each filed briefs in opposition to the motion to transfer on March 10, 1983. On March 16, 1983, Woodall filed a reply to the brief on Hoof Products and on March 23, 1983, Woodall filed a reply to the brief of Piper Aircraft. The motion to transfer was [*4] referred to United States Magistrate Raymond J. Durkin for his report and recommendation in accordance with the order adopted in Re Assignment of Matters to Magistrates by Judges, Misc. No. 81-133 (M.D. Pa. June 15, 1981). See Order of March 7, 1983. On April 6, 1983, Magistrate Durkin filed his report recommending that the motion to tgransfer be granted. On April 18, 1983, Piper Aircraft and Hoof Products each filed objections to the Magistrate's report and recommendation and briefs in support thereof. On April 21, 1983, Woodall replied to the Defendants' exceptions. This matter is now ripe for decision by this Court.

Preliminarily, the Court notes that in its answer to the complaint, Hoof Products raised the defense that this Court lacks in personam jurisdiction over Hoof Products. See Answer, p. 15, filed March 2, 1983. The parties dispute the legal import of the claim by Hoof Products that this Court lacks personal jurisdiction over it. Both Hoof Products and Piper Aircraft contend that, before this Court can transfer a case, it must have personal jurisdiction over each Defendant. Bothe the Magistrate and Plaintiff Woodall are of the view that the matter of jurisdiction [*5] may be resolved by the transferree forum. The Court is concerned that were it to reach the question of peersonal jurisdiction over Hoof Products at this time, the matter would be raised before the Court, in essence, Sua sponte. No motion to dismiss for lack of personal jurisdiction has been filed in this case and, indeed, the time for filing such a motion under *Rule 12 of the Federal Rules of Civil Procedure* has likely passed. See *F.R.Civ.P.* *12(a)*, *(g)*. While Piper Aircraft vigorously asserts that the Court must resolve the issue of jurisdiction, Hoof Products, the party most directly affected by the jurisdictional issue, barely asserts the issue, stating in its brief in opposition to the motion to transfer:

This writer would like to point out to the Court that Defendant Hoof [Products], has submitted as its affirmative defense that no jurisdiction exists in Pennyslvania and therefore, sit would be improper for the Court to transfer this matter to Virginia. The Court should review the facts of the case of Piper Aircraft Corp vs. Reno [sic ].

The Court notes that both Hoof Products and Piper Aircraft gave incorrect citations for the Piper Aircraft case.

In *Piper Aircraft* [*6] *vs. Reyno, 454 U.S. 235 (1981)*, suit was originally brought in a California probate court against Defendants Piper Aircraft and Hartzell Propeller, Inc. The case was subsequently removed to the United States District Court for the Central District of California. Piper Aircraft then moved to transfer the case to the United States District Court for the Middle District of Pennsylvania pursuant to *28 U.S.C. § 1404(a)*. Hartzell Propeller moved to dismiss for lack of personal jurisdiction or in the alternative to transfer. The California district court concluded that it could not assert personal jurisdiction over Hartzell Propeller consistent with due process. However, the California district court decided not to dismiss Hartzell Propeller because the corporation would be amendable to process in Pennsylvania. The California district court quashed service on Hartzell Propeller and transferred the case to the Middle District of Pennsylvania. Thereafter, the plaintiff properly served process on Hartzell Propeller. See Piper Aircraft,    U.S.   , 102 S.Ct. at 258 & nn. 4, 5.

The procedure followed by the California District Court in Piper Aircraft was neither approved nor [*7] disapproved by the Supreme Court. While the Defendants assert that the holding in Piper Aircraft mandates that the question of jurisdiction be resolved prior to further action in the matter, this Court does not read Piper Aircraft as so holding. Indeed, the question whether a Court has the power to transfer a case if it lacks personal jurisdiction has not definitively been decided. Compare, e.g., *James vs. Dailey and Lewis, 406 F.Supp. 645 (D. Del. 1976)*; *Total Sound, Inc. vs. Universal Record Distributing Corp., 286 F.Supp. 123 (S.D.N.Y. 1968)*; *Tetes vs. Hawker, 278 F.Supp., 834* (D.W. Va. 1968) with *Baron & Co., Inc. vs. Bank of New Jersey, 497 F.Supp. 534 (E.D. Pa. 1980)*; *Troyer vs. Karcagi, 488 F.Supp. 1200 (S.D.N.Y. 1980)*; *Brown vs. Grimm, 483 F.Supp. 40 (N.D. Ill. 1979)*; *Wooldridge vs Beech*

1983 U.S. Dist. LEXIS 17465, *7; 18 Av. Cas. (CCH) P17,169

*Aircraft Corp., 479 F.Supp. 1041 (D. Mo. 1979)*; *Shong Ching Lau vs. Change, 415 F.Supp. 627 (E.D. Pa. 1976)*. Given the split of authority, the apparent rule in the district courts in this circuit that the issue of lack of personal jurisdiction need not be resolved prior to a determination of a motion to transfer, see *Baron & Co., 497 F.Supp. 534*; *Shong Ching Lan, 415 F.Supp. 627*, and the [*8] grossly inadequate presentation by Hoof Products of its claim of lack of personal jurisdiction to this Court, this Court concludes that it may properly determine the motion to transfer without first deciding the issue of jurisdiction by this Court over Hoof Products.

Woodall moves to transfer pursuant to *28 U.S.C. § 1404(a)*. That section provides:

For the convenience of parties and witnesses, in the interests of justice, a District Court may transfer any civil action to any other district or division where it might have been brought.

Woodall's principal justification for transfer of the action is the pendency of similar actions in the United States District Court for the Eastern District of Virginia. The Virginia actions involve the same parties and facts as this action. Indeed, it would appear that the sole basis for filing this action is that under Virginia law there is no cause of action for strict product liability. See Affidavit of Charles J. McKelvey, Esq., of April 18, 1983 at P3. The Magistrate, in his report of April 7, 1983, exhaustively reviewed the applicable case law and concluded that, in the interest of justice, this action sould be transferred to the [*9] Eastern District of Virginia for possible consolidation with the Virginia actions. This Court agrees both with the reasoning and conclusion of the Magistrate.

Piper Aircraft urges the Court to decline to transfer this case, contending that Woodall is "forum shopping" and that Piper Aircraft might have to respond to a product liability claim if this case is transferred. This Court agrees with the Magistrate that it is difficult to see how either Piper Aircraft or Hoof Products could conceivably be prejudiced in any way by a transfer. If the transfer were denied and jurisdiction found lacking as to Hoof Products, Piper Aircraft might still have to answer to the strict liability claim in this Court. If the motion to transfer be granted, the jurisdictional and choice of law issues would be resolved by the Virginia courts. If Pennsylvania law is found by the Virginia court to be applicable to this case, Piper Aircraft and Hoof Products

would be in no different position in the Virginia court than they would be in this Court. Hoof Products has raised the defense of lack of personal jurisdiction in the Virginia court. If it is found that there is no jurisdiction over Hoof Products [*10] in Virginia, this action will, of course, be dismissed as against Hoof Products.

For all the reasons, the motion to tranfer will be granted.

An appropriate order will be entered.

ORDER

1. The motion of Plaintiff Marlene Woodall, administratrix and personal representative of the estates of Letcher W. Breeden and Patricia Ann Breeden to transfer this action to the United States District Court to the Eastern District of Virginia is granted.

2. This action is hereby transferred to the United States District Court for the Eastern District of Virginia.

3. The Clerk of Court shall send a copy of this order to the Honorable J. Calvitt Clarke, United States District Court Judge for the Eastern District of Virginia, Norfolk Division.

4. The Clerk of Court shall send a copy of this order to Magistrate Durkin.

REPORT OF MAGISTRATE

(April 6, 1983)

DURKIN, U.S. Magistrate: Before the court is the plaintiff's motion to transfer this action pursuant to *28 U.S.C.§ 1404(a)*.

On December 4, 1981, plaintiff, invoking the court's diversity jurisdiction, filed actions against the above-named defendants in the United States District Court for the Eastern District of Virginia, [*11] concerning the deaths of two Virginia residents resulting from an airplane accident occurring in Virginia.Plaintiff alleges that the cause of the accident was a defect in a fuel valve manufactured and sold by defendant Hoof Products Company, an Illinois corporation, and installed in the aircraft by Piper Aircraft Corporation, a Pennsylvania corporation. The suits were based upon a negligence theory and breach of express and implied warranties. The Virginia cases are scheduled for trial on

1983 U.S. Dist. LEXIS 17465, *11; 18 Av. Cas. (CCH) P17,169

June 6, 1983.

Plaintiff, on behalf of the same decedents, filed the instant case in the United States District Court for the Middle District of Pennsylvania on December 13, 1982, against the same defendants and based on the same airplane accident which occurred in Virginia. The primary difference is that the Pennsylvania action is based on a theory of strict liability which, apparently, is a cause of action not available to the plaintiff in the Virginia forum.

On February 22, 1983, plaintiff filed a motion, pursuant to *28 U.S.C.A.  § 1404(a)*, to transfer this action to the Eastern District of Virginia, and a brief in support thereof. On March 7, 1983, the court referred this motion to the [*12] magistrate. On March 10, 1983, Piper and Hoof filed responsive briefs. On March 16, 1983, plaintiff filed a reply to Piper's response and on March 23, 1983, plaintiff filed a reply to Hoof's response.

*28 U.S.C.A.  § 1404(a)* provides that:

"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Plaintiff's primary justification for transfer is that the pendency of a similar action in Virginia involving the same parties, facts, and incident, renders this transfer in the best interest of justice. Plaintiff further states that the access to witnesses and proof, and convenience of, and the least expense to, the parties justifies transfer of this case.

Defendant Hoof contends that the interests of justice and convenience of the parties dictates that this action remain in the Middle District of Pennsylvania. Hoof claims that plaintiff is improperly forum shopping and that plaintiff, as the moving party, has failed to present a clear case for transfer in that plaintiff's motion is unsupported by affidavits, depositions, or stipulations. Hoof [*13] also contends it has "submitted" as an affirmative defense that the Pennsylvania court lacks personal jurisdiction over Hoof and that transfer, therefore, would be improper prior to a resolution of this question.

Defendant Piper submits three arguments in opposition to the motion to transfer, the third being an extension of the first.

Piper's first and third arguments are as follows: the court must first determine if it has jurisdiction over defendant Hoof. If the Middle District court does not have personal jurisdiction over Hoof but does transfer the action, then Pennsylvania's laws of strict liability will not apply to Hoof in the Virginia forum. Piper argues that if, under these circumstances, the action is transferred, plaintiff would attempt to impose Pennsylvania's strict liability law upon Piper while Hoof need only answer in negligence and warranty in accordance with Virginia law. Piper contends that this is unjust as to Piper and that the interest of justice militates against the transfer.

Piper's second argument is that *§ 1404(a)* does not govern the instant case in that plaintiff is not seeking a transfer here for the purposes intended in *§ 1404(a)*, but rather [*14] plaintiff is impermissible forum shopping and attempting to inject Pennsylvania law into a Virginia court. Piper contends that the interests of justice are not best served by permitting a plaintiff to commence an action in one jurisdiction, subsequently commence a similar action in a second jurisdiction, and then attempt to transfer the second action into the original jurisdiction simply to obtain the benefit of a more favorable law of the state from which transfer was made.

A district court is empowered to transfer a civil action under *§ 1404(a)* if the transfer is warranted for the convenience of parties and witnesses and promotes the interest of justice, and the proposed transferee district is one in which the action "might have been brought." *Van Dusen v. Barrack, 376 U.S. 612, 616 (1964)*. The burden of persuasion rests with the moving party to establish that a balance of the proper interests weigh in favor of the transfer. *Shutte v. Armco Steel Corporation, 431 F. 2d 22, 25 (3d Cir. 1970)*, cert. denied, *401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808*.

The limiting clause, "where it might have been brought," was interpreted in *Shutte, supra, at 24*, as authorizing transfer only [*15] if plaintiff had an unqualified right to bring the action in the transferee forum at the time of the commencement of the action. The court held that transfer was authorized where venue was proper in the transferee district and the transferee court would have had in personam jurisdiction over all of the defendants. *Id.  at 24*.

It is evident that these elements have been

established as the action in the Virginia court involved the exact same parties and incident as the Pennsylvania action. Defendants have not argued that the Virginia court lacks jurisdiction over the defendants or thast venue is improper with respect to the action now pending in Virginia, and these factors indicate that the instant action "might have been brought" in Virginia. The fact that Virginia does not recognize the strict liability cause of action is not determinative of the question of where the action might have been brought. Transfer should not be denied simply because, under the laws of the transferee court, plaintiff at the time of the commencement of the instant action would have been otherwise frustrated in bringing his strict liability cause of action in Virginia. See *Van Dusen, supra, at 621*. [*16]

Defendant Hoof contends that the Pennsylvania court should not order the transfer on the bare motion of the moving party, absent affidavits, depositions, or stipulations, showing the necessity of the transfer.There are decisions holding that where the movant does not support this motion for transfer with affidavits, depositions, or stipulations containing facts establishing the necessary elements for the transfer, the motion should be denied. *Plum Tree Incorporated v. Stockment, 488 F. 2d 754, 756 (3d Cir. 1973)*; *Keck v. Employees Independent Association, 387 F. Supp. 241, 244, n. 6 (E.D. Pa. 1974)*.

Concerning the question of convenience of parties, access to witnesses and proof, and least expense to the parties, plaintiff has merely alleged in a conclusory manner that these interests justify a transfer. Plaintiff fails to support these allegations in any manner.

However, plaintiff has alleged sufficient facts concerning the pendency of a similar action which would render a transfer in the best interest of justice.

The presence of a related action in the transferee forum has been considered an overriding factor in the balancing of interests. In *Kisko v. Penn Central Transportation* [*17] *Company, 408 F.Supp. 984, 987 (M.D. Pa. 1976)*, the court held that the potential for the avoidance of duplicative litigation and judicial economy constituted powerful reasons for the granting of the transfer. *Id. at 987*.

One court, albeit with some reservation, held that *§ 1404(a)* authorizes transfer where the only reason is to enable the case to be consolidated for trial with another

case with a related claim pending in the transferee district. *Maxlow v. Leighton, 325 F.Supp. 913, 915 (E.D.Pa. 1971)*.

The factual situation in that case is somewhat similar to the instant case. In Maxlow, plaintiff instituted actions in two different districts which arose out of the same incident but against different defendants. There defendants moved for transfer which motion the court granted, stating:

"Generally speaking, litigation of related claims in the same tribunal is favored in the federal court system in order to avoid duplicitous litigation, attendant unnecessary expense and loss of time to courts, witnesses and litigants and to avoid inconsistent results." *Id. at 916*.

The factors mentioned by the court in reaching its decision are present in the instant case, since the defendants [*18] have apparently agreed that the Virginia action involves the same parties and arose out of the same incident as in the instant action.

Although plaintiff could have alleged facts in support of her motion with greater specificity, the avoidance of dupblicative litigation best serves the purpose of *§ 1404(a)* which is to prevent the waste "of time, energy and money" and "to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen, supra, at 616*, quoting *Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26, 27*.

As noted above, Hoof takes the position that its defense of lack of personal jurisdiction must be decided before any decision on the motion to transfer is made. It invites the court to review the facts in *Piper Aircraft v. Reyno, 454 U.S. 235 (1981)*, [1] "for a similar unjust end that could come out of transfer." In its brief opposing plaintiff's motion to transfer, defendant Piper, alluding to Hoof's defense, elaborates by arguing that if the Pennsylvania court lacks jurisdiction over HOof, then it cannot transfer plaintiff's case against Hoof. Piper clarifies this by stating that if jurisdiction over HOof is lacking, the [*19] Virginia court could not apply Pennsylvania's laws of strict liability against Hoof. Piper apparently believes that under these circumstances, and if a transfer were ordered, then the Virginia court might theoretically apply Pennsylvania's strict liability law against Piper and that this would be grossly unjust to Piper.

1983 U.S. Dist. LEXIS 17465, *19; 18 Av. Cas. (CCH) P17,169

1  Hoof's brief provides an incorrect citation.

Hoof raised the defense of lack of personal jurisdiction not by motion, but in its answer. If Hoof believed that it should not be before this court fvor any further purposes, it should have applied for a determination of this issue under *Rule 12(d), Fed. R. Civ. P.* Instead, Hoof now asks for determination of this issue in a brief opposing plaintiff's motion to transfer. In any event, a transfer under *§ 1404(a)* is proper even though the transferor court lacked personal jurisdiction. *Reyno v. Piper Aircraft Co., 630 F. 2d 149, 164-165 (3d Cir. 1980)*; reversed on other grounds, *454 U.S. 235 (1981)*. The jurisdictional issue should be decided by the Virginia court.

Further, it is difficult to see how Piper would be prejudiced in any way by an transfer. If transfer were denied and jurisdiction found lacking [*20] as to Hoof, Piper must still answer to the strict liability claim in the Pennsylvania court. If the motion to transfer were granted, the jurisdictional and choice of law issues would be resolved by the Virginia court, and if Pennsylvania law on strict liability is found applicable to Piper, it is in no different position. Further, Hoof, except for inviting the court to review the facts of the Supreme Court's decision in *Reyno, supra*, has not demonstrated how the "unjust end that could come out of a transfer" would work to its prejudice. If by this brief argument Hoof is

alluding to the subtleties of conflict of laws principles, it should not be for the court, by being invited to examine a case, to have to speculate as to Hoof's contention that an unjust end could come out of the transfer. Further, Hoof's argument is apparently an invitation to the court to take a position on what law would apply, and the effects thereof, and this would interfere with the transferee court's right to make such determinations. See *Dispenza v. Eastern Airlines, Inc., 508 F. Supp. 239 (E.D.N.Y. 1981)*.

The final issue to be considered is defendants' contention that *§ 1404(a)* does not govern the instant [*21] case in that plaintiff is not seeking a transfer here for the purposes intended in that section and is merely forum shopping. Nothing in the statute itself nor the case law construing it suggests that plaintiff is improperly making use of *§ 1404(a)*. The fact that plaintiff originally selected the forum is not controlling as plaintiff is not bound by this decision and may move to transfer pursuant to *§ 1404(a). Advocate v. Nexus Industries, Inc., 497 F. Supp. 328, 330, n. 3 (D. Del. 1980)*; *Haire v. Miller, 447 F. Supp. 57, 62 (N.D. Miss. 1977)*.

For the reasons set forth above it is respectfully recommended that plaintiff's motion to transfer be granted.