**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

————————————————————

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| NOWAK DENTAL SUPPLIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:07-cv-01799 |
| | ) | |
| v. | ) | |
| | ) | (Judge Conner) |
| DENTSPLY INTERNATIONAL INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**PLAINTIFF NOWAK DENTAL SUPPLIES INC.'S RESPONSE TO
DEFENDANT'S MOTION TO TRANSFER VENUE**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

I. PRELIMINARY STATEMENT ..................................................................1

II. FACTUAL BACKGROUND ....................................................................3

    A.    Several Cases Pending Before This Court Invoke Precedent
             Established By the Third Circuit in Prior Related Litigation ..............3

    B.    The Instant Motion Attempts to Bring Plaintiff Into a Jurisdiction
             Already Determined to Be Inappropriate ...............................................7

    C.    Nowak is No Longer a Party to the Hess Action .................................9

III. QUESTION PRESENTED ................................................................. 10

IV. LEGAL ARGUMENT................................................................... 10

    A.    Significant Deference Is Accorded to Plaintiff's Choice of Venue ... 11

    B.    Litigation Efficiencies Favor Keeping Nowak in This Court ............ 14

    C.    Judge Robinson's Participation in Prior Cases Does Not Mandate
             Transfer............................................................................................. 16

         1.    The Pendency of Related Litigation in
                  Another Forum is Not Dispositive...........................................17

         2.    The Nowak Action Will Involve Questions of Law
                  Not Addressed in Hess..............................................................19

V. CONCLUSION ................................................................................ 20

i

# TABLE OF AUTHORITIES

## CASES

*In re Amendt,*
     169 Fed. Appx 93 (3rd Cir. 2006) ................................................................18

*In Re AT&T Access Charge Litigation,*
     2005 U.S. Dist. LEXIS 35431 (D.D.C. November 16, 2005) .......................14

*Ayling v. Traveler's Prop. Casualty Corp,*
     1999 U.S. Dist. LEXIS 16716 (E.D. Pa October 27, 1999) ..........................17

*Bank of America NA v. US Airways, Inc.,*
     2005 U.S. Dist. LEXIS 34902 (D. Del. December 21, 2005) .......................18

*Clark v. Burger King Corp. and Dime-Mor II, Inc.,*
     255 F. Supp. 2d 334 (D.N.J. 2003) ................................................................12

*First Union National Bank v. United States,*
     55 F. Supp. 2d 331 (E.D.Pa. 1999) ................................................................12

*Fusi v. Emery World Airlines,*
     2007 U.S. Dist. LEXIS 89784 (S.D. Ohio November 23, 2007) ..................17

*Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.,*
     2007 U.S. Dist. LEXIS 71563 (D. Del. Sept. 26, 2007) ..........................9, 19

*Howard Hess Dental Laboratories v. Dentsply International, Inc.,*
     424 F.3d 363 (3d. Cir. 2005) ................................................................passim

*Illinois Brick Co. v. Illinois,*
     431 U.S. 720 (1977).....................................................................2, 8, 19, 20

*Job Haines Home for the Aged v. Young,*
     936 F. Supp. 223 (D.N.J. 1996).....................................................................18

*Jumara v. State Farm Insurance,*
     55 F.3d 873 (3d Cir. 1995) ....................................................................10, 16

*Kedia v. Jamal*,
　　2007 U.S. Dist. LEXIS 48474 (D.N.J. July 5, 2007) ....................................17

*Kucala Enterprises v. Automobile Wax Co.*,
　　2002 U.S. Dist. LEXIS 13147 (N.D. Ill. July 18, 2002) ...............................17

*Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*,
　　102 F. Supp. 2d 518 (D.N.J.  2000).............................................................18

*Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.*,
　　6 F. Supp. 2d 349 (D.N.J. 1998)...................................................................13

*Samsung Electronics Co. Ltd v. Rambus, Inc.*,
　　386 F. Supp. 2d 708 (E.D. Va. 2005)......................................................13, 17

*Shan Sparshott, et al v. Feld Entertainment, Inc.*,
　　89 F. Supp. 2d 1 (D.D.C. 2000).............................................................11, 17

*Shutte v. Armco Steel Corp.*,
　　431 F.2d 22 (3d Cir. 1970) ...................................................................11, 12

*Sovereign Bank, F.S.B. v. Rochester Community Savings Bank*,
　　907 F. Supp. 123 (E.D.Pa. 1995)..................................................................12

*United States v. Dentsply International, Inc.*,
　　399 F.3d 181 (3d Cir. 2005) ..........................................................................4

*U.S. v. Grinnell Corp.*,
　　384 U.S. 563 (1966)......................................................................................14

*Woodall v. Piper Aircraft*,
　　1983 U.S. Dist. LEXIS 17465 (M.D. Pa April 25, 1983) .............................18

# DOCKETED CASES

*Hess v. Dentsply International, Inc.*,
   No. 1:99-255 (D.Del.)......................................................................2

*Jersey v. Dentsply, International Inc, et al*,
   No. 1:01 CV-00267 (D.Del.) ..........................................................2

*Lactona Corp. v. Dentsply International, Inc.*,
   No. 1:07-00774 (M.D.Pa.).........................................................1, 15

*Univac Dental Co. v. Dentsply International, Inc.*,
   No. 1:07 CV-00493 (M.D.Pa.) ........................................................1

Plaintiff Nowak Dental Supplies, Inc. files this response in opposition to Defendant Dentsply International Inc.'s motion to transfer venue in this case to the District of Delaware.

## I.  PRELIMINARY STATEMENT

In its opening brief, Dentsply lists numerous factors the Third Circuit weighs when considering a motion to transfer.[1]  Strikingly, none of these enumerated factors favor transfer here, let alone weigh heavily enough to counterbalance the strong presumption in favor of plaintiff's choice of jurisdiction.  Put quite plainly, Nowak has chosen to come to Dentsply's *home district*, where it is already involved in related cases involving *the same facts and causes of action*.[2]  There can be no more convenient venue for Dentsply to produce documents and witnesses, appear before the court and defend itself at trial, than here - particularly when Dentsply will be compelled to make these same efforts in the prosecution of the *Univac* and *Lactona* actions regardless of whether Nowak remains in this venue.  Indeed, Dentsply concedes that it would not be burdened by litigating here, and it is puzzling that Dentsply would seek to double its obligations.   On the other hand, transfer will not only leave many of the same issues pending before this

---

[1] Defendant Dentsply International Inc.'s Brief in Support of Its Motion to Transfer ("Def. Brf.") at 8.

[2] *Univac Dental Co. v. Dentsply International, Inc.*, No. 1:07 CV-00493 (M.D.Pa.) ("*Univac*").   *Lactona Co. v. Dentsply International, Inc.*, No. 1:07 CV-00774 (M.D.Pa.) ("*Lactona*").

Court, but will also place before the Delaware court novel questions of law and fact unrelated to any case now pending before it.

In an attempt to counter this clear balance of benefits in favor of this Court, Dentsply devotes much of its brief (and nearly all of its legal argument) to detailing the experience of the Delaware court in a near-complete case which arose from Dentsply's proven anticompetitive conduct, but which involved different parties and claims.[3]   It is this experience alone, Dentsply contends, that mandates transfer of *only* the Nowak case to that foreign court.  In fact, transfer of this action would create precisely the inefficiency and risk of inconsistent judgments of which Dentsply professes concern.

It is well settled that where competition has been harmed by a firm's anticompetitive conduct, it is the *competitors* of, and *direct purchasers* from, that firm that are empowered to pursue antitrust remedies. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977).  Accordingly, Univac, Lactona and Nowak must each satisfy the same elements of Section 2, requiring this Court to consider precisely the same factual and legal issues in each case.  Likewise, all three plaintiffs have made allegations that Dentsply will be estopped from contesting its anticompetitive conduct, and the harm to competition caused thereby, already determined by the Third Circuit in the government action.  Therefore, transfer of

---

[3] *Hess v. Dentsply Int'l, Inc*., No. 99-255 (D.Del.);  *Jersey v. Dentsply, Int'l Inc, et al,* No. 1:01 CV-00267 (D.Del.) (collectively, "*Hess*").

this action would *increase* the risk of inconsistent judgments, as two separate courts would then be asked to address for the first time substantially identical claims and the preclusive effect of Third Circuit precedent thereon.

Notably, Judge Robinson's opinion regarding the potential preclusive effects of the Third Circuit's findings on the claims of *indirect* purchasers is not dispositive of, nor particularly relevant to, the factually and legally distinct claims of direct purchasers and competitors. Moreover, the *Hess* action is over but for a conspiracy claim that is irrelevant to the cases now before this Court. Judicial economy will not be served by compelling the Delaware court to assume jurisdiction of a case that is in its nascent stages, in order to preside over discovery disputes and motion practice not only distinct from any prior cases, but also not conducive to coordination with any other process now before that court.

In reality, Dentsply's motion is a litigation tactic designed to drag Nowak back into the *Hess* action, from which it has been dismissed *for lack of personal jurisdiction*. Dentsply's motion should be rejected.

## II. FACTUAL BACKGROUND

### A.    Several Cases Pending Before This Court Invoke Precedent Established By the Third Circuit in Prior Related Litigation

In 1999, the Department of Justice Antitrust Division (DOJ) filed an antitrust suit under Sections 1 and 2 of the Sherman Act against Dentsply in the

District Court of Delaware, Dentsply's state of incorporation.[4]   As alleged in that case, beginning as early as 1987, Dentsply imposed upon its dealers an exclusive dealing requirement which, among other things, compelled dealers to reject products from competing manufacturers in favor of Dentsply's teeth.   This requirement was subsequently codified in Dentsply's "Dealer Criterion 6" which provided that dental dealers promoting Dentsply's products "may not add further tooth lines to their product offering." (Nowak Complaint at ¶23). The DOJ alleged that the purpose and effect of Dealer Criterion 6 was to restrain competition, maintain a monopoly in the market for artificial teeth, prevent new entry into the market, and thereby cause artificial teeth prices to increase to artificially high levels.

In fact, the DOJ was proven precisely correct regarding the anticompetitive intent, and impact, of Dentsply's restrictive dealer policies.    In an opinion dated February 24, 2005, the Third Circuit concluded that Dentsply's exclusionary conduct in the market for artificial teeth violated Sherman Act Section 2.   *See United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005).  In so finding, the Third Circuit made, or relied upon, a number of factual and legal findings that will be directly relevant to the several cases now before this Court arising from Dentsply's wrongful exclusionary conduct.  Specifically, the Third Circuit found

---

[4] *United States v. Dentsply Int'l, Inc.*, 99-cv-005 (D. Del.).

that Dentsply had achieved and maintained a dominant share of the market for artificial teeth and that:

a.    "The reality is that over a period of years, because of Dentsply's domination of dealers, direct sales have not been a practical alternative for most manufacturers. . . .  This is the part of the real market that is denied to the rivals." *Id*. at 189.

b.    "The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market."  *Id*. at 190.

c.    "By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly. It helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition." *Id*. at 191.

d.    Persuasive evidence existed of Dentsply's control, and inflation, of artificial tooth prices: "Dentsply did not reduce its prices when competitors elected not to follow its increases. Dentsply's profit margins have been

growing over the years. . . . The results have been favorable to Dentsply, but of no benefit to consumers." *Id*.

Based on these findings of fact, the Third Circuit concluded that, (a) Dentsply had market power in the relevant market for prefabricated artificial teeth in the United States, (b) "Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors," and (c) "on this record, the Government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated Section 2." *Id*. at 196.

Thereafter, entities harmed by this anticompetitive conduct, including manufacturers and direct purchasers of artificial teeth, filed suit in Dentsply's home district (Dentsply's principal place office is located in York, Pennsylvania). Univac and Lactona, two competitors of Dentsply, and Nowak, a direct purchaser from Dentsply, filed their complaints in this district in 2007. Notably, all three of these plaintiffs allege Section 2 claims arising from harm to competition recognized by the Third Circuit. Specifically, each complaint alleges that Dentsply maintained and exercised monopoly power in the artificial teeth market through exclusionary and anti-competitive conduct, including the implementation and enforcement of Dealer Criterion 6, which precluded Dentsply's competitors from gaining access to dealers. Each party further alleges that Dentsply's exclusionary

practices were intended to, and did, stifle competition in the artificial tooth market, as evidenced, *inter alia*, by the monopoly prices Dentsply was able to extract for its tooth products.[5]  Furthermore, Nowak, Univac and Lactona also allege that the doctrine of collateral  estoppel applies to the Third Circuit's conclusion that Dentsply violated Section 2 of the Sherman Act, and will therefore be dispositive of that issue.

### B.    The Instant Motion Attempts to Bring Plaintiff Into a Jurisdiction Already Determined to Be Inappropriate

The principal basis for the instant motion is the Delaware district court's experience as the trial court in the government action and in another action also arising from Dentsply's wrongful conduct – *Hess* – which involves very different plaintiffs and legal theories than presented to the Court here. Defendant submits that this experience, by itself, is compelling enough to transfer this case (but not *Lactona* or *Univac*) *from* defendant's home district and *to* the district where Judge Robinson recently ruled that she did not have jurisdiction over Nowak as a defendant and that venue was improper.

In its current incarnation, the *Hess* action asserts a Sherman Act Section 1 conspiracy based on resale price maintenance, bearing very little resemblance to *Nowak*, *Univac* or *Lactona*.    *Hess* began as a Section 2 action by a class of

---

[5] *See Univac* Complaint at ¶¶ 1-8, 15-16;  *Lactona* Complaint at ¶¶ 1-7, 25-28; *Nowak* Complaint at ¶¶ 4-7, 27-34 (Complaints from each action are appended, collectively, as "Attachment A").

*indirect* purchasers, *i.e.* consumers that purchased artificial teeth through wholesalers or retailers, rather than directly from Dentsply.    The district court dismissed the *Hess* Section 2 case against Dentsply because it lacked standing ***as an indirect purchaser*** to seek damages against Dentsply.  The court's ruling was based on the principles of *Illinois Brick,* wherein the Supreme Court drew a bright line between direct and indirect purchasers, holding that direct purchasers may recover damages in antitrust cases whereas indirect purchasers cannot.[6]

*Hess* then unsuccessfully attempted to revive its Section 2 claims by alleging that it was both an indirect ***and*** direct purchaser.    The district court again dismissed, holding that the same *Illinois Brick* policy concerns were implicated.[7] On appeal, the Third Circuit affirmed that *Hess* was barred from bringing a Section 2 claim by *Illinois Brick* and, furthermore, the facts did not fit within any of the *Illinois Brick* exceptions that would confer standing.[8]    The only *Hess* claim surviving the Third Circuit's decision was very different than the claims now before this Court: the indirect purchasers' allegation of a retail price fixing

---

[6] In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 735-45 (1977), the Supreme Court identified three policy concerns which favor granting standing only to direct purchasers:   (1) the danger of duplicative recovery is too great to allow both classes of purchasers to be entitled to recover damages;   (2) identifying and tracing overcharges incurred by indirect purchasers would be too difficult; and (3) the risk of inefficient enforcement of the antitrust laws if indirect purchaser actions were to be allowed.

[7] *Howard Hess Dental Labs v. Dentsply Int'l, Inc.,* 424 F.3d 363, 373 (3d. Cir. 2005).

[8] *Id.*, at 370-2.

conspiracy between the dental supply dealers, such as plaintiff Nowak, and Dentsply. The Third Circuit held that, unlike the Section 2 claim, which was predicated on Dealer Criterion 6 and its exclusionary effect, a resale price maintenance claim did not raise the same *Illinois Brick* concerns that were fatal to Hess' Section 2 claims.[9]

### C.    Nowak is No Longer a Party to the *Hess* Action

On October 10, 2006, *Hess* re-filed its complaint, now alleging retail price fixing by, and conspiracy between, Dentsply and its dealers, including Nowak. In response to that complaint, Nowak, among others, moved to dismiss the action against them for lack of personal jurisdiction and proper venue. On September 26, 2007, Judge Robinson dismissed Nowak as a defendant from the *Hess* actions on both grounds.[10]

Although Judge Robinson noted that she was not required to address venue (having found that personal jurisdiction did not exist as to Nowak), she proceeded to dismiss the case against Nowak and certain other defendants on that basis stating:

> "The court finds that domestic defendants' national contacts do not suffice to render venue appropriate in the District of Delaware….The court, therefore, finds

---

[9] *Id*. at 376-81.

[10] *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc*., 2007 U.S. Dist. LEXIS 71563, *38-42 (D. Del. Sept. 26, 2007).

that the moving **defendants have satisfied their burden to establish that venue in this district is improper**.[11]

Judge Robinson also dismissed all pending conspiracy counts, leaving intact only the indirect purchasers' retail price fixing claim. *Id*. at 32.

## III.  QUESTION PRESENTED

Whether the presumption favoring Plaintiff's choice of venue, which is defendant's home forum, and litigation efficiencies that will be realized in advancing three related antitrust cases against Dentsply in this Court have been offset by the fact that one substantially similar case which is concluded, and one dissimilar case which is near its conclusion, were litigated in a different jurisdiction, thereby favoring transfer to that jurisdiction?

## IV.  LEGAL ARGUMENT

Under the law of the Third Circuit, the moving party bears the burden of proving why a court should grant a transfer. *See Jumara v. State Farm Ins.*, 55 F.3d 873, 879 (3d Cir. 1995).  While there is no definitive formula, the Third Circuit has identified twelve factors that generally apply to transfer motions.[12]  As

---

[11] *Id*. at 24-25 (emphasis added).

[12]  The most common factors are (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) "convenience of the parties as indicated by their relative physical and financial conditions"; (5) the convenience of the witnesses; (6) the location of books and records; (7) the enforceability of the judgment; (8) practical considerations that could expedite or

it is plaintiff's privilege to choose the forum, unless the balance of inconvenience of the parties *strongly* favors defendant, plaintiff's choice of forum should prevail. *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir. 1970). The presumption in favor of plaintiff is so strong, in fact, that absent a compelling showing by the defendant, plaintiff's choice should not be disturbed. *See Shan Sparshott, et al v. Feld Entertainment, Inc.,* 89 F. Supp. 2d 1, 4 (D.D.C. 2000).

Notably, Dentsply relies on only two factors in support of its motion: the practical consideration of making the litigation easier and less expensive, and the potential danger of inconsistent rulings. Defendant does not contest that venue is appropriate in Pennsylvania, nor does it point to any reasons why it is *less* convenient to litigate this action in Pennsylvania rather than in Delaware. In fact, Defendant concedes that Pennsylvania is convenient. Instead, Dentsply's entire argument is based on the proposition that the existence of *Hess* so substantially outweighs all other relevant considerations that transfer is appropriate.

Defendant has failed to meet its burden.

## A. Significant Deference Is Accorded to Plaintiff's Choice of Venue

Where, as here, there is a legally cognizable nexus among the district, the dispute and the parties, a plaintiff's choice of forum becomes "a paramount

---

simplify trial; (9) the level of court congestion in the two fora; (10) "the local interest in deciding local controversies at home"; (11) the public policies of the fora; and (12) in a diversity case, the familiarity of the two courts with state law. *Jumara,* 55 F.3d at 879-880.

consideration that should not lightly be disturbed." *Clark v. Burger King Corp. and Dime-Mor II, Inc.* 255 F. Supp. 2d 334, 338 (D.N.J. 2003)*; First Union National Bank v. United States,* 55 F. Supp.2d 331, 332 (E.D.Pa. 1999). Dentsply fails to demonstrate how issues of convenience are so compelling that the presumption favoring Plaintiff's choice of venue should be overturned.

Dentsply argues that the District of Delaware is a forum of greater convenience because Plaintiff does not reside in Pennsylvania and the claim did not arise in Pennsylvania. Defendant mistakes the purpose of the forum *non-conveniens* argument: the test is not whether it would be more convenient (or preferable) for defendant to appear in Delaware rather than Pennsylvania; the burden is upon defendant to show that litigating the case in Pennsylvania is inconvenient.[13]   *See Shuttfe v. Armco Steel Corp.*, 431 F.2d 22, 24 (3d Cir. 1970).

Defendant has already conceded that litigating in Pennsylvania is convenient. (Def. Brf. at 19). In fact, three of the four parties with related cases now before this Court – Dentsply, Univac, and Lactona – have their principal places of business in this district, further bolstering the presumption that litigation here would facilitate the convenience of parties and witnesses as well as document

---

[13] Whether or not Nowak resides in Pennsylvania has no bearing on whether defending here is less convenient to defendant. The mere fact that plaintiff files in a district other than its home does not compel transfer to another forum. *See Sovereign Bank, F.S.B. v. Rochester Community Savings Bank,* 907 F. Supp. 123, 126 (E.D.Pa. 1995) (court denied defendant's motion to transfer even though plaintiff filed in a district which was not his home **nor** the situs of events.)

search, retrieval and production more so than anywhere else. [14]  *See Samsung Electronics Co. Ltd v. Rambus, Inc.,* 386 F. Supp. 2d 708, 717 (E.D. Va. 2005) (defendant's home district is a convenient forum for defendant);  *Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.,* 6 F. Supp. 2d 349, 357-58 (D.N.J. 1998) (venue in defendant's principal place of business appropriate and may be preferred in certain cases).  Furthermore, as long as *Univac* and *Lactona*  remain with this Court (and there has been no move by defendant to transfer those cases despite their pendency in this Court for nearly a year), the same documents and witnesses would nonetheless have to travel here.

Finally, Dentsply's assertion that the claims at issue here are not connected to this District is incorrect.  Nowak, Univac and Lactona allege that Dentsply implemented a nationwide policy intended to exclude its competitors from the market for artificial teeth, and thereby drive up tooth prices (and its own profits).  Dentsply does not dispute this.  (Def. Brf. at 17).  The nationwide scope of Dentsply's misconduct does not change the fact that the epicenter of the unlawful

---

[14] Dentsply suggests that the location of documents produced in prior litigation in Washington D.C. makes Delaware a preferable venue to Pennsylvania.  This is makeweight.  As Dentsply admits, the location of documents is only a consideration when "the records could not be produced in the alternative forum." Def. Brf. at 18, *quoting LG Elecs. Inc. v. First Int'l Computer of America, Inc.*, 138 F.Supp. 574, 591 (D.N.J. 2001).  Of course, Dentsply cannot contend that these documents could more easily be produced in Wilmington than Harrisburg.  And as Dentsply further admits, that much of these documents are kept electronically (and therefore are easily transportable) vitiates any convenience rationale based on the existence of these previously-produced records.

conduct and the decisions arising therefrom was Dentsply's corporate headquarters in Pennsylvania.    This fact supports plaintiff's forum selection and further weighs against transfer. *See, e.g.*, *In Re AT&T Access Charge Litigation,* 2005 U.S. Dist. LEXIS 35431, *15 (D.D.C. November 16, 2005) (the location where the conduct is coordinated and controlled is the location where the conduct occurred).

As Defendant resides in this forum and the situs of events is here, the strong preference for plaintiff's choice of venue remains undisturbed.

### B.    Litigation Efficiencies Favor Keeping *Nowak* in This Court

The pendency of *Lactona* and *Univac* before this Court further counsels against transfer due to the common issues shared between the three cases.    Each case now before the Court asserts a claim under Section 2, for which each of these plaintiffs must prove (1) defendant's possession of monopoly power and (2) the willful acquisition or maintenance of that power. *U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). All three complaints allege that these elements are satisfied by the same factual bases: Dentsply's institution and enforcement of restrictive dealer policies which precluded competitors from entering the market, thereby preserving a monopoly share (and monopoly profits) for Dentsply.

Furthermore, since each plaintiff has made virtually the same allegations regarding the preclusive effect of the Third Circuit's findings, this Court must eventually apply that ruling regardless of where *Nowak* is litigated.  Even if the

Court eventually rejects this estoppel argument, the cases will not be disposed of, but rather each party will then prove, likely via common evidence, each of the elements described above. Thus, issues common to all three plaintiffs can be addressed by one court, promoting judicial economy, and transferring *Nowak* creates no efficiencies for this Court: even in *Nowak*'s absence, the Court must still oversee the same questions of law and fact arising from Dentsply's anticompetitive conduct.

Even Dentsply recognized the efficiencies of litigating these claims together, when it recently moved to transfer *Univac* and *Lactona* to the same docket:

> "…failure to merge these cases into one proceeding will result in a waste of judicial resources and impose extreme financial burden on Dentsply….if these cases proceed separately, two sets of discovery will be taken that will require the same documents to be exchanged and the same witnesses deposed twice. Allowing these cases to proceed as one will substantially streamline discovery…Interests of judicial economy will be served by having these cases proceed as a single action for the additional reason that repetitious conferences, discovery disputes, and other motion practice will be avoided."[15]

If litigation efficiencies can be realized by consolidating *Univac* and *Lactona*, then additional efficiencies would be gained by retaining and advancing all three cases through a coordinated process through this Court. These practical

---

[15] Motion of Dentsply International, Inc. to Close Case and Transfer to Univac Docket, *Lactona Corp. v. Dentsply Int'l, Inc.*, No. 1:07-00774 (M.D.Pa.) (filed 12/07/2007), at 2. This motion is currently pending.

considerations make litigation easier, expeditious, and less expensive, and further support the presumption favoring plaintiff's venue choice. *See Jumara,* 55 F3d at 879-880.  On the other hand, transfer would increase the burden on the Delaware court by compelling it to take on a case that is factually and legally distinct from any case now before it, and not susceptible to any form of consolidation or coordination due to the advanced stage of *Hess*.

Inconceivably, when it comes to this case, Defendant seems untroubled by proposing that discovery exchanges, depositions, conferences, discovery disputes, and other motion practice on matters common to all three cases be handled by two different judges in two different fora.[16]

## C.    Judge Robinson's Participation in Prior Cases Does Not Mandate Transfer

Dentsply's brief makes it clear that its ***only*** argument in support of transfer is Judge Robinson's experience in the government and *Hess* actions.  However, Dentsply has failed to show how Judge Robinson's knowledge of this particular matter is so critical to the interests of justice in this case that it outweighs the

---

[16] Dentsply's motives are further  revealed by the fact that it has not even moved to consolidate all manufacturer cases in a single forum.  Unmentioned in Dentsply's brief is the existence of a related California action, *Vident v. Dentsply International, Inc.,* Case No. SACV 06-1141 (C.D. Cal). *Vident* is an antitrust action brought by a manufacturer of artificial teeth which alleges it was excluded from the market as a result of Dentsply's misconduct. Defendant has not sought transfer of the *Vident* case to Delaware. In fact, discovery has already commenced in that case.

16

strong presumption in favor of plaintiff's choice of forum and the efficiencies that would be realized by advancing the *Nowak*, *Univac* and *Lactona* actions in this Court.

> 1.    *The Pendency of Related Litigation in*
> *Another Forum is Not Dispositive*

As an initial matter, it is well established that the mere existence of related cases in another forum, even very similar cases with overlapping facts, is insufficient grounds for transfer. *See, e.g.*, *Kedia v. Jamal*, 2007 US Dist. LEXIS 48474, *12-15 (D.N.J. July 5, 2007) (refusing transfer despite related litigation involving same parties and "substantially overlap[ping]" claims, since different legal and damage theories made inconsistent judgments unlikely); *Shan Sparshott*, 89 F. Supp. 2d. at 4 (denying transfer despite closely related foreign bankruptcy proceedings, noting that the "mere existence of a related case in another forum is insufficient."); *Fusi v. Emery World Airlines*, 2007 U.S. Dist. LEXIS 89784, * 27-28 (S.D. Ohio November 23, 2007) (transfer rejected notwithstanding multiple cases pending in other forum); *Samsung,* 386 F. Supp. 2d at 717;   *Kucala Enterprises v. Auto Wax Co.,* 2002 U.S. Dist. LEXIS 13147, *13 (N.D. Ill. July 18, 2002).

Nor do the cases relied upon by Dentsply counsel differently.  For example, in *Ayling v. Traveler's Prop. Cas. Corp,* 1999 U.S. Dist. LEXIS 16716 (E.D. Pa October 27, 1999) the court granted transfer because, in the alternative forum: (a)

the majority of the witnesses and the defendant's headquarters were located; (b)

the alleged violations arose; and (c) the trial judge had a "virtually identical case"

before him, *involving the same class*. *Id*. at *4, 18-19.   None of these factors

support transfer here.  Likewise, in *In re Amendt,* 169 Fed. Appx 93 (3rd Cir. 2006)

defendant first-filed a declaratory judgment action in Illinois, and plaintiffs sought

a transfer of that action to Pennsylvania.  That transfer was *denied.*  A year after

the Illinois action was filed, plaintiffs filed "essentially identical litigation" in

Pennsylvania. *Id* at 96.   The Pennsylvania court transferred to Illinois, finding that

the new case was merely an attempt by plaintiffs to re-litigate the Illinois denial of

transfer.  *Id*.  Dentsply's remaining cases are also readily distinguished on their

facts.  *See, e.g., Bank of America NA v. US Airways, Inc*., 2005 U.S. Dist LEXIS

34902, *8-9 (D. Del. December 21, 2005) (transfer granted where "functionally

identical" claims were before bankruptcy court and depended upon interpretation

of reorganization plan); *Woodall v. Piper Aircraft*, 1983 U.S. Dist LEXIS 17465,

*8-9 (M.D. Pa April 25, 1983) (transfer granted where related case involved same

parties and facts, and sole basis for filing in transferor court appeared to be to

avoid bad law); *Job Haines Home for the Aged v. Young,* 936 F. Supp. 223, 227,

233  (D.N.J. 1996) (granting transfer where "the underlying facts have virtually

nothing whatsoever to do with the forum state", while venue of related cases was

the situs of the conduct at issue); *Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*

102 F. Supp 2d 518, 533 (D.N.J. 2000) (transfer granted to home forum of defendant, where anticompetitive policy was developed, implemented and monitored).

2.    *The Nowak Action Will Involve Questions of Law*
      *Not Addressed in Hess*

In claiming that Judge Robinson has already addressed Nowak's estoppel claims, and determined the preclusive effects of the Third Circuit's holdings in the government action, Dentsply mistakes (or intentionally obfuscates) the essential and important distinction between direct and indirect purchaser actions.

Nowak brings this antitrust case on behalf of a proposed class of direct purchasers, which, as the Third Circuit has recognized, are the only purchasers with standing to assert a Section 2 claim against Dentsply. *See, supra* at 7-8. By contrast, *Hess* is an indirect purchaser case wherein a Section 2 claim against Dentsply was dismissed because *Illinois Brick* precludes such recovery. As Dentsply concedes, the *Hess* plaintiffs argued that the Third Circuit had determined that *consumers* (*i.e.* indirect purchasers) paid artificially high prices. (Def. Brf. at 6). Judge Robinson ultimately rejected this argument, holding that the question of whether consumers suffered antitrust injuries was not necessarily litigated in the government action. *See Hess*, 2007 U.S. Dist. LEXIS 71563 at *25. However, as established by *Illinois Brick* and its progeny, the question of whether

indirect purchasers were injured is irrelevant to the determination of whether direct

purchasers were overcharged. [17]

Accordingly, Judge Robinson's prior decisions in *Hess* and final

adjudication of what remains of that case, has little bearing on the claims to be

litigated in *Nowak*, *Univac* and *Lactona*.[18]    In contrast, the Third Circuit's

determination in the government case - that Dentsply's conduct harmed

competition - **will** be directly relevant and dispositive in these cases, because these

entities, unlike *Hess*, are particularly privileged to act as "private attorneys

general" in enforcing the  antitrust laws and recovering damages resulting from

anticompetitive conduct.  *See Illinois Brick*, 431 U.S. at 746-747.


## V. CONCLUSION

Dentsply offers no rationale as to why this Court, plaintiffs, potential

witnesses, and third parties would be best served by moving only *Nowak* to

---

[17] An "overcharge" is the difference between the price that was actually paid and
the price that would have been paid had the anti-competitive conduct not occurred.
It is widely accepted that direct purchasers have the right to pursue damages
measured as overcharges under Section 4 of the Clayton Act. *See Illinois Brick,*
431 U.S. at 729 ("the overcharged direct purchaser . . . is the party 'injured in his
business or property' within the meaning of [that] section").

[18] Dentsply's argument that the preclusive effect of another court's opinion should
be considered by "the court that rendered the original judgment" is makeweight.
(Def. Brf. at 13).  It is not Judge Robinson's decisions, but the holding of the Third
Circuit which Nowak, Univac and Lactona invoke for its preclusive effect before
this Court.

Delaware while leaving *Univac* and *Lactona* in Pennsylvania, thereby separating three similar cases and trying them in two separate fora.    Transfer of the Nowak case to Delaware would not facilitate the goals of section 1404(a); it would only jeopardize those goals, burdening the Delaware court and creating the possibility of inconsistent judgments.  Accordingly, Defendant's motion to transfer should be denied.

Dated: January 10, 2008                    Respectfully submitted,

                                           /s/ Steven E. Grubb, Esq.
                                           Steven E. Grubb
                                           GOLDBERG KATZMAN, P.C.
                                           320 Market Street, Strawberry Square
                                           P.O. Box 1268
                                           Harrisburg, PA 17108
                                           Tel:  (717) 234-4161
                                           Fax: (717) 234-6808


GARWIN GERSTEIN & FISHER LLP               KAPLAN, FOX & KILSHEIMER, LLP

Bruce E. Gerstein                          Linda Nussbaum
Noah Silverman                             850 Third Avenue
Adam Steinfeld                             New York, NY 10022
1501 Broadway, Suite 1416                  Tel: (212) 687-1980
New York, NY 10036                         Fax: (212)687-7714
Tel: (212) 398-0055
Fax: (212) 764-6620


ODOM & DES ROCHES, L.L.P.                  PHELPS DUNBAR, LLP
John Gregory Odom                          Brent B. Barrier
Stuart E. Des Roches                       365 Canal Street, Suite 2000
Suite 2020, Poydras Center                 New Orleans, LA  70130
650 Poydras Street                         Tel: (504) 566-1311

21

New Orleans, LA 70130                  Fax: (504) 568-9130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, L.L.P.          KOZYAK TROPIN &
David P. Smith                        THROCKMORTON
W. Ross Foote                         Adam Moskowitz
720 Murray Street                     2525 Ponce de Leon Blvd., 9th Floor
P.O. Box 1632                         Miami, FL 33134
Alexandria, LA 71309                  Tel: (305) 372-1800
Tel: (318) 445-4480                   Fax: (305) 372-3508
Fax: (318) 487-1741

*Counsel for the Plaintiff, Louisiana Wholesale Drug Co., Inc.*

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## LOCAL RULE 7.8(b)(2)

Pursuant to Local Rule 7.8(b)(2), it is hereby certified that the foregoing Plaintiff Nowak's Memorandum in Opposition to Defendant Dentsply's Motion to Transfer Venue contains 4,957 words, exclusive of the title page, table of contents, table of authorities this certificate of compliance, and certificate of service according to the Microsoft Word word processing system used to prepare it, and that the memorandum therefore complies with the type-volume limitations of Local Rule 7.8(b)(2).

/s/ Adam Steinfeld
Name of Attorney

Dated January 10, 2008

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing document was served this 10th day of January 2008 via electronic means upon counsel via the ECF filing system.

/s/ Adam Steinfeld
Adam Steinfeld

## APPENDIX OF UNREPORTED CASES

*In Re AT&T Access Charge Litigation*,
    2005 U.S. Dist. LEXIS 35431 (D.D.C. 2005

*Ayling v. Traveler's Prop. Casualty Corp*,
    1999 U.S. Dist. LEXIS 16716 (E.D. Pa 1999)

*Bank of America NA v. US Airways, Inc.*,
    2005 U.S. Dist. LEXIS 34902 (D.Del. 2005)

*Fusi v. Emery World Airlines*,
    2007 U.S. Dist. LEXIS 89784 (S.D. Ohio 2007)

*Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*,
    2007 U.S. Dist. LEXIS 71563 (D. Del. Sept. 26, 2007)

*Kedia v. Jamal*,
    2007 U.S. Dist. LEXIS 48474 (D.N.J. 2007)

*Kucala Enterprises v. Automobile Wax Co.*,
    2007 U.S. Dist. LEXIS 13147 (N.D. Ill. 2002)

*Woodall v. Piper Aircraft*,
    1983 U.S. Dist. LEXIS 17465 (M.D. Pa 1983)

# ATTACHMENT A

*Nowak Dental Supplies, Inc. v. Dentsply International, Inc.*
        No. 1:07-cv-001799 (M.D.Pa.).

*Univac Dental Co. v. Dentsply International, Inc.*,
        No. 1:07 CV-00493 (M.D.Pa.).

*Lactona Co. v. Dentsply International, Inc.*,
        No. 1:07 CV-00774 (M.D.Pa.).

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NOWAK DENTAL SUPPLIES, INC. , | : | |
| | : | Docket No.: _____ |
| Plaintiff, | : | |
| | : | <u>Complaint</u> – <u>Class Action</u> |
| v. | : | |
| | : | <u>JURY TRIAL DEMANDED</u> |
| DENTSPLY INTERNATIONAL, Inc., | : | |
| | : | |
| Defendant. | : | |
| | : | |

1.    Nowak Dental Supplies, Inc. ("Nowak" or "Plaintiff"), brings this class action on behalf of itself and all others similarly situated, and avers as follows, on information and belief:

## NATURE OF THE ACTION

2.    Plaintiff is a distributor of prefabricated artificial teeth, that, at all relevant times, bought such teeth directly from defendant Dentsply International,

Inc. ("Dentsply" or "Defendant").  Nowak brings this civil action for damages

because the prices that it and other members of the Class (defined below) paid for

artificial teeth were artificially inflated due to Dentsply's conduct.

3.    Absent Dentsply's anti-competitive conduct, Plaintiff and the other

Class members would have paid less for artificial teeth purchased during the Class

Period (defined below).  Prices for these products would have been lower with

unfettered competition because absent the exclusionary conduct: (a) Dentsply's

prices to members of the Class for artificial teeth would have been lower; and, (b)

members of the Class would have replaced some of their artificial teeth purchases

from Dentsply with less-expensive dental products sold by Dentsply's competitors.

As a result of Dentsply's unlawful conduct, Plaintiff and the other Class members

paid overcharges on their purchases of artificial teeth throughout the Class Period.

4.    Dentsply's anti-competitive practices center around an intentional and

concerted effort to deny its competitors access to the market for artificial teeth by

imposing upon dental supply dealers exclusive dealing requirements forbidding

purchase of artificial teeth manufactured by Dentsply's competitors, threatening to

terminate or in fact terminating dealers who purchased and distributed such

competing goods, and refusing to deal with dealers who distributed competing

tooth lines.  These practices had the effect of suppressing and foreclosing

2

competition from products sold by other manufacturers, thus enabling Dentsply to charge prices for artificial teeth substantially above competitive levels, and drive up prices for all artificial teeth in the relevant market.

5.      Dentsply's imposition of exclusive dealing requirements (and retaliation against certain dealers who refused to abide by its demands) was particularly effective because of Dentsply's dominant share of the market for artificial teeth. Many dealers were faced with a Hobson's choice: restrict themselves to only Dentsply teeth (and the monopoly prices Dentsply could extract for such products), or be denied the opportunity to carry such products which, at all relevant times, constituted 80% or more of the market for prefabricated artificial teeth in the United States.

6.      The cumulative effect of Dentsply's exclusionary conduct has been to foreclose competing manufacturers of artificial teeth from a substantial portion of the market, and to prevent them from (a) gaining market share, and (b) achieving economies of scale and scope, thus driving up prices in the market for artificial teeth. As a result, Plaintiff and the other members of the Class that Plaintiff seeks to represent have paid supra-competitive prices for the artificial teeth at issue in this complaint.

3

7.    In 1999, the Department of Justice filed an antitrust suit against

Dentsply and succeeded in obtaining entry of an injunction against Dentsply by the

United States District Court for the District of Delaware, based upon the Third

Circuit's finding that Dentsply violated Section 2 of the Sherman Act as a result of

the acts detailed herein.  The Third Circuit expressly found that distributors, such

as Plaintiff Nowak, are direct purchasers who would be harmed if Dentsply's

exclusionary conduct resulted in artificial tooth prices higher than would have been

charged but for that conduct.  The final findings of fact and conclusions of law in

the Delaware litigation will be binding upon Dentsply in the instant action pursuant

to the judicial principle of collateral estoppel.

## JURISDICTION AND VENUE

8.    This Complaint is filed and these proceedings are instituted under

Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the

costs of suit, including a reasonable attorneys' fee, for the injuries sustained by

Plaintiff and members of the Class resulting from violations by the Defendant, as

hereinafter alleged, and under Section 2 of the Sherman Act, 15 U.S.C. § 2.  The

jurisdiction of this Court is based upon 28 U.S.C. §§ 1331 and 1337(a) and 15

U.S.C. § 15.

9.      The Defendant named herein is found or transacts business within this judicial district, and the interstate trade and commerce, hereinafter described, is carried out, in substantial part, in this district. Venue, therefore, is appropriate within this district under 15 U.S.C. §§ 22 and 28  U.S.C. § 1391(b) and (c).

10.      The Court has personal jurisdiction over Dentsply pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## THE PARTIES

11.      Plaintiff Nowak Dental Supplies, Inc. is a Louisiana corporation with a business address of 6716 Hwy 11 North, Carriere, MS 39426.  At all relevant times, Nowak purchased prefabricated artificial teeth directly from Dentsply and was injured thereby.

12.      Defendant Dentsply International Inc. is a Delaware corporation with corporate headquarters in York, Pennsylvania.  Dentsply is a leading manufacturer and worldwide distributor of products and equipment for the dental market. Dentsply's total net sales in 2001 were approximately $1.1 billion. Through its Trubyte division, Dentsply manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. Dentsply regularly transacts business in this judicial district.  Dentsply has had a high and/or dominant market share of the market for prefabricated artificial teeth in the United

5

States.

## CLASS ACTION ALLEGATIONS

13.    Plaintiff brings this action as a class action pursuant to the Federal

Rules of Civil Procedure 23(a) and (b)(3), and in accordance with M.D. Pa. Local

Rule 23.2, on its own behalf and as representatives of the following class of

persons and entities ("the Class"):

> All persons and entities who purchased prefabricated artificial teeth in
> the United States directly from Dentsply at any time during the period
> January 5, 1995, through the present (the "Class Period"). The Class
> excludes Dentsply, and Dentsply's parents, subsidiaries and affiliates.

14.    Joinder of all Class members is impracticable.  While the size of the

Class is not yet known with certainty, based on the nature of the trade and

commerce involved, Plaintiff reasonably believe that there are dozens of members

in the Class. Class members are geographically dispersed throughout the United

States.  The Class members are readily identifiable from information and records in

Dentsply's exclusive possession.

15.    Questions of law and fact are common to the Class, including but not

limited to:

a.    whether Defendant obtained and maintained monopoly power

in the market for prefabricated artificial teeth in the United States;

b.    whether Defendant obtained and/or maintained monopoly

6

power in the relevant market through anti-competitive and unlawful activity;

     c.    whether Defendant engaged in conduct which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to competing prefabricated artificial teeth;

     d.    whether Defendant's unreasonably anti-competitive conduct has caused Plaintiff and the other members of the Class to suffer antitrust injury in the form of overcharges;

     e.    whether Dentsply's unlawful conduct caused Plaintiff and other Class members to pay more for prefabricated artificial teeth than they otherwise would have paid; and

     f.    the appropriate Class-wide measure of damages.

16.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and other Class members are direct purchasers of prefabricated artificial teeth and were overcharged, and thus injured by, the same wrongful conduct of Defendant. Defendant's violation of the antitrust laws, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiff and the other Class members.

17.    As representative of the Class, Plaintiff will fairly and adequately protect the interests of all Class members, and has engaged counsel experienced

7

and competent in antitrust and class litigation. The interests of the Plaintiff are coincident with, and not antagonistic to, the interests of the other Class members.

18.    The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

19.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## FACTUAL ALLEGATIONS

## I.    The District Court Action

20.    In 1999, the United States brought suit against Dentsply in the District

8

of Delaware, for, *inter alia*, violations of Section 2 of the Sherman Act arising

from Dentsply's foreclosure of competition in the market for artificial teeth. See

United States v. Dentsply Int'l, Inc., 99-cv-005 (D. Del.) (SLR).  Following a

bench trial, the Delaware court made detailed *findings of fact* regarding the market

for artificial teeth in the United States, and the exclusionary nature of Dentsply's

actions therein.  These findings were either affirmed or left undisturbed by a

subsequent opinion of the Third Circuit.

21.    As an initial matter, the District Court determined that Dentsply had

dominated the market for artificial teeth used in the United States "for at least ten

years" and had a 75%-85% share of the market for prefabricated artificial teeth in

the United States on a revenue basis, and was 15 times larger than its next closest

competitor.  See United States v. Dentsply Int'l, Inc., 277 F.Supp.2d 387, 423 (D.

Del. 2003).

22.    The District Court recited voluminous anecdotal evidence establishing

that, starting at least as early as 1987, Dentsply decided to leverage this dominant

share of the artificial tooth market in order to "lock up" the most efficient means of

artificial tooth distribution (the dental supply dealers), thereby substantially

foreclosing effective competition from other artificial tooth manufacturers seeking

to enter or expand into the U.S. market.  Id. at 412–413.  Dentsply achieved this

purpose by rigorously promoting a policy of discouraging its dealers from adding

competitors' teeth to their lines of products, and enforcing such policy by

threatening to terminate (or in fact terminating) dealers who refused to comply.  Id.

at 412–419. Notably, before Dentsply imposed its restrictive dealing requirements

in the late 1980s, Dentsply did not restrain Class members' ability to sell the

artificial teeth of other manufacturers.  Id. at 413.

     23.    Subsequently, in 1993, Dentsply decided to formalize its exclusionary

policy through the imposition of written "Dealer Criteria" for its Trubyte Division.

These Dealer Criteria set forth various conditions for continuing as, or becoming, a

dealer of Trubyte products.  "Dealer Criterion Number 6" states that dealers that

are recognized as authorized distributors "may not add further tooth lines to their

product offering."  Id. at 412. Thus, in enacting Dealer Criterion 6, Dentsply

expressly stated its refusal to do business with dealers that added its rivals' tooth

lines.  Id. at 413.

     24.    As it had with its unwritten policies, Dentsply actively monitored

compliance with Dealer Criteria 6, and enforced the criteria by warning dealers not

to add new lines of teeth, terminating dealers that did add new lines, and

compelling some dealers to enter into express agreements to assure their partial or

complete compliance with the criteria.  Id. at 412–419. Furthermore, when

threatening to terminate a dealer, Dentsply also threatened a refusal to sell any

other merchandise to that dealer, "as additional leverage in coercing dealers to

agree not to add competing tooth lines." Id. at 420.  Even Dentsply dealers who

merely acquired non-Dentsply dealers were required to drop the non-Dentsply

lines of the acquired dealers. Id. at 412–413. Meanwhile, consistent with Dealer

Criterion 6, most new dealers were accepted by Dentsply only when they dropped

their sales of non-Dentsply teeth.  Id. at 414.

25.    Dentsply's dealer policies, embodied in Dealer Criterion 6, were

intended to have, and did have, the effect of foreclosing Dentsply's competitors'

access to dental supply dealers. Id. at 419–422.  Moreover, there can be no doubt

of the exclusionary intent behind Dentsply's conduct.  Dentsply has admitted that

the express purpose of Dealer Criterion 6 was to "block competitive distribution

points" and "tie up dealers".  As Gordon Hagler, Trubyte's Director of Sales and

Marketing from 1989-93 stated on the record, the purpose of Dealer Criterion

Number 6 was "solely" to exclude Dentsply' s competitors from the dealers so that

Dentsply's competitors' teeth could not effectively be sold to dental laboratories.

As Hagler stated about Dealer Criterion 6:

> You don't want your competition with your distributors, you don't
> want to give the distributors an opportunity to sell a competitive
> product.  And you don't want to give your end user, the customer,
> meaning a laboratory and/or a dentist, a choice.  He has to buy

11

> Dentsply teeth. That's the only thing that's available. The only place you can get it is through the distributor and the only one that the distributor is selling is Dentsply teeth. That's your objective.

Id. at 420.

26.    Finally, the District Court concluded that Dentsply's alleged justification for Dealer Criterion 6 was pretextual and did not excuse its exclusionary practices. Its asserted justifications were inconsistent with its own announced reason for its exclusionary policies, its conduct enforcing the policy, its rival suppliers' actions, and dental supply dealers' behavior in the marketplace. Moreover, its exclusionary intent was also apparent from its use of non-tooth products as additional leverage in coercing dental supply dealers to agree not to add competing tooth brands. Id. at 440–49.

## II.    The Third Circuit Opinion

27.    In an opinion dated February 24, 2005, the Third Circuit, having reviewed the record below and the prior findings of the District Court, reexamined Dentsply's conduct, and made additional findings regarding the relevant market and the effects of Dentsply's exclusionary conduct. See United States v. Dentsply Int'l, Inc., 399 F.3d 181 (3d Cir. 2005).

28.    First, the Court made findings regarding the important role dental supply dealers play in the market for artificial teeth. Id. at 191–193. Although

some artificial tooth manufacturers sell directly to dental laboratories, Dental

supply dealers such as Nowak have been, and continue to be, the primary channel

of distribution of artificial teeth to dental laboratories. Such dealers provide

efficiencies of scale that reduce distribution costs, and take on credit risks that

manufacturers otherwise would have to assume if selling to laboratories directly.

Id. Dealers also provide one-stop shopping for products manufactured by various

suppliers, as well as one-stop returning of products manufactured by various

suppliers. As a result, manufacturers of artificial teeth need to distribute through

local dental supply dealers throughout the country in order to compete effectively.

Id. at 193 ("The benefits that dealers provide manufacturers help make dealers the

preferred distribution channels - in effect, the 'gateways' - to the artificial teeth

market. [Selling directly to dental laboratories] is 'viable' only in the sense that it

is 'possible,' not that it is practical or feasible in the market as it exists and

functions.")

29.    Thus, because of dealers' key role in the distribution chain, Dentsply's

efforts to deny competitors' access to dealers effectively foreclosed competitors

from a substantial portion of the market.  As the Court observed, "[t]he reality is

that over a period of years, because of Dentsply's domination of dealers, direct

sales have not been a practical alternative for most manufacturers. It has not been

so much the competitors' less than enthusiastic efforts at competition that produced
paltry results, as it is the blocking of access to the key dealers. This is the part of
the real market that is denied to the rivals." Id. at 189.

30.    In short, given Dentsply's monopoly share of the market, and
Dentsply's demand that its dealers comply with its exclusive dealing requirements,
the Third Circuit concluded: "The evidence demonstrated conclusively that
Dentsply had supremacy over the dealer network and it was at that crucial point in
the distribution chain that monopoly power over the market for artificial teeth was
established. The reality in this case is that the firm that ties up the key dealers rules
the market." Id. at 190. As a result, Dentsply's exclusionary policies harmed
competition in the market for artificial teeth.  Id. at 191 ("By ensuring that the key
dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion
6 has a significant effect in preserving Dentsply's monopoly. It helps keep sales of
competing teeth below the critical level necessary for any rival to pose a real threat
to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to
competition.")

31.    Furthermore, the Court found that Dentsply's control over prices for
its artificial teeth was indicative of market power: "Dentsply did not reduce its
prices when competitors elected not to follow its increases. Dentsply's profit

14

margins have been growing over the years. . . . The results have been favorable to

Dentsply, but of no benefit to consumers." Id. at 190–191. Regardless of the

magnitude of the premium Dentsply's extracted, "[t]he record of long duration of

the exclusionary tactics and anecdotal evidence of their efficacy make it clear that

power existed and was used effectively." Id.

    32.    Based on these findings of fact, the Third Circuit concluded that, (a)

Dentsply had power in the relevant market for prefabricated artificial teeth in the

United States, and (b) Dentsply maintained that power by means of improper

exclusionary conduct: "Dentsply's grip on its 23 authorized dealers effectively

choked off the market for artificial teeth, leaving only a small sliver for

competitors. The District Court erred when it minimized that situation and focused

on a theoretical feasibility of success through direct access to the dental labs.

While we may assume that Dentsply won its preeminent position by fair

competition, that fact does not permit maintenance of its monopoly by unfair

practices. We conclude that on this record, the Government established that

Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated

Section 2." Id. at 196.

    33.    Following the Third Circuit's decision, the District Court entered

judgment for the Government, and further granted significant and comprehensive

15

injunctive relief designed to bar Dentsply from instituting and/or enforcing

exclusive dealing arrangements with dental supply dealers.  See United States v.

Dentsply Int'l, Inc., 2006 U.S. Dist. LEXIS 94907 (D. Del., Apr. 26, 2006).  The

opinions of the District Court and Third Circuit are now final and not subject to

further court review.

34.     Under Section 5(a) of the Clayton Act, 15 U.S.C. Sec. 16(a), and the

collateral estoppel doctrine, the findings and conclusions of the Third Circuit in

United States v. Dentsply International, Inc., 399 F.3d 181 (3d Cir. 2005), cert.

denied, 126 S.Ct. 1023 (Jan. 9, 2006), and the undisturbed findings of the

Delaware District Court, are conclusive in the instant action as against Dentsply,

and Dentsply is estopped from contesting the same in this action.

## ANTICOMPETITIVE EFFECTS OF DENTSPLY'S CONDUCT

35.     The overall effect of Dentsply's anti-competitive, exclusionary acts

has been to substantially foreclose and impair competition (and the threat of such

competition) from lower-priced and/or superior quality prefabricated artificial

teeth.

36.     Dentsply's refusals to deal, restrictive dealing requirements, and other

anticompetitive acts as alleged in this Complaint have effectively deprived rival

tooth

16

manufacturers of access to the vast majority of, and the most important and efficient, sales outlets for artificial teeth in the United States and, therefore, of the ability to compete effectively in the United States market for prefabricated, artificial teeth.

37.    Absent the challenged conduct, and the substantial foreclosure and impairment of effective competition caused by such conduct, Dentsply, as a rational manufacturer, would have reduced its prices as a response to the added competitive pressure that would have resulted from unimpaired competition by other manufacturers of prefabricated artificial teeth. Moreover, had other actual or potential prefabricated artificial teeth manufacturers not been substantially foreclosed or stifled by Dentsply's anti-competitive conduct from effectively competing in the market for such products, the other actual or potential competitors would have sold much more of their products and gained much larger market share, enabling them to achieve economies of scale and scope.  As these competitors increased their sales and achieved economies of scale, their costs would have fallen, and thus they would have been able to provide their products at even lower prices, further pressuring Dentsply to lower its prices in response.

38.    By unlawfully excluding and impairing competition, Dentsply's conduct has caused Plaintiff and the other Class members to pay more for

17

prefabricated artificial teeth than they otherwise would have paid absent

Dentsply's illegal, exclusionary conduct.

## DAMAGES

39.    As a result of Dentsply's illegal conduct, members of the Class were

compelled to pay, and did pay, artificially inflated prices for the prefabricated

artificial teeth they purchased.  Had potential competitors been able to enter the

market unimpeded by Defendant's illegal conduct (or been a threat to enter the

market), and been able to achieve economies of scale, Plaintiff and other members

of the Class would have been able to, *inter alia*, purchase less expensive

prefabricated artificial teeth.  The prices that Plaintiff and the other Class members

paid for prefabricated artificial teeth during the Class Period were substantially

greater than the prices that Plaintiff and the Class members would have paid absent

the illegal exclusionary conduct alleged herein because: (1) the prices of all

prefabricated artificial teeth were artificially inflated by Dentsply's illegal conduct;

and (2) Class members were deprived of the opportunity to purchase competing

prefabricated artificial teeth, other than Dentsply's, and to purchase those

competing products at substantially lower prices.  Members of the Class have, as a

consequence, sustained substantial losses and damage to their business and

property in the form of overcharges.  The full amount and components of such

18

damages will be calculated after discovery and upon proof at trial.

## STATUTE OF LIMITATIONS

40.    Pursuant to section 5(i) of the Clayton Act, 15 U.S.C. §16(i), the

running of the statute of limitations with respect to this private right of action

based upon matters complained of in  the United States' litigation against Dentsply

was tolled during the pendency of that litigation, and one year thereafter. The

United States' litigation began on January 5, 1999 and continued through April 26,

2006, thus tolling the statute of limitations (and defenses related to time) through

April 27, 2007.  On or around April 24, 2007, Plaintiff and Defendant Dentsply

entered into an agreement to further toll any statutes of limitation and defenses

related to time applicable "to any claim, cause of action, complaint, cross-claim,

petition, demand or other legal action or proceeding against Dentsply under

Sections 1 or 2 of the Sherman Act or Section 3 of the Clayton Act . . . arising out

of or related in any manner to the facts, or issues, or transactions raised or referred

to in . . . United States v. Dentsply Int'l, Inc., D. Del., Civil Action No. 99-005-

MMS."  Such tolling was in effect from April 1, 2007 through the filing of this

Complaint.

41.    Accordingly, pursuant to 15 U.S.C. §16(i) and the subsequent

agreement between Plaintiff and Dentsply, Plaintiff is entitled to seek recovery for

damages attributable to Dentsply's wrongful conduct beginning, at least, as of four

years prior to the commencement of the government action, or January 5, 1995.

## CAUSE OF ACTION

### COUNT I
### Monopolization- Sherman Act §2

42.    Plaintiff incorporates by reference all of the foregoing allegations as

though fully set forth at length.

43.    Dentsply willfully maintained and unlawfully exercised monopoly

power in the relevant market.

44.    Dentsply's conduct in maintaining and extending its monopoly power

in the relevant markets constitutes unlawful monopolization in violation of §2 of

the Sherman Act. (15 U.S.C. §2).

45.    Dentsply acted willfully to maintain and exercise monopoly power in

the relevant market through exclusionary, anti-competitive conduct set forth above,

including, but not limited to, compelling independent dental supply dealers to

refrain from adding lines of prefabricated artificial teeth made by competing

manufacturers.

46.    There is no legitimate business justification for the actions and

conduct through which Dentsply maintained its monopoly in the relevant market.

20

47.    Dentsply has effectively excluded competition from the relevant

markets, maintained its dominant market share in the relevant markets, and

profited from its anti-competitive conduct by excluding less expensive, superior

competitive products, by maintaining prices at artificially high levels, and by

reaping the benefits of its illegal obtained monopoly power.

48.    The anti-competitive effects of Dentsply's conduct far outweigh any

conceivable procompetitive benefits or justifications.

49.    Plaintiff and members of the Class were injured in their business or

property by Defendant's monopolization of the market for prefabricated artificial

teeth.  Without limiting the generality of the foregoing, Plaintiff and the other

members of the Class have been forced to pay higher prices for prefabricated

artificial teeth than they would have paid in the absence of Defendant's unlawful

conduct.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully

request that:

(i)    The Court determine that this action may be maintained as a class

action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that

reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii)    The acts alleged herein be adjudged and decreed to be unlawful acts in

violation of Section 2 of the Sherman Act;

(iii)    Each member of the Class recover three-fold the damages determined

to have been sustained by each of them, and that judgment be entered against

Defendant in favor of the Class; and

(iv)    The Class recover its costs of suit, including reasonable attorneys'

fees and costs as provided by law.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 2, 2007                    Respectfully submitted,

                                          /S/ Steven E. Grubb, Esquire_____
                                          Steven E. Grubb, Esquire (PA75897)
                                          GOLDBERG KATZMAN, P.C.
                                          320 Market Street, Strawberry Square
                                          P.O. Box 1268
                                          Harrisburg, PA 17108
                                          Tel:  (717) 234-4161
                                          Fax: (717) 234-6808

GARWIN GERSTEIN & FISHER LLP      KAPLAN, FOX & KILSHEIMER, LLP
Bruce E. Gerstein                 Linda Nussbaum
Noah Silverman                    850 Third Avenue
Adam Steinfeld                    New York, NY 10022
1501 Broadway, Suite 1416         Tel: (212) 687-1980
New York, NY 10036                Fax: (212)687-7714
Tel: (212) 398-0055
Fax: (212) 764-6620

ODOM & DES ROCHES, L.L.P.
John Gregory Odom
Stuart E. Des Roches
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PHELPS DUNBAR, LLP
Brent B. Barrier
365 Canal Street, Suite 2000
New Orleans, LA  70130
Tel: (504) 566-1311
Fax: (504) 568-9130

PERCY, SMITH & FOOTE, L.L.P.
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

KOZYAK TROPIN &
THROCKMORTON
Adam Moskowitz
2525 Ponce de Leon Blvd., 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
**Counsel for the Plaintiff,
Nowak Dental Supplies, Inc.**

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

_____

UNIVAC DENTAL COMPANY,

                                    Plaintiff,

      v.

DENTSPLY INTERNATIONAL, INC.

                                    Defendant.

_____

**COMPLAINT**

**(JURY TRIAL DEMANDED)**

Civil Action No._____

Plaintiff Univac Dental Company ("plaintiff"), by and through its attorneys,

Robert M. Stengel, P.C. and Harris Beach PLLC, as and for its Complaint, alleges as follows:

### NATURE OF ACTION

1.     Plaintiff seeks damages for violations of Section 2 of the Sherman Act, 15 U.S.C.

§2, state common law restraint of trade, and unfair competition.

2.     Defendant, Dentsply International, Inc. ("Dentsply"), was adjudicated by the

United States Court of Appeals for the Third Circuit in <u>United States v. Dentsply International,

Inc.</u>, 399 F.3d 181 (3d Cir. 1005), <u>cert</u>. <u>den</u>., 126 S.Ct. 1023 (Jan. 9, 2006) ("The Government

Action") to have violated Section 2 of the Sherman Act by implementing an unlawful monopoly

maintenance scheme specifically intended to injure plaintiff and others.

3.     Under Section 5(a) of the Clayton Act, 15 U.S.C. §16(a) and the collateral

estoppel doctrine, the findings and conclusions of the Third Circuit in the Government Action

and the undisturbed findings of the District Court are conclusive in the instant action as against

Dentsply, and Dentsply is estopped from contesting them in this action.  Alternatively, the findings and conclusions of the Third Circuit in The Government Action and the undisturbed findings of the District Court are admissible here and constitute *prima facie* evidence of Dentsply's violations of Section 2 of the Sherman Act, raise a rebuttable presumption in favor of Univac, and shift the burden of proof to Dentsply in this action.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. §15 and 28 U.S.C. §§ 1331 and 1337.

5.      This Court has supplemental jurisdiction over the claims made in this Complaint under Pennsylvania common law for restraint of trade and unfair competition.

6.      Venue is proper in the Middle District of Pennsylvania pursuant to 15 U.S.C. §§ 15 and 22 as a district in which Defendant resides is found and/or transacts business; and 28 U.S.C. §1391(b) as a district in which the Defendant resides and/or conducts business and in which a substantial part of the events giving rise to the claims occurred.  Service may be effected in this district pursuant to 15 U.S.C. §22 as a district in which Defendant is found.

7.      Plaintiff and Dentsply are involved in interstate trade and commerce, and Dentsply's conduct complained of herein occurred in and had a substantial adverse effect on interstate trade and commerce.  In the conduct of its business, Dentsply directly or indirectly used the means and instrumentalities of interstate trade and commerce in furtherance of the acts complained of herein.

2

## PARTIES

8.      Plaintiff, formerly known as Universal Dental Company and Mogo, Inc., is a Pennsylvania corporation with its principal office located in Doylestown, Pennsylvania.  Plaintiff markets and has marketed dental materials, including artificial teeth.

9.      Dentsply is a Delaware corporation with its principal office located in York, Pennsylvania.  Dentsply manufactures a range of professional dental products that are marketed, distributed and sold throughout the United States.  In particular, it sells artificial teeth for use in dentures and other restorative dental appliances.

10.     Plaintiff has been one of Dentsply's competitors for the United States artificial tooth market.  Dentsply's unlawful maintenance scheme has operated to close plaintiff and other Dentsply competitors out of a significant share of the United States market.

11.     All references in this Complaint to any Dentsply act, deed or transaction refer to the corporation's acts, deeds, and/or transactions by or through its officers, directors, agents, employees or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

## MARKET STRUCTURE AND THE RELEVANT MARKET

12.     Manufacturers and sellers participating in the artificial tooth market in the United States typically distribute their teeth in one of three ways: (1) directly to dental laboratories, which use the teeth to fabricate dentures for sale to dentists; (2) through dental products dealers, which, in turn, supply the teeth and other materials to the dental labs; or (3) through a hybrid system which combines direct sales to labs with sales to dental dealers.

13.     For a number of reasons, dental labs generally prefer to purchase artificial teeth from dental products dealers rather than directly from manufacturers, and manufacturers prefer

3

to sell artificial teeth through dental products dealers. As such, dental products dealers are the "preferred distribution channels – in effect, the 'gateways' – of the artificial teeth market."

14.     Because of the nature of the denture-fabrication business, maintaining comprehensive tooth inventories and providing efficient service at the dealer level are essential for the prefabricated artificial tooth market's end users. There are over 10,000 dental laboratories and 150,000 dentists across the United States, and effectively servicing their tooth needs depends largely on the efforts of local and regional dental products dealers.

15.     The relevant product market is the sale of prefabricated, artificial teeth both to dental products dealers and to dental laboratories.

16.     The relevant geographic market is the United States.

## ANTITRUST INJURY

17.     Plaintiff has suffered antitrust injury and has antitrust standing to bring this claim. Dentsply's violations of the antitrust laws have directly and proximately lessened competition generally, injured plaintiff in its business, and damaged it in an amount which will be proved at trial. Plaintiff is entitled to recover damages, trebled, as well as prejudgment interest and the costs of this action, including attorneys' fees.

## FACTUAL BACKGROUND

18.     Dentsply sells its artificial teeth and Caulk Division products exclusively to dental products dealers, and Dentsply's network of dental products dealers is a dominant gateway to the dental laboratories.

19.     In the United States, although plaintiff had relationships with dental products dealers, plaintiff also was forced by Dentsply's unlawful practices to distribute its teeth directly to dental laboratories.

4

20.     Dentsply has long dominated the prefabricated artificial tooth industry in the United States. It has enjoyed a 75 to 80% market share on a revenue basis, about 15 times larger than its next closest competitor, Ivoclar Vivadent, Inc., which, on information and belief, has a 4-5% market share. Plaintiff's market share was about 1-2%.

21.     For more than 15 years, Dentsply has operated under policies that prohibited dental products dealers selling Dentsply teeth from selling competitors' teeth. Dentsply adopted the following policies found to be illegal by the United States Court of Appeals for the Third Circuit: (1) it made agreements with dental products dealers that the dealers would lose their Dentsply account if they sold a competing brand of teeth; and (2) it made agreements with new dental products dealers to drop some, or all, competing tooth brands in order to obtain a Dentsply account.

22.     Dentsply also adopted other policies to further its monopolistic position in the market, including the buying out of competitors' teeth from dental products dealers in exchange for cash payments and/or Dentsply teeth, and the making of agreements with dental laboratories to supply them with a certain amount of free Dentsply teeth in exchange for the recipient's promise to purchase Dentsply teeth in the future.

23.     Dentsply's dominant position in the market for prefabricated artificial teeth in the United States necessarily means that many dental laboratories currently use Dentsply teeth and expect their dental products dealers to have the Dentsply line available. Thus, a dental products dealer selling Dentsply teeth stands to lose a significant volume of business if it is suddenly unable to supply its laboratory customers with Dentsply teeth or else to gain a significant volume of business if it can obtain a Dentsply account by dropping competing brands.

24.    Founded in 1917, plaintiff has always striven to build and maintain its dental products dealer network. However, Dentsply's efforts to "lock up" and "lock in" dental products dealers has significantly hampered that endeavor.

25.    As a result, plaintiff attempted but was unable to make inroads with a number of dental products dealers including, for example, Dental Laboratory Discount Supply ("DLDS").

26.    In 1993, Dentsply issued written "Dealer Criteria" setting forth various conditions for becoming or continuing as a Dentsply dental products dealer ("Dealer Criterion 6"). formalized the exclusive dealing arrangement Dentsply had been previously imposing on its dental products dealers and provided that Dentsply's authorized dental products dealers were forbidden from "add[ing] further tooth lines to their product offering."

27.    According to Dentsply's records, the express purpose of Dealer Criterion 6 was to "block competitive distribution points" and "[t]ie up dental products dealers."

28.    Some dental products dealers who had carried competing products prior to 1993 were "grandfathered" for sales of those products, but Dentsply rebuffed attempts by those dental products dealers to expand their lines of competing products beyond the grandfathered ones by threatening them with termination, and in some cases, terminating them as Dentsply dealers.

29.    For example, DLDS is a dental products dealer headquartered in Branford, Connecticut. In 1994, DLDS placed an initial tooth stocking order with plaintiff for $25,000 worth of teeth. When Dentsply learned of this, Dentsply wrote to a DLDS principal, advising that DLDS was forbidden to stock competitors' teeth, and threatening to remove all Dentsply products from DLDS's inventory if it continued to do business with plaintiff. As a result, DLDS discontinued selling plaintiff's teeth in order to placate Dentsply.

6

30.     Dental products dealers' exchange accounts with Dentsply further increased their economic disincentive to add competing tooth lines.  These accounts reflected credit that Dentsply owed the dental products dealers against future purchases of teeth.  A terminated dental products dealer could not apply its exchange account against future purchases (since it was not permitted to make any further purchases from Dentsply) and essentially forfeited most or all of the cash value of its exchange account to Dentsply.

31.     In addition to threatening termination for dental products dealers opting to carry competing teeth, Dentsply has also engaged in the routine buy-out of competitors' artificial tooth products, including prefabricated artificial teeth manufactured by plaintiff, from dental products dealers.  Specifically, Dentsply has offered plaintiff's dealers cash payments, rebates and/or Dentsply teeth in exchange for plaintiff's teeth.

32.     For example, Benco, a regional dental products dealer headquartered in Wilkes-Barre, Pennsylvania and one of the top four dental products dealers in the United States, had a 50-year relationship with plaintiff and was one of plaintiff's top dealers, offering an extensive inventory of plaintiff's teeth.  After repeated, aggressive entreaties by Dentsply, Benco was ultimately persuaded to accept Dentsply's offer to buy out its stock of plaintiff's teeth.  As a result, plaintiff suffered a significant loss of business and coverage in the region and thereafter was only able to marginally sell its teeth in that region through a more costly drop-ship method.

33.     Guggenheim, a Los Angeles dental products dealer and long-time seller of plaintiff's teeth, was approached by Dentsply and given $100,000 worth of Dentsply teeth in exchange for its $50,000 inventory of plaintiff's teeth.

7

34.    Moreover, Dentsply has secured arrangements with dental laboratories, providing free Dentsply teeth in exchange for promises by dental laboratories to thereafter buy Dentsply teeth.

35.    When confronted with Dentsply's foregoing unlawful tactics, plaintiff tried to compete by conducting various promotions and advertising campaigns, increasing sales efforts, offering drop shipments, and engaging in direct selling in order to remain viable in the market. In so doing, plaintiff expended valuable resources and significant capital but was able to make little headway against Dentsply's practices.  Ultimately, plaintiff's efforts were unsuccessful, and it was forced to sell off portions of the company at a distressed price and was eliminated as an effective competitor of Dentsply in the prefabricated artificial tooth business.

36.    Absent Dentsply's unlawful activities described above, plaintiff would have marketed and successfully sold its prefabricated artificial teeth in the United States through dental products dealers and thereby effectively competed with Dentsply.

37.    In the United States, through tactics including the implementation of Dealer Criterion 6, Dentsply established supremacy over the dental products dealer network and was ultimately able to exclude competitors from the dental products dealer network, a narrow but nearly exclusive channel to the dental laboratories.  By ensuring that the key dental products dealers could offer Dentsply teeth only as the sole or dominant choice, Dealer Criterion 6 had a significant effect in preserving Dentsply's monopoly.  It helped suppress sales of competing teeth below the critical level necessary for any rival, including plaintiff, to pose a realistic threat to Dentsply's market share.

38.    The economic elements involved, including but not limited to the sizable share of the market held by Dentsply and its conduct in excluding competing manufacturers, made its

arrangements with its dental products dealers as effective as written exclusive contracts, and in spite of the legal ease with which those relationships could be terminated, the dental products dealers had a strong economic incentive to continue carrying Dentsply teeth.

39.    Because dental products dealers have a controlling degree of access to the laboratories and because of Dentsply's long-entrenched dealer network with its ties to the laboratories, it was impracticable and unfeasible for any artificial tooth manufacturer such as plaintiff to rely on direct distribution to the laboratories in any significant amount, and the miniscule market shares attained by direct-selling manufacturers such as plaintiff bear witness to that fact.

40.    In summary, Dealer Criterion 6 and Dentsply's other practices created a strong economic incentive for dental products dealers in the United States to reject competing lines such as plaintiff's in favor of Dentsply's teeth. Dentsply's exclusive deals were designed to and have thwarted plaintiff's attempt to build a dental products dealer network in the United States and thus have eliminated its ability to effectively compete in the United States.

41.    Plaintiff and other Dentsply artificial tooth competitors simply cannot provide the dental products dealers with a comparable economic incentive to switch brands.

42.    Dentsply's alleged justification for Dealer Criterion 6 was pretextual and did not excuse its exclusionary practices. Its asserted justifications were inconsistent with its own published reasons for its exclusionary policies, its conduct enforcing it, its rival suppliers' action, and the behavior of dental products dealers in the marketplace. Moreover, its exclusionary intent was also apparent from its use of Dentsply Caulk Division products as additional leverage in coercing dental products dealers to agree not to add competing tooth brands.

43.    The intended and actual effect of this exclusive dealing arrangement was to eliminate any competition sufficient to pose a threat to Dentsply's monopoly of the relevant market.

44.    The Department of Justice filed an antitrust suit against Dentsply in January 1999 (identified above as "The Government Action") and successfully obtained entry of an injunction against Dentsply by the Delaware District Court in April 2006 based upon the Third Circuit's finding that Dentsply had violated Section 2 of the Sherman Act.

45.    Dentsply has been maintaining and augmenting its monopoly through specific exclusionary and other initiatives since the late 1980's.

46.    Pursuant to Section 5(i) of the Clayton Act, 15 U.S.C. §16(i), the running of the statute of limitations with respect to this private right of action based upon matters complained of in the The Government Action was tolled during the pendency of that action and for a period of one year thereafter, or from January 1999 through April 2007.

### CLAIMS

### FIRST CAUSE OF ACTION:
### SECTION 2 OF THE SHERMAN ACT - MONOPOLIZATION

47.    Plaintiff repeats and realleges the allegations in paragraphs 1-46 above with the same force and effect as if fully set forth herein.

48.    Dentsply has knowingly, intentionally and with specific intent to do so, implemented an exclusive dealing arrangement held by the United States Court of Appeals for the Third Circuit in The Government Action to be "a solid pillar of harm to competition," 399 F.3d at 191, and, as determined in The Government Action, succeeded in its unlawful scheme to maintain a monopoly in the relevant product and geographic market in violation of Section 2 of the Sherman Act. In short, "Dentsply's grip on its 23 authorized dealers effectively choked off

the market for artificial teeth, leaving only a small sliver for competitors." 399 F.3d at 196.

## SECOND CAUSE OF ACTION:
### PENNSYLVANIA COMMON LAW: RESTRAINT OF TRADE AND UNFAIR COMPETITION

49.    Plaintiff repeats and realleges the allegations in paragraphs 1-48 above with the same force and effect as if fully set forth herein.

50.    Dentsply has restrained trade in the sale of prefabricated artificial teeth in the United States and engaged in unfair competition, in violation of the common law of the Commonwealth of Pennsylvania.

51.    Dentsply's actions are contrary to honest industrial and commercial practices, fall far below the minimum standard of fair dealing, and constitute unfair competition under the common law of the Commonwealth of Pennsylvania.

52.    Dentsply's actions have violated the public's interest in free and open competition, as well as the protectable interests of plaintiff.

53.    Through its unlawful restraint of trade and unfair competition, Dentsply harmed competition generally in the sale of prefabricated artificial teeth and damaged plaintiff by, among other things, precluding it from making additional sales and thus causing it to lose profits, harming its market presence and denying it the opportunity to compete in a free market.  Plaintiff is entitled to recovery of all damages allowable by law.

WHEREFORE, plaintiff demands judgment against Dentsply for violations of Section 2 of the Sherman Act and the common law of the Commonwealth of Pennsylvania, as follows:

A.  Adjudging and decreeing that the actions of Dentsply as described above constitute violations of Section 2 of the Sherman Act, restraint of trade and unfair competition;

B.  Requiring Dentsply to confirm to plaintiff and this Court that, as a result of the injunctive relief ordered against it in The Government Action, Dentsply has: (1) removed Dealer Criterion 6 from its list of requirements for dealers to obtain recognition and maintain authority as authorized Dentsply tooth dealers; (2) has distributed the revised Criteria and a copy of the Final Judgment in The Government Action to each dealer selling Dentsply teeth and to any tooth dealer it authorized, or prospective tooth dealer with which it negotiated, after the Final Judgment in The Government Action; (3) is no longer enforcing or otherwise conditioning the sale of its products, or the authorization of dental products dealers to sell its products, based on Dealer Criterion 6 or any other exclusive policy or on the dealer's agreement to cease, limit, or otherwise not engage in the sale of non-Dentsply teeth; and (4) is not threatening, retaliating against, intimidating, or otherwise discriminating in any manner against any dental products dealer or other customer based on the customer's sale or potential sale of non-Dentsply teeth;

C.  Awarding damages to plaintiff in an amount which will be proven with reasonable certainty at the time of trial;

D.  Trebling the amount of damages proved by plaintiff at trial (as to the first cause of action);

E.  Awarding plaintiff reasonable attorneys' fees and costs;

F.  Assessing interest; and

G.  Awarding such other and further relief as the Court deems just and proper.

12

**A JURY TRIAL IS DEMANDED.**

Dated: March 14, 2007
      Doylestown, Pennsylvania

                               ROBERT M. STENGEL, P.C.

                               s/ Robert M. Stengel
                               Robert M. Stengel
                               (Pa. I.D. No. 01911)
                               179 North Broad Street
                               Doylestown, Pennsylvania  18901
                               (215) 230-9484

                               s/ Paul R. Braunsdorf
                               HARRIS BEACH PLLC
                               Paul R. Braunsdorf
                               Gregory J. McDonald
                               Rayne Hammond Benz
                               Attorneys for Plaintiff
                               99 Garnsey Road
                               Pittsford, New York 14534
                               (585) 419-8800

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LACTONA CORPORATION** | : | **CIVIL ACTION NO.** _____ |
| | : | |
| **PLAINTIFF,** | : | **COMPLAINT** |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **DENTSPLY INTERNATIONAL, INC.** | : | |
| | : | |
| **DEFENDANT.** | : | **Filed Electronically** |
| | : | |

## COMPLAINT

Plaintiff Lactona Corporation, by its undersigned attorneys, brings this action for damages under the antitrust laws of the United States of America against the defendant named above, demanding trial by jury, and in support thereof alleges, upon information and belief except as to those paragraphs applicable to the plaintiff, which are based on personal knowledge, as follows:

## JURISDICTION AND VENUE

1.      This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, and the costs of suit, including a reasonable attorneys' fee, for the injuries sustained by plaintiff, resulting from violations by the defendant, as hereinafter alleged, of Section 2 of the Sherman Act, 15 U.S.C. § 2. The jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331, 1337, and 15 U.S.C. § 15.

2.      The violations charged in this Complaint were carried out in substantial part within this District. The defendant named herein is found, does business or transacts business within this District, and the interstate trade and commerce hereinafter described is carried out in substantial part within this District. Venue is appropriate within this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391.

## PARTIES

3.      Plaintiff Lactona Corporation ("Lactona"), formerly known as Uni Lac Corporation, is a Delaware corporation with its place of business in Hatfield, Pennsylvania. During the relevant period, Lactona did business using the name Universal Dental Co. ("Universal"), and manufactured and sold dental products, including prefabricated artificial teeth.

4.      Defendant Dentsply International, Inc. ("Dentsply") is a Delaware corporation with its principal place of business in York, Pennsylvania. At all relevant times, Dentsply manufactured, sold, marketed and/or distributed a range of dental products, including prefabricated artificial teeth, to customers in the United States.

5.      The acts charged in this Complaint have been done by Dentsply and were authorized, ordered and done by its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control or transaction of its business or affairs.

6.      Dentsply's unlawful and intentional actions have severely damaged Plaintiff and its other competitors in the market for prefabricated artificial teeth.

2

## RELEVANT MARKET

7.     The relevant market is the sale of prefabricated artificial teeth in the United States, including sales to both dealers and dental laboratories.  The dealers supply the teeth and various other materials to laboratories, which fabricate dentures for sale to dentists.

8.     For various reasons, laboratories are compelled to buy far more heavily from dealers than manufacturers, and manufacturers prefer to sell through dealers.

9.     Since at least 1987, Dentsply has held monopoly power in the relevant market, in large part by virtue of the unlawful actions described herein.

## TRADE AND INTERSTATE COMMERCE

10.     During all of the period during which the events described herein occurred, Dentsply manufactured, sold, and distributed prefabricated artificial teeth in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which Dentsply produced prefabricated artificial teeth.

11.     Dentsply's activities, as described herein, were within the flow of and had a substantial effect on interstate commerce.

## FACTUAL BACKGROUND

12.     Almost all artificial teeth sold in the United States are used by dental laboratories to make dentures.  A denture is a removable prosthetic device comprised of pre-fabricated artificial teeth fixed in an acrylic base material to replace some or all of a person's natural teeth. Artificial teeth are the single most expensive component of a denture.  Dental laboratories generally use prefabricated artificial teeth in making dentures.

13.     Dentsply has long dominated the United States market for prefabricated artificial teeth, which consists of approximately a dozen manufacturers.  Dentsply has maintained a market

3

share of 75 to 80 percent on a revenue basis during most of the relevant period, and is approximately 15 times larger than its next closest competitor.

14.     Lactona and its predecessors have sold dental products using the Lactona and/or Universal names since 1917. At all times prior to Dentsply's taking the actions described herein, Lactona sold dental products primarily through dealers, in large part because its sales force was not sufficient to service a broad base of laboratory customers.

15.     Prior to 1987, most dealers carried at least two lines of prefabricated artificial teeth. Beginning no later than that year, Dentsply initiated a series of actions for the purpose of restraining its dealers' ability to sell other manufacturers' prefabricated artificial teeth. Those actions culminated in 1993 with its imposition of "Dealer Criteria," including "Dealer Criterion Number 6," which provided that its dealers "may not add further tooth lines to their product offering." One former Dentsply manager testified under oath that Dealer Criterion 6 was designed to "block competitive distribution points."

16.     As a result of Dentsply's unlawful efforts to maintain its monopoly, Lactona was unable to do business with numerous dealers with whom it had previously done business.

17.     For example, in 1994, Branford, Connecticut- based Dental Laboratory Discount Supply ("DLDS"), ordered $25,000 worth of prefabricated artificial teeth from Lactona. Dentsply thereafter informed DLDS management that it could not stock competitors' teeth, and threatened to remove all Dentsply products from DLDS's inventory if it continued to do so. DLDS thereafter discontinued its purchases and sales of Lactona teeth.

18.     By way of further example, Benco Dental of Wilkes-Barre, Pennsylvania, sold Lactona products for over 50 years. After repeated requests by Dentsply, Benco Dental agreed to sell Dentsply its entire stock of Lactona prefabricated artificial teeth, which Dentsply thereafter

4

destroyed. Lactona thereafter suffered a significant loss of end users that Benco Dental had previously served.

19.     Guggenheim Dental Supply ("Guggenheim") of Hawthorne, California was another long-time seller of Lactona products – until Dentsply gave Guggenheim $100,000 worth of Dentsply prefabricated artificial teeth in exchange for $50,000 worth of Lactona teeth.

20.     When Dentsply threatened to terminate dealers for selling competing brands of prefabricated artificial teeth, it concurrently threatened to withhold other dental products, many of which themselves occupied substantial shares of their markets.

21.     At all relevant times, dental laboratories have expected their dealers to stock Dentsply prefabricated artificial teeth. Any dealer that did not would lose a significant portion of its business, as laboratories tend to purchase numerous different dental products from a single dealer.

22.     Dentsply further discouraged dealers from carrying competing lines of prefabricated artificial teeth by refusing to pay terminated dealers for unused teeth. Laboratories buy artificial teeth on cards containing six or eight teeth, but frequently do not use all the teeth on a card in making a particular denture. Generally, dealers collect the unused teeth from the laboratories, then return the teeth to Dentsply, which in turn gives the dealers credit against future purchases in the form of an exchange account. However, terminated dealers could not apply their accumulated exchange accounts against future purchases, as they were not permitted to make additional purchases from Dentsply upon being terminated. Dentsply also would not settle the exchange accounts of terminated dealers for cash. The forfeiture of their exchange accounts constituted a substantial deterrent for dealers threatened with termination by Dentsply –

5

and thus constituted a substantial deterrent to their carrying competing products which Dentsply deemed objectionable.

23.     Dentsply's practices collectively deterred dealers from adding competing lines of teeth. No existing dealer of Dentsply's artificial teeth added a new tooth line between 1987 and 1999.

24.     Absent Dentsply's unlawful actions, Lactona would have successfully sold prefabricated artificial teeth throughout most of the United States, as it did before Dentsply embarked on the unlawful course of action described herein.

## GOVERNMENT ACTION AGAINST DENTSPLY

25.     On January 5, 1999, the United States Department of Justice filed suit against Dentsply in the United States District Court for the District of Delaware, seeking relief enjoining Dentsply from pursuing the course of action described herein (the "Government Action"). On August 8, 2003, that court granted summary judgment in Dentsply's favor. *See United States v. Dentsply Int'l, Inc.*, 277 F. Supp.2d 387 (D. Del. 2003).

26.     On February 24, 2005, the United States Court of Appeals for the Third Circuit reversed the judgment in favor of Dentsply, and remanded the case with directions to grant the injunctive relief requested by the Government, holding that "[t]he evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market." *United States v. Dentsply*, 399 F.3d 181, 190 (3d Cir. 2005).

6

27.    On April 26, 2006, the district court entered final judgment against Dentsply, granting injunctive relief, establishing a program to ensure Dentsply's compliance therewith, and means for the Government to certify that compliance.

28.    Pursuant to Section 5(i) of the Clayton Act, 15 U.S.C. § 16(i), the running of the statute of limitations in respect to this private action – which is based in substantial part on the Government Action – was suspended during the pendency of the Government Action, and for one year thereafter.

## VIOLATIONS ALLEGED

29.    At a time presently unknown to plaintiff, but beginning no later than 1987, Dentsply engaged in a continuing course of action in unreasonable restraint of trade and commerce in the manufacture and sale of prefabricated artificial teeth in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

30.    Dentsply wilfully maintained a monopoly in the United States market for prefabricated artificial teeth, and abused its monopoly power in that market by, *inter alia*: (1) entering into agreements and taking other actions to induce dealers not to carry certain competing lines of prefabricated artificial teeth; (2)  explicitly agreeing with some dealers that they would not carry certain competing lines of prefabricated artificial teeth; and (3) threatening to refuse to sell prefabricated artificial teeth and other dental products to dealers that considered adding certain lines of competing teeth.

## EFFECTS

31.    The aforesaid course of action had the following effects, among others:

7

a.    Dentsply effectively deprived rival tooth manufacturers of access to the most important sales outlets for prefabricated artificial teeth in the United States and, therefore, of the ability to compete effectively in the United States market for prefabricated artificial teeth.

b.    Dentsply's exclusion of its rivals resulted in higher prices, loss of choice, less market information, and lower quality for artificial teeth. But for Dentsply's actions, additional dental supply dealers would have distributed other manufacturers' artificial teeth, including Lactona's. But for Dentsply's actions, prices for prefabricated artificial teeth would have been lower. Moreover, laboratories would have a greater choice of teeth and more market information regarding competing teeth.

c.    The lack of a substantial dealer network frustrated other tooth manufacturers' efforts to encourage dental laboratories to use their brands of teeth, and led them to curtail their promotional efforts, as such efforts would have been futile without an adequate dealer network.

32.    Dentsply's conduct was undertaken for the purpose of eliminating competition in violation of Section 2 of the Sherman Act.

## DAMAGES TO THE PLAINTIFF

33.    As a direct and proximate result of Dentsply's unlawful conduct described herein, Lactona has suffered damages including, but not limited to, profits it lost by virtue of its loss of customers whom Dentsply induced to cease doing business with Lactona. Lactona cannot state at this time the precise amount of damages it sustained, which amount will require discovery from Dentsply's books and records, but alleges that the damages are substantial.

8

## JURY TRIAL DEMAND

34.     Plaintiff demands trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that:

A.     Dentsply's actions described herein be adjudged and decreed to be in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

B.     Plaintiff recover damages, as provided by law, that it is determined to have sustained, and that judgment in favor of plaintiff be entered against Dentsply;

C.     Plaintiff recover its costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.     Plaintiff be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

9

Dated: April 25, 2007

Respectfully submitted,

BERGER & MONTAGUE, P.C.

By: _____s/ Keino R. Robinson_____
H. Laddie Montague, Jr. (hlmontague@bm.net)
Attorney No. PA03607
Bart D. Cohen (bcohen@bm.net)
Attorney No. PA57606
Keino R. Robinson (krobinson@bm.net)
Attorney No. PA84980
1622 Locust Street
Philadelphia, PA  19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

Robert J. Nolan (Rnolan@KaleidaHealth.Org)
Attorney No. PA19613
93 West Afton Avenue
Yardley, PA  19067
Telephone: (215) 880-2772
Facsimile: (215) 321-1488

*Counsel for Plaintiff Lactona Corporation*

# APPENDIX OF UNREPORTED CASES

*In Re AT&T Access Charge Litigation*,
    2005 U.S. Dist. LEXIS 35431 (D.D.C. November 16, 2005)

*Ayling v. Traveler's Prop. Casualty Corp*,
    1999 U.S. Dist. LEXIS 16716 (E.D. Pa October 27, 1999)

*Bank of America NA v. US Airways, Inc.*,
    2005 U.S. Dist. LEXIS 34902 (D. Del. December 21, 2005)

*Fusi v. Emery World Airlines*,
    2007 U.S. Dist. LEXIS 89784 (S.D. Ohio November 23, 2007)

*Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*,
    2007 U.S. Dist. LEXIS 71563 (D. Del. Sept. 26, 2007)

*Kedia v. Jamal*,
    2007 U.S. Dist. LEXIS 48474 (D.N.J. July 5, 2007)

*Kucala Enterprises v. Automobile Wax Co.*,
    2002 U.S. Dist. LEXIS 13147 (N.D. Ill. July 18, 2002)

*Woodall v. Piper Aircraft*,
    1983 U.S. Dist. LEXIS 17465 (M.D. Pa April 25, 1983)

LEXSEE

**IN RE: AT&T ACCESS CHARGE LITIGATION**

**Civil Action No. 05-1360 (ESH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 35431**

**November 16, 2005, Decided**
**November 16, 2005, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The case was a coordinated action related to defendant corporation's alleged failure to pay required charges for its use of plaintiffs, local telephone networks', facilities to receive and complete long-distance telephone calls. The corporation moved under 28 U.S.C.S. § 1404(a) to transfer venue to the United States District Court for the District of New Jersey, which was opposed by the networks.

**OVERVIEW:** The networks did not dispute that venue would have been appropriate in the District of New Jersey. Thus, the only question before the court was whether the public and private factors weighed heavily enough in favor of New Jersey to warrant transfer under 28 U.S.C.S. § 1404 to that district. The court found that because the District of Columbia had no meaningful ties to the controversy and no particular interest in the parties or subject matter, deference to the networks' choice of forum was not appropriate. Considering the public interest factors, New Jersey had a much stronger interest in resolving the dispute as compared to the District of Columbia where although the case involved alleged damages in a multitude of states, the actions in question were undertaken by a New Jersey corporation and implemented by New Jersey-based employees, and the State of New Jersey had a significant interest in allegations of fraudulent activity by its corporations and certainly had a greater interest than the District of Columbia, where very few of the alleged harms were manifested and most of the parties have virtually no ties.

**OUTCOME:** The corporation's motion to transfer was granted.

**CORE TERMS:** place of business, venue, convenience, ties, access charges, telephone, choice of forum, long-distance, involvement, deference, switched, fraudulent schemes, corporate headquarters, public interest, telecommunications, collectively, transferee, nationwide, carriers, lawsuit, weigh, fora, coordinated action, federal agencies, calling cards, interest of justice, balance of convenience, substantial deference, travel expenses, phone-to-phone

**LexisNexis(R) Headnotes**

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Parties*
*Civil Procedure > Venue > Motions to Transfer > Convenience of Witnesses*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN1]28 U.S.C.S. § 1404(a) states that for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. The moving party bears the burden of showing that transfer is proper. 28 U.S.C.S. § 1404(a) grants the district court discretion to adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness. Courts retain broad discretion in balancing the asserted convenience and fairness to the parties.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*


**Civil Procedure > Venue > Motions to Transfer > General Overview**

[HN2]To succeed in a motion to transfer, defendants must make two showings. First, they must establish that the action might have been brought in the proposed transferee district. Second, they must demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in their favor. In analyzing the relative convenience of the competing venues, a court must weigh a number of private and public interest factors. Private interest factors include, but are not limited to: (1) the plaintiffs' privilege of choosing the forum; (2) the defendants' preferred forum; (3) location where the claim arose; (4) convenience of the parties; (5) convenience of witnesses, but only to the extent that witnesses may be unavailable for trial in one of the fora; and (6) ease of access to sources of proof. Public interest considerations include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home. Courts may also consider the availability of compulsory process to compel the attendance of unwilling witnesses and other practical aspects of expeditiously and conveniently conducting a trial.

**Civil Procedure > Venue > Motions to Transfer > Choice of Forum**

[HN3]The first private interest factor, the plaintiffs' choice of forum, is a paramount consideration in any determination of a transfer request. Typically, courts accord plaintiffs' choice of forum substantial deference when analyzing a transfer motion. While a court may not transfer simply because it thinks another forum may be superior to plaintiffs' chosen forum, such deference is substantially diminished where the chosen forum is neither their home forum nor has any meaningful ties to the controversy.

**Civil Procedure > Venue > Federal Venue Transfers > General Overview**
**Civil Procedure > Venue > Motions to Transfer > General Overview**

[HN4]The United States District Court for the District of Columbia has ruled on several occasions that mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative. The court has held that courts in the District of Columbia Circuit must examine challenges to venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia by alleging the involvement of government officials.

**Civil Procedure > Venue > Federal Venue Transfers > General Overview**
**Civil Procedure > Venue > Motions to Transfer > General Overview**
**Civil Procedure > Venue > Motions to Transfer > Choice of Forum**

[HN5]In the context of a motion to transfer venue, after considering the plaintiffs' and the defendants' choice of fora, courts typically look to whether the claim arose in the district in which suit was filed.

**Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers**
**Civil Procedure > Venue > Motions to Transfer > Convenience of Parties**

[HN6]In the context of a motion to transfer venue, courts consider the convenience of the parties. Typically, the location of counsel carries little, if any, weight in an analysis under 28 U.S.C.S. § 1404(a) since that factor can easily be manipulated thereby permitting forum shopping. Nevertheless, where convenience of counsel bears directly on the cost of litigation, it becomes a factor to consider.

**COUNSEL:**  [*1]  For ITC DELTACOM COMMUNICATIONS, INC., BUSINESS TELECOM, INC., BUSINESS TELECOM OF VIRGINIA, INC., Plaintiffs: Eric Jay Branfman, Swidler Berlin LLP, Washington, DC.

For CONSOLIDATED COMMUNICATIONS OF TEXAS COMPANY, (CA-05-2047), Plaintiff: Anitra D. Goodman, SWIDLER & BERLIN, CHARTERED, Washington, DC; Eric Jay Branfman, Swidler Berlin LLP, Washington, DC; Joshua M. Bobeck, SWIDLER BERLIN, LLP, Washington, DC.

For GRANITE TELECOMMUNICATIONS, LLC, (CA-05-1416), RCN TELECOM SERVICES, INC., (CA-05-1432), RCN-BECOCOM, LLC, (CA-05-1432), STARPOWER COMMUNICATIONS, LLC, (CA-05-1432), RCN TELECOM SERVICES OF WASHINGTON, D.C., INC., (CA-05-1432), RCN TELECOM SERVICES OF MASSACHUSETTS, INC., (CA-05-1432), RCN TELECOM SERVICES OF ILLINOIS, LLC, (CA-05-1432), MCCLURE TELEPHONE COMPANY, (CA-05-1681), LEXCOM TELEPHONE COMPANY, (CA-05-1740), SUPRA TELECOMMUNICATIONS & INFORMATION SYSTEMS, INC., (CA-05-1785), PRAIRIE GROVE TELEPHONE COMPANY, (CA-05-1858), ATX COMMUNICATIONS, INC., CA-05-2067), Plaintiff: Anitra D. Good-

man, SWIDLER & BERLIN, CHARTERED, Washington, DC.

For AT&T CORP., AT&T COMMUNICATIONS, INC., Defendants: Brendan James McMurrer, Michael Joseph Hunseder, SIDLEY AUSTIN [*2]  BROWN & WOOD, Washington, DC; David M. Schiffman, Chicago, IL.

For AT&T CORP., AT&T COMMUNICATIONS, INC., Counter Claimants: Brendan James McMurrer, Michael Joseph Hunseder, SIDLEY AUSTIN BROWN & WOOD, Washington, DC; David M. Schiffman, Chicago, IL.

For CONSOLIDATED COMMUNICATIONS OF TEXAS COMPANY, CONSOLIDATED COMMUNICATIONS OF FORT BEND COMPANY, ILLINOIS CONSOLIDATED TELEPHONE COMPANY, ATX COMMUNICATIONS, INC., CA-05-2067), Counter Defendants: Anitra D. Goodman, SWIDLER & BERLIN, CHARTERED, Washington, DC.

**JUDGES:** ELLEN SEGAL HUVELLE, United States District Judge.

**OPINION BY:** ELLEN SEGAL HUVELLE

**OPINION**

**MEMORANDUM OPINION**

This case is a coordinated action relating to defendant AT&T Corp.'s alleged failure to pay required charges for its use of plaintiffs' local telephone network facilities to receive and complete long-distance telephone calls. Before the Court is AT&T Corp.'s and AT&T Communications, Inc.'s (collectively "AT&T" or "defendants") Motion to Transfer Venue to the United States District Court for the District of New Jersey, which is opposed by plaintiffs. For the reasons discussed below, the Court will grant defendants' motion.

**BACKGROUND**

This coordinated [*3]  action currently includes eleven complaints brought by seventeen plaintiffs -- a number that is likely to grow. [1] Each plaintiff claims that AT&T underpaid federal and state mandated switched access charges to local exchange carriers for the use of local exchange facilities to originate and terminate long-distance calls. Plaintiffs allege that defendants began disguising long-distance calls as interexchange calls sometime in 2000 in order to avoid detection and thereby avoid the applicable switched access charges. Plaintiffs contend defendants orchestrated and implemented two fraudulent schemes, one using phone-to-phone Internet

Protocol telephony technology and the other using AT&T's prepaid calling cards, through concerted action by employees at AT&T corporate headquarters in New Jersey.

[1]    The current plaintiffs include: ITC¬DeltaCom, Inc. ("ITCD"), an Alabama corporation with its principal place of business in Huntsville, Alabama; Business Telecom, Inc. and Business Telecom of Virginia, Inc. (collectively "BTI"), a North Carolina and a Virginia corporation, respectively, with their principal place of business in Huntsville, Alabama; Granite Telecommunications, LLC ("Granite"), a Delaware corporation with its principal place of business in Quincy, Massachusetts; RCN Telecom Services of Illinois, an Illinois company with its principal place of business in Chicago, Illinois; RCN Telecom Services, Inc., a Pennsylvania corporation with its principal place of business in Princeton, New Jersey; RCN Telecom Services of Philadelphia, Inc., a Pennsylvania corporation with its principal place of business in Princeton, New Jersey; RCN Telecom Services of Massachusetts, Inc., a Massachusetts corporation with its principal place of business in Princeton, New Jersey; RCN Telecom Services of Washington, D.C., Inc., a District of Columbia corporation with its principal place of business in Princeton, New Jersey; RCN BecoCom LLC, a Massachusetts corporation with its principal place of business in Princeton, New Jersey; Starpower Communications LLC, a Delaware corporation with its principal place of business in Princeton, New Jersey; McClure Telephone Co. ("McClure"), an Ohio company with its principal place of business in McClure, Ohio; Lexcom Telephone Co. ("Lexcom"), a North Carolina company with its principal place of business in Lexington, North Carolina; Supra Telecommunications and Information Systems, Inc. ("Supra"), a Florida company with its principal place of business in Miramar, Florida; Illinois Consolidated Telephone Co. ("ICTC"), an Illinois corporation with its principal place of business in Mattoon, Illinois; Consolidated Communications of Fort Bend Co. ("CCFB") and Consolidated Communications of Texas ("CCTX"), both Texas corporations with their principal place of business in West Conroe, Texas; and Prairie Grove Telephone Co. ("Prairie Grove"), an Arkansas company with its principal place of business in Prairie Grove, Arkansas.

[*4]  Two years after implementing these allegedly fraudulent schemes, AT&T filed two petitions with the Federal Communications Commission ("FCC") request-

ing that specific types of long-distance calls, calls matching the types alleged by the plaintiffs, be exempt from access charges. The FCC ultimately rejected both of AT&T's petitions on April 21, 2004 and February 23, 2005. *See Petition for a Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Services are Exempt from Access Charges*, WC Docket No. 02-361, Order, 19 F.C.C.R. 7457 (2004); *AT&T Corp. Petition for Declaratory Ruling Regarding Enhanced Prepaid Calling Card Services*, WC Docket Nos. 03-313 and 05-68, Order and Notice of Proposed Rulemaking, 20 F.C.C.R. 4826 (2005). Furthermore, the FCC instructed local exchange carriers to pursue collection actions against AT&T for any unpaid access charges with an appropriate court.

ITCD and BTI initiated this action on July 7, 2005. Several additional plaintiffs subsequently filed identical complaints, causing the Court on September 23, 2005, to issue a Case Management Order coordinating the actions for pre-trial purposes. In response to the Case Management [*5] Order, AT&T withdrew the Motion to Transfer Venue it had previously filed on September 12, 2005, in the individual actions and re-filed it ("Defs.' Mot.") on September 30, 2005 as part of the coordinated action. Plaintiffs filed a joint Opposition to the Motion to Transfer Venue ("Pls.' Opp'n") on October 14, 2005, to which defendants filed a Reply ("Defs.' Reply") on October 24, 2005.

**ANALYSIS**

Defendants seek to transfer this case pursuant to 28 U.S.C. § 1404(a), which states: [HN1]"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The moving party bears the burden of showing that transfer is proper. *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996). Section 1404(a) grants the district court discretion to "adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness.'" *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 50 (D.D.C. 2000) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988)). [*6] Courts retain broad discretion in balancing the asserted convenience and fairness to the parties. *Sheraton Operating Corp. v. Just Corporate Travel*, 984 F. Supp. 22, 25 (D.D.C. 1997).

[HN2]To succeed in a motion to transfer, defendants must make two showings. First, they must establish that this action might have been brought in the proposed transferee district, *i.e.*, the District of New Jersey. *DeLoach v. Philip Morris Cos.*, 132 F. Supp. 2d 22, 24 (D.D.C. 2000). Second, they must "demonstrate that the

balance of convenience of the parties and witnesses and the interest of justice are in their favor." *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 569 F. Supp. 773, 774 (D.D.C. 1983). In analyzing the relative convenience of the competing venues, a court must weigh a number of private and public interest factors. *Reiffin*, 104 F. Supp. 2d at 51-52. Private interest factors include, but are not limited to: (1) plaintiffs' privilege of choosing the forum; (2) defendants' preferred forum; (3) location where the claim arose; (4) convenience of the parties; (5) convenience of witnesses, but only to the extent that witnesses [*7] may be unavailable for trial in one of the fora; and (6) ease of access to sources of proof. *Airport Working Group of Orange County, Inc. v. U.S. Dep't of Def.*, 226 F. Supp. 2d 227, 229 (D.D.C. 2002) (citing *Trout Unlimited*, 944 F. Supp. at 16). Public interest considerations include: (1) the transferee's familiarity with the governing law; (2) the relative congestion of the courts of the transferor and potential transferee; and (3) the local interest in deciding local controversies at home. *Id.* Courts may also consider the availability of compulsory process to compel the attendance of unwilling witnesses and other practical aspects of expeditiously and conveniently conducting a trial. *See Reiffin*, 104 F. Supp.2d at 52; *SEC v. Page Airways, Inc.*, 464 F. Supp. 461, 463 (D.D.C. 1978); *accord* 15 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §§ 3848-3854 (2d ed. 1986).

Given the substantial ties of defendants to the District of New Jersey, there can be no dispute that all of the cases that have been coordinated here could have been brought in the District of New Jersey. AT&T maintains [*8] corporate headquarters in Bedminster, New Jersey, is subject to personal jurisdiction in that district, and venue is proper there under 28 U.S.C. § 1391(b) and (c) as its relevant entities reside in New Jersey. Plaintiffs do not dispute that venue would be appropriate in the District of New Jersey. Thus, the only question before the Court is whether the public and private factors outlined above weigh heavily enough in favor of New Jersey to warrant transfer to that district.

[HN3]The first private factor, plaintiffs' choice of forum, is a "paramount consideration" in any determination of a transfer request. *Sheraton Operating Corp.*, 984 F. Supp. at 25. Typically, courts accord plaintiffs' choice of forum "substantial deference" when analyzing a transfer motion. *Gross v. Owen*, 95 U.S. App. D.C. 222, 221 F.2d 94, 95 (D.C. Cir. 1955) ("It is almost a truism that a plaintiff's choice of a forum will rarely be disturbed . . . unless the balance of convenience is strongly in favor of the defendant."); *see also Reiffin*, 104 F. Supp. 2d at 52. While a court may not transfer simply because it thinks another forum may be superior to plaintiffs' [*9] chosen forum, *Shapiro, Lifschitz & Schram,*

*P.C. v. R.E. Hazard, Jr. Ltd. Pshp.*, 24 F. Supp. 2d 66, 71 (D.D.C. 1998), such deference is substantially diminished where the chosen forum is neither their home forum nor has any meaningful ties to the controversy. *Trout Unlimited*, 944 F. Supp. at 17. Defendants argue that none of the plaintiffs is located within the District of Columbia and therefore plaintiffs' choice of forum "deserves no deference." (Defs.' Mot. at 7.) Plaintiffs maintain their principal places of business in Alabama, Arkansas, Florida, Illinois, Massachusetts, New Jersey, North Carolina, Ohio, Texas and Virginia. The sole plaintiff that is incorporated under the laws of the District of Columbia, RCN Telecom Services of Washington, D.C. ("RCN DC"), maintains its principal place of business in New Jersey. [2] Indeed, a plurality of the plaintiffs maintain New Jersey as their principal place of business. [3]

> 2    The Court notes that RCN DC, as a D.C. corporation, arguably has a stronger claim to venue in the District of Columbia than any of the other plaintiffs. Nevertheless, the Court's Case Management Order instructed that if it was necessary for the Court to consider one party separate from the others with regard to any motion, a pleading should filed with a specialized caption alerting the Court to that party's unique status. (9/23/05 Order P II.B.) None of the plaintiffs requested individualized treatment with respect to the Motion to Transfer. Thus, despite slight variations among plaintiffs with respect to the strength of their claim to venue, the Court will treat the plaintiffs as a collective whole for purposes of determining whether to order a transfer.

[*10]

> 3    Plaintiffs RCN Telecom Services, Inc., RCN Telecom Services of Philadelphia, Inc., RCN Telecom Services of Massachusetts, Inc., RCN Telecom Services of Washington, D.C., Inc., RCN BecoCom LLC, and Starpower Communications LLC, all have as their principal place of business Princeton, New Jersey. Plaintiffs assert in their Opposition that RCN's New Jersey offices will be closing next year and will be relocated to Pennsylvania, Illinois, and Northern Virginia. Even accepting plaintiffs' assertions as true, the relocation of offices to these three jurisdictions does not strengthen their ties to D.C. or the argument for deference to their decision to file their complaints in the District of Columbia.

Plaintiffs' claim to substantial deference is further vitiated by the lack of any meaningful ties between the chosen forum and the substance of the dispute. *See Trout Unlimited*, 944 F. Supp. at 17. First, of the 17 plaintiffs, eight -- ITCD, McClure, Lexcom, Supra, Prairie Grove,

ICTC, CCFB and CCTX -- provide absolutely *no* services within the District of Columbia. Of the six RCN [*11] plaintiffs, only one provides any services in D.C. The remaining plaintiffs maintain what can best be described as only minimal business operations within the District. BTI, which provides local phone service on 53 lines (Pls.' Opp'n at 8 n.9), did not bill AT&T for any services provided in the District of Columbia during the year preceding the filing of its complaint. (Defs.' Mot. at 6.) Between August 2004 and July 2005, Granite billed AT&T only $ 2670.00 for switched access services, which amounted to only 0.14 percent of Granite's nationwide bill to AT&T during that time. (Defs.' Mot., Decl. of Geri Lancaster Ex. 1.) The one RCN entity to service D.C. accounted for only 5.64 percent of RCN's total nationwide bills to AT&T. (Defs.' Mot., Decl. of Geri Lancaster Ex. 2.)

Lacking substantial financial or business ties to the District of Columbia, plaintiffs attempt to fashion an argument based on regulatory ties: AT&T filed petitions regarding switched-access tariffs with the Federal Communications Commission ("FCC") in the District of Columbia and the FCC issued its rulings, which form the basis for plaintiffs' claims, from its headquarters in the District of Columbia. (Pls.' Opp'n [*12] at 5-7, 9-14.) [HN4]This Court has ruled on several occasions, however, that "mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not determinative" of the question of venue. *Shawnee Tribe v. United States*, 298 F. Supp. 2d 21, 25-26 (D.D.C. 2002). Particularly appropos is the case of *DeLoach v. Philip Morris Co.*, 132 F. Supp. 2d 22 (D.D.C. 2000), where tobacco producers brought suit in the District of Columbia against Philip Morris under the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2, for allegedly anti-competitive actions. The Court granted defendant's motion to transfer venue, finding that "the only real connection this lawsuit has to the District of Columbia is that a federal agency headquartered here . . . is charged with generally regulating and overseeing" the process Philip Morris was accused of manipulating. *Id.* at 25. Similarly, even if defendants made fraudulent misrepresentations in their FCC filings, as plaintiffs allege, this is not sufficient to create venue since the FCC has not had any "significant day-to-day role in observing, managing, [*13] or running" switched access usage or billing within the telecommunications industry, *id.*, as compared to the extensive level of agency involvement in *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 13-14 (D.D.C. 2000). Moreover, to accept plaintiffs' argument would amount to an open invitation to litigants to sue private parties in this jurisdiction whenever the case has some relationship to an agency action. Such an expansive view of venue finds no support in the law and therefore will not be adopted here. *See Cameron v. Thornburgh*,

299 U.S. App. D.C. 228, 983 F.2d 253, 256 (D.C. Cir. 1993) ("Courts in this circuit must examine challenges to . . . venue carefully to guard against the danger that a plaintiff might manufacture venue in the District of Columbia" by alleging the involvement of government officials.); *see also Airport Working Group of Orange County, 226 F. Supp. 2d at 230-31* ("Given the lack of any meaningful ties to this jurisdiction, this Court is particularly mindful of the admonition that courts must be especially cautious in allowing [cases] to remain in the District of Columbia.'") (alteration in original) (citing *Trout Unlimited, 983 F. Supp. at 17*). [*14]

Nor does this case rise to the level of "national significance" present in *Wilderness Soc'y.* There, the Court found that the Secretary of the Interior's extensive involvement in the conduct of various environmental studies relating to the development of oil and gas resources in Alaska supported venue in the District of Columbia because of "the national scope of the environmental issues." *104 F. Supp. 2d at 14.* By contrast, while AT&T's alleged actions may have taken place all over the country, this case does not involve a "national policy decision" or a significant "public interest." *Id. at 13-14.*

Therefore, because the District of Columbia has "no meaningful ties to the controversy and no particular interest in the parties or subject matter," *Chung v. Chrysler Corp., 903 F. Supp. 160, 165 (D.D.C. 1995)* (internal quotation marks omitted), the Court finds that deference to the plaintiffs' choice of forum is not appropriate.

Turning to the other factors relevant to a transfer determination, the Court concludes that New Jersey constitutes a far more appropriate forum. [HN5]After considering the plaintiffs' and defendants' choice of fora, [*15] courts typically look to whether the claim arose in the district in which suit was filed. *Trout Unlimited, 944 F. Supp. at 16.* In this case, plaintiffs accuse AT&T of "orchestrating and implementing at least two fraudulent schemes in an attempt to avoid plaintiffs' access charges'." (Compl. P 2.) While the manifestations of defendants' alleged actions were felt by local carriers nationwide, the conduct forming the basis of plaintiffs' suit took place primarily in New Jersey. As plaintiffs' allege: "AT&T coordinates and controls one overarching position concerning all of these issues from its corporate headquarters." (Compl. P 14.) It is therefore clear that the conduct that underlies plaintiffs' claims and caused their alleged harms occurred in New Jersey.

Next, [HN6]courts consider "the convenience of the parties." *Trout Unlimited, 944 F. Supp. at 16.* As none of the individual plaintiffs has the District of Columbia as its principal place of business, and the majority are not located in New Jersey, the two fora appear to be of equal inconvenience for plaintiffs. But as plaintiffs' counsel

candidly admitted at the initial scheduling conference, plaintiffs' [*16] choice of forum is driven by their counsel's location in the District of Columbia. [4] Typically, the "location of counsel carries little, if any, weight in an analysis under *§ 1404(a)*," *Armco Steel Co. v. CSX Corp., 790 F. Supp. 311, 324 (D.D.C. 1991)*, since this factor can easily be manipulated thereby permitting forum shopping. Nevertheless, where "convenience of counsel bears directly on the cost of litigation, it becomes a factor to consider." *Blumenthal v. Mgmt. Assistance, 480 F. Supp. 470, 474 (N.D. Ill. 1979); see also Green v. Footlocker Retail, Inc., 2005 U.S. Dist. LEXIS 11190, Civ. Action No. 04-1875, 2005 WL 1330686 (D.D.C. 2005)*. Although plaintiffs' argument rests on this cost factor, they do no more than merely assert that a transfer to the District of New Jersey will drive up litigation costs by requiring local counsel to be hired and increasing travel expenses. (Pls.' Opp'n at 16-17.) There is no showing that plaintiffs collectively are not in a position to absorb the difference in cost. [5] Furthermore, a substantial amount of pre-trial discovery must be conducted in New Jersey as defendants' documents and witnesses are located there. Thus, [*17] travel expenses will be significant whether the case remains here or is transferred. Additionally, since the majority of witnesses and relevant documents are found in New Jersey, the ease of access to the sources of proof will be improved if the case is transferred.

4    At the initial scheduling conference, plaintiffs' counsel stated: "Your Honor, I want to be very up front about this. [Our clients] would like to keep the cost down. *We re here.* It's a case that involves a lot of expertise. There are not New Jersey lawyers that are experienced with respect to these FCC orders. . . . *I know the cases say the convenience of counsel does not mean anything.* But . . . it is a lot more economical for our clients to litigate this case in D.C. than in New Jersey." (9/13/05 Tr. of Initial Sch. Conf. at 22 (emphases added).)

5    Given that the combined revenues of plaintiffs, excluding ICTC, CCFB and CCTX (who filed suit after plaintiffs filed their Opposition), were $ 1,305,000,000 in 2004 (Pls.' Opp'n at 15), there is no reason to assume that plaintiffs would be unable to absorb the extra cost (if any) of litigating in New Jersey. In addition, the need to hire local counsel is not clear, since it appears from Swidler Berlin's website that it has both a New York office and at least two attorneys who are members of both the New Jersey bar and the bar for the U.S. District Court for the District of New Jersey.

[*18] Considering the public interest factors, the Court finds that New Jersey has a much stronger interest in resolving this dispute as compared to the District of Columbia. Though the case involves alleged damages in a multitude of states, the actions in question were undertaken by a New Jersey corporation and implemented by New Jersey-based employees. The State of New Jersey has a significant interest in allegations of fraudulent activity by its corporations and certainly has a greater interest than the District of Columbia, where very few of the alleged harms were manifested and most of the parties have virtually no ties.

Plaintiffs had a decision to make when filing their lawsuits: either file in each plaintiff's home district and protect their venue choice or file a multitude of lawsuits in one jurisdiction and conserve costs. Having reaped the benefit of cost-sharing, plaintiffs have less standing to complain that their choice of venue is not being honored.

The coordination of these cases in a single venue is no doubt more cost-efficient than trying each of them separately. That New Jersey may not be as cost-efficient a location for plaintiffs because they have chosen to hire D. [*19] C. counsel is simply not enough to tip the balance when the remaining factors weigh heavily in favor of transfer.

**CONCLUSION**

For the foregoing reasons, defendants' Motion to Transfer Venue shall be **GRANTED.** An appropriate Order accompanies this Memorandum Opinion.

ELLEN SEGAL HUVELLE

United States District Judge

Date: November 16, 2005

LEXSEE



Caution
As of: Jan 10, 2008

**THERESA AYLING, on behalf of herself, and all others similarly situated, Plaintiff, v. TRAVELERS PROPERTY CASUALTY CORP.; TRAVELERS GROUP INC.; TRAVELERS LIFE AND ANNUITY COMPANY, TOWER SQUARE SECURITIES, INC.; SALOMON SMITH BARNEY HOLDINGS, INC.; RINGLER ASSOCIATES, INC.; WELLS AND ASSOCIATES, INC.; UNIDENTIFIED BROKERS 1 THROUGH 99, Defendants.**

CIVIL ACTION NO. 99-3243

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1999 U.S. Dist. LEXIS 16716

October 27, 1999, Decided

**DISPOSITION:**      [*1]   Defendants' Motion to Transfer Venue to the District of Connecticut GRANTED and case Transferred to the District of Connecticut.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Principal defendant, property and casualty insurance company, moved to transfer venue pursuant to 28 U.S.C.S. § 1404(a) to the District of Connecticut and to enlarge time to respond to a proposed class action suit brought by consumer plaintiff who alleged fraud and RICO violations in defendant's structured settlement annuities.

**OVERVIEW:** Principal defendant, property and casualty insurance company, moved to transfer venue pursuant to 28 U.S.C.S. § 1404(a) to the District of Connecticut and to enlarge time to respond to a proposed class action suit brought by consumer plaintiff in her home state of Pennsylvania. She alleged defendant committed fraud and negligent misrepresentation, and violated the Pennsylvania Unfair Insurance Practices Act, Unfair Trade Practices Act, and Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., by receiving rebates on commissions from brokers in the course of issuing structured settlement annuities for putative plaintiffs. The court found that, although plaintiff

was a paraplegic for whom travel was difficult, the defendants demonstrated that Connecticut was a more appropriate forum, because similar litigation was already filed there before a judge familiar with many of the issues, and the convenience of witnesses, location of documents, and similarity of statutes favored transfer.

**OUTCOME:** Defendant insurance company's motion to transfer venue was granted; the only factor against transfer was that named plaintiff was a paraplegic Pennsylvania resident; Transferee state Connecticut was defendant's principal place of business, was where most transactions were completed, and similar litigation was pending there; transferee court would decide other motions.

**CORE TERMS:** annuity, convenience, venue, structured settlements, interests of justice, factual allegations, convenience of witnesses, choice of forum, settlement, congestion, putative, reside, settling, class action, giving rise, inconvenience, familiarity, transferred, transferee, structured, calendar, weighs, state law, class of persons, negligent misrepresentation, cases involving, similar claims, civil action, financial condition

**LexisNexis(R) Headnotes**

1999 U.S. Dist. LEXIS 16716, *

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN1]A district court may transfer the venue of any civil action for the convenience of parties and witnesses or in the interests of justice, to any other district where it might have been brought. 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN2]Although 28 U.S.C.S. § 1404(a) gives a district court the discretion to decide a motion based on an individualized case by case basis, consideration of convenience and fairness, such motions are not to be liberally granted.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN3]In ruling on a motion to transfer under 28 U.S.C.S. § 1404(a), the Court should consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
*Civil Procedure > Venue > Motions to Transfer > Interests of Justice*
[HN4]The first step in a court's analysis of a transfer motion under 28 U.S.C.S. § 1404(a) is to determine whether venue would be proper in the transferee district. If the first prong of the inquiry is satisfied, the court then should determine whether a transfer would be in the interests of justice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN5]The party moving to transfer a case on grounds of inconvenience has the burden of showing that the existing forum is inconvenient.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Venue > Individual Defendants*
[HN6]Any civil action wherein jurisdiction is not founded solely on the diversity of citizenship may be brought in a district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C.S. § 1391(b)(2).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Civil Procedure > Venue > Motions to Transfer > Choice of Forum*
[HN7]After determining that a transferee forum is one where the action could originally have been brought, the second part of the transfer analysis requires a balancing of the interests of justice and the convenience of witnesses and parties. Factors to be considered in determining whether to transfer venue include (1) the convenience and preference of the parties, including the plaintiff's choice of forum, (2) the convenience of witnesses, (3) access to sources of proof such as books and records, (4) practical considerations that make litigation easy, expeditious or inexpensive, (5) the relative calendar congestion of the two competing districts, (6) where the events at issue took place and the interest of the respective courts in deciding local controversies (7) the enforceability of any judgment and (8) the familiarity of the trial judge with the applicable law.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN8]A plaintiff's choice of forum is a paramount consideration that should not lightly be disturbed.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN9]Unless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN10]When considering a motion to transfer, a court may consider the convenience of the parties as indicated by their relative physical and financial condition.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN11]The courts have found that the presence of related cases in the transferee forum is a reason to grant a transfer. This consideration is powerful enough to tilt the balance in favor of a transfer even when the convenience of the parties and witnesses would point to a denial.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN12]Although courts may consider calendar congestion in ruling upon a 28 U.S.C.S § 1404(a) motion, the

relative congestion of the respective courts dockets is not a factor of great importance in this type of motion.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
*Governments > Local Governments > Claims By & Against*
[HN13]Where plaintiff's cause of action arises from strategic policy decisions of a defendant corporation, the defendant's headquarters can be considered the place where events giving rise to the claim occurred.

**COUNSEL:** For THERESA AYLING, PLAINTIFF: JOHN JOSEPH GALLAGHER, PHILADELPHIA, PA USA. LAURENCE S. BERMAN, LEVIN, FISHBEIN, SEDRAN & BERMAN, PHILADELPHIA, PA USA.

For TRAVELERS PROPERTY CASUALTY CORP., TRAVELERS GROUP INC., TRAVELERS LIFE AND ANNUITY COMPANY, DEFENDANTS: JOHN CHESNEY, MARY E. KOHART, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

For TOWER SQUARE SECURITIES, INC., SALO-MON SMITH BARNEY HOLDINGS, INC., DEFEN-DANTS: MARY E. KOHART, DRINKER BIDDLE & REATH LLP, PHILADELPHIA, PA USA.

For RINGLER ASSOCIATES, INC., MICHAEL J. DUNN, MURPHY & O'CONNOR, PHILADELPHIA, PA USA.

For WELLS AND ASSOCIATES, DEFENDANT: JO-SEPH M. HANKINS, BRITT, HANKINS, SCHAIBLE & MOUGHAN, PHILA, PA USA. C. SCOTT CRABTREE, DENVER, CO USA.

**JUDGES:** RONALD L. BUCKWALTER, J.

**OPINION BY:** RONALD L. BUCKWALTER

**OPINION**

### MEMORANDUM & ORDER

BUCKWALTER, J.

October 27, 1999

Presently before the Court is the Travelers Defendants [1] Motion to Transfer Venue pursuant to 28 U.S.C. § 1404(a) and to Enlarge Defendants' Time to Respond. For the reasons [*2] stated below, the Motion is Granted as to the Transfer. The Motion to Enlarge the Time to Respond will be decided by the Transferee Court.

1   The Travelers Defendants who made this motion include Travelers Property Casualty Corp. ("TPC"), Travelers Group, Inc. ("Travelers"), Travelers Life and Annuity Company ("TLAC"), Tower Square Securities, Inc. ("Tower"), and Salomon Smith Barney Holdings, Inc. ("Smith Barney"). Ringler Associates, Inc. ("Ringler") has requested that it be joined in the Motion of the Travelers' Defendants.

### I. Factual Background

This action has been brought on behalf of a class of persons who entered into structured settlement agreements with TPC and allegedly were subsequently defrauded as a result of Defendants' elaborate rebating scheme. Structured settlements involve a defendant's promise to make a specified number of future periodic payments in lieu of a single lump sum payment. They are often used as a means of resolving personal injury lawsuits. A single premium settlement [*3] annuity is then purchased by the insurer naming the settling plaintiff as beneficiary.

Plaintiff asserts that the Travelers Defendants have undertaken to defraud persons entering into structured settlements with TPC by misrepresenting the cost of annuities, and in so doing, have taken advantage of class members. The basic scheme of the alleged fraud is that TPC would first enter into exclusive contracts for the purchase of the structured settlement annuities with the various securities companies. In exchange for these exclusive contracts, TPC would then agree to rebate a percentage of the commissions (50-75%) they were to receive from the purchase of the annuities. TPC would then show the settling plaintiff the amount that the annuity had cost, while including the full commission price. [2] The settling plaintiff would never know the true cost of the annuity. The Plaintiffs allege that this business practice was fraudulent, in violation of both federal and state law.

2   For example, TPC would report to the settling plaintiff that the annuity would be funded with a hypothetical $ 104,000. That would include the $ 100,000 principal and $ 4,000 commission. Then the broker would return $ 2,000 of the commission, so that the annuity really cost TPC only $ 102,000. Plaintiff alleges that this practice led to the settling plaintiffs receiving less than the amount to which they were entitled.

[*4] Plaintiff brings this action pursuant to the "RICO" statute, 18 U.S.C. § 1961 et seq.. Plaintiff also asserts claims under Pennsylvania common law, sounding in fraud and negligent misrepresentation, as well as

violations of the Pennsylvania Unfair Insurance Practices Act and Unfair Trade Practices Act.

The Travelers Defendants ask the Court to transfer this case to the District of Connecticut pursuant to 28 U.S.C. § 1404(a). They raise three major reasons as to why such a transfer would be in the interests of justice. First, a case alleging the same violations by the same defendants on behalf of the same class is currently before a judge in the District of Connecticut. [3] Secondly, the majority of witnesses and documents needed for this case are located in the vicinity of Hartford in that state, which serves as the headquarters of TPC. Finally, Defendants assert that Connecticut is where the alleged violations arose.

> 3    Abdullah v. Traveler Property Cas. Corp., No. 399-CV-0155, filed on January 27, 1999 (currently pending before Judge Warren Eginton of the District of Connecticut.). Two other cases involving very similar claims, defendants and class members, Macomber v. Travelers Property Cas. Co., No. 398-CV-1060, filed June 5, 1998, and Huaman v. Travelers Property Cas. Co., No. 398-CV-1093, June 10, 1998, were dismissed by Judge Eginton on March 30, 1999.

[*5] **II. Legal Standard**

[HN1]A district court may transfer the venue of any civil action for the convenience of parties and witnesses or in the interests of justice, to any other district where it might have been brought. 28 U.S.C. § 1404(a). The purpose of this section is "to prevent the waste of 'time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense'" Van Dusen v. Barrack, 376 U.S. 612, 616, 11 L. Ed. 2d 945, 84 S. Ct. 805 (1964) (quoting [HN2] Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26-27, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960)). Although § 1404(a) gives a district court the discretion to decide a motion based on a individualized case by case basis consideration of convenience and fairness, such motions are not to be liberally granted.   [HN3] Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1987).

In ruling on a motion to transfer, the Court should consider "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a [*6] different forum. See, [HN4] Jumara v. State Farm Ins. Cos., 55 F.3d 873, 879 (3d Cir. 1995). The first step in a court's analysis of a transfer motion is to determine whether venue would be proper in the transferee district. If the first prong of the inquiry is satisfied, the court then should determine whether a transfer would be

in the interests of justice.   [HN5] Id. at 879. It is important to note that the party moving to transfer a case on grounds of inconvenience has the burden of showing that the existing forum is inconvenient. Britcomo Underwriters v. Raymond E. Wallace Productions, Inc., 56 F. Supp. 2d 542, 545 (E.D. Pa. 1999) (Joyner, J.).

**III. Discussion**

**A. Could the action have been brought in Connecticut?**

[HN6]Any civil action wherein jurisdiction is not found solely on the diversity of citizenship may be brought in a district in which a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2). Likewise, as Plaintiffs assert a RICO violation, venue would be proper in any district in which such person resides. See, 18 U.S.C. 1965 [*7] (a). Since TPC (the primary defendant) resides in Connecticut, and the alleged 'kickbacks' were paid to TPC in Hartford, the action could have been brought in the District of Connecticut.

**B. Would a transfer to Connecticut be in the interests of justice and for the convenience of witnesses and parties?**

[HN7]The second part of the transfer analysis requires a balancing of the interests of justice and the convenience of witnesses and parties. Factors to be considered in determining whether to transfer venue include (1) the convenience and preference of the parties, including the plaintiff's choice of forum, (2) the convenience of witnesses, (3) access to sources of proof such as books and records, (4) practical considerations that make litigation easy, expeditious or inexpensive, (5) the relative calendar congestion of the two competing districts, (6) where the events at issue took place and the interest of the respective courts in deciding local controversies (7) the enforceability of any judgment and (8) the familiarity of the trial judge with the applicable law. See, Jumara, 55 F.3d at 879-880. These factors will be discussed in turn.

1. Convenience   [*8]    of Parties and Plaintiff's Choice of Forum:

The [HN8]plaintiff's choice of forum is a paramount consideration that should not lightly be disturbed. See, First Union National Bank v. United States, 55 F. Supp. 2d 331, 332 (E.D. Pa. 1999) (quoting   Sovereign Bank, F.S.B. v. Rochester Community Savings Bank, 907 F. Supp. 123, 126 (E.D. Pa. 1995) (denying motion to transfer even though plaintiff filed in a district which was not his home nor the situs of events in contention). Moreover, [HN9]unless the balance of convenience of

the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail. See, [HN10] Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). When considering a motion to transfer, a court may consider the "convenience of the parties as indicated by their relative physical and financial condition." Jumara, 55 F.3d at 879.

In this case, the named Plaintiff's physical and financial condition are much more limiting than are those of the Travelers Defendants. The named Plaintiff in this putative class action is a 20 year old paraplegic. The Defendants are a group of corporations [*9] worth billions of dollars. The mere fact that the Travelers Defendants have more resources than Plaintiff should not be the sole reason for refusing a transfer, but an assessment of relative inconvenience weighs in her favor. See, National Mortgage Network, Inc. v. Home Equity Centers, Inc., 683 F. Supp. 116, 119 (E.D. Pa. 1988). Three of the five Travelers Defendants, including TPC and TLAC, are headquartered in Connecticut. The remaining Defendants are not headquartered in either of the potential forum states. While Connecticut would be more convenient for the Travelers' Defendants, traveling to Philadelphia is probably not as significant a hardship for the Defendants from Connecticut as it would be for Ms. Ayling to travel to Connecticut. On the other hand, Ms. Ayling is not the only party on the plaintiff's side. Since she is bringing the suit on behalf of a nationwide class, it is not clear how convenient Pennsylvania would be to other members of the putative class.

The Defendant also argues that a plaintiff's choice of forum deserves less deference in a class action than in ordinary litigation. See, Bolton v. Tesoro Petroleum Corp., 549 F. Supp. 1312, 1314-15 (E.D. Pa. 1982) [*10] (finding that plaintiff's forum choice is of less weight in actions in which the nominal plaintiff's role is likely to be quite minimal). As Plaintiff has proposed a nationwide class, this suit probably could have been brought in almost any state in which TPC does business. Since the named plaintiff in a class action is often not very relevant to the litigation, the Defendants' point is well taken. However, Plaintiff asserts that her role in this litigation could be extensive and that she has a significant financial stake in the outcome of the litigation. At this point in the proceedings we accept these statements as true. Since this is not a derivative security suit, Ms. Ayling's role may be more than nominal. It is difficult to make a showing that will overcome the strong presumption towards keeping the plaintiff's chosen forum. Therefore, the 'convenience of parties' factor favors denying the transfer.

2. Convenience of the Witnesses:

The Plaintiff, in her brief, spends significant time arguing against the Travelers' Defendants' claim that the 'convenience of witnesses' factor favors Connecticut. The focus of Plaintiff's position is that the Defendants have not specifically [*11] identified which witnesses will testify. See, Pl. Mem. in Opp. pp. 8-11. In assessing the propriety of a district court's decision to transfer an action, the Court of Appeals for the Third Circuit has required that defendants submit affidavits, depositions or other evidence to support their motion for transfer. See, Plum Tree v. Stockment, 488 F.2d 754, 756 (3d. Cir. 1973). The Defendants have included such documentation in their Reply Brief. See, Affidavit of Peter F. Sexton, Associate General Counsel of TPC, dated September 28, 1999 ("Sexton Aff."). Sexton lists four witnesses who are likely to testify in this case by name and position. Sexton Aff. P 6. There is some credibility to Sexton's declaration because the Defendants have gone through three similar suits and should now know who is likely to testify in a suit raising similar claims. All four of these witnesses work and reside in Connecticut. The only potential witness identified by the Plaintiff is Ms. Ayling herself (although they do assert that several key witnesses live in the Eastern District of Pennsylvania without any further elaboration. See, Pl. Mem in Opp. p. 14). It would not be [*12] an overwhelming inconvenience for the Travelers' Defendants to transport four witnesses to Philadelphia. However, since the Plaintiff has only speculatively identified one witness who resides in Pennsylvania, the Court finds that the Defendants have demonstrated that the 'convenience of witnesses' factor favors transfer to Connecticut.

3. Access to Documents:

Defendants state that the vast majority of the documents are located at TPC's headquarters in Hartford. Sexton Aff. P 7. However, it is not clear how great a burden it would be to move the necessary documents to Philadelphia. The Plaintiffs do not argue that any of the relevant documents are located in this district. The Court finds on balance that while this factor favors transfer, it should not be accorded great weight.

4. Practical Considerations Making Litigation Easy, Expeditious and Inexpensive.

The Supreme Court has stated that to permit a situation in which two cases involving precisely the same issues are simultaneously pending in two different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent. See, Continental Grain, 364 U.S. at 26. [*13] Therefore, [HN11]courts have found that the presence of related cases in the transferee forum is a reason to grant a transfer. See, e.g., Prudential Insurance Company of America v. Rodano, 493 F. Supp. 954, 955 (E.D. Pa. 1980); Jontri

Transp. Co. v. North Bank Dev. Co., 1990 U.S. Dist. LEXIS 10857, 1990 WL 121511 at *2 (E.D. Pa. 1990). In fact this consideration is powerful enough to tilt the balance in favor of a transfer even when the convenience of the parties and witnesses would point to a denial. See, Blanning v. Tisch, 378 F. Supp. 1058, 1061 (E.D.Pa.1974). The Plaintiff distinguishes Continental because in that case the action transferred arose out of the same incident as the related case. She asserts that this case involves different parties and different facts. However, in reviewing the Abdullah, Macomber and Huaman complaints, this Court finds them to be almost identical to Ms. Ayling's complaint. The Defendants are virtually the same. So too are the factual allegations of RICO violations, common law fraud, negligent misrepresentation and violations of state insurance and trade acts. Each of the actions was on the behalf of the same [*14] class of persons who entered into structured settlements with TPC from 1982 to the present. Therefore, the only real difference is who the class has decided to name as lead plaintiff. Of course the particular factual allegations pertaining to the structured settlement entered into by Ms. Ayling will be different than those made by the named plaintiffs in Abdullah, Macomber and Huaman. But the point of these putative class actions is that the Travelers' Defendants engaged in a pattern of behavior that harmed any plaintiff who entered into a structured settlement with TPC. The result of these actions will be a determination of whether the Travelers' Defendants have defrauded plaintiffs with whom they entered structured settlements by engaging in the allegedly illegal rebating scheme. Allowing two separate actions on behalf of the same class might lead to inconsistent results, even if the witnesses and documentary evidence were identical. Furthermore, as Judge Eginton is already familiar with the factual and legal issues of the putative class' allegations, having him decide the present matter would serve the interests of judicial efficiency. [4] This factor favors transfer [*15] of the case to the District of Connecticut.

> 4    Due to Judge Eginton's knowledge of the factual allegations, and the very similar nature of Ms. Ayling's Complaint to those he has previously ruled upon, this Court feels that a transfer would be justified even if the Abdullah complaint is dismissed prior to transfer.

5. Calendar Congestion:

[HN12]Although courts may consider calendar congestion in ruling upon a 1404(a) motion, the relative congestion of the respective courts dockets is not a factor of great importance in this type of motion. See, Kisko v. Penn. Cent. Transp. Co., 408 F. Supp. 984 (M.D. Pa. 1976). It appears, given the more complete analysis provided by the Plaintiffs, that Connecticut has a more con-

gested forum. However, the real issue would be the congestion of Judge Eginton's docket, because if the case were transferred to Connecticut, it would most likely be assigned to him. The Court does not currently have information concerning Judge Eginton's docket. Therefore, [*16] although this factor leans slightly towards denying the transfer, it will be assigned little weight.

6. Where the events at issue took place.

In Continental Grain Co., a court transferred a suit from New Orleans to Memphis because a related case arising from the same boat crash in Memphis was already under consideration in that city. 364 U.S. at 19. The cases involving the Travelers' Defendants are likewise similar in so far as they all arise from the same corporate policy decisions by TPC to allegedly defraud their customers. [HN13]Where plaintiff's cause of action arises from strategic policy decisions of a defendant corporation, the defendant's headquarters can be considered the place where events giving rise to the claim occurred. See, Paul v. Lands' End, 742 F. Supp. 512, 514 (N.D. Ill. 1990) (granting transfer to district of corporation's headquarters after finding that plaintiffs' cause of action essentially stemmed from corporate policy and decisions made at the corporation's headquarters). If Plaintiff is to prove her case, she will have to show that TPC made certain decisions that affected the whole organization. The type of decision [*17] that could have this kind of effect would likely have been made at the highest levels of TPC management in Hartford. Such decisions included (1) entering exclusive agreements with the various brokerages through whom the annuities were purchased, (2) arranging rebates of the commissions paid to the brokers for selling the annuities, and (3) not sharing the true cost of the annuity with the plaintiffs. So while it is true that Ms. Ayling did not enter into the settlement in Connecticut, the decisions that led to her alleged injury all were made in Connecticut. The Defendant also asserts that the majority of structured settlements entered into by TPC were created and approved at TPC's Hartford headquarters. Sexton Aff., P 7. Since Connecticut is the place where the events giving rise to this claim occurred, this factor favors a transfer of venue.

7. Enforceability of Judgment.

As both sides agree, a judgment obtained in either the Eastern District of Pennsylvania or the District of Connecticut will be equally enforceable.

8. Familiarity of the Trial Judge with Applicable State Law.

As to the federal claims, both Judge Eginton and this court are equally familiar [*18] with the applicable federal claims. Of course, Judge Eginton is more familiar with the particular factual allegations. The two com-

plaints that Judge Eginton has dismissed, Macomber and Huaman, both stated violations of Connecticut's Unfair Trade and Insurance Practice Acts. Judge Eginton obviously found that the allegations did not support a claim under either of these acts. The Ayling complaint attempts to state a claim under the equivalent Pennsylvania statutes and similar statutes in other states (one of which is presumably Connecticut). Therefore, the trial judge will have to be familiar not just with Pennsylvania state law, but with similar statutes of many states. Judge Eginton's familiarity of the law of other states is likely comparable to this Court's. This factor is neutral with regard to transfer. Judge Eginton's factual knowledge weighs in favor of transfer while this Court's better familiarity with Pennsylvania state law weighs against the transfer.

**IV. Conclusion.**

The Court finds a transfer of venue to the District of Connecticut is justified in this case. Connecticut is a forum more related to this action as the events giving rise to the claim occurred [*19]  in that state. Also, the Defendants, identified witnesses and documents reside in that state. The interests of judicial efficiency require the transfer as the trial judge currently has a virtually iden-

tical case before him and is very familiar with the factual allegations at the center of this Complaint. The only significant factor weighing against the transfer is the putative class' choice of Ms. Ayling, a paraplegic resident of Pennsylvania, as its lead plaintiff. The plaintiff's choice of forum has been given significant weight, but the Court finds that the other interests overcome the strong presumption towards the choice of Pennsylvania as a forum. Therefore, Defendant's motion is granted in its entirety.

An appropriate Order follows.

**ORDER**

AND NOW, this 27th day of October, 1999, upon consideration of Defendants' Motion to Transfer Venue to the District of Connecticut (Docket No. 11), Plaintiff's Response thereto (Docket No. 15), and Defendants' Reply (Docket No. 16); it is hereby **ORDERED** that Defendants' Motion is **GRANTED** and this case is Transferred to the District of Connecticut.

BY THE COURT:

RONALD L. BUCKWALTER, J.

LEXSEE



Caution
As of: Jan 10, 2008

BANK OF AMERICA, N.A. (USA), Plaintiff, v. US AIRWAYS, INC., US AIR-
WAYS GROUP, INC. and AMERICA WEST AIRLINES, INC., Defendants, and
JUNIPER BANK, Intervenor.

Civil Action No. 05-793-JJF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2005 U.S. Dist. LEXIS 34902

December 21, 2005, Decided

**SUBSEQUENT HISTORY:** Later proceeding at, Transferred to Bank of Am., N.A. (USA) v. US Airways, Inc., 2006 U.S. Dist. LEXIS 49026 (E.D. Va., July 19, 2006)

**CORE TERMS:** credit card, reorganization plan, matter jurisdiction, convenience, co-branded, interest of justice, fora, venue, weigh, executive offices, better position, choice of forum, claims filed, card, reasons discussed, tortiously, interfered, merged

**COUNSEL:** [*1] Richard L. Horwitz, Esquire, Kevin R. Shannon, Esquire and Brian C. Ralston, Esquire of POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware. Of Counsel: Evan R. Chesler, Esquire and David R. Marriott, Esquire of CRAVATH, SWAINE & MOORE LLP, New York, New York, for Plaintiff Bank of America, N.A. (USA).

David C. McBride, Esquire, Martin S. Lessner, Esquire and Christian Douglas Wright, Esquire of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware. Of Counsel: Mark H. Epstein, Esquire and Kristin Linsley Myles, Esquire of MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Defendants US Airways, Inc., US Airways Group, Inc. and America West Airlines, Inc.

Kenneth J. Nachbar, Esquire of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Intervenor Juniper Bank.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Joseph J. Farnan Jr.

**OPINION**

*MEMORANDUM OPINION*

December *21*, 2005

Wilmington, Delaware

Joseph J. Farnan Jr.

**Farnan, District Judge.**

Pending before the Court are Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5) and Plaintiff's Motion For Expedited Remand To Vice Chancellor Strine Of The Delaware Chancery Court [*2] (D.I. 11). For the reasons discussed, the Court will grant Defendants' Motion to Transfer and decline to rule on Plaintiff's Motion To Remand.

**BACKGROUND**

Plaintiff Bank of America, N.A. (USA) ("Bank of America") is a Delaware corporation with its principal executive offices in Arizona. Defendants US Airways, Inc. and US Airways Group, Inc. are Delaware corporations with their principal executive offices in Virginia. US Airways, Inc. is the principal operating subsidiary of US Airways Group, Inc. Defendant America West Airlines Inc., which is wholly owned by America West Holdings Corp., is a Delaware corporation with its principal executive offices in Arizona.

In May, 2003, Bank of America and US Airways, Inc. entered into a co-branded credit card agreement under which Bank of America was to be the sole issuer of the US Airways credit card to United States residents until December 3, 2008. On September 27, 2005, as a part of US Airways Group's reorganization plan under Chapter 11 of the United States Bankruptcy Code, US Airways Group merged with America West Holdings, with the merged entity operating under the US Airways name. In August, 2005, America West, US Airways Group, [*3] and Juniper Bank ("Juniper") entered into an agreement under which Juniper will issue a co-branded credit card for US Airways. That agreement took effect with the merger on September 27, 2005.

By its Complaint, Bank of America alleges breach of contract and tortious interference with contract and prospective economic relations. Specifically, Bank of America alleges that, as a result of contracting with Juniper to issue a US Airways credit card, Defendants breached provisions on exclusivity and marketing obligations in the co-branded card agreement between them and Bank of America. Bank of America further alleges that America West tortiously interfered with its contract with US Airways and that both America West and US Airways Group tortiously interfered with its prospective economic advantage. Bank of America seeks unspecified monetary damages, specific performance of the co-branded card agreement, and injunctive relief barring Juniper from issuing a US Airways credit card.

Bank of America originally filed this action in the Court of Chancery for the State of Delaware in and for New Castle County as Del. Ch. C.A. No. 1713-N. On November 15, 2005, Defendants and Juniper removed the [*4] action to this Court (D.I. 1) and on November 16, 2005, Defendants filed their Motion To Transfer (D.I. 5). On November 23, 2005, Bank of America filed its Motion For Expedited Remand (D.I. 11).

**DISCUSSION**

**I. Whether The Court Has Subject Matter Jurisdiction**

Bank of America contends that the Court must deny Defendant's Motion To Transfer and grant its Motion To Remand because the Court lacks subject matter jurisdiction. (D.I. 12 at 10; D.I. 18 at 3.) Defendants contend that the Court has subject matter jurisdiction under 28 U.S.C. § 1334(b) because this case is a core proceeding within the meaning of 28 U.S.C. § 157(b) and is related to a case under title 11. The Court concludes that it does have subject matter jurisdiction.

Section 1334(b) provides in relevant part that "the district courts shall have original but not exclusive juris-

diction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). The Court of Appeals for the Third Circuit has given a broad interpretation to "related to," even in cases like this one that arise after [*5] confirmation of the debtor's reorganization plan. See Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.), 372 F.3d 154, 164 (3d Cir. 2004). Under § 1334(b)'s "related to" standard, a district court has jurisdiction of a proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Id. (quoting Pacor, Inc., v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). A proceeding is related to a case under title 11 "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." Id. According to Defendant's brief in support of their Motion To Transfer, a significant percentage of the cash needed to implement US Airways' Chapter 11 reorganization plan was to come from the contract with Juniper, which Bank of America seeks to enjoin. (D.I. 6 at 11.) Taking this into account, and applying the Third Circuit's broad standard, the Court concludes that this action is related to Defendants' case under title 11. Therefore, the Court has subject matter jurisdiction [*6] under 28 U.S.C. § 1334(b).

**II. Whether The Court Should Transfer Venue To The Eastern District Of Virginia**

Defendants contend that the Court should transfer venue to the United States District Court for the Eastern District of Virginia where proceedings concerning US Airways' Chapter 11 case are pending before the Honorable Stephen S. Mitchell. (D.I. 6 at 1.) In support of this contention, Defendants argue that, because Judge Mitchell has presided over this large and complex bankruptcy, he is in a better position than this Court to weigh the issues raised by Bank of America's Motion to Remand as well as its Complaint. In response, Bank of America contends that its choice of forum should be given substantial deference and that Defendants have not met their burden, under 28 U.S.C. § 1412, of showing that transfer of venue would serve the interest of justice or the convenience of the parties. (D.I. 18 at 6.)

Secton 1412 provides that "[a] district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412. [*7] A determination of whether to transfer a proceeding under § 1412 should be based on the same factors used to decide a motion to transfer under § 1404(a), which permits a court to transfer any civil action for the convenience of the parties or in the interest of justice. Son v.

*Coal Equity, Inc. (In re Centennial Coal, Inc.),* 282 B.R. 140, 144 (Bankr. D. Del. 2002). The Third Circuit set forth a list of those factors in *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879-80 (3d Cir. 1995). That list includes: (1) the plaintiff's choice of forum; (2) the defendant's preferred forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; (6) the location of books and records, similarly limited to the extent that the files could not be produced in one of the fora; (7) the enforceability of the judgment; (8) practical considerations that could make the trial easy, expeditious, or inexpensive; (9) the relative administrative difficulty in the two fora resulting from [*8]   court congestion; (10) the local interest in deciding local controversies at home; (11) the public policies of the fora; and (12) the familiarity of the trial judge with the applicable state law. *Id.* The burden is on the movant to establish that the balance of the interests weighs strongly in favor of transfer. *Datex-Ohmeda, Inc. v. Hill-Rom Services, Inc.,* 185 F.Supp.2d 407, 412 (D. Del. 2002).

Having considered all of the relevant factors, the Court concludes that the balance of interests here weighs strongly in favor of transferring this action to the Eastern District of Virginia, where related bankruptcy matters are pending. That conclusion is based largely on the eighth factor, practical considerations. Judge Mitchell is simply in a far better position than this Court to expeditiously decide critical questions pertaining to Bank of America's Motion To Remand and the merits of the case. For example, Bank of America contends that the Court must abstain from hearing this case pursuant to 28 U.S.C. § 1334(c)(2), because it is not a core proceeding. (D.I. 12 at 21.) Defendants, on the other hand, contend that the claims in the Complaint [*9]   are "functionally identical" to administrative claims filed by Bank of America in US Airways' Chapter 11 proceedings, (D.I. 6 at 1), and that those administrative claims, therefore, transform this action into a core proceeding, *Id.* at 9-10. Also at issue

with respect to the Motion For Remand, is the effect on the Court's jurisdiction of a paragraph in Judge Mitchell's order confirming the reorganization plan, which reserves certain of Bank of America's rights with respect to the co-branded credit card agreement. (D.I. 13, Ex. 13 at 49.) Another crucial issue in contention is the importance to the reorganization plan of the cash received by US Airways from its contract with Juniper. (D.I. 6 at 10-11.) Judge Mitchell, being vastly more familiar with the nature of the administrative claims filed by Bank of America, the correct interpretation of his own orders, and the details of US Airways' reorganization plan, is well positioned to quickly and efficiently resolve these and other issues, whereas this Court would have to expend considerably more time and resources to arrive at a just resolution. Therefore, the Court concludes that, for practical considerations alone, it is in the interest [*10]   of justice to transfer this case to the Eastern District of Virginia.

**CONCLUSION**

For the reasons discussed, the Court will grant Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5). The Court declines to rule on Plaintiff's Motion For Expedited Remand To Vice Chancellor Strine Of The Delaware Chancery Court (D.I. 11).

An appropriate order will be entered.

***ORDER***

At Wilmington, this *21* day of December 2005, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1. Defendants' Motion To Transfer To The Eastern District Of Virginia (D.I. 5) is ***GRANTED.***

2. This case is transferred to the United States District Court for the Eastern District of Virginia.

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

LEXSEE

**RANDAL FUSI, et al., Plaintiffs, -v- EMERY WORLDWIDE AIRLINES, INC., et al., Defendants.**

**Case No. C-3-07-039**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION**

**2007 U.S. Dist. LEXIS 89784**

**November 23, 2007, Decided
November 23, 2007, Filed**

**CORE TERMS:** grievance, venue, flight, convenience, shutdown, reside, settlement agreement, crewmember, unwilling, air, attendance, weigh, settlement, arbitrate, principal place of business, negotiation, resident, airline, relevant factors, choice of forum, compulsory process, arbitration, lawsuit, factual issues, transferee, congestion, remaining claim, participated, arbitrated, grounding

**COUNSEL:** [*1] For Randal Fusi, Timothy Vest, Craig Sandman, Patrick Arnello, Robert Kircher, Richard Newberry, Rob Ferguson, Nick Stephens, Reeve Birmingham, Steven Zettler, Mike Farrell, Plaintiffs: Matthew D Stokely, LEAD ATTORNEY, Altick & Corwin - 3, Dayton, OH.

For Emery Worldwide Airlines Inc, Defendant: Michael Christian Hallerud, LEAD ATTORNEY, Ellen M Papadakis, Kent Jonas, Thelen Reid Brown Raysman & Steiner LLP, San Francisco, CA.

For Air Line Pilots Association, Defendant: David Marvin Cook, LEAD ATTORNEY, Cincinnati, OH; Jeffrey B Demain, Katherine M Pollock, Stephen P Berzon, LEAD ATTORNEYS, Altshuler Berzon LLP, San Francisco, CA.

For Menlo Worldwide Forwarding Inc, doing business as Menlo Worldwide also known as Emery Worldwide, Defendant: Ellen M Papadakis, LEAD ATTORNEY, Thelen Reid Brown Raysman & Steiner LLP, San Francisco, CA.

For CNF Inc, Defendant: Michael Christian Hallerud, LEAD ATTORNEY, Thelen Reid Brown Raysman & Steiner LLP, San Francisco, CA.

**JUDGES:** THOMAS M. ROSE, UNITED STATED DISTRICT JUDGE.

**OPINION BY:** THOMAS M. ROSE

**OPINION**

**ENTRY AND ORDER OVERRULING DEFENDANTS' JOINT MOTION TO TRANSFER VENUE (Doc. # 13)**

This matter comes before the Court on Defendants' Motion To Transfer Venue. The Plaintiffs in [*2] this matter are Randal Fusi, Timothy Vest, Craig Sandman, Patrick Arnello, Robert Kircher, Richard Newberry, Rob Ferguson, Nick Stephens, Reeve Birmingham, Steven Zettler and Mike Farrell (collectively the "Plaintiffs"). Defendants in this matter are Emery Worldwide Airlines ("EWA"), Menlo Worldwide Forwarding, Inc. ("EWW") and CNF, Inc. ("CNF") (collectively the "Corporate Defendants"). The Air Line Pilots Association International ("ALPA") is also a Defendant.

Plaintiff's First Amended Complaint ("FAC") includes three Claims for Relief. The First Claim for Relief is an alleged "hybrid" claim under the Railway Labor Act ("RLA") against EWA for breach of a collective bargaining agreement, against EWW for breach of a subcontractor letter of agreement and against ALPA for breach of its duty of fair representation. The Second Claim for Relief is against ALPA under the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 et seq. The Third Claim for Relief seeks to compel the Corporate Defendants to arbitrate certain grievances.

**FACTUAL BACKGROUND**

### 1. The Parties and Initial Agreements

The Plaintiffs are furloughed flight crewmembers of EWA. (FAC P 1.) One of the Plaintiffs resides [*3] in Ohio, two reside in California, three reside in Florida, one resides in the state of Washington, one in Connecticut, one in Georgia, one in Arizona and the state of residence of one of the Plaintiffs is not indicated in the Complaint.

EWA is a Nevada Corporation that designates its principal place of business as Ohio, presently has no employees and presently conducts no business operations. (Declaration of Mark C. Thickpenny ("Thickpenny Decl.") P 4 June 8, 2007). EWA previously operated as a "common air carrier" but ceased its commercial air carrier operations on August 13, 2001, in response to a threat by the Federal Aviation Administration that it would revoke EWA's operating certificate if EWA did not voluntarily ground its aircraft. (Id. P 5.) On December 4, 2001, EWA's cessation of air carrier operations and the furloughs of its flight crew members became permanent. (Id. P 5.)

At all times relevant, EWW was a freight forwarding corporation organized under the laws of Delaware with its principal place of business in California. (Id. P 6.) EWW was EWA's principal customer until December of 2004 when it was merged into its purchaser and successor, UPS Supply Chain Solutions, Inc. [*4] ("UPS-SCS"). (Id. PP 6-7.)

CNF, now known as Con-way, Inc, is a holding company of various global supply-chain businesses.(Id. PP 1-2.) CNF is a Delaware corporation with its principal place of business in California. (Id. P 2.) CNF is EWA's corporate parent and, until December 2004, was EWW's corporate parent. (Id. PP 4, 6.)

ALPA is a labor organization with headquarters in Washington, D.C. and Herndon, Virginia. (Declaration of Marcus Migliore ("Migliore Decl. I") P 2 June. 14, 2007). ALPA represents flight crew members throughout the country. (Id.)

In September 2000, EWA and ALPA executed a Collective Bargaining Agreement (the "CBA") that established the terms and conditions of employment for EWA's flight crewmembers. (FAC P 12.) At the same time, EWA, EWW and ALPA executed a Subcontracting Letter of Agreement ("SLA") regarding subcontracting. (FAC P 13.) The SLA provided that EWW would successively, in each calendar year from 2001 through 2004, increase the proportion of its air freight transported by air by EWA and Ryan Airlines. (Id.)

### 2. The 2001 Grounding and Shutdown and the Resulting Grievances

On August 13, 2001, EWA ceased commercial air carrier operations and furloughed all [*5] of its flight crewmembers. (Id. P 14-15.) That same day, ALPA filed grievances under the CBA and a dispute under the SLA to challenge the propriety of EWA's cessation of operations, the flight crewmembers furloughs and EWW's alleged noncompliance with the SLA's subcontracting limitations (the "Grounding Grievances"). (FAC P 15; Request for Judicial Notice In Support of Defendants' Motion To Transfer Venue ("RJN") Ex. OO, PP.)

On December 5, 2001, EWA permanently ceased operations. (Id. P 17.) The previous furloughs then became a permanent termination of employment. (Id.) In January of 2002, ALPA again filed grievances claiming that the shutdown and furlough violated the CBA. (Id. P 18.) ALPA also filed a second grievance under the SLA alleging EWW's continuing noncompliance. (RJN Ex. OO, PP.) The grievances filed after EWA permanently ceased operations are collectively referred to herein as the "Shutdown Grievances."

In 2001 and 2002, EWA and ALPA arbitrated the Grounding Grievances regarding violation of the CBA before the EWW System Board of Adjustment and arbitrated the Grounding Grievance regarding violation of the SLA before a Permanent Umpire. [1] (RJN Ex. OO, PP.) The System Board [*6] and the Permanent Umpire held that the August 2001 grounding of EWA's aircraft was a force majeure event that excused both EWA's obligations under the CBA and EWW's obligations under the SLA. (Id.)

> 1   Disputes arising under the CBA were to be arbitrated before the System Board of Adjustment and disputes arising under the SLA were to be arbitrated before a Permanent Umpire. (RJN Ex. OO, PP.)

In November and December of 2002, ALPA and EWA agreed to arbitrate the Shutdown grievances. (FAC P 19.) EWW refused to arbitrate the Shutdown Grievance regarding the alleged violation of the SLA. (Id.)

### 3. The Ensuing Litigation

On March 14, 2003, 133 flight crewmembers filed suit against ALPA, EWA, EWW and CNF in the United States Court for the Northern District of California, San Francisco Division. *Rachford v. Air Line Pilots Association International,* No. C 03-01103 ("*Rachford I*"). The *Rachford I* Plaintiffs sought a declaratory judgment that, among other things, they have a right to be represented by counsel of their choice in any negotiation, System Board arbitration or action in a court of law concerning any claims by Plaintiffs against EWA, EWW and CNF for a breach of the CBA. (RJN Ex. A.) The *Rachford*

[*7] I Plaintiffs also sought a declaratory judgment that the grievances filed by ALPA against EWA and EWW regarding the shutdown should not be arbitrated but, rather, heard by a court of law. (Id.) The *Rachford I* Plaintiffs were willing to dismiss the request for declaratory judgment regarding hearing of the grievances in a court of law but argued that the dismissal should be without prejudice to avoid any prejudicial effect on claims asserted in *Rachford II,* another lawsuit then pending. (RJN Ex. J.)

On September 14, 2005, ALPA's counsel agreed to not raise any objection to the *Rachford I* Plaintiffs being represented by counsel of their choice in any negotiations, System Board arbitration or action in a court of law concerning any claims that the *Rachford I* Plaintiffs may have against EWA, EWW and CNF for breach of the CBA and the SLA. (Declaration of Jeffrey B. Demain ("Demain Decl.") Ex. A. June 14, 2007.) *Rachford I* was ultimately dismissed on December 30, 2005, by District Court Judge Hamilton. (RJN Ex. J.) Judge Hamilton found that the *Rachford I* Plaintiffs' request for a declaratory judgment that they have a right to obtain their own representation was moot because ALPA allegedly [*8] had agreed to the request. (Id.) Judge Hamilton also found that dismissal of the other claims against ALPA should be without prejudice to the question being raised in *Rachford II* but with prejudice to the question being raised in all other respects. (Id.)

On April 4, 2003, after *Rachford I* had been filed, ALPA filed suit in Federal District Court for the Northern District of California against EWA and EWW seeking to compel arbitration of the Shutdown Grievances. *ALPA v. Emery Worldwide Airlines, Inc.,* No. C 03-1449 ("*ALPA v. EWA*"). EWA and EWW claimed that the parties had settled the Shutdown Grievances in the first quarter of 2003 but Judge Hamilton concluded that the parties had not yet reached an enforceable settlement. (Demain Decl. P 4; RJN Ex. E.) On August 8, 2006, ALPA and EWA settled *ALPA v. EWA* on behalf of and with regard to only those 279 former EWA flight crewmembers still represented by ALPA. (FAC P 27; Demain Decl. Ex. B.)

The August 8 Settlement Agreement identified each flight crewmember represented by ALPA in connection with the settlement and specifically preserved the rights of the *Rachford I* Plaintiffs to pursue the Shutdown Grievances on their own behalf. [2] (Demain [*9] Decl. Ex. B.) The Plaintiffs here are among a group of flight crewmembers who sent letters to ALPA indicating that ALPA did not have the flight crewmembers' consent to settle the pending grievances. (FAC P 28.) The grievances were resolved and settlement reached without any notice and without representation of Plaintiffs in the matter. (FAC P 27.) The settlement agreement signed by ALPA and EWA also terminated the CBA. (Id.)

> 2  The Plaintiffs argue that this settlement has a significant effect on their rights and interests and that such effect was caused by ALPA's failure to honor the promise made to the court at the conclusion of *Rachford I.*

Subsequent to this settlement, Plaintiffs sent letters to the Corporate Defendants' lead counsel demanding arbitration of the ALPA grievances. (FAC P 32.) The Corporate Defendants have refused to agree to arbitrate these grievances. (Id. P 33.)

On August 4, 2003, while *Rachford I* and *ALPA v. EWA* were still pending, 270 former flight crewmembers, including the Plaintiffs in this case, filed another lawsuit against ALPA, EWA, EWW and CNF. *Rachford v. Air Line Pilots Association International,* No. 03-03618 ("*Rachford II*"). The *Rachford II* Plaintiffs [*10] initially alleged that ALPA breached its duty of fair representation by settling the Shutdown Grievances and that EWA and EWW had breached the CBA and SLA in connection with the furloughs. (RJN Ex. S.) These two allegations were ultimately dismissed because they were predicated upon the existence of an enforceable settlement. (RJN Ex. F.) However, *Rachford II* evolved into a class action brought by four plaintiffs making eleven claims for relief. (RJN Ex. V.)

On April 10, 2006, the only remaining claim against ALPA was dismissed. (RJN Ex. X.) In separate proceedings between May and September of 2006, the court ordered arbitration of the *Rachford II* plaintiffs' claim against EWW for breach of the SLA and dismissed all remaining claims. (Declaration of Michael C. Hallerud ("Hallerud Decl.") PP 7-8 June 11, 2007.) Arbitral proceedings regarding breach of the SLA have begun and the Rockford II plaintiffs have appealed the dismissal of the remaining claims, an appeal which remains pending. (Id. PP 7, 9.)

On October 4, 2006, two additional cases were filed in the Northern District of California regarding the Shutdown Grievances. (RJN Exs. EE, HH.) *Call v. Emery Worldwide Airlines, Inc.,* No. [*11] 06-6245 and *Del Turco v. Emery Worldwide Airlines, Inc.,* No. 06-6246 were pro se lawsuits that sought to compel the arbitration of the Shutdown Grievances. (Id.) Both lawsuits were voluntarily dismissed in December of 2006. (RJN Exs. GG, HH.) The plaintiffs in these cases are not plaintiffs in the matter now before this Court.

On February 7, 2007, Plaintiffs filed the litigation that is now before the Court. [3] *Rachford I* has been dismissed. *ALPA v. EWA* has been settled on behalf of the flight crewmembers. represented by ALPA. *Call v.*

*Emery* and *Del Turco v. Emery* have been dismissed. Regarding *Rachford II*, arbitral proceedings about breach of the SLA have begun and the plaintiffs have appealed the dismissal of the remaining claims, an appeal which remains pending. Regarding the Complaint that is now before this Court, the Plaintiffs argue that since ALPA and the Corporate Defendants have terminated the CBA and since the Corporate Defendants now refuse to arbitrate their grievances, they have no means other than litigation to seek relief or to compel the Corporate Defendants to arbitrate their grievances.

> 3  The Southern District of Ohio is currently serving as the venue for a case where  [*12] the Corporate Defendants in this case are parties. *Bledsoe v. Emery Worldwide Airlines,* No. C-3-02-068 (S.D. Ohio). Also, ALPA has recently been a party to an action in the Southern District of Ohio. *Air Line Pilots Association, International v. DHL Holdings(USA), Inc.,* No. 1:06cv823 (S.D. Ohio).

## MOTION TO TRANSFER VENUE

Motions to transfer venue, such as the one now before the Court, are governed by 28 U.S.C. § 1404(a). *Van Dusen v. Barrack, 376 U.S. 612, 616, 84 S. Ct. 805, 11 L. Ed. 2d 945 (1964).* Section 1404(a) provides that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The purpose of such a transfer is to "prevent that waste of time, energy and money and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen, 376 U.S. at 616.*

District courts have wide discretion in deciding motions to transfer. *Van Dusen, 376 U.S. at 616, Norwood v. Kirkpatrick, 349 U.S. 29, 31-32, 75 S. Ct. 544, 99 L. Ed. 789 (1955).* Further, "[s]ection 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient. *Van Dusen, 376 U.S. at 645-46.*  [*13] Finally, the moving party, the Defendants in this case, bears the burden of proving why a court should grant a transfer. *Jumara v. State Farm Insurance Co., 55 F.3d 873, 879 (3d Cir. 1995).*

When deciding a motion to transfer venue, the threshold consideration is whether the action "might have been brought" in the court to which the movant wishes to transfer. *Jamhour v. Scottsdale Insurance Co., 211 F.Supp.2d 941, 945 (S.D. Ohio 2002)* (citing *Sky Technology Partners LLC v. Midwest Research Institute, 125 F.Supp.2d 286, 291 (S.D. Ohio 2000)).* An action might have been brought in the court to which movant wishes to transfer (the "transferee court") if:

> a. the transferee court has jurisdiction over the subject matter of the action,
>
> b. venue is proper in the transferee court, and
>
> c. the defendants are amenable to process issuing out of the transferee court.

*Id.*

If the threshold consideration is satisfied, the court next weighs case-specific factors to determine whether a transfer would comport with Section 1404(a). *Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29-30, 108 S. Ct. 2239, 101 L. Ed. 2d 22 (1988).* The factors to be considered are similar to those weighed by courts in determining *forum non conveniens* motions  [*14] except that transfers pursuant to Section 1404(a) may be granted "upon a lesser showing of inconvenience." *Jamhour, 211 F.Supp.2d 945* (citing *Norwood, 349 U.S. at 32).*

The factors to be considered that are relevant to this case fall into two general categories: the private interests of the litigants and the public's interest in the administration of justice. *Id.* The litigants' interests relevant to this matter include: the convenience of the parties; the convenience of the witnesses; the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and other practical problems that make trial of the case easy, expeditious and inexpensive. *See id.* The Public's interests relevant to this matter include: docket congestion; the burden of trial to a jurisdiction with no relation to the cause of action; the value of holding trial in a community where the public affected live; the familiarity of the court with controlling law; judicial economy; and the avoidance of inconsistent judgments. *See Jamhour, 211 F.Supp.2d at 945-46; Samsung Electronics Co., Ltd. v. Rambus, Inc., 386 F.Supp.2d 708, 721 (E.D.Va. 2005).*  [*15] Finally, the plaintiff's choice of forum is given considerable weight and the balance of convenience, considering all of the relevant factors "should be strongly in favor of a transfer before such will be granted." *Jamhour, 211 F.Supp.2d at 946* (citing *Hanning v. New England Mutual Life Insurance Co., 710 F.Supp. 213, 214 (S.D. Ohio 1989)).*

## THRESHOLD CONSIDERATION

In this case, the Defendants want to transfer this action to the United States District Court for the Northern District of California and present argument that this action might have been brought in the Northern District of

California. The Plaintiffs agree that their action could have been brought in the Northern District of California.

The Northern District of California has original subject matter jurisdiction over Plaintiffs' Claims for Relief which are brought pursuant to federal law. Further, according to the Defendants, the Northern District of California has personal jurisdiction over all of them. ALPA represents pilots located in the Northern District of California. EWA and EWW were licensed to do business in California and had significant contacts there. Further, EWW and CNF both maintain their principal place of business [*16] in California. Finally, according to the Defendants, venue is proper in the Northern District of California because all Defendants "reside" in California for purposes of the venue statute.

Therefore, the threshold requirement is satisfied. The Northern District of California has jurisdiction over the subject matter of the action, venue is proper in the Northern District of California, and the Defendants are amenable to process issuing out of the United States District Court of the Northern District of California. Plaintiffs' Complaint might have been brought in the United States District Court for the Northern District of California. The analysis next turns to the private interests of the litigants.

## PRIVATE INTERESTS OF THE LITIGANTS

The relative factors to be considered as private interests include: the convenience of the Parties; the convenience of the witnesses; the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining attendance of willing witnesses; and other practical problems that make trial of the case easy, expeditious and inexpensive. Each will be addressed seriatim.

## 1. Convenience of the [*17] Parties

The Defendants argue that the convenience of the Parties "strongly" favors venue in California. However, the evidence indicates that "strongly" may be an overstatement..

The Parties are found in diverse locations throughout the United States. One of the Plaintiffs resides in Ohio, two reside in California, three reside in Florida, one resides in Georgia, one resides in Arizona and the state of residence of one of the Plaintiffs is not indicated on the complaint.

As for the Defendants, ALPA's principal place of businesses are in the Washington D.C. area. EWA's principal place of business is Ohio. [4] EWW and CNF identify California as their principal place of business.

4    EWA presently has no employees. (Thickpenny Decl. P 4.)

## 2. Convenience of the Witnesses

The Defendants argue that the location of the witnesses favors venue in California. However, as above, the evidence indicates that the Defendants' argument is debatable, particularly considering that the convenience of witnesses who are employees of a party is generally not given as much consideration as is given to other witnesses. *Zimmer Enterprises, Inc. v. Atlandia Imports, Inc., 478 F.Supp.2d 983, 991 (S.D. Ohio 2007).*

The Defendants [*18] first argue that nine of the participants in the negotiations and mediation that culminated in the August 8 Settlement are residents of California and none of the key witnesses are Ohio residents. The Plaintiffs respond that all of those who participated in the negotiations on behalf of the Corporate Defendants are still employed by the Corporate Defendants and, of those who participated on behalf of ALPA, one is no longer an employee.

The Defendants reply that some of the individuals counted as employees by the Plaintiffs are actually lawyers who are not employees of the Corporate Defendants. However, if these individuals were acting on behalf of the Corporate Defendants, they arguably are treated the same as Corporate Defendants for purposes of this analysis.

The Plaintiffs also respond that their claims are based upon the terms and effect of the Settlement Agreement, the language of which has already been placed before the Court. Presumably, then, since the terms of the Settlement Agreement are available, the importance of testimony from those who participated in its preparation is minimal at best.

The Defendants next argue that five of the key witnesses involved in the bargaining [*19] of the CBA and SLA are California residents, three of which have retired. The Plaintiffs respond that, with regard to the grievance dispute, of those who actually participated on behalf of the Corporate Defendants, none are still employed by the Corporate Defendants - two are residents of California, one is a resident of Connecticut and one is a resident of North Carolina. Of those who participated on behalf of ALPA, one is no longer an employee and is a resident of Florida.

Defendants also argue that the retirees would not be subject to compulsory process in Ohio under Fed. R. Civ. P. 45 and there are no means of ensuring their presence in Ohio. However, if these witnesses are unwilling and not subject to compulsory process, they would not be

inconvenienced by a trial in Ohio any more than by a trial in California.

### 3. Ease of Access To Other Sources of Proof

Plaintiffs expect that most of the real evidence necessary for this litigation will be identifiable documents which are easily transferable to the chosen venue. This factor is not addressed by the Defendants and does not favor transfer to California.

### 4. Availability of Compulsory Process for Attendance of Unwilling Witnesses

The Plaintiffs [*20] argue that the 1991 Amendments to Fed. R. Civ. P. 45 allow for effective nationwide service of process. They, therefore, have access to compulsory process to ensure the presence of unwilling witnesses. The Defendants respond that Rule 45 governs the attendance of unwilling witnesses at deposition, not at trial.

Rule 45 addresses the subpoena for attendance at trial. It also provides that such a subpoena may be quashed under certain circumstances. However, this line of argument is not relevant to the factor being considered because no unwilling witnesses have been identified by either party.

The Defendants also argue that, because it would be impossible to compel the attendance of all unwilling witnesses in any venue, California should be chosen because the Defendants would be able to compel more unwilling witnesses there, including those whose testimony would have greater significance. However, it is not possible, based upon the information provided by the Parties, to determine whose testimony will have a greater significance, where that individual is located and if that individual would be an unwilling witness. Therefore, this factor does not favor transfer.

### 5. Cost of Obtaining Willing [*21] Witnesses

The Defendants do not address this factor in the Memorandum In Support of their Motion. They do, however, argue in their Reply brief that the cost of obtaining willing witnesses favors transfer to California. The basis for this argument is their assertion that fourteen of the potential witnesses reside in California while only two reside in Ohio and the remaining ten will have to travel regardless of the forum selected. The Plaintiffs argue that, in past negotiations, the Corporate Defendants have flown individuals from around the country to California and will experience not greater burden in flying these individuals to Ohio. The Plaintiffs also argue that the Corporate Defendants and ALPA can far more easily afford to transport their employees than the small group of plaintiffs.

As indicated, above, it is not possible, based upon the evidence and argument presented, to determine whose testimony will be of significance, and thus, where those individuals are located. Further, the Parties argue about travel from the state in which witnesses may be located. However, California is a large area and witnesses located in California may have to travel considerable distances to a trial [*22] located in California. Therefore, the Defendants have not shown that this factor weighs in favor of transfer.

### 6. Other Practical Problems

The Defendants do not address this factor in their Memorandum supporting their Motion To Transfer. The Plaintiffs argue that the transfer of documents does not weigh into the analysis of this factor but the financial impact on the Parties of the costs associated with flights weighs in favor of not transferring. Further, the Defendants will manage costs easier than a small group of individuals and the Defendants will need to manage these costs regardless of the venue. Finally, the Plaintiffs argue that, if as the Defendants assert, many of the witnesses to the negotiations are retired employees, the Defendants would not be affected by lost work days.

In their Reply, the Defendants argue that the practical problem associated with trying this case most expeditiously and inexpensively is "unquestionably" the time and expense associated with familiarizing this Court with the extensive factual and procedural background to the case. Although this Court recognizes that it has already been necessary to become familiar with much of the factual and procedural [*23] background to effectively decide Defendants' Motion To Transfer, this issue is addressed within another factor.

In addition to what they believe to be the "unquestionably" most important practical problem, the Defendants argue that work days lost to them are relevant. They also argue that the only currently active members of the airline industry are the Plaintiffs and not any of the Defendants.

What ever may be the practical problems associated with trying this case in Ohio, the Defendants have not proved that fewer will exist in California. This factor does not weigh in favor of transfer.

### PUBLIC'S INTERESTS

The relevant factors to be considered regarding the public's interests include: docket congestion; the burden of trial to a jurisdiction with no relation to the cause of action; the value of holding trial in a community where the public affected live; the familiarity of the court with controlling law; judicial economy and the avoidance of inconsistent judgments. Each will be addressed seriatim.

## 1. Docket Congestion

The Defendants do not address this issue in the Memorandum In Support of their Motion To Transfer. The Plaintiffs argue that, based upon Judicial Caseload Profiles, the Southern  [*24] District of Ohio maintains less total filings, less civil filings and fewer pending cases than the Northern District of California, although the Northern District of California resolves matters slightly faster. The Defendants reply that the docket congestion analysis refutes Plaintiffs' argument that docket congestion favors not transferring because the data shows that the Northern District of California, on average, disposes of cases slightly more quickly than the Southern District of Ohio.

The data presented by the Plaintiffs is summary information presented for the entire Southern District of Ohio and is not necessarily representative of this particular Court. Further, this Court does not deem its docket to be too congested to accept another case, particularly when compared to the data presented for the Northern District of California. Therefore, this factor does not weigh in favor of transfer.

## 2. Burden of Trial To Jury With No Relation To the Cause of Action

Neither Party presents argument on this factor. The Court, however, is aware that EWW had a major freight forwarding operation at the Dayton International Airport for several years. Therefore, the issues raised herein may relate  [*25] to this community. This factor does not favor transfer.

## 3. Value of Trial Where Public Affected Live

Again, neither Party presents argument on this factor. Based upon the Court's current understanding of the issues raised by the Plaintiffs, it is difficult to imagine that a trial either in Ohio or California will have a direct affect on the public in either location. Therefore, this factor is neutral with regard to transfer.

## 4. Familiarity of the Court With Controlling Law

The issues in this matter appear to involve contract law and federal labor laws, both of which this Court is familiar. This factor does not weigh in favor of transfer.

## 5. Judicial Economy

The Defendants argue that a transfer to the Northern District of California will avoid a waste of judicial resources. However, this argument is unavailing.

This argument is premised on the existence of multiple cases concerning the same complex factual issues in the Northern District of California. However, the five identified cases no longer exist in the Northern District of California and the court in the Northern District of California was not intimately involved with resolution of four of them.

*Rachford I* was dismissed primarily by  [*26] agreement of the Parties. *ALPA v. EWA* was settled by the Parties. *Call v. Emery and Del Turco v. Emery* were dismissed by the Plaintiffs. Rachford II is no longer in the hands of the district court. Arbitral proceedings regarding breach of the SLA have begun and the plaintiffs have appealed the dismissal of the remaining claims, an appeal which remains pending.

The Defendants also argue that a lawsuit that relies upon a challenged interpretation of a settlement agreement entered in prior litigation "realistically" must be viewed as but a later state of the lawsuit originally brought. The Defendants also argue that a case that turns on the preclusive effect of a prior judgment of the transferee forum should likewise be transferred.

However, both of these arguments are unavailing in this case. In this case, the Settlement Agreement was reached by the some of the Parties with no apparent court involvement, the alleged "prior litigation" is no longer active and the issues brought by the Plaintiffs here focus on the August 8 Settlement Agreement which occurred after almost all of the litigation in California was concluded.

In addition to the fact that the cases are no longer pending, the issues  [*27] in the case brought here are not the same as the issues heard by the California District Court. The Plaintiffs that are now before this Court seek relief since the ALPA and the Corporate Defendants have terminated the CBA and since the Corporate Defendants now refuse to arbitrate their grievances, all actions taken after and/or as a result of matters adjudicated in the Northern District of California. This factor does not weigh in favor of transfer.

## 6. Avoidance of Inconsistent Judgments

The Defendants argue that transfer to the Northern District of California is necessary to avoid inconsistent judgments. This argument is based upon a case from the Western District of Washington where the court found that a case with several highly technical factual issues should be transferred to a court that has become familiar with those factual issues. *Amazon.com v. Cendant Corp., 404 F.Supp.2d 1256, 1262 (W.D. Wash. 2005)*.

This argument too is unpersuasive as it applies to this case. First, this case does not have "highly technical" factual issues. Second, the factual issues, although not technical, presented by this case appear to be different

from those already addressed by the Northern District [*28] of California. Third, this Court has had to become familiar with many of the factual and procedural issues to effectively adjudicate Defendants' Motion To Transfer.

The Defendants also argue that resolution of this matter depends upon the interpretation and effect of a Settlement Agreement and prior judgment in the Northern District of California. This argument too, is unpersuasive.

The Settlement Agreement was negotiated by the Parties and the case was dismissed based upon the existence of the Settlement Agreement. There is no indication that the Court was involved in the negotiation of the settlement. Also, assuming interpretation of the Settlement Agreement is an issue in this case, the Defendants have presented no reason why this Court is not able to interpret an agreement as well as any other court presented with the agreement.

## PLAINTIFFS' CHOICE OF FORUM

A plaintiff's choice of forum is normally given considerable weight and the balance of convenience, considering all of the relevant factors should strongly favor a transfer before a transfer is granted. The Defendants here argue that Plaintiffs' choice of forum is not entitled to dispositive consideration because the choice of an [*29] Ohio forum provides no significant counterbalance to the factors strongly favoring a California venue. However, this is not an argument that Plaintiffs' choice of forum is not given considerable weight. It merely argues that, in

the eyes of the Defendants, the considerable weight is overcome by the other relevant factors.

The Defendants also argue that a transfer is necessary to defeat the Plaintiffs' forum shopping. This Court fails to see how the Plaintiffs could be forum shopping if they are entitled to bring their action in this Court and their choice of forum is not outweighed by other relevant factors. Further, it would seem that, to the same extent that Plaintiffs may be forum shopping by bringing their complaint in this Court, the Defendants may be forum shopping by attempting to have this matter transferred to the Northern District of California.

## CONCLUSION

The Plaintiffs have selected this forum and there is no argument that this is not a proper forum. Further, the Defendants have not shown that the balance of convenience, considering all of the relevant factors is strongly, if at all, in favor of a transfer to the Northern District of California. Finally, Defendants' request [*30] for oral argument is not well founded. Therefore, the Defendants' Joint Motion To Transfer Venue (doc. # 13) is OVERRULED.

**DONE** and **ORDERED** in Dayton, Ohio, this Twenty-Third day of November, 2007.

**s/Thomas M. Rose**

THOMAS M. ROSE

UNITED STATED DISTRICT JUDGE

LEXSEE



Analysis
As of: Jan 10, 2008

**HOWARD HESS DENTAL LABORATORIES INC. and PHILIP GUTTIEREZ
d/b/a Dentures Plus, on behalf of themselves and all others similarly situated, Plain-
tiffs, v. DENTSPLY INTERNATIONAL, INC., Defendant. JERSEY DENTAL
LABORATORIES f/k/a Howard Hess Dental Laboratories Incorporated, and PHI-
LIP GUTTIEREZ d/b/a Dentures Plus, on behalf of themselves and all others simi-
larly situated, Plaintiffs, v. DENTSPLY INTERNATIONAL, INC., and named den-
tal dealers, Defendants.**

**Civ. No. 99-255-SLR, Civ. No. 01-267-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563; 2007-2 Trade Cas. (CCH)
P75,890**

**September 26, 2007, Decided**

**PRIOR HISTORY:** Howard Hess Dental Labs., Inc. v.
Dentsply Int'l, Inc., 2005 U.S. App. LEXIS 21445 (3d
Cir. Del., Oct. 4, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In one action, plaintiff
dental laboratories filed an antitrust class action against
defendant company. In a second action, the same plain-
tiffs filed suit against defendant company and twenty-six
dental dealers. Plaintiffs moved for summary judgment
in the first action. In the second action, defendants filed
several motions, including motions to dismiss for lack of
personal jurisdiction and improper venue brought by nine
nonresident defendants.

**OVERVIEW:** In the first action, plaintiffs moved for
summary judgment on their claim against defendant for
"exclusive dealing/monopoly maintenance." Plaintiffs
claimed that, because the Third Circuit found that de-
fendant violated § 2 of the Sherman Act in the govern-
ment action, defendant was collaterally estopped from
contesting its liability vis-a-vis this complaint. The
court declined to infer that a finding of anticompetitive effects
necessarily implied a finding that consumers (here, the
dental laboratories) had been hurt in view of the lack of a
determination that plaintiffs had suffered an injury in fact

(which was demonstrably linked to the conduct which
had been proscribed by the Third Circuit) and the nature
of such injury. Regarding the second action, the court
found that the moving defendants had submitted affida-
vits which demonstrated that they were not incorporated
in Delaware, and had conducted no business within the
State. In response, plaintiffs had put forward no evidence
that defendants "purposefully availed" themselves of
doing business with Delaware citizens.

**OUTCOME:** In the first action, plaintiffs' motion for
summary judgment was denied. In the second action,
defendants' motions were granted.

**CORE TERMS:** dental, dealer, venue, injunction, con-
spiracy, laboratory, antitrust, personal jurisdiction, mo-
nopoly, teeth, injunctive relief, domestic, citations omit-
ted, artificial, monopolize, Sherman Act, Clayton Act,
summary judgment, purchaser, ection, conspired, indi-
rect, government action, co-conspirator, competitor, es-
toppel, pled, specific intent, collateral, consumer

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of
Production & Proof > General Overview*

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN1]A court shall grant summary judgment only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. Facts that could alter the outcome are "material," and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. If the moving party has demonstrated an absence of material fact, the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards > General Overview*

[HN2]On a motion for summary judgment, the court will view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

[HN3]When reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2), a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Once a jurisdictional defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction.

To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

[HN4]A court may dismiss a lawsuit for improper venue pursuant to Fed. R. Civ. P. 12(b)(3). However, the Federal Rules of Civil Procedure do not contain any specific venue provisions or requirements. A court, therefore, must determine whether venue is proper in accordance with the appropriate statutes when deciding a motion to dismiss for improper venue. The moving party has the burden of proving that venue is improper. In ruling on defendant's motion the plaintiff's choice of venue should not be lightly disturbed.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*

[HN5]In reviewing a motion filed under Fed. R. Civ. P. 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. A complaint does not need detailed factual allegations; however, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. The factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true.

*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel*

[HN6]The doctrine of collateral estoppel states that, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation. Plaintiffs must establish the following four requirements for collateral estoppel to apply: (1) the identical issue was previously adjudicated; (2) the issue was actually litigated;

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

(3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action. Doubts about application of the doctrine of collateral estoppel should usually be resolved against its use.

***Antitrust & Trade Law > Monopolization > Actual Monopolization > Claims***
[HN7]Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. There must be proof that competition, not merely competitors, has been harmed.

***Antitrust & Trade Law > Private Actions > Injuries & Remedies > General Overview***
[HN8]Antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. Plaintiffs, therefore, must have both suffered an injury, and that injury must have resulted from the occurrence of the condemned events.

***Civil Procedure > Remedies > Injunctions > Elements > General Overview***
***Civil Procedure > Remedies > Injunctions > Permanent Injunctions***
[HN9]In deciding whether to grant a permanent injunction, courts must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest.

***Antitrust & Trade Law > Clayton Act > Jurisdiction & Venue***
[HN10]See 15 U.S.C.S. § 22.

***Antitrust & Trade Law > Clayton Act > Jurisdiction & Venue***
***Evidence > Procedural Considerations > Burdens of Proof > Allocation***
[HN11]Plaintiffs bear the burden of showing that personal jurisdiction exists. Plaintiffs must meet this burden through affidavits or other competent evidence. Personal jurisdiction must be considered separately from venue pursuant to § 12 of the Clayton Act.

***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview***
[HN12]Fed. R. Civ. P. 4(k)(2)(A), personal jurisdiction may be established by service if the defendant is not subject to jurisdiction in any state's courts of general jurisdiction.

***Antitrust & Trade Law > Clayton Act > Jurisdiction & Venue***
[HN13]Personal jurisdiction under § 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment.

***Antitrust & Trade Law > Clayton Act > Jurisdiction & Venue***
***Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts***
[HN14]Specific jurisdiction arises when a defendant has both purposefully directed its activities at residents of the forum state and the action arises from, or is directly related to, the defendant's actions within the forum state. As for the Constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process.

***Antitrust & Trade Law > Monopolization > Conspiracy to Monopolize > Claims***
[HN15]To state a conspiracy to monopolize claim, plaintiffs must allege: (1) an agreement or understanding between the dealers and defendant; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy. The specific intent element requires plaintiffs to plead that both alleged conspirators had a conscious commitment to defendant's common scheme designed to achieve an unlawful objective, namely that of endowing defendant with monopoly power.

***Antitrust & Trade Law > Price Fixing & Restraints of Trade > Horizontal Restraints > Sherman Act***
[HN16]Unilateral activity by a defendant, no matter the motivation, cannot give rise to a § 1 of the Sherman Act violation. A plaintiff must plead the essential facts of a horizontal restraint or group boycott in order to plead either properly. A general allegation of conspiracy without a statement of facts is an allegation of a legal conclusion and insufficient to constitute a cause of action.

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

**COUNSEL:** [*1] Pamela S. Tikellis, Esquire, Robert J. Kriner, Jr., Esquire, and A. Zachary Naylor, Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Thomas A. Dubbs, Esquire, Richard T. Joffe, Esquire, and Craig L. Briskin, Esquire of Labaton Sucharow & Rudoff LLP, New York, New York.

W. Harding Drane, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants Accu Bite, Inc., Dental Supplies and Equipment, Inc., Hendon Dental Supply, Inc., Henry Schein Inc., Kentucky Dental Supply Co. Inc. n/k/a KDSC Liquidation Corp., Mohawk Dental Co., and Nowak Dental Supplies, Inc. Of Counsel for Defendant Nowak Dental Supplies, Inc.; H. Cary A. Des Roches, Esquire of the Law Offices of Cary A. Des Roches, APLC, New Orleans, Louisiana.

Kathleen Jennings, Esquire and Karen V. Sullivan, Esquire of Oberly Jennings & Rhodunda, P.A., Wilmington, Delaware. Counsel for Defendant Arnold Dental Supply Co.

Henry E. Gallagher, Esquire and Jaclyn M. Mason, Esquire of Connolly Bove Lodge & Hutz LLP, Wilmington, Delaware. Counsel for Defendants Atlanta Dental Supply Co., Benco Dental Co., and Darby Dental Laboratory Supply Co., Inc.

Kurt M. Heyman, [*2] Esquire and Particia L. Enerio, Esquire of Proctor Heyman LLP, Wilmington, Delaware. Counsel for Defendant Burkhart Dental Supply Co.

William D. Johnston, Esquire and Christian Douglas Wright, Esquire of Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant Dentsply International Inc. Of Counsel: Margaret M. Zwisler, Esquire, Eric J. McCarthy, Esquire, Charles R. Price, Esquire, and Amanda P. Biles, Esquire of Latham & Watkins LLP, Washington, D.C., and Brian M. Addison, Esquire, of Dentsply International Inc., York, Pennsylvania.

Edward M. McNally, Esquire and Fotini Antonia Skouvakis, Esquire of Morris James LLP, Wilmington, Delaware. Counsel for Defendants Iowa Dental Supply, Co., LLC, Johnson & Lund Co., Inc. and Marcus Dental Supply Co.

William J. Wade, Esquire of Richards, Layton & Finger, Wilmington, Delaware. Counsel for Defendant Patterson Dental Co.

James J. Maron, Esquire, Wayne A. Marvel, Esquire, and Antionette Hubbard, Esquire of Maron Marvel Bradley & Anderson, P.A., Wilmington, Delaware. Counsel for Defendant Pearson Dental Supply, Inc.

Thomas P. Preston, Esquire of Blank Rome LLP, Wilmington, Delaware. Counsel for Defendant Ryker Dental of [*3] Kentucky, Inc. Of Counsel: Charles W. Jirauch, Esquire of Quarles & Brady LLP, Pheonix, Arizona.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION**

**MEMORANDUM OPINION**

Sue L. Robinson, District Judge

**I. INTRODUCTION**

Currently pending before the court are several motions in two related cases. Plaintiffs Howard Hess Dental Laboratories, Inc. ("Hess") and Philip Guttierez d/b/a Dentures Plus ("Dentures Plus") filed an antitrust class action against Dentsply International, Inc. ("Dentsply") on April 21, 1999. *Hess Dental Laboratories, et. al v. Dentsply International Inc.* ("the *Hess* action"), Civ. No. 99-255 (D.I. 1). Hess subsequently became Jersey Dental Laboratories ("Jersey Dental") and, on April 24, 2001, the same plaintiffs filed an antitrust class action against Dentsply and twenty-six dental dealers. [1] *Jersey Dental Laboratories f/k/a Howard Hess Dental Laboratories, Inc. and Philip Guttierez d/b/a Dentures Plus v. Dentsply et. al* ("the *Jersey Dental* action"), Civ. No. 01-267 (D.I. 1). An amended complaint was filed in the *Jersey Dental* action on October 10, 2006, wherein plaintiffs allege that defendants have conspired to maintain a purported monopoly on the manufacture of [*4] artificial teeth for sale in the United States, to restrain trade by the implementation of exclusive dealing arrangements, and to sell such teeth at anticompetitive prices. (Civ. No. 01-267, D.I. 259 at P 45) Plaintiffs seek damages, equitable relief, and costs.

1    The defendants are Dentsply; A. Leventhal & Sons, Inc.; Accubite Dental Lab, Inc.; Addium Dental Products; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Supply Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Edentaldirect.com, Inc., as successor to Crutcher Dental, Inc.; Hendon Dental Supply, Inc.; Henry Schein,

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

Inc. and its affiliates, including, without limitation, Zahn Dental Co., Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; JB Dental Supply Co., Inc.; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Midway Dental Supply Inc.; Mohawk Dental Co. Inc.; Nashville Dental, Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company, its subsidiaries, predecessors, successors, assigns, affiliates, and related companies; Pearson Dental Supplies, Inc.; Ryker  [*5] Dental Supplies, Inc.; and Thompson Dental Company.

Currently before the court is plaintiffs' motion for summary judgment in the *Hess* action. (Civ. No. 99-255, D.I. 256) For the reasons that follow, the court denies plaintiffs' motion. In the *Jersey Dental* action, several motions to dismiss have been filed: (1) motions to dismiss for lack of personal jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3), brought by nine nonresident defendants (D.I. 266) [2] and by defendant Nowak Dental Supplies, Inc. ("Nowak") (D.I. 274) (collectively, the "non-Delaware defendants"); (2) certain dental dealer defendants' motion to dismiss counts II and IV of the amended complaint (D.I. 264); [3] and (3) Dentsply's motion to dismiss counts III and V of the amended complaint (D.I. 279). For the reasons that follow, [the court grants each of these motions.]

2    The moving defendants are Arnold Dental Supply Company; Atlanta Dental Supply Company; Dental Supplies and Equipment, Inc.; Iowa Dental Supply Company, LLC; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc. n/k/a/ KDSA Liquidation Corporation; Marcus Dental Supply Company, Inc.; Mohawk Dental Co.;  [*6] and Ryker Dental of Kentucky, Inc..

3    The moving defendants are Accubite Dental Lab, Inc.; Arnold Dental Supply Company; Atlanta Dental Supply Company; Benco Dental Company; Burkhart Dental Supply Company; Darby Dental Laboratory Supply Co., Inc.; Dental Supplies and Equipment, Inc.; Hendon Dental Supply, Inc.; Henry Schein, Inc.; Iowa Dental Supply Co.; Jahn Dental Supply Company; Johnson & Lund Co., Inc.; Kentucky Dental Supply Company, Inc., a/k/a KDSC Liquidation Corp.; Marcus Dental Supply Co.; Mohawk Dental Co. Inc.; Nowak Dental Supplies, Inc.; Patterson Dental Company; Pearson Dental Supplies, Inc.; and Ryker Dental Supplies, Inc.. (D.I. 264)

## II. BACKGROUND

### A. The Parties

Plaintiffs Jersey Dental and Dentures Plus are dental laboratories that purchase Dentsply products, including Dentsply's "Trubyte" brand of artificial teeth, indirectly through dental dealers. They bring this action on behalf of themselves and other similarly situated dental laboratories that have purchased and regularly purchase Dentsply's Trubyte brand of artificial teeth. According to the amended complaint, the class includes "thousands of other similarly situated dental laboratories." (Civ. No. 01-267, D.I.  [*7] 259 at PP 2, 3)

Defendant Dentsply is a leading manufacturer and worldwide distributor of products and equipment for the dental market. Through its Trubyte Division, Dentsply manufactures and markets products used by dental laboratories to make dentures and other removable dental prosthetics. (*Id.* at P 4)

The remaining defendants are dental dealers that distribute Dentsply's products, including Trubyte brand teeth, through direct sales to dental laboratories. (*Id.* at PP 5-26) The dental dealers are the primary source of distribution of artificial teeth to dental laboratories. (*Id.* at PP 55, 59) Dental dealers stock a "full array" of products needed to make dentures, including artificial teeth, and generally employ skilled sales and service people to provide services to dental laboratory customers. (*Id.* at P 60)

### B. History of this Antitrust Litigation

For more than fifteen years, Dentsply operated under a policy that discouraged the dental dealers from carrying competitors' artificial teeth. *U.S. v. Dentsply Int'l, 399 F.3d 181, 185 (3d Cir. 2005)*, cert. denied, 546 U.S. 1089, 126 S. Ct. 1023, 163 L. Ed. 2d 853 (2006). In 1993, Dentsply adopted "Dealer Criterion 6," which provided that dental dealers promoting Dentsply's  [*8] products "may not add further tooth lines to their product offering." *Id.* Dentsply's relationship with the dealers is "especially terminable at will" because Dentsply operates on a purchase order basis. *Id.* Dealer Criterion 6 was enforced against dealers that were not "grandfathered" for sales of competing products, i.e., that had carried competing products before 1993. *Id.* "[I]n the recent past, none of [the dental dealers] have given up the popular Dentsply teeth to take on a competitive line." *Id.* Dentsply also rebuffed attempts by [the grandfathered dealers] to expand their lines of competing products beyond the grandfathered ones." *Id.*

### 1. The government action

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

The first suit to be filed regarding Dealer Criterion 6 was an antitrust action filed by the United States ("the government action") on January 5, 1999. (Civ. No. 99-005, D.I. 1) In its suit, the government alleged that Dentsply: (1) acted unlawfully to maintain a monopoly in violation of § 2 of the Sherman Act, 15 U.S.C. § 2; (2) entered into unlawful restrictive dealing agreements that substantially lessened competition in violation of § 3 of the Clayton Act, 15 U.S.C. § 14; and (3) entered into unlawful agreements in unreasonable [*9] restraint of interstate trade and commerce in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. (Id.) Following a bench trial, this court entered judgment in favor of Dentsply on August 12, 2003. (Id., D.I. 517) This court found that Dealer Criterion 6 did not preclude Dentsply's main rivals from marketing their teeth directly to the dental laboratories and, therefore, Dentsply had no power to control prices or exclude competitors from the consumers. (Id., D.I. 514 at 157-59) The Third Circuit reversed, finding that Dealer Criterion 6 functionally excluded competitors from the dealers' network, "a narrow, but heavily traveled channel to the dental laboratories," and ultimately was "a solid pillar of harm to competition." U.S. v. Dentsply, 399 F.3d at 190-91.

Following the Third Circuit's mandate (Civ. No. 99-005, D.I. 534), the court entered injunctive relief in favor of the government (id., D.I. 559). The injunction was entered on April 26, 2006 and directed, inter alia, Dentsply to cease requiring its dealers to be exclusive Dentsply dealers and to remove Dealer Criterion 6 from its list of dealer requirements. (Id.) The injunction will be in effect for seven and one-half years, [*10] or until October 26, 2013. (Id.)

**2. The private actions**

Plaintiffs Hess and Dentures Plus filed the Hess action against Dentsply on April 21, 1999. (Civ. No. 99-255, D.I. 1) Plaintiffs alleged the same antitrust violations as the government and, in addition, added causes of action for attempt to monopolize and conspiracy to monopolize, as well as damages claims, against Dentsply. (Id.) Dentsply moved for summary judgment against plaintiffs on April 3, 2000. On March 30, 2001, this court granted in part Dentsply's motion. Specifically, the court found that plaintiffs are indirect purchasers who lack standing to sue for damages under Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977). (Id., D.I. 181, 182) Therefore, the court granted Dentsply's motion "to the extent the Hess plaintiffs [sought] damages" and denied the motion to the extent they sought injunctive relief. (Id., D.I. 182 at 33, found at 2001 U.S. Dist. LEXIS 9057, 2001 WL 624807 (D. Del. Mar. 30, 2001))

Less than a month later, on April 24, 2001, plaintiffs filed the Jersey Dental action in this court, alleging Sherman Act violations against Dentsply and twenty-six dental dealers (the "dealer defendants") arising from the same exclusive dealing arrangement [*11] alleged in the government and Hess actions. (Civ. No. 01-267, D.I. 1 [4]) This time, plaintiffs alleged that they were direct purchasers. The court subsequently granted Dentsply's motion to dismiss the damages portion of the antitrust claims against it, finding that the indirect purchaser rule still applied to plaintiffs (i.e., that the "co-conspirator" exception to Illinois Brick did not apply). (Id., D.I. 166; D.I. 167, found at 180 F. Supp. 2d 541 (D. Del. 2001)) The court reasoned that despite plaintiffs having named, or attempted to name, all alleged co-conspirators as co-defendants, the policy concerns of Illinois Brick were still implicated, namely: (1) nothing prevented the dental dealers, who were not "substantially equal" participants in the alleged conspiracy under any set of alleged facts, from filing their own lawsuits against Dentsply; (2) the difficulties of damage apportionment between direct and indirect purchasers was still present; and (3) plaintiffs did not fall within the group of private attorneys general that Congress created to redress Dentsply's assumed antitrust violation through use of the treble damage remedy. (Id., D.I. 166)

> 4    In their original complaint, the [*12] Jersey Dental plaintiffs alleged that the named defendants conspired to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; conspired to monopolize in the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; and conspired to restrain trade in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

Plaintiffs thereafter moved to amend their complaint in an attempt to overcome some of these deficiencies. The proposed amended complaint alleged that defendants have engaged in a retail price-fixing conspiracy, that intermediary dental dealers act only as agents for Dentsply, that plaintiffs suffered lost profits from the unrealized sale of competitive teeth, and that the dental dealers will not sue Dentsply. (Id., D.I. 170, exs. A & B) The court denied leave to amend, reasoning that plaintiff's amended claims would not withstand a motion to dismiss; the co-conspirator exception to Illinois Brick still did not apply because the dental dealers could still sue Dentsply; and Illinois Brick barred recovery of lost profits damages because plaintiffs were indirect purchasers. (Id., D.I. 208, found at 2002 U.S. Dist. LEXIS 17018, 2002 WL 2007916 (D. Del. Aug. 27, 2002))

On September [*13] 21, 2005, having heard the appeal of the Hess action, the Third Circuit affirmed this

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

court's decision that plaintiffs, as indirect purchasers, lacked standing to sue for damages on its exclusive dealing claims. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363 (3d Cir. 2005). The Third Circuit held that a co-conspirator exception for conspiracies that are not resale price maintenance conspiracies "would only exist in circumstances where the middlemen would be barred from bringing a claim against their former co-conspirator - the manufacturer - because their involvement in the conspiracy was 'truly complete'." *Id.* at 378-79. The Court found that plaintiffs did not qualify for such an exception "because the [d]istrict [c]ourt concluded, and [p]laintiffs have conceded, that the dealers' involvement in the alleged conspiracy with Dentsply was **not** 'truly complete'." *Id.* at 383 (emphasis in original). Plaintiffs' admission on appeal that the dealers and Dentsply were not "substantially equal," [5] therefore, was fatal to its claim for damages for the alleged exclusive dealing; plaintiffs were nevertheless permitted to proceed under the co-conspirator exception to pursue  [*14] an action for overcharge damages caused by the alleged vertical price-fixing conspiracy. *Id.* at 384 & n.19.

> 5    (Civ. No. 01-267, D.I. 273 at 9 (citing Appellants' Reply Br. at 23 n.16)) Plaintiffs do not contest defendants' recount of these statements in their responsive brief. (D.I. 290 at 26)

### C. The Amended *Jersey Dental* Complaint

Plaintiffs responded to the Third Circuit's *Hess* decision by filing an amended complaint in the *Jersey Dental* action on October 10, 2006. (Civ. No. 01-267, D.I. 259) Plaintiffs continue to assert claims against all defendants for retail price-fixing; [6] these claims are not challenged in the present motions to dismiss. (*Id.* at PP 131-136) The amended complaint alleges that Dentsply and the dental dealers engaged in an exclusive dealing conspiracy in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In counts II and III, plaintiffs allege that Dentsply and the dental dealers conspired to monopolize the artificial teeth market. (*Id.* at PP 137-165) In count II, plaintiffs seek both damages and injunctive relief against the dealer defendants for this alleged conspiracy. (*Id.* at PP 148-149) In count III, plaintiffs seek only an injunction, and not  [*15] damages, against Dentsply for its role in this alleged conspiracy. (*Id.* at PP 161, 165)

> 6    Omitted from the amended complaint are originally-named defendants A. Leventhal & Sons, Inc.; Midway Dental Supply Inc.; Nashville Dental, Inc.; and Thompson Dental Company. (D.I. 259) Zila, Inc. is presently named "as successor to Ryker Dental of Kentucky, Inc." (*Id.*)

In counts IV and V, plaintiffs allege that Dentsply and the dental dealers conspired to restrain trade which, they allege, constituted a group boycott of Dentsply's competitors. (*Id.* at PP 166-187) Once again, plaintiffs seek both damages and injunctive relief against the dealer defendants (count IV) (*id.* at PP 175-176), but seek only an injunction against Dentsply (count V) (*id.* at P 186). [7]

> 7    Plaintiffs state in the heading for count V that this claim is "[a]gainst Dentsply, for [i]njunctive [r]elief," but, aside from alleging that plaintiffs have no adequate remedy at law (*id.* at 175), fail to particularly request injunctive relief vis-a-vis Dentsply in the body of the amended complaint. (*Compare id.* at P 176 (seeking "damages from the [d]ealer [d]efendants, . . . and a permanent injunction enjoining the continuing violation of [s]ection  [*16] 1 of the Sherman Act, 15 U.S.C. § 1"))

> For each count discussed above, plaintiffs also seek a declaratory judgment that the complained-of actions constitute Sherman Act violations. (*Id.* at PP 149, 165, 176, 187)

### III. STANDARDS OF REVIEW

#### A. Summary Judgment

[HN1]A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.,* 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward  [*17] with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). [HN2]The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).*

**B. Motion to Dismiss for Lack of Personal Jurisdiction**

[HN3]When reviewing a motion to dismiss pursuant to *Fed. R. Civ. P. 12(b)(2),* a court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor. Once a jurisdictional [*18] defense has been raised, the plaintiff bears the burden of establishing with reasonable particularity that sufficient minimum contacts have occurred between the defendant and the forum state to support jurisdiction. *See Provident Nat'l Bank v. California Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987).* To establish personal jurisdiction, a party must allege facts sufficient to satisfy two requirements, one statutory and one constitutional. *See Reach & Assocs., P.C. v. Dencer, 269 F. Supp. 2d 497, 502 (D. Del. 2003).* With respect to the statutory requirement, the court must determine whether there is a statutory basis for jurisdiction under the forum state's long arm statute. *See id.* As for the constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See id.; see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).*

**C. Motion to Dismiss for Improper Venue**

[HN4]A court may dismiss a lawsuit for improper venue pursuant to *Fed. R. Civ. P. 12(b)(3).* However, the Federal Rules of Civil Procedure do not contain any specific venue provisions or requirements. A court, therefore, must determine whether venue [*19] is proper in accordance with the appropriate statutes when deciding a motion to dismiss for improper venue. *See Albright v. W.L. Gore & Assocs., Civ. A. No. 02-304, 2002 U.S. Dist. LEXIS 13936, 2002 WL 1765340, *3 (D. Del. July 31, 2002)* (citations omitted). The moving party has the burden of proving that venue is improper. *See id.* (citing *Myers v. American Dental Ass'n, 695 F.2d 716, 724 (3d Cir. 1982)).* "[I]n ruling on defendant['s] motion the plaintiff's choice of venue should not be lightly disturbed." *Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995)* (citations omitted).

**D. Motion to Dismiss Pursuant to Rule 12(b)(6)**

[HN5]In reviewing a motion filed under *Fed. R. Civ. P. 12(b)(6),* the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff. *See Erickson v. Pardus, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007); Christopher v. Harbury, 536 U.S. 403, 406, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002).* A complaint must contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* [*20] A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id. at 1964-65* (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id. at 1959.*

**IV. DISCUSSION**

**A. Plaintiffs' motion for summary judgment in the *Hess* action**

In the *Hess* action, the dental laboratory plaintiffs have moved for summary judgment on their claim against Dentsply for "exclusive dealing/monopoly maintenance" (count II). (Civ. No. 99-255, D.I. 256, D.I. 257 at 1, 5) Plaintiffs claim that, because the Third Circuit found that Dentsply violated section 2 in the government action, Dentsply is collaterally estopped from contesting its liability vis-a-vis the *Hess* complaint. Although Dentsply's violations are claimed to be the same, plaintiffs also claim that they are presently entitled to greater injunctive relief than that awarded by this court in the government [*21] action.

**1. Collateral estoppel**

[HN6]The doctrine of collateral estoppel states that, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States, 440 U.S. 147, 153, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979).* Plaintiffs must establish the following four requirements for collateral estoppel to apply: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue

was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.,* 458 F.3d 244, 249 (3d Cir. 2006) (citations omitted). Doubts about application of the doctrine of collateral estoppel should usually be resolved against its use. *See Witkowski v. Welch,* 173 F.3d 192, 206 (3d Cir. 1999) (citing *Kauffman v. Moss,* 420 F.2d 1270, 1274 (3d Cir. 1970)).

## 2. Discussion

The complaint in the *Hess* action contains certain causes of action pled in the government action, and some new claims. Both cases involve monopoly maintenance, [*22] restrictive dealing, and restraint of trade claims againstDentsply. [8] *U.S. v. Dentsply,* 399 F.3d at 184; (Civ. No. 99-255, D.I. 1 (counts I, II, and V)) The section 2 claim brought in the government action was a monopoly maintenance claim. *U.S. v. Dentsply,* 399 F.3d at 184. [HN7]"Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power . . . There must be proof that competition, not merely competitors, has been harmed." *Id. at 187* (citations omitted). Following its review of the relevant market, Dentsply's power to exclude, and the efficacy of Dealer Criterion 6, the Third Circuit found in *U.S. v. Dentsply* that "the government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated [s]ection 2" of the Sherman Act. 399 F.3d at 196. Plaintiffs assert that, in view of this determination, Dentsply is collaterally estopped from contesting its liability for monopoly maintenance in the *Hess* case. (Civ. No. 99-255, D.I. 257 at 10-14) Dentsply counters that collateral estoppel does not apply because the issue of [*23] antitrust injury, specifically, the question of whether plaintiffs paid higher prices due to Dentsply's conduct, was never litigated in the government action. (*Id.,* D.I. 262 at 8-10)

> 8    Plaintiffs acknowledge that the *Hess* complaint contains two claims against Dentsply not pled in the government action: attempt to monopolize; and conspiracy to monopolize in violation of section 2 of the Sherman Act. (Civ. No. 99-255, D.I. 257 at 2; D.I. 1 (counts III and IV)) Plaintiffs limit their motion to count II, or their "exclusive dealing/monopoly maintenance" claim. (*Id.* at 1, 5)

The relevant market for Dentsply's teeth, as defined by the Third Circuit, consists of two consumers combined: the dental dealers and the dental laboratories. *Id. at 188.* The question posed by plaintiffs' motion is, essentially, whether the Third Circuit's finding that competition in this market was harmed necessarily means that

plaintiffs have suffered antitrust injury. Put another way, do plaintiffs' claims require proof of specific injuries to plaintiffs, such as higher prices paid?

In support for their argument that an acknowledgment of their injuries is implicit in the Third Circuit's decision, plaintiffs highlight   [*24] the Court's finding that Dentsply's exclusive dealing had two anti-competitive effects: (1) "keep[ing] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share"; and (2) "impair[ing] the laborator[ies'] choice in the marketplace." (D.I. 266 at 6-7, 11 (citing *U.S. v. Dentsply,* 399 F.3d at 191, 194)) Certainly, these findings are to be given preclusive effect. *See Montana v. U.S.,* 440 U.S. at 153; *Burlington N. R.R. v. Hyundai Merchant Marine Co.,* 63 F.3d 1227, 1231 (3d Cir. 1995).

Plaintiffs' estoppel argument, however, impermissibly combines the concepts of causation and injury. [HN8]Antitrust injury "is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Angelico, M.D. v. Lehigh Valley Hospital,* 184 F.3d 268, 273 (3d Cir. 1999) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986)) (additional citations and internal quotations omitted). Plaintiffs, therefore, must have both suffered an injury, and that injury must have resulted from the occurrence of the condemned events, here, the use of Dealer Criterion   [*25] 6 and other exclusionary practices to maintain Dentsply's monopoly. It is certainly plausible that plaintiffs, representing one of two consumer groups who collectively form the relevant market in this case, lost profits as the result of Dentsply's exclusionary practices. *See U.S. v. Dentsply,* 399 F.3d at 190-91 ("experts for both parties testified that were Dealer Criterion 6 abolished, prices would fall," presumably raising the profit margin for the laboratories). The Third Circuit, however, has issued no such finding.

The court declines to infer that a "finding of anti-competitive effects necessarily implies a finding that consumers [here, the dental laboratories] have been hurt" (D.I. 257 at 19-20), [9] in view of the lack of a determination that plaintiffs have suffered an injury in fact (which is demonstrably linked to the conduct which has been proscribed by the Third Circuit) and the nature of such injury. The court, therefore, declines to grant plaintiffs' motion for summary judgment on the ground of collateral estoppel. *See In re Microsoft Corp. Antitrust Litig.,* 232 F. Supp. 2d 534, 538 (D. Md. 2002) (denying motions for partial summary judgment where "[n]othing in the [previous]   [*26] government case against Microsoft demonstrate[d] that the consumer plaintiffs . . . suffered any such injuries").

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

9   The authority cited by plaintiffs on this point is not persuasive. (D.I. 257 at 19-20) In *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6 (1st Cir. 1999), the First Circuit affirmed a finding that plaintiff did not have standing on antitrust injury where plaintiff brought "its claim as [n]either a competitor [n]or a consumer but as a distributor whose injuries resulted from the loss of [market] position." *Id.* at 12. In *Bell v. Dow Chem. Co.*, 847 F.2d 1179 (5th Cir. 1988), the Fifth Circuit also affirmed the district court's holding that plaintiff, a manufacturer-seller who was "neither a consumer nor a competitor" in the relevant market, did not have standing where "there [was] no evidence that [defendant's] conduct caused the loss of future sales, as opposed to any number of factors -- e.g. price, market conditions, unproven technology, limited product uses, or [plaintiff's] inability to purchase technical material from other distributors." *Id.* at 1183. Finally, the Third Circuit's decision in *Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210 (3d Cir. 1997), in which the Court found that [*27] a plaintiff who was barred from contesting liability for a debt as a sanction for discovery abuses could not challenge the debt in a subsequent bankruptcy proceeding, is equally unpersuasive in this context. *Id.* at 215 ("We do not hesitate in holding that a party such as Docteroff, who deliberately prevents resolution of a lawsuit, should be deemed to have actually litigated an issue for purposes of collateral estoppel application.").

### 3. Injunctive relief sought

The court notes that the fact that plaintiffs seek only injunctive relief rather than damages does not alter plaintiffs' obligation to establish its antitrust injuries. It does, however, provide an additional basis for the court's denial of plaintiffs' motion in view of the fact that Dentsply has already been enjoined from the monopolist activities condemned by the Third Circuit. (Civ. No. 99-005, D.I. 559)

Plaintiffs assert that granting another injunction "will not be redundant but, rather, will substantially enhance the effectiveness of the injunctive relief already granted." (Civ. No. 99-255, D.I. 257 at 23) In addition to provisions that are "essentially the same" as the prohibitions set forth in the government's injunction, [*28] plaintiffs additionally request that another injunction: (1) be of unlimited duration, as compared to seven and a half years; (2) require that Dentsply (a) post the injunction on its website and (b) hire an outside, independent monitor, in contrast to the employee it has designated as the antitrust compliance officer for the government's injunction;

and (3) prohibit Dentsply's participation in meetings or phone calls between dental dealers and laboratories absent the laboratories' request. (*Id.* at 25-28)

Aside from its theories on why additional relief would be beneficial to them, plaintiffs have not adequately explained why the government's injunction is insufficient to prevent Dentsply from engaging in anti-competitive practices. In fact, despite seeking a permanent injunction, plaintiffs assert only that they are "threatened with loss or injury proximately resulting from the recurrence of Dentsply's exclusive dealing/monopoly maintenance." (D.I. 257 at 24) Even if plaintiffs could meet the stringent requirements of the permanent injunction standard (and the court believes they cannot), [10] plaintiffs nevertheless fail to demonstrate a need for further, non-duplicative measures to those [*29] already in place. [11] The court, therefore, denies plaintiffs' motion on the alternative basis that plaintiffs have not demonstrated that they are entitled to additional injunctive relief. [12] *See Harthman v. Witty*, 480 F.2d 337, 339-40, 10 V.I. 632 (3d Cir. 1973) (holding that "a second injunction was unnecessary and it would have been the duty of the court to refuse to grant it" where a first, permanent injunction of broad terms was in place, and plaintiff could have sought relief for continuing violations under that injunction) (vacating district court's order denying plaintiff's motion for damages); *see also Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 476 (6th Cir. 2004) (district court committed reversible error in concluding irreparable harm had been shown, and awarding injunctive relief, three months after standing consent decree was obtained by the government).

10   [HN9]In deciding whether to grant a permanent injunction, courts must consider whether: "(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) [*30] the injunction would be in the public interest." *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

The Third Circuit has recently recognized a conflict in its precedent regarding whether irreparable harm is a prerequisite to the grant of a permanent injunction relief. *See Stolt-Nielsen, S.A. v. U.S.*, 442 F.3d 177, 185 n.5 (3d Cir. 2006) (collecting cases).

11   This case presents a scenario opposite to that presented in *United States v. Borden Co.*, 347 U.S. 514, 74 S. Ct. 703, 98 L. Ed. 920 (1954), where the Court found a refusal to grant the **gov-**

Page 10

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

ernment an injunction under the Clayton Act in view of the existence of a **private** injunction already in place. In *Borden,* the Court noted that a private litigant "may be expected to exercise [its remedy] only when its personal interest will be served," while the "[g]overnment [has a] right and duty to seek an injunction to protect the public interest [] without regard to any private suit or decree." *Id. at 518-19.*

While plaintiffs argue in this case that it would be advantageous to have over 7,000 dental laboratories police Dentsply's conduct (Civ. No. 99-255, D.I. 257 at 23), clearly any dental laboratory can notify the government of any further antitrust violations by Dentsply,   [*31] regardless of the status of the instant private litigation.

12   It appears as though the record in this case is closed; it is unclear to the court whether plaintiffs have, but did not put forward, evidence sufficient to demonstrate antitrust injury and that additional injunctive relief is warranted (notwithstanding the presence of the government's injunction). The court will provide a mechanism for the parties to address these issues.

## B. The Non-Delaware Defendants' Motions to Dismiss for Lack of Personal Jurisdiction and Improper Venue

Nine non-Delaware defendants move to dismiss in the *Jersey Dental* action for lack of jurisdiction and improper venue pursuant to Federal Rules of Civil Procedure 12(b)(2) and (b)(3). (Civ. No. 01-267, D.I. 266) [13] Defendant Nowak has filed its own motion on these grounds. (D.I. 274)

13   Hereinafter, all docket items referenced by the court refer to the *Jersey Dental* action, Civ. No. 01-267.

### 1. The Clayton Act

Section 12 of the Clayton Act provides:

[HN10]Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an **inhabitant,** but also in any district wherein it may be **found** or transacts   [*32] **business; and** all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (emphasis added). The first clause relates to venue, while the second clause concerns service of process and, therefore, personal jurisdiction. *In re: Automotive Refinishing Paint Antitrust Litigation* (hereinafter, *"Automotive Refinishing"*), 358 F.3d 288, 293 (3d Cir. 2004).

### 2. Jurisdiction

In response to defendants' challenge to personal jurisdiction by this court,[HN11] plaintiffs bear the burden of showing that personal jurisdiction exists. *Marten v. Godwin,* No. Civ. A. 05-5520, 2007 U.S. App. LEXIS 19921, 2007 WL 2377807, *2 (3d Cir. Aug. 22, 2007) (citing *GE v. Deutz AG,* 270 F.3d 144, 150 (3d Cir. 2001)). Plaintiffs must meet this burden through "affidavits or other competent evidence." *Dayhoff Inc. v. H.J. Heinz Co.,* 86 F.3d 1287, 1302 (3d Cir. 1996) (citations omitted). Personal jurisdiction must be considered separately from venue pursuant to section 12 of the Clayton Act. *See Automotive Refinishing,* 358 F.3d 294-97.

Plaintiffs assert that the jurisdictional clause of the Clayton Act requires only that personal jurisdiction be demonstrated by "national contacts,"   [*33] rather than specific contacts with the jurisdiction in which defendants have been sued. (D.I. 289 at 6-13) Since each of the moving defendants are incorporated in one of the states of the United States, plaintiffs assert that sufficient national contacts exist. (*Id.* at 12) In support for their argument, plaintiffs rely on the Third Circuit's decision in *Automotive Refinishing,* 358 F.3d 288, 296-97 (3d Cir. 2004); defendants dispute the applicability of *Automotive Refinishing* to the present case.

*Automotive Refinishing* involved an antitrust class action filed against two German corporations that subsequently brought a motion to dismiss for lack of personal jurisdiction. *Id. at 290.* In contrast to the case at bar, the *Automotive Refinishing* Court was not confronted with a challenge to personal jurisdiction brought by domestic corporate defendants. The dispute involved whether the jurisdiction and venue clauses of section 12 operate independently of each other; the *Automotive Refinishing* Court resolved this question by stating that "the service of process provision on **foreign** corporations is independent of, and does not require satisfaction of, the specific venue provision under [s]ection   [*34] 12 of the Clayton Act." *Id. at 297* (emphasis added). The *Automotive Refinishing* Court next proceeded to analyze appellants' arguments that section 12 did not confer personal jurisdiction over them, and concluded that "personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole." *Id. at 298.*

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

Though this holding is not, in literal terms, limited to jurisdiction over foreign corporations, there are several compelling reasons for limiting *Automotive Refinishing* to its facts. First, the authority relied upon by the *Automotive Refinishing* Court does not concern domestic defendants. The *Automotive Refinishing* Court relied upon prior Third Circuit precedent set forth in *Pinker v. Roche Holdings Ltd., 292 F.3d 361 (3d Cir. 2002)*, in which the Court assessed a foreign defendant's "national contacts" in determining that jurisdiction was appropriate. *Automotive Refinishing, 358 F.3d at 298-99*; *see also Pinker, 292 F.3d at 371-72* ("A foreign corporation that purposefully avails itself of the American securities market has adequate notice that it may be haled into an American court for fraudulently manipulating [*35] that market."). The *Automotive Refinishing* Court also stated that its holding is consistent with *Federal Rule of Civil Procedure 4(k)(2)*, which establishes personal jurisdiction over foreign defendants. *358 F.3d at 298-99*; *see also* [HN12] *Fed. R. Civ. P. 4(k)(2)(A)* (2007) (personal jurisdiction may be established by service "if the defendant is not subject to jurisdiction in any state's courts of general jurisdiction").

Secondly, and perhaps most importantly, the *Automotive Refinishing* Court had no occasion to consider jurisdiction vis-a-vis domestic defendants; it acknowledged, however, a "crucial" distinction between alien and domestic corporations in its discussion of venue. *Automotive Refinishing, 358 F.3d at 297 n.10* ("The general venue provision of *28 U.S.C. § 1391(c)* governing such **domestic** corporations is, in contrast to *§ 1391(d)* governing **alien** corporations, **more** difficult to satisfy than the [s]ection 12 venue requirements.") (quoting *GE v. Bucyrus-Erie Co., 550 F. Supp. 1037, 1041 (S.D.N.Y. 1982)*) (internal brackets omitted) (emphasis in original); *see also Cumberland Truck Equipment Co. v. Detroit Diesel Corporation, 401 F. Supp. 2d 415, 421 (E.D. Pa. 2005)* (noting [*36] that the *Automotive Refinishing* Court "emphasized the importance of distinguishing between out-of-state and foreign corporate antitrust defendants" in its opinion) (citing *Automotive Refinishing, 358 F.3d at 296 n.10*).

Insofar as the Third Circuit has never applied a "national contacts" test for establishing personal jurisdiction over a domestic antitrust defendant, the court declines to extend the holding of *Automotive Refinishing* in a manner that would counterindicate traditional long-arm jurisprudence with respect to such defendants. [14] The court, therefore, will review whether plaintiffs have alleged facts sufficient to satisfy both the Delaware long-arm statute, [15] i.e., specific jurisdiction, and the Constitutional due process requirements of the *Fifth Amendment*, i.e., general jurisdiction, with respect to the domestic defendants. [16] *See Automotive Refinishing, 358 F.3d at 299*

([HN13]"[P]ersonal jurisdiction under [s]ection 12 of the Clayton Act is as broad as the limits of due process under the *Fifth Amendment*.") (citations omitted).

14  *Cf. Action Embroidery Corp. v. Atlantic Embroidery, Inc., 368 F.3d 1174, 1180 (9th Cir. 2004).*

15  *10 Del. C. § 3104(c).*

16  Defendants have not challenged [*37] the sufficiency of service under Delaware's long-arm statute.

[HN14]Specific jurisdiction arises when a defendant has both purposefully directed its activities at residents of the forum state and the action arises from, or is directly related to, the defendant's actions within the forum state. *See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).* As for the Constitutional basis, the court must determine whether the exercise of jurisdiction comports with the defendant's right to due process. *See Reach & Assocs., P.C. v. Dencer, 269 F. Supp. 2d 497, 502 (D. Del. 2003)*; *see also Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945).*

In the case at bar, the moving defendants have submitted affidavits which demonstrate that they are not incorporated in Delaware, and have conducted no business within the State. (D.I. 267, exs. A-H; D.I. 276; D.I. 295, ex. A [17]) In response, plaintiffs have put forward no evidence that defendants "purposefully availed" themselves of doing business with Delaware citizens. [18] Likewise, the court is not satisfied that defendant Nowak or the non-Delaware defendants "[had] certain minimum contacts with [the State] such that the maintenance of [plaintiffs'] suit [*38] does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe, 326 U.S. at 316* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 85 L. Ed. 278 (1940)).* For these reasons, the court grants the moving defendants' motions to dismiss on the basis of lack of jurisdiction. (D.I. 266, 274)

17  Plaintiffs assert that Ryker Dental has been succeeded by Zila, Inc., a Delaware corporation. (D.I. 289 at 20) Ryker Dental asserts that Zila, Inc. is not its successor, but its parent corporation, and has submitted a Certificate of Existence issued by the Commonwealth of Kentucky which demonstrates that Ryker Dental is a distinct corporate entity in good standing in that state. (D.I. 295, ex. A) As Zila, Inc. is not a party to this litigation, and the record demonstrates that Ryker Dental and Zila, Inc. maintain distinct corporate

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

indentities, plaintiffs' assertions that Ryker Dental is an inhabitant of Delaware (and has "waived any objection to venue") are unpersuasive.

18   Because jurisdiction based on specific contacts is lacking, the court is clearly no general jurisdiction based upon "systematic" or regular contacts with this forum. 10 Del. C. § 3104(c)(4).

## 3. Venue

Although the court need not address   [*39] the moving defendants' arguments regarding venue in view of this holding, the court notes that there is no indication that venue in this district is appropriate and, therefore, improper venue provides an alternative basis for the court's disposition of the motions.

In order to establish that venue is improper in this case, defendants must demonstrate that they are not inhabitants of, found in, or do not transact business in, the District of Delaware pursuant to section 12. 15 U.S.C. § 22. A defendant is an "inhabitant" if it is "incorporated under the laws of [Delaware]." Automotive Refinishing, 358 F.3d at 293 n.6 (citation omitted).

> Being "found" in a district is generally equated with "doing business" there, and requires greater contacts than does "transacting business." A corporation is "found" where it has "presence" and "continuous local activities" in the district.

Id. (citations omitted). Defendants' affidavits demonstrate no such activities within this district.

In response, and despite pleading that venue in this district is proper pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, plaintiffs argue that venue in the District of Delaware is proper pursuant to the general [*40] venue statute, 28 U.S.C. § 1391(c), which provides that a corporation is a resident of "any judicial district in which [defendant corporation] is subject to personal jurisdiction at the time the action is commenced." (D.I. 259 at P 27; D.I. 289 at 14) Plaintiffs argue, based on their interpretation of Automotive Refinishing and the "national contacts" theory rejected above, that all defendants "reside" in Delaware because "there is personal jurisdiction in this district over each and every [d]efendant." (D.I. 289 at 14)

The court finds that domestic defendants' national contacts do not suffice to render venue appropriate in the District of Delaware. Put another way, section 12 of the Clayton Act may not be supplemented with the general venue provisions of 28 U.S.C. 1391(b) and/or (c) for

purposes of establishing venue for domestic defendants, and must be considered independently of those provisions. See Cumberland Truck Equipment Co., 401 F. Supp. 2d at 420-21, 424 (finding that Third Circuit precedent supported "allowing [s]ection 12's venue clause to be supplemented for alien but not domestic defendants.") (citing Automotive Refinishing, 358 F.3d at 296 & n.10). [19] To extend Automotive   [*41] Refinishing in such a manner would effectually, and improperly, create unlimited venue for antitrust actions against domestic corporations. Id. at 423.

19   The court in Cumberland Truck Equipment Co. v. Detroit Diesel Corporation, 401 F. Supp. 2d 415 (E.D. Pa. 2005), analyzed in detail three distinct approaches utilized by district courts for assessing proper venue when a plaintiff asserts personal jurisdiction pursuant to section 12: (1) courts that "suggest that a plaintiff suing a domestic defendant for antitrust violations must use the [s]ection 12 venue clause exclusively, but allow a plaintiff suing an alien defendant to use the general venue statute, 28 U.S.C. § 1391(d)"; (2) courts that allow plaintiffs to establish venue under section 12 or an alternative source interchangeably; and (3) courts that "find that the [s]ection 12 venue claims is the exclusive venue for all defendants, alien and domestic, and it preempts the general venue statutes." Id. at 420 (collecting cases).

The district court in Automotive Refinishing, affirmed by the Third Circuit, noted that

> [t]he broad grant of venue under [Section 1391(d)] is inapplicable to domestic corporations. . . [N]othing in   [*42] Go-Video, Inc. v. Akai Electric Co., 885 F.2d 1406 (9th Cir. 1989)] permits a domestic corporation to be sued in any district. Rather, a domestic corporation could only be sued [] according to [s]ection 12. . . .

In re Auto. Refinishing Paint Antitrust Litig., No. Civ. A. 1426, 2002 U.S. Dist. LEXIS 15099, 2002 WL 31261330, *9 (E.D. Pa. July 31, 2002) (citation omitted). The court, therefore, agrees with the rationale of Cumberland Truck that the Third Circuit approves of the first approach discussed above, or allowing supplementation of section 12 venue only for alien corporations. See Cumberland Truck Equipment Co., 401 F. Supp. 2d at 420-21.

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

Plaintiffs do not contest the facts as alleged in defendants' affidavits (D.I. 289 at 21), and have provided only legal argument, rather than counter-evidence, in opposition to defendants' motion. The court, therefore, finds that the moving defendants have satisfied their burden to establish that venue in this district is improper; defendants' motions (D.I. 266, 274) are properly denied on this alternate ground.

### C. Motions to Dismiss Counts II-V in the *Jersey Dental* Action Pursuant to Rule 12(b)(6)

Counts II and III of the amended complaint contain plaintiffs' conspiracy to  [*43] monopolize claims against the dealer defendants (count II) and Dentsply (count III). (D.I. 259 at PP 137-165) Counts IV and V of the amended complaint contain plaintiffs' exclusive dealing claims, in which plaintiffs allege that the dealers (count IV) and Dentsply (count V) conspired to restrain trade, which constituted a group boycott of Dentsply's competitors. (*Id.* at PP 166-187) Several defendants [20] and Dentsply have separately moved to dismiss these claims. (D.I. 264, 279 [21]) The court will address defendants' arguments in turn.

20   *Supra* n.3

21   The current motion is a corrected version of D.I. 272, which is denied as moot.

### 1. Injunctive relief sought against Dentsply for violations asserted in counts III and V

Dentsply asserts that, even assuming plaintiffs have stated viable claims, plaintiffs would still lack standing to seek injunctive relief in view of the injunction that has already been secured by the government. (D.I. 279) As discussed above, plaintiffs have not alleged any facts that could demonstrate a threat of future injury and/or irreparable harm. Absent such a proffer, plaintiffs cannot establish that they are entitled to a second injunction against Dentsply  [*44] for the same conduct currently enjoined by the government's injunction. [22] Count V, for which only injunctive relief is sought, therefore, is dismissed for failure to state a claim upon which can be granted. [23] With respect to Dentsply's conduct asserted in count III, plaintiffs also seek "a declaratory judgment that Dentsply's actions complained of herein are violations of the prohibition against combining or conspiring to monopolize, under [s]ection 2 of the Sherman Act, 15 U.S.C. § 2," and for this court to order the "divestiture of the Trubyte division from Dentsply." (D.I. 259 at P 165) The parties do not address this proposed relief in their submissions; the court, therefore, proceeds to evaluate defendants' additional arguments with respect to claim III.

22   There is no indication, and the court does not assume, that the injunction sought by plaintiffs in the *Jersey Dental* suit would contain stricter measures than those imposed by the government's injunction, such as has been asserted by plaintiffs in the *Hess* action.

23   As discussed *supra* (fn.7), plaintiffs characterize count V as "[a]gainst Dentsply, for [i]njunctive [r]elief," but, aside from alleging that plaintiffs have no adequate  [*45] remedy at law (*id.* at 175), plaintiffs fail to particularly request injunctive relief with respect to Dentsply in the body of that count. (*See* D.I. 249 at P 187 (seeking damages from the dealer defendants, a declaratory judgment that the dealers' actions violate section 1 of the Sherman Act, and generally, "a permanent injunction enjoining the continuing violation of [s]ection 1")) The parties have not addressed this discrepancy. For purposes of the present motion, and consistently with the parties' arguments, the court has treated count V as seeking injunctive relief from Dentsply.

### 2. Damages sought from the dealers for violations asserted in counts II and IV

The dealer defendants assert that plaintiffs are barred from suing for damages by reason of the Third Circuit's prior decision in the *Hess* case, in which the Court held that plaintiffs, as indirect purchasers, had no standing to sue under *Illinois Brick*. (D.I. 265 at 23-24 (citing *Howard and Hess Dental Labs., 424 F.3d at 376, 384*)) Plaintiffs respond that, although plaintiffs are indirect purchasers from Dentsply, they are direct purchasers from the dealers, and should not be deemed to be "indirect purchasers" regardless of who plaintiffs'  [*46] claims are brought against. (D.I. 288 at 37-40)

This court previously determined, and the Third Circuit agreed, that "[t]he intermediate dental dealers suffer the direct harm from any lost opportunity to sell a greater volume of Dentsply products or to sell competitive product lines and profit therefrom. Any harm suffered by plaintiffs remains indirect." *See Howard Hess Dental Labs., 424 F.3d at 376*. Plaintiffs "claim[ed] that they come within the [general] 'cooconspirator exception' to *Illinois Brick* because their purchases from Dentsply's dealers were made [directly] from members of an exclusive-dealing conspiracy." *Id. at 378*. The Third Circuit disagreed, since the facts did not demonstrate that "the [dealer] middlemen would be barred from bringing a claim against [Dentsply]." *Id. at 379*.

Plaintiffs are correct that the Third Circuit had no occasion in *Hess* to evaluate plaintiffs' standing to sue the dealers for damages, as the dealers were not parties to

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

that action. Nevertheless, counts II and IV in the case at bar allege non-vertical price-fixing conspiracies that are subject to the Third Circuit's ruling. *Howard Hess Dental Labs., Inc., 424 F.3d at 378* (a general co-conspirator [*47] exception "would only exist in circumstances where . . . [the dealers'] involvement in the conspiracy was 'truly complete.'") This is so regardless of the fact that plaintiffs purchased artificial teeth "directly" from the dental dealers. As in *Hess,* and as discussed in further detail *infra,* the amended complaint in the present action contains no indication that Dentsply and the dealers were equal participants in the alleged conspiracies. Consequently, there is no indication that plaintiffs may pursue overcharge damages from the dealers pursuant to the general co-conspirator exception of *Illinois Brick.* Dismissal of counts II and IV is appropriate, therefore, on the basis that plaintiffs cannot obtain the relief sought.

### 3. Counts II and III - specific intent

The court also finds that dismissal of counts II and III is appropriate for failing to allege any factual allegations that support plaintiffs' claim that the dental dealers shared Dentsply's specific intent for Dentsply to monopolize the artificial tooth market. (D.I. 265 at 17-22; D.I. 279)

[HN15]To state a conspiracy to monopolize claim, plaintiffs must allege: (1) an agreement or understanding between the dealers and Dentsply; (2) a [*48] specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy. *See Untracht v. Fikri,* 454 F. Supp. 2d 289, 315 (W.D. Pa. 2006) (citation omitted); *ID Security Systems Canada, Inc. v. Checkpoint Sys., Inc.,* 249 F. Supp. 2d 622, 657 (E.D. Pa. 2003) (citing *Pontius v. Children's Hosp.,* 552 F. Supp. 1352, 1377 (E.D. Pa. 1982)). The specific intent element requires plaintiffs to plead that both alleged conspirators "had a conscious commitment to [Dentsply's] common scheme designed to achieve an unlawful objective, namely that of endowing [Dentsply] with monopoly power." *ID Security Systems Canada, Inc.,* 249 F. Supp. 2d at 660 (citation and internal quotations omitted).

To this end, plaintiffs have pled that the dealer defendants "have conspired with Dentsply and with each other to, among other things, restrict Dentsply's dealers from carrying the artificial teeth of any competing manufacturer, and to restrict which dealers are allowed to carry Dentsply's artificial teeth." (D.I. 259 at P 72) Plaintiffs further assert that "the intended effect of this exclusive dealing arrangement, known to each and every [d]efendant, has been the elimination of any and all competition [*49] to Dentsply sufficiently significant to pose a threat to its monopoly of the markets for artificial teeth and/or premium artificial teeth sold in the U.S." (*Id.* at P 73) Finally, "each and every [d]efendant knew that

this exclusive dealing arrangement was and is an illegal restraint of trade designed to maintain Dentsply's monopoly." (*Id.* at P 74)

On its face, the asserted complaint contains the general allegation that the dealers intended for Dentsply to maintain a monopoly. (*Id.* at PP 73, 156) [24] The court finds that plaintiffs have not, however, pled "facts from which it can reasonably be inferred that the [dealers] formulated [the] intent" that "maintaining [Dentsply's] monopolies was a goal that they themselves wanted to accomplish." *In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d 728, 731 (D. Md. 2001).*

> 24  Plaintiffs point only to paragraphs 71-74 of the amended complaint in support for their argument that specific intent was pled. (D.I. 288 at 34; D.I. 290 at 27-28)

The amended complaint does not appear to contain and, indeed, plaintiffs do not point out any facts that could supplement their general assertion of intent. In contrast, and as discussed previously, plaintiffs [*50] have maintained throughout this litigation that the dealers were coerced into accepting Dentsply's terms. Plaintiffs have pled that Dentsply demanded the dealers' participation in the exclusive dealing arrangement (*id.* at PP 81, 84); in fact, several dealer relationships were terminated by Dentsply when dealers did not accept its terms (*id.* at PP 91-99). Based on plaintiffs' own allegations, "it is at least as likely that the [dealer] defendants simply chose to make the best of a bad situation" in order to have access to the Dentsply tooth line. *In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d at 732.*

In response to Dentsply's motion, plaintiffs assert that a specific intent is "inferable, without more, from [the dealers'] participation in a conspiracy whose purpose and means is the unlawful . . . creation or maintenance of a monopoly." (D.I. 288 at 34) This logic, however, is circular; an element required to prove the existence of conspiracy cannot be inferred from the existence of a conspiracy. Plaintiffs also assert that "the fact that a conspirator has been threatened does not necessarily mean that when it finally decides to **agree to conspire,** its only motive is fear." (D.I. [*51] 288 at 35) (emphasis added). This argument, again, presumes the presence of a conspiracy in the first instance. Even if the dealer defendants were compensated for their acceptance of Dealer Criterion 6, it does not follow that they shared the specific intent for Dentsply to achieve a monopoly.

Finally, plaintiffs' allegation that the defendants have conspired, "each with all of the others," to achieve a Dentsply monopoly does not substantiate plaintiffs' claim that defendants were part of a single conspiracy. No facts have been pled from which it could be inferred that the

516 F. Supp. 2d 324; 2007 U.S. Dist. LEXIS 71563, *;
2007-2 Trade Cas. (CCH) P75,890

dealer defendants acted in unison, "sharing a unity of purpose" or a "meeting of the minds," rather than in parallel. [25] For all of these reasons, the court finds that plaintiffs have not sufficiently pled a section 2 conspiracy to monopolize claim. See In re Microsoft Corp. Antitrust Litig., 127 F. Supp. 2d at 733-34 (granting defendant's motion to dismiss conspiracy to monopolize claim under similar circumstances).

> 25    Similarly, plaintiffs have not proffered facts that could demonstrate a "concerted action" between the defendants as required for plaintiffs' section 1 claims (counts IV & V). See Cosmetic Gallery, Inc. v. Schoeneman Corp., 495 F.3d 46, 55 (3d Cir. 2007) [*52] [HN16]("[u]nilateral activity by a defendant, no matter the motivation, cannot give rise to a section 1 violation.") (citation omitted); Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir. 1988) ("[A] plaintiff must plead the essential facts of a horizontal restraint or group boycott in order to plead either properly. . . . A general allegation of conspiracy without a statement of facts is an allegation of a legal conclusion and insufficient to constitute a cause of action.") (quoting Black & Yates, Inc. v. Mahogany Asso., 129 F.2d 227, 231-32 (3d Cir. 1941)) (internal quotations omitted).

This deficiency is especially troubling considering that the dealers had no rational motive to join a conspiracy with Dentsply which would limit the dealers' ability to sell a variety of products to its customers. See U.S. v. Dentsply, 399 F.3d at 192 (dealers "provide laboratories the benefit of 'one stop shopping' and extensive credit services. Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources."). Dismissal of these counts, therefore, is appropriate on this alternate ground. [*53] See Brunson Communs., Inc. v. Arbitron, Inc., 239 F. Supp. 2d 550, 562 (E.D. Pa. 2002) ("[U]nder any theory, Plaintiff has not alleged the essential statutory element of

concerted activity. . . The facts alleged in the Amended Complaint are extremely vague and do not sufficiently describe any contract, combination or conspiracy") (dismissing section 1 claim).

## V. CONCLUSION

For the aforementioned reasons, plaintiffs' motion for summary judgment in the *Hess* action (Civ. No. 99-255, D.I. 256) is denied, and each of the motions to dismiss in the *Jersey Dental* action (Civ. No. 01-267, D.I. 264, 266, 274, 279) are granted. An order shall follow.

## ORDER

At Wilmington this 26th day of September 2007, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment (Civ. No. 99-255, D.I. 256) is denied.

2. Defendants' motion to dismiss counts II and IV of the amended complaint (Civ. No. 01-267, D.I. 264) is granted.

3. Defendants' motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I. 266) is granted.

4. Dentsply's motion to dismiss counts III and V of the amended complaint (Civ. No. 01-267, D.I. 272) is [*54] denied as moot.

5. Defendant Nowak's motion to dismiss for lack of personal jurisdiction and improper venue (Civ. No. 01-267, D.I. 274) is granted.

6. Dentsply's motion to dismiss counts III and V of the amended complaint (Civ. No. 01-267, D.I. 279) is granted.

Sue L. Robinson

United States District Judge

LEXSEE



Analysis
As of: Jan 10, 2008

**NILESH KEDIA, Plaintiff, v. ALAN JAMAL and VINIT KESHARI, Defendants.**

**Civ. No. 06-6054 (GEB)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2007 U.S. Dist. LEXIS 48474**

**July 5, 2007, Decided**
**July 5, 2007, Filed**

**NOTICE:**     NOT FOR PUBLICATION

**PRIOR HISTORY:** Kedia v. Jamal, 2007 U.S. Dist. LEXIS 30343 (D.N.J., Apr. 25, 2007)

**CORE TERMS:** reconsideration, overlooked, moving papers, personal jurisdiction, counterclaim, present action, public interest, transferee, defamation, severing, misrepresentations, inconsistent judgments, joined, causes of action, tortious interference, economic advantage, disparagement, reconsider, consultants, overlap, moving party, distinguishable, co-defendant, transferred, responsive, declining, agreeing, sever, electronic mail, misinforming

**COUNSEL:**   [*1] For NILESH KEDIA, Plaintiff: CRAIG S. HILLIARD, LEAD ATTORNEY, STARK & STARK, PC, PRINCETON, NJ.

For ALAN JAMAL, VINIT KESHARI, Defendants: ELYSE C. HERMAN, LEAD ATTORNEY, PELLET-TIERI, RABSTEIN AND ALTMAN, PRINCETON, NJ.

**JUDGES:** GARRETT E. BROWN, JR., U.S.D.J..

**OPINION BY:** GARRETT E. BROWN, JR.

**OPINION**

**MEMORANDUM OPINION**

**BROWN, Chief Judge**

This matter comes before the Court upon defendants Alan Jamal and Vinit Keshari's ("Defendants") Motion for Reconsideration of the Court's April 25, 2007, Opinion and Order. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. The Court, having considered the parties' submissions and decided the matter without oral argument pursuant to Federal Rules of Civil Procedure Rule 78, and for the reasons set forth below, will deny Defendants' motion.

**I. BACKGROUND**

The factual background of this action is discussed at length in the April 25th Opinion at 1-4. In that Opinion, the Court denied Defendants' Motion to Dismiss or, in the Alternative, to Transfer Venue to the United States District Court for the District of Massachusetts pursuant to the first-filed rule. On May 9, 2007, Defendants filed the pending motion. Briefing on the matter now complete, the   [*2] Court will address the pending motion.

**II. DISCUSSION**

**A. First-Filed Rule**

**1. The Parties' Arguments**

Defendants argue that the Court overlooked controlling law that establishes that the first-filed rule applies in this case. (Reconsideration Brief at 1). They cite to five cases that the Court has allegedly overlooked, not a single one of which was mentioned in the parties' moving papers. Id. at 3-4. The cases include: In Kerotest Manufacturing Co. v. C-O-Two Fire Equipment Co., 189 F.2d

Page 1

31 (3d Cir. 1951), *aff'd by* 342 U.S. 180, 72 S. Ct. 219, 96 L. Ed. 200, 1952 Dec. Comm'r Pat. 407 (1952); *American Telephone & Telegraph Co. v. MCI Communications Corp.,* 736 F. Supp. 1294 (D.N.J. 1990); *Glaxosmithkline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp.,* 2005 U.S. Dist. LEXIS 40007 (D.N.J. May 10, 2005); *Advanta Corp. v. Advanta Nat'l Bank U.S.A.,* 1997 U.S. Dist. LEXIS 2007, (E.D. Pa. February 19, 1997); *Hanover Fire & Casualty Insurance Co. v. Edwin Sieron,* 2007 U.S. Dist. LEXIS 1901 (E.D. Pa. January 10, 2007). Defendants argue that these support the proposition that the presence of Keshari in the New Jersey but not the Massachusetts action does not prevent the application of the first-filed rule. *Id.* Defendants also for the first time offer  [*3] evidence and arguments proving that the Massachusetts court has personal jurisdiction over Keshari. *Id.* at 11-13. The evidence includes an affidavit from Keshari, wherein he consents to the jurisdiction of the Massachusetts court. (Reconsideration Brief Ex. B P 8 (Kesahri Aff.)).

Nilesh Kedia argues that the Court correctly declined to apply the first-filed rule and that the standard governing motions for reconsideration strongly counsels against considering evidence and arguments that could have been raised in the moving papers but were not. (Opposition to Motion for Reconsideration at 4-7 & 9-11). Therefore, according to Kedia, the Court should decline to consider arguments concerning the Massachusetts court's jurisdiction over Keshari. *Id.* at 9-11.

## 2. Standard of Review

Motions for reconsideration are governed by Local Civil Rule 7.1(i). These motions can succeed only upon a showing that either (1) the court overlooked "dispositive factual matters or controlling decisions of law" that were presented in the moving papers and "might reasonably have resulted in a different conclusion by the court," *United States v. Compaction Systems Corp.,* 88 F. Supp. 2d 339, 345-46 (D.N.J. 1999); (2)  [*4] an intervening change in controlling law has occurred, *Electric Mobility Corp. v. Bourns Sensors/Controls,* 87 F. Supp. 2d 394, 401 (D.N.J. 2000); or (3) evidence not previously available has become available, *Database America, Inc. v. Bellsouth Advertising & Publishing Corp.,* 825 F. Supp. 1216, 1220 (D.N.J. 1993).

Generally, the moving party is not entitled to raise new arguments that could have been addressed in the original moving and responsive papers. *Bowers v. NCAA,* 130 F. Supp. 2d 610, 613 (D.N.J. 2001) ("Not only are such motions not a substitute for the appellate process, such motions are *not* an opportunity to argue what could have been, but was not, argued in the original set of moving and responsive papers"); *NL Industries Inc. v. Commercial Union Ins. Co.,* 935 F. Supp. 513, 516 (D.N.J. 1996) ("Reconsideration motions . . . may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment.").

The term "overlooked matters" refers only to facts and legal arguments properly presented to the court in the moving papers, and not to matters presented for the first time in the motion for reconsideration. *Polizzi Meats, Inc. v. Aetna Life & Casualty Co.,* 931 F. Supp. 328, 339 (D.N.J. 1996)  [*5] ("[Rule 7.1(i)] explicitly invites counsel to draw the court's attention to decisions which may have been overlooked by the court, not those which were overlooked by counsel."). "A motion for reconsideration is improper when it is used 'to ask the Court to rethink what it had already thought through--rightly or wrongly.'" *Oritani S & L v. Fidelity & Deposit,* 744 F. Supp. 1311, 1314 (D.N.J. 1990) (quoting *Above the Belt v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D. Va. 1983)); *see also Koch Materials Co. v. Shore Slurry Seal, Inc.,* 209 F. Supp. 2d 418, 420 (D.N.J. 2002) (declining to consider new argument on motion for reconsideration and noting, "[the defendant] must bear the burden of its own omissions. Otherwise, litigants, who too often will desire to delay, to increase the expense of litigation for their opposition, or simply to economize on their own research costs, will not have sufficient incentive to consolidate all the pertinent facts and law together in one . . . motion.").

In limited circumstances, Rule 7.1(i) is subject to relaxation by the court. *See, e.g., Panna v. Firstrust Sav. Bank,* 760 F. Supp. 432, 435 (D.N.J. 1991) ("There is nothing to prevent the court  [*6] from examining new facts or evidence that might lead to a different result if considered by the court."); *Elizabethtown Water Co. v. Hartford Cas. Ins. Co.,* 998 F. Supp. 447, 460-461 (D.N.J. 1998) (agreeing to consider new argument, but warning "other Courts might not be so lenient, and [plaintiff] should be more cautious when designing and writing its briefs."); *Union Steel America Co. v. M/V Sanko Spruce,* 1998 U.S. Dist. LEXIS 18021, at *5 (D.N.J. 1998) (agreeing to consider new case law because the "Court's consideration of the issue *sub judice* was to some degree *sua sponte,* since defendants now cite additional pertinent authorities, and in light of the specter of litigation in two countries with its attendant expense and risk of inconsistent results, this Court has given the issues presented at this stage of the case another searching review.").

However, some judges have refused to relax Rule 7.1(i), particularly when the moving party sought to introduce evidence for the first time that was available at the time the court entered its original decision. *See e.g., Resorts Int'l v. Greate Bay Hotel and Casino,* 830 F. Supp. 826, 831& n.3 (D.N.J. 1992). The *Resorts International* court  [*7] disagreed with *Panna,* holding:

it is well established in this district that a motion for reconsideration is an extremely limited procedural vehicle. . . . We feel that [the position taken in *Panna*] is without foundation, either in the language of Rule [7.1(i)] itself or in the vast majority of the interpretive cases of this court. We are in fact bound *not* to consider such new materials, lest the strictures of our reconsideration rule erode entirely. [*Id*].

### 3. The Court will not Reconsider Decision not to Apply First-Filed Rule

The Court could not have "overlooked" the cases Defendants cite to in their Motion for Reconsideration within the meaning of Rule 7.1(i) because the parties did not mention these in their moving papers. Further, the cases were not controlling law at the time the Court entered its decision because Defendants failed to establish that identity of the parties could be created in Massachusetts action.

In the aforementioned cases, courts used their discretion to apply the first-filed rule despite a lack of identity of the parties or issues because identity could be created by means of a counterclaim, amended pleading, intervention or joinder. *See, e.g., Hanover Fire & Casualty Insurance Co., 2007 U.S. Dist. LEXIS 1901, at * 17* [*8] (applying first-filed rule because additional parties in second-filed action filed affidavits consenting to jurisdiction of the transferee court and Hanover's claims against Sieron and additional entities could be asserted in transferee court as counterclaims); *Advanta Corp., 1997 U.S. Dist. LEXIS 2007, * 6-7* (applying first-filed rule even though second-filed action contained additional party and involved different issues because identity in transferee court could be achieved through counterclaim. Opinion did not mention personal jurisdiction issues with respect to additional party); *American Telephone & Telegraph Co., 736 F. Supp. at 1305-1313* (transferring second-filed action pursuant to Section 1404(a) after establishing that transferee court had personal jurisdiction over additional party).

Similarly, in *Kerotest Manufacturing Co.,* the Third Circuit Court of Appeals stayed the prosecution of a Delaware action involving two parties, Kerotest Manufacturing Corporation ("Kerotest") and C-O-Two Fire Equipment Corporation, in favor of a first-filed Illinois action involving C-O-Two as the plaintiff, Acme Equipment Company, Inc., as the defendant and Kerotest

as the subsequently joined [*9] co-defendant. 189 F.2d at 32. The court based its decision on the fact that the Illinois court had jurisdiction over all of the relevant parties and was likely to resolve all issues pending in both actions, whereas the Delaware court did not have personal jurisdiction over Acme and was unable to resolve all outstanding issues. *Id. at 34.* In affirming the Third Circuit's decision, the Supreme Court held that the stay was proper because Kerotest was properly joined as a co-defendant in the Illinois action. 342 U.S. at 185-86. The Supreme Court noted that if Kerotest could not have been joined, the court should have permitted both actions to proceed simultaneously. *Id.*

The fifth case, *Glaxosmithkline Consumer Healthcare, L.P., 2005 U.S. Dist. LEXIS 40007 at *23,* is distinguishable from the present action because it involved two actions that included the same parties but different issues. The court relied on Fifth Circuit precedent in stating that, "there is no requirement that the issues or the parties be identical." *Id. at *25.*

By contrast, this Court could not have applied the first-filed rule because it was unclear whether identity of the parties could be created in the Massachusetts [*10] action. Defendants failed to establish that the Massachusetts court has personal jurisdiction over Keshari, despite the fact that Kedia raised this issue in his Brief in Opposition to Defendants' Motion to Dismiss. April 25th Opinion at 8. Had the Court transferred this action without knowing whether Massachusetts has personal jurisdiction over Keshari, it would have risked depriving Kedia of the ability to pursue his claims against Keshari.

The Court will not exercise its discretion to consider the new cases in light of the new evidence concerning the Massachusetts court's personal jurisdiction over Keshari. This evidence should have been included in the defendants' moving papers. Defendants have proffered no excuse for failing to include it and no good reason for the Court to disregard the strong policy against considering evidence raised for the first time in a motion for reconsideration. The Court will not reconsider its decision not to dismiss or transfer this action pursuant to the first-filed rule.

### B. Transfer Pursuant to Section 1404(a)

### 1. The Parties' Arguments

Defendants argue that the Court erred by not considering whether to transfer Kedia's claims against Jamal pursuant to [*11] 28 U.S.C. §1404(a). (Reconsideration Brief at 8). Although the defendants did not address severing Kedia's claims in their moving papers or specifically request transfer pursuant to Section 1404(a), they argue that in asserting that this action should be trans-

ferred pursuant to the first-filed rule, they addressed some factors courts consider in a Section 1404(a) analysis. *Id* at 8-10; *see also* (Brief in Support of Motion to Dismiss at 7-8); (Reply in Support of Motion to Dismiss at 5-6). According to Defendants, by not considering whether to sever the present action the Court overlooked these arguments. *Id.*

Kedia argues that the Court properly declined to server his claims because that would have forced him to prosecute the defamation case against Keshari in New Jersey, while simultaneously prosecuting the same case against Jamal in Massachusetts. (Opposition to Motion for Reconsideration at 8). Such a ruling would be contrary to one of Section 1404(a)'s core aims--the avoidance of inconsistent judgments. *Id.* Also, Kedia argues that Defendants have failed to meet their burden of establishing that transfer pursuant to Section 1404(a) is warranted because they have not addressed all of [*12] the private and public interest factors involved in a Section 1404(a) analysis. *Id.* at 11. He argues that the balance of private and public interest factors weigh against a transfer. *Id.*

**2. The Court will not Reconsider Decision not to Transfer**

The Court did not err within the meaning of Rule 7.1(i) by not severing Kedia's claims. The Court did not address this possibility because the parties never raised it in their moving papers. Defendants' general allegations that various public interest factors favored a transfer of this entire action were not sufficient to indicate to the Court that Defendants wanted to sever Kedia's claims. Further, the Court could not have conducted a Section 1404(a) analysis with respect to Jamal only, because Defendants failed to address all of Section 1404(a)'s private and public interest factors. Therefore, the Court did not overlook arguments regarding severing Kedia's claims.

Additionally, the Court properly utilized its discretion in declining to transfer. *See, e.g., LG Elecs. Inc. v. First Int'l Computer, 138 F. Supp. 2d 574, 587 (D.N.J. 2001)* (decision to transfer is within court's discretion); *SportsMEDIA Technology Corp. v. Upchurch, 839 F. Supp. 8, 9-10 (D. Del. 1993)* [*13] ("district courts are vested with broad discretion in deciding whether to transfer a case to another district."). The Court agrees with Kedia's argument that severing this action could result in inconsistent judgments and, thus, be contrary to Section 1404(a)'s core aims. [1]

1    The Court has considered the parties' arguments concerning the similarity of the claims involved in the present action and the Massachusetts action. The Court concludes that while these

substantially overlap, allowing the claims to proceed in different courts is not likely to result in inconsistent judgments. First, the causes of action are distinct: the causes of action at issue in the present action are defamation and business disparagement, Complaint PP 21-30, whereas the cause of action at issue in Massachusetts is tortious interference with economic advantage, Counterclaim PP 79-83.

Second, the defamation and business disparagement claims are strictly based on the August 5, 2006, electronic email message that Keshari and Jamal allegedly circulated to SoftwareArt Corporation's ("SoftwareArt") employees, ex-employees and subcontractors, stating that Kedia defrauded and embezzled from SoftwareArt and that he lied [*14] to everyone. April 25th Opinion at 3-4. The tortious interference with economic advantage claim states that it is based on the following actions allegedly committed by Jamal and SoftwareArt:

> [R]e-routing Bramha business prospects to SoftwareArt and/or Maxima, diverting Bramha consultants to work for SoftwareArt and/or Maxima clients on SoftwareArt and/or Maxima projects, using Bramha funds for SoftwareArt and/or Maxima expenses, raiding Bramha and luring the Bramha consultants to work for SoftwareArt and /or Maxima, using Bramha moneys to pay for SoftwareArt and/or Maxima expenses, wrongfully withholding monies due to Bramha from certain clients . . .. [Counterclaim P 82].

While these claims do not appear to overlap, Kedia has alleged in the Massachusetts action that Jamal and his agents have made misrepresentations about him. These misrepresentations were allegedly made before the August 5th electronic mail. Specifically, the section of the Counterclaim titled "Background" states: "Since this litigation began, Jamal and/or other agents or employees of SoftwareArt have been misinforming Bramha concultants that . . . Kedia was fired from SoftwareArt for 'malpractice.'" Counterclaim P [*15] 53. Also, on April 5, 2006, Kedia's attorney wrote a letter to to Keshari, accusing him of "engaging in a series of communications with Bramha employees in an effort to disparage

2007 U.S. Dist. LEXIS 48474, *

Bramha." (Reply in Support of Motion to Dismiss at 2). Kedia also stated in a response to an interrogatory in the Massachusetts action that "since this litigation began, Jamal and /or other agents or employees of SoftwareArt have been misinforming Bramha consultants that: Kedia was fired from SoftwareArt for 'malpractice' . . .. Thus, as a result of the Plaintiffs' tortious interference with the economic advantage of Bramha and Kedia, Bramha and Kedia have been damaged." (Brief in Support of Motion to Dismiss at 5-6). While these alleged misrepresentations may play a role in the Massachusetts action in determining whether Jamal and/or his employees harmed Bramha, these are separate from the misrepresentations involved in the present action and do not comprise a defamation or business disparagement claim.

Third, while there is some overlap in the damages sought in both actions, these are primarily distinguishable. In the present action, Kedia seeks general and specific damages for the harm caused by the electronic [*16] mail to his personal and professional reputations, as well as to Bramha's business reputation, whereas in the Massachusetts action he seeks damages for the harm caused to Bramha's business. (Brief in Opposition to Motion for Reconsideration at 6-7).

## III. CONCLUSION

For these reasons, Defendants' Motion for Reconsideration is hereby denied. An appropriate form of order is filed herewith.

Dated: July 5, 2007

s/ Garrett E. Brown, Jr., U.S.D.J.

LEXSEE

**ORACLE USA, Plaintiff, v. GRAPHNET INC, Defendant.**

**No. C06-05351 MJJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 13147**

**February 12, 2007, Decided**
**February 12, 2007, Filed**

**CORE TERMS:** software, license, declaration, preliminary injunction, copyright infringement, customer, database, licensing agreements, fax, software programs, presentation, likelihood of success, irreparable harm, citation omitted, rtallapragada, messaging, hotmail, servers, com, balance of hardships, en banc, tip, evidentiary objections, license to use, unauthorized use, competent evidence, evidentiary, purportedly, click-wrap, infringed

**COUNSEL:** [*1] For Oracle USA Inc., a Colorado corporation, Oracle International Corporation, a California corporation, Plaintiffs: Srecko Vidmar, LEAD ATTORNEY, Nancy Kay Gegenheimer, Holme Roberts & Owen LLP, San Francisco, CA; Dorian Daley, John V. Wadsworth, Oracle Corporation, Redwood City, CA.

For Graphnet Inc, a Delaware corporation, Defendant: Vineeta A. Bathia, LEAD ATTORNEY, Foley & Lardner LLP, Washington, DC US; Jason M. Julian, Kimberly K. Dodd, Foley & Lardner LLP, San Francisco, CA; Jeffrey A. Sirot, Greenbaum Rowe, Rosland, NJ US; Jeremy L. Wallison, Foley & Lardner LLP, New York, NY US; Marc J. Gross, Greenbaum Rowe, Roseland, NJ.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION**

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Before the Court is Plaintiff Oracle USA, Inc. ("Oracle USA") and Plaintiff Oracle International Cor-

poration's ("OIC") (collectively, "Oracle" or "Plaintiff") Motion for Preliminary Injunction. [1] Defendant Graphnet, Inc. ("Graphnet" or "Defendant") opposes the motion. Also before the Court are Defendant's Evidentiary Objections to certain evidence filed in support of Plaintiff's Motion [*2] for Preliminary Injunction. [2] For the following reasons, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction.

  1  Docket No. 15.

  2  Docket No. 32.

**FACTUAL BACKGROUND**

The current action arises from Defendant's alleged copyright infringement of certain software programs owned by Plaintiff.

**A. The Parties**

Plaintiff is a software company that develops, manufactures, markets, distributes, and services database and middleware software as well as applications software. (Complaint ("Compl.") P 17; Defendant's Proposed Findings of Fact ("Defendant's PFF") P 2.) Defendant develops, markets, and sells customized telecommunication solutions in the messaging industry relating to fax, e-mail, voice, and SMS technologies. (Declaration of Guy Conte ("Conte Decl.") P 2; Compl. P 11.)

Plaintiff is the owner of all rights, title, privilege, and interest in the software programs entitled, "Oracle Works." (Declaration of Thomas Angioletti ("Angioletti Decl.") P 4.) Oracle Works consists of the [*3] following software programs: Oracle8 Database Enterprise Edition ("Oracle8"), Oracle8i Database Enterprise Edition ("Oracle8i"), Oracle9i Database Enterprise Edition Release 1 ("Oracle9i Release 1"), and Oracle9i Database

Enterprise Edition Release 2 ("Oracle9i Release 2"). (*Id.*) Oracle Works are relational database programs that enable the user to store, manage, and process large amounts of data. (Compl. P 18; Defendant's PFF P 5.) Plaintiff is authorized to sell Oracle Works software licenses to customers in the United States. (Angioletti Decl. P 4.)

Plaintiff sells software licenses for Oracle Works through Plaintiff's website, through Plaintiff's direct sales force, or through authorized resellers. (Angioletti Decl. at P 5.) When a customer purchases a license from Plaintiff's website, the customer must create a customer account and agree to a "click-wrap agreement" that sets out licensing definitions, terms, and conditions governing the use, copying, and other rights and limitations in the applicable software. (*Id.*) The "click-wrap agreement" requires the potential customer to manifest his or her assent to the terms of a license by clicking a button on a dialog box or [*4]  pop-up window before the customer can download the software being licensed or before the software media will be shipped to the customer. (*Id.*) Customers can manifest rejection by clicking a separate button or leaving the webpage. (*Id.*)

**B. The Parties' Licensing Agreements**

The parties do not agree on the particular software license agreements at issue in this case. Plaintiff's Complaint does not specifically identify the software licenses that Defendant has allegedly infringed. Plaintiff alleges only that Defendant is infringing copyrights for "one or more of the Oracle Works." (Compl. PP 27, 36; Defendant's PFF P 8.) Plaintiff's Motion for Preliminary Injunction similarly does not identify the particular software licenses that Defendant has allegedly infringed. However, the record contains documentary evidence of at least three software licensing agreements between the parties.

**1. 1996 Contract**

On April 17, 1996, Defendant purchased a license from Plaintiff to use the Oracle7 version of Plaintiff's software ("1996 contract"). (Declaration of Rick Vanaria ("Vanaria Decl.") P 5, Ex. D, Licensing Agreement for Oracle7; Second Declaration of Rick Vanaria ("Second [*5]  Vanaria Decl.") P 5, Ex. B, Order Form for Oracle7.) The Oracle7 license was solely for the purpose of developing other software programs and did not permit Defendant to use the software to run its own internal business operations. (Vanaria Decl. P 5, Ex. B.) Defendant contends that it stopped using Oracle7 in the late 1990s. (Declaration of Guy Conte ("Conte Decl.") P 6.)

**2. 1998 Contract**

On August 20, 1998, Defendant purchased a license from Plaintiff to use the Oracle8 version of Plaintiff's software ("1998 contract"). (Second Declaration of Rick Vanaria ("Second Vanaria Decl.") P 4, Ex. A, Order Form for Oracle8.) Defendant admits that it currently uses Oracle8 on one of its servers to store billing information. (Conte Decl. PP 3, 8.) Defendant claims that it purchased Oracle8 "in the late 1990s." (*Id.*) Neither party has been able to locate a copy of the Oracle8 licensing agreement. (*Id.* at P 3; Second Vanaria Decl. P 6.) However, Plaintiff sent a report to Defendant in November 2002 indicating that Defendant had a license to use Oracle8 at that time. (Conte Decl. P 3, Ex. A, Contracts Report.) Defendant contends that Oracle8 is the only one of Plaintiff's software [*6]  programs that Defendant currently uses. (*Id.* at P 4.)

**3. 2002 Contract**

On July 19, 2002, an individual identified as "rtallapragada@hotmail.com" purchased a license from Plaintiff to use the Oracle9i version 9.2.0.1.0 of Plaintiff's software ("2002 contract"). (Vanaria Decl. P 6, Ex. E, Licensing Agreement.) The 2002 contract granted Defendant a 30-day "trial" license to use the software. (*Id.*) Upon expiration of the trial license, Defendant was obligated to either cease using the program and delete it from its computer system, or obtain a license from Plaintiff to continue use. (*Id.*)

Defendant disputes the validity of the 2002 contract. In particular, Defendant contends that "rtallapragada@hotmail.com" is a former employee of Defendant who was not employed by Defendant at the time of the 2002 contract, and therefore had not authority to enter into any software agreements on Defendant's behalf. (Conte Decl. P 7.) The address listed on the 2002 contract is 1560 Pollitt Drive Apt 1A Fair Lawn, NJ 07410. (Vanaria Decl. P 6, Ex. E, Licensing Agreement.) Defendant contends that this is the last known home address for "rtallapragada@hotmail.com." (*Id.*)

Plaintiff [*7]  asserts that Defendant has admitted to using Oracle9 software. (Declaration of Baldish Takhar ("Takhar Decl.") in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss P 7-8, Exs. D, E.) Plaintiff identifies two documents in support of this contention: (1) a November 16, 2006 e-mail from Defendant's employee, Joel Kenan, to Oracle stating, "The version of Oracle we use now is 9.2.0.3"; and (2) a March 3, 2006 facsimile from Defendant's attorney to Plaintiff's counsel containing references to versions 8 and 9.2. (*Id.*)

**C. Defendant's Alleged Copyright Infringement**

Plaintiff makes a series of general copyright infringement allegations against Defendant. [3]  Plaintiff states that in 2004, it learned that Defendant was reproducing and using Plaintiff's programs, including the Oracle Works database programs, in excess of rights

granted by any license. (Vanaria Decl. P 7.) [4] Plaintiff claims that a former unnamed employee of Defendant notified Plaintiff that Defendant was impermissibly using Plaintiff's software. (*Id.* P 8.) Plaintiff contends that it subsequently demanded an audit of Defendant's software use whereby Plaintiff met with two of Defendant's employees. [*8] (*Id.* P 9.) Plaintiff states that during the audit, Defendant's employees filled out an "Oracle Server Worksheet" thereby listing the Oracle software Defendant was using, including Oracle9. (*Id.*) [5] Plaintiff further avers that it learned that Defendant was using Plaintiff's software as a component of the software products that Defendant sells to its customers. (*Id.* at P 10.) According to Plaintiff, Plaintiff subsequently notified Defendant of its unauthorized use and attempted to resolve the matter without success. (*Id.* at PP 11-13.)

> 3    As discussed more fully below, Defendant makes evidentiary objections to these general allegations of copyright infringement.

> 4    Plaintiff's Complaint makes different assertions and alleges that Plaintiff became aware of the alleged unauthorized use in 2005, not 2004. (Compl. P 27.)

> 5    Plaintiff has not provided a copy of the Oracle Server Worksheet in support of its motion.

**D. Procedural History**

On August 30, 2006, Plaintiff filed the current [*9] action against Defendants alleging claims for copyright infringement and breach of contract. (Compl. PP 30-44; Defendant's PFF P 7.) On January 8, 2007, this Court denied Defendant's motion to dismiss for lack of personal jurisdiction and denied Defendant's motion to transfer. Plaintiff now seeks a preliminary injunction based on its copyright infringement claim requiring Defendant to stop using all unlicensed Oracle software.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to preserve the positions of the parties until a full trial can be conducted. *LGS Architects, Inc. v. Concordia Homes,* 434 F.3d 1150, 1158 (9th Cir. 2006) (citing *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)). In all cases, the burden of persuasion remains with the party seeking preliminary injunction relief. Hon. William R. Schwarzer, et al., *Federal Civil Procedure Before Trial* § 13:159 (2006) (citing *West Point-Pepperell, Inc. v. Donovan,* 689 F2d 950, 956 (11th Cir. 1982)). When a party is seeking a preliminary injunction, he or she must make [*10] a "clear show-

ing" of either: "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party. These standards 'are not separate tests but the outer reaches of a single continuum.'" *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.,* 240 F.3d 832, 839-40 (9th Cir. 2001) (citation omitted); *City of Angoon v. Marsh,* 749 F.2d 1413, 1415 (9th Cir. 1984). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Roe v. Anderson,* 134 F.3d 1400, 1402 (9th Cir.1998) (citation omitted). Consequently, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Southwest Voter Registration Educ. Project v. Shelley,* 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam) (citation omitted); *see also Miller v. California Pac. Med. Ctr.,* 19 F.3d 449, 456 (9th Cir. 1994) [*11] (en banc) (citations omitted).

The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged except in a case clearly warranting it. *Sierra Club v. Hickel,* 433 F.2d 24, 33 (9th Cir. 1970). However, the standard is different in copyright infringement actions. "A showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm." *Triad Systems Corp. v. Southeastern Express Co.,* 64 F.3d 1330, 1335 (9th Cir. 1995). "An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com, LLC v. Ironport Sys.,* 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004). A party showing a reasonable likelihood of success on the merits of a copyright infringement claim is thus normally entitled to a preliminary injunction. *Id.*

**DISCUSSION**

At oral argument in this matter, Plaintiff's counsel explained that the Plaintiff's copyright contentions pertain to three software applications: (1) billing; (2) messaging; and (3) development. In support of Plaintiff's motion for a preliminary injunction, Plaintiff primarily relies on [*12] the two declarations of its sales manager, Rick Vanaria, and the declaration of its business practices manager, Baldish Takhar. [6] As evidence of its likelihood of success on the merits, Plaintiff cites to a business presentation, created by Plaintiff, purportedly from information obtained directly from Defendant. (Second Vanaria Decl. P 7, Ex. C.) According to Plaintiff, the content of the business presentation demonstrates that Defendant has admitted to using Plaintiff's business applications in excess of the applicable license, and has admitted to using Plaintiff's messaging and development

2007 U.S. Dist. LEXIS 13147, *

applications without any license. Plaintiff insists that the content of the business presentation was taken from the March 3, 2006 fax, purportedly sent from Defendant to Plaintiff. (Takhar Decl., P 8, Ex. E.) Defendant objects to the Vanaria declarations on grounds that Vanaria fails to establish personal knowledge of the statements contained therein, that the statements are hearsay, and that Vanaria has failed to provide a sufficient evidentiary foundation. Defendant objects to the content of the March 3, 2006 fax on grounds of foundation, authentication, and settlement communications.

> 6    Takhar's declaration was offered by Plaintiff in support of Plaintiff's opposition to Defendant's prior motion to dismiss.

[*13]   The Court finds, upon review of the evidentiary record in this matter, that Plaintiff has failed to present competent evidence which would support its request for injunctive relief. Even assuming the March 6, 2003 fax, and accompanying documents, were provided to Plaintiff by a representative of Defendant, Vanaria's opinion that Graphnet is engaged in copyright infringement is not supported by admissible evidence. First, the Vanaria declarations, and particularly paragraph 7 of his second declaration, provide no factual basis for the opi-

nions he provided therein. As importantly, the second Vanaria declaration fails to set forth the basis for his opinion that the documents accompanying the March 6, 2003 fax and the business presentation reflected in Exhibit C, establish unlawful copyright infringement. The Court has reviewed both the fax documents attached to the Takhar declaration and the business presentation reflected in Exhibit C, and finds that the text of these documents do not establish that Defendant has engaged in copyright infringement. Finally, Plaintiff has failed to submit competent evidence which would establish that any representative of Defendant made an admission that [*14]   supports a finding of copyright infringement with respect to the applications at issue.

**CONCLUSION**

Accordingly, the Court **DENIES** Plaintiff's Motion for Preliminary Injunction **WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

> Dated: February 12, 2007
>
> MARTIN J. JENKINS
>
> UNITED STATES DISTRICT JUDGE

LEXSEE



Cited
As of: Jan 10, 2008

**MARLENE WOODALL, Administratrix and Personal Representative of the Estates of LETCHER W. BREEDEN and PATRICIA ANN BREEDEN, Deceased v. PIPER AIRCRAFT CORPORATION and HOOF PRODUCTS COMPANY**

**Civil No. 82-1554.**

**United States District Court for the Middle District of Pennsylvania**

**1983 U.S. Dist. LEXIS 17465; 18 Av. Cas. (CCH) P17,169**

**April 25, 1983**

**CORE TERMS:** aircraft, personal jurisdiction, interests of justice, transferee, convenience, strict liability, transferred, unjust, shopping, reply, valve, fuel, civil action, moving party, jurisdictional, depositions, opposing, manufactured, selector, pendency, case law, choice of law, liability cause of action, personam jurisdiction, commencement, prejudiced, avoidance, commence, alluding, grossly

**COUNSEL:** [*1]  Michael J. Pangia, Washington, D.C., for plaintiff.

Scott A. Williams and Williams & Seevers, Williamsport, Pennsylvania, and Lord, Bissell & Brook, Chicago, Illinois, for Piper Aircraft.

Charles J. McKelvey, and McNearney, Page, Vanderlin & Hall, Williamsport, Pennsylvania, and Seawell, Dalton, Hughes & Timms, Norfolk, Virginia, for Hoof Products Co.

**OPINION BY:** MUIR

**OPINION**

OPINION

MUIR, District Judge: Plaintiff Marlene Woodall, personal representative of the Estates of Letcher W. Breeden, deceased, and Patricia Ann Breeden, deceased, filed this products liability action against Defendants Piper Aircraft Corporation (Piper Aircraft) and Hoof Products Company (Hoof Products) on December 31, 1982.  This action arises out of the crash of a Piper Comanche aircraft on December 14, 1980 near the Patrick Henry International Airport in Newport News, Virginia, which resulted in the deaths of Letcher W. Breeden and Patricia Ann Breeden.  According to the complaint, the Piper Comanche aircraft was manufactured by Piper Aircraft and Defendant Hood Products manufactured a fuel selector valve which was a component part in the Piper Comanche aircraft. The fuel selector valve was allegedly distributed [*2]  by Hoof Products and installed by Piper Aircraft in the Piper Comanche.  It is alleged that a defect in the cast aluminum housing of the fuel selector valve caused the crash of the Piper Comanche aircraft. By order of December 14, 1982, this case was placed on the Court's February 1984 list for trial in Williamsport, Pennsylvania.

On February 11, 1983, Piper Aircraft filed a motion for a stay of these proceedings pending the outcome of trial and final determination of Woodall vs. Piper Aircraft, et al., Nos 81-1149N and 81-1150N (E.D. Va., Norfolk Div., 1981) (hereinafter sometimes "the Virginia action").  The Virginia action, filed on December 4, 1981, is allegedly identical or substantially similar to the action before this Court.  See Exhibits "A", "B", "C", "D", and "E" annexed to Piper Aircraft's motion to stay.  By order of February 16, 1983, the motion to stay this action pending resolution of the Virginia actions was denied.  The Court noted:

This Court will not clog its docket with cases which are stayed indefinitely pending resolution of other cases. . . .  This Court is of the opinion that the proper procedure is not to stay this action but, rather, to transfer this [*3]  action to the Eastern District of Virginia for con-

solidation with the earlier actions. There is, however, no motion presently before the Court requesting transfer. The Court will in the first instance await such a motion and possible briefing so that the views of counsel may be considered.If no such motion is filed within a reasonable time, the Court will act on its own.

On February 22, 1983, Plaintiff Woodall filed a motion to transfer this action to the United States District Court for the Eastern District of Virginia, Norfolk Division, where the Virginia action is pending. While Woodall originally indicated the concurrence of opposing counsel in the motion to transfer, a revised certificate of concurrence indicates that counsel for Piper Aircraft and Hoof Products do not concur in the motion. Also on February 22, 1983, Woodall filed a memorandum of law in support of the motion to transfer. Piper Aircraft and Hoof Products each filed briefs in opposition to the motion to transfer on March 10, 1983. On March 16, 1983, Woodall filed a reply to the brief on Hoof Products and on March 23, 1983, Woodall filed a reply to the brief of Piper Aircraft. The motion to transfer was [*4] referred to United States Magistrate Raymond J. Durkin for his report and recommendation in accordance with the order adopted in Re Assignment of Matters to Magistrates by Judges, Misc. No. 81-133 (M.D. Pa. June 15, 1981). See Order of March 7, 1983. On April 6, 1983, Magistrate Durkin filed his report recommending that the motion to tgransfer be granted. On April 18, 1983, Piper Aircraft and Hoof Products each filed objections to the Magistrate's report and recommendation and briefs in support thereof. On April 21, 1983, Woodall replied to the Defendants' exceptions. This matter is now ripe for decision by this Court.

Preliminarily, the Court notes that in its answer to the complaint, Hoof Products raised the defense that this Court lacks in personam jurisdiction over Hoof Products. See Answer, p. 15, filed March 2, 1983. The parties dispute the legal import of the claim by Hoof Products that this Court lacks personal jurisdiction over it. Both Hoof Products and Piper Aircraft contend that, before this Court can transfer a case, it must have personal jurisdiction over each Defendant. Bothe the Magistrate and Plaintiff Woodall are of the view that the matter of jurisdiction [*5] may be resolved by the transferree forum. The Court is concerned that were it to reach the question of peersonal jurisdiction over Hoof Products at this time, the matter would be raised before the Court, in essence, Sua sponte. No motion to dismiss for lack of personal jurisdiction has been filed in this case, and, indeed, the time for filing such a motion under Rule 12 of the Federal Rules of Civil Procedure has likely passed. See F.R.Civ.P. 12(a), (g). While Piper Aircraft vigorously asserts that the Court must resolve the issue of jurisdiction, Hoof Products, the party most directly affected by the jurisdictional issue, barely asserts the issue, stating in its brief in opposition to the motion to transfer:

This writer would like to point out to the Court that Defendant Hoof [Products], has submitted as its affirmative defense that no jurisdiction exists in Pennsylvania and therefore, sit would be improper for the Court to transfer this matter to Virginia. The Court should review the facts of the case of Piper Aircraft Corp vs. Reno [sic].

The Court notes that both Hoof Products and Piper Aircraft gave incorrect citations for the Piper Aircraft case.

In Piper Aircraft [*6] vs. Reyno, 454 U.S. 235 (1981), suit was originally brought in a California probate court against Defendants Piper Aircraft and Hartzell Propeller, Inc. The case was subsequently removed to the United States District Court for the Central District of California. Piper Aircraft then moved to transfer the case to the United States District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). Hartzell Propeller moved to dismiss for lack of personal jurisdiction or in the alternative to transfer. The California district court concluded that it could not assert personal jurisdiction over Hartzell Propeller consistent with due process. However, the California district court decided not to dismiss Hartzell Propeller because the corporation would be amendable to process in Pennsylvania. The California district court quashed service on Hartzell Propeller and transferred the case to the Middle District of Pennsylvania. Thereafter, the plaintiff properly served process on Hartzell Propeller. See Piper Aircraft, U.S. , 102 S.Ct. at 258 & nn. 4, 5.

The procedure followed by the California District Court in Piper Aircraft was neither approved nor [*7] disapproved by the Supreme Court. While the Defendants assert that the holding in Piper Aircraft mandates that the question of jurisdiction be resolved prior to further action in the matter, this Court does not read Piper Aircraft as so holding. Indeed, the question whether a Court has the power to transfer a case if it lacks personal jurisdiction has not definitively been decided. Compare, e.g., James vs. Dailey and Lewis, 406 F.Supp. 645 (D. Del. 1976); Total Sound, Inc. vs. Universal Record Distributing Corp., 286 F.Supp. 123 (S.D.N.Y. 1968); Tetes vs. Hawker, 278 F.Supp., 834 (D.W. Va. 1968) with Baron & Co., Inc. vs. Bank of New Jersey, 497 F.Supp. 534 (E.D. Pa. 1980); Troyer vs. Karcagi, 488 F.Supp. 1200 (S.D.N.Y. 1980); Brown vs. Grimm, 483 F.Supp. 40 (N.D. Ill. 1979); Wooldridge vs Beech Aircraft Corp., 479 F.Supp. 1041 (D. Mo. 1979); Shong Ching Lau vs. Change, 415 F.Supp. 627 (E.D. Pa. 1976). Given the split of authority, the apparent rule in the district courts

1983 U.S. Dist. LEXIS 17465, *; 18 Av. Cas. (CCH) P17,169

in this circuit that the issue of lack of personal jurisdiction need not be resolved prior to a determination of a motion to transfer, see Baron & Co., 497 F.Supp. 534; Shong Ching Lan, 415 F.Supp. 627, and the [*8] grossly inadequate presentation by Hoof Products of its claim of lack of personal jurisdiction to this Court, this Court concludes that it may properly determine the motion to transfer without first deciding the issue of jurisdiction by this Court over Hoof Products.

Woodall moves to transfer pursuant to 28 U.S.C. § 1404(a). That section provides:

For the convenience of parties and witnesses, in the interests of justice, a District Court may transfer any civil action to any other district or division where it might have been brought.

Woodall's principal justification for transfer of the action is the pendency of similar actions in the United States District Court for the Eastern District of Virginia. The Virginia actions involve the same parties and facts as this action. Indeed, it would appear that the sole basis for filing this action is that under Virginia law there is no cause of action for strict product liability. See Affidavit of Charles J. McKelvey, Esq., of April 18, 1983 at P3. The Magistrate, in his report of April 7, 1983, exhaustively reviewed the applicable case law and concluded that, in the interest of justice, this action should be transferred to the [*9] Eastern District of Virginia for possible consolidation with the Virginia actions. This Court agrees both with the reasoning and conclusion of the Magistrate.

Piper Aircraft urges the Court to decline to transfer this case, contending that Woodall is "forum shopping" and that Piper Aircraft might have to respond to a product liability claim if this case is transferred. This Court agrees with the Magistrate that it is difficult to see how either Piper Aircraft or Hoof Products could conceivably be prejudiced in any way by a transfer. If the transfer were denied and jurisdiction found lacking as to Hoof Products, Piper Aircraft might still have to answer to the strict liability claim in this Court. If the motion to transfer be granted, the jurisdictional and choice of law issues would be resolved by the Virginia courts. If Pennsylvania law is found by the Virginia court to be applicable to this case, Piper Aircraft and Hoof Products would be in no different position in the Virginia court than they would be in this Court. Hoof Products has raised the defense of lack of personal jurisdiction in the Virginia court. If it is found that there is no jurisdiction over Hoof Products [*10] in Virginia, this action will, of course, be dismissed as against Hoof Products.

For all the reasons, the motion to tranfer will be granted.

An appropriate order will be entered.

ORDER

1. The motion of Plaintiff Marlene Woodall, administratrix and personal representative of the estates of Letcher W. Breeden and Patricia Ann Breeden to transfer this action to the United States District Court to the Eastern District of Virginia is granted.

2. This action is hereby transferred to the United States District Court for the Eastern District of Virginia.

3. The Clerk of Court shall send a copy of this order to the Honorable J. Calvitt Clarke, United States District Court Judge for the Eastern District of Virginia, Norfolk Division.

4. The Clerk of Court shall send a copy of this order to Magistrate Durkin.

REPORT OF MAGISTRATE

(April 6, 1983)

DURKIN, U.S. Magistrate: Before the court is the plaintiff's motion to transfer this action pursuant to 28 U.S.C.§ 1404(a).

On December 4, 1981, plaintiff, invoking the court's diversity jurisdiction, filed actions against the above-named defendants in the United States District Court for the Eastern District of Virginia, [*11] concerning the deaths of two Virginia residents resulting from an airplane accident occurring in Virginia.Plaintiff alleges that the cause of the accident was a defect in a fuel valve manufactured and sold by defendant Hoof Products Company, an Illinois corporation, and installed in the aircraft by Piper Aircraft Corporation, a Pennsylvania corporation. The suits were based upon a negligence theory and breach of express and implied warranties. The Virginia cases are scheduled for trial on June 6, 1983.

Plaintiff, on behalf of the same decedents, filed the instant case in the United States District Court for the Middle District of Pennsylvania on December 13, 1982, against the same defendants and based on the same airplane accident which occurred in Virginia. The primary difference is that the Pennsylvania action is based on a theory of strict liability which, apparently, is a cause of action not available to the plaintiff in the Virginia forum.

On February 22, 1983, plaintiff filed a motion, pursuant to 28 U.S.C.A. § 1404(a), to transfer this action to the Eastern District of Virginia, and a brief in support thereof. On March 7, 1983, the court referred this motion to the [*12] magistrate. On March 10, 1983, Piper and Hoof filed responsive briefs. On March 16, 1983,

plaintiff filed a reply to Piper's response and on March 23, 1983, plaintiff filed a reply to Hoof's response.

28 U.S.C.A. § 1404(a) provides that:

"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

Plaintiff's primary justification for transfer is that the pendency of a similar action in Virginia involving the same parties, facts, and incident, renders this transfer in the best interest of justice. Plaintiff further states that the access to witnesses and proof, and convenience of, and the least expense to, the parties justifies transfer of this case.

Defendant Hoof contends that the interests of justice and convenience of the parties dictates that this action remain in the Middle District of Pennsylvania. Hoof claims that plaintiff is improperly forum shopping and that plaintiff, as the moving party, has failed to present a clear case for transfer in that plaintiff's motion is unsupported by affidavits, depositions, or stipulations. Hoof [*13] also contends it has "submitted" as an affirmative defense that the Pennsylvania court lacks personal jurisdiction over Hoof and that transfer, therefore, would be improper prior to a resolution of this question.

Defendant Piper submits three arguments in opposition to the motion to transfer, the third being an extension of the first.

Piper's first and third arguments are as follows: the court must first determine if it has jurisdiction over defendant Hoof. If the Middle District court does not have personal jurisdiction over Hoof but does transfer the action, then Pennsylvania's laws of strict liability will not apply to Hoof in the Virginia forum. Piper argues that if, under these circumstances, the action is transferred, plaintiff would attempt to impose Pennsylvania's strict liability law upon Piper while Hoof need only answer in negligence and warranty in accordance with Virginia law. Piper contends that this is unjust as to Piper and that the interest of justice militates against the transfer.

Piper's second argument is that § 1404(a) does not govern the instant case in that plaintiff is not seeking a transfer here for the purposes intended in § 1404(a), but rather [*14] plaintiff is impermissible forum shopping and attempting to inject Pennsylvania law into a Virginia court. Piper contends that the interests of justice are not best served by permitting a plaintiff to commence an action in one jurisdiction, subsequently commence a similar action in a second jurisdiction, and then attempt to transfer the second action into the original jurisdiction simply to obtain the benefit of a more favorable law of the state from which transfer was made.

A district court is empowered to transfer a civil action under § 1404(a) if the transfer is warranted for the convenience of parties and witnesses and promotes the interest of justice, and the proposed transferee district is one in which the action "might have been brought." Van Dusen v. Barrack, 376 U.S. 612, 616 (1964). The burden of persuasion rests with the moving party to establish that a balance of the proper interests weigh in favor of the transfer. Shutte v. Armco Steel Corporation, 431 F. 2d 22, 25 (3d Cir. 1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808.

The limiting clause, "where it might have been brought," was interpreted in Shutte, supra, at 24, as authorizing transfer only [*15] if plaintiff had an unqualified right to bring the action in the transferee forum at the time of the commencement of the action. The court held that transfer was authorized where venue was proper in the transferee district and the transferee court would have had in personam jurisdiction over all of the defendants. Id. at 24.

It is evident that these elements have been established as the action in the Virginia court involved the exact same parties and incident as the Pennsylvania action. Defendants have not argued that the Virginia court lacks jurisdiction over the defendants or that venue is improper with respect to the action now pending in Virginia, and these factors indicate that the instant action "might have been brought" in Virginia. The fact that Virginia does not recognize the strict liability cause of action is not determinative of the question of where the action might have been brought. Transfer should not be denied simply because, under the laws of the transferee court, plaintiff at the time of the commencement of the instant action would have been otherwise frustrated in bringing his strict liability cause of action in Virginia. See Van Dusen, supra, at 621. [*16]

Defendant Hoof contends that the Pennsylvania court should not order the transfer on the bare motion of the moving party, absent affidavits, depositions, or stipulations, showing the necessity of the transfer. There are decisions holding that where the movant does not support this motion for transfer with affidavits, depositions, or stipulations containing facts establishing the necessary elements for the transfer, the motion should be denied. Plum Tree Incorporated v. Stockment, 488 F. 2d 754, 756 (3d Cir. 1973); Keck v. Employees Independent Association, 387 F. Supp. 241, 244, n. 6 (E.D. Pa. 1974).

Concerning the question of convenience of parties, access to witnesses and proof, and least expense to the parties, plaintiff has merely alleged in a conclusory manner that these interests justify a transfer. Plaintiff fails to support these allegations in any manner.

1983 U.S. Dist. LEXIS 17465, *; 18 Av. Cas. (CCH) P17,169

However, plaintiff has alleged sufficient facts concerning the pendency of a similar action which would render a transfer in the best interest of justice.

The presence of a related action in the transferee forum has been considered an overriding factor in the balancing of interests. In Kisko v. Penn Central Transportation [*17]  Company, 408 F.Supp. 984, 987 (M.D. Pa. 1976), the court held that the potential for the avoidance of duplicative litigation and judicial economy constituted powerful reasons for the granting of the transfer. Id. at 987.

One court, albeit with some reservation, held that § 1404(a) authorizes transfer where the only reason is to enable the case to be consolidated for trial with another case with a related claim pending in the transferee district. Maxlow v. Leighton, 325 F.Supp. 913, 915 (E.D.Pa. 1971).

The factual situation in that case is somewhat similar to the instant case. In Maxlow, plaintiff instituted actions in two different districts which arose out of the same incident but against different defendants. There defendants moved for transfer which motion the court granted, stating:

"Generally speaking, litigation of related claims in the same tribunal is favored in the federal court system in order to avoid duplicitous litigation, attendant unnecessary expense and loss of time to courts, witnesses and litigants and to avoid inconsistent results." Id. at 916.

The factors mentioned by the court in reaching its decision are present in the instant case, since the defendants [*18]  have apparently agreed that the Virginia action involves the same parties and arose out of the same incident as in the instant action.

Although plaintiff could have alleged facts in support of her motion with greater specificity, the avoidance of duplicative litigation best serves the purpose of § 1404(a) which is to prevent the waste of "time, energy and money" and "to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." Van Dusen, supra, at 616, quoting Continental Grain Co. v. Barge FBL-585, 364 U.S. 19, 26, 27.

As noted above, Hoof takes the position that its defense of lack of personal jurisdiction must be decided before any decision on the motion to transfer is made. It invites the court to review the facts in Piper Aircraft v. Reyno, 454 U.S. 235 (1981), [1] "for a similar unjust end that could come out of transfer." In its brief opposing plaintiff's motion to transfer, defendant Piper, alluding to Hoof's defense, elaborates by arguing that if the Pennsylvania court lacks jurisdiction over HOof, then it cannot transfer plaintiff's case against Hoof. Piper clarifies this by stating that if jurisdiction over HOof is lacking,

the [*19]  Virginia court could not apply Pennsylvania's laws of strict liability against Hoof. Piper apparently believes that under these circumstances, and if a transfer were ordered, then the Virginia court might theoretically apply Pennsylvania's strict liability law against Piper and that this would be grossly unjust to Piper.

1    Hoof's brief provides an incorrect citation.

Hoof raised the defense of lack of personal jurisdiction not by motion, but in its answer. If Hoof believed that it should not be before this court fvor any further purposes, it should have applied for a determination of this issue under Rule 12(d), Fed. R. Civ. P. Instead, Hoof now asks for determination of this issue in a brief opposing plaintiff's motion to transfer. In any event, a transfer under § 1404(a) is proper even though the transferor court lacked personal jurisdiction. Reyno v. Piper Aircraft Co., 630 F. 2d 149, 164-165 (3d Cir. 1980); reversed on other grounds, 454 U.S. 235 (1981). The jurisditional issue should be decided by the Virginia court.

Further, it is difficult to see how Piper would be prejudiced in any way by an transfer. If transfer were denied and jurisdiction found lacking [*20]  as to Hoof, Piper must still answer to the strict liability claim in the Pennsylvania court. If the motion to transfer were granted, the jurisdictional and choice of law issues would be resolved by the Virginia court, and if Pennsylvania law on strict liability is found applicable to Piper, it is in no different position. Further, Hoof, except for inviting the court to review the facts of the Supreme Court's decision in Reyno, supra, has not demonstrated how the "unjust end that could come out of a transfer" would work to its prejudice. If by this brief argument Hoof is alluding to the subtleties of conflict of laws principles, it should not be for the court, by being invited to examine a case, to have to speculate as to Hoof's contention that an unjust end could come out of the transfer. Further, Hoof's argument is apparently an invitation to the court to take a position on what law would apply, and the effects thereof, and this would interfere with the transferee court's right to make such determinations. See Dispenza v. Eastern Airlines, Inc., 508 F. Supp. 239 (E.D.N.Y. 1981).

The final issue to be considered is defendants' contention that § 1404(a) does not govern the instant [*21]  case in that plaintiff is not seeking a transfer here for the purposes intended in that section and is merely forum shopping. Nothing in the statute itself nor the case law construing it suggests that plaintiff is improperly making use of § 1404(a). The fact that plaintiff originally selected the forum is not controlling as plaintiff is not bound by this decision and may move to transfer pursuant to § 1404(a). Advocate v. Nexus Industries, Inc.,

1983 U.S. Dist. LEXIS 17465, *; 18 Av. Cas. (CCH) P17,169

497 F. Supp. 328, 330, n. 3 (D. Del. 1980); Haire v. Miller, 447 F. Supp. 57, 62 (N.D. Miss. 1977).

For the reasons set forth above it is respectfully recommended that plaintiff's motion to transfer be granted.